**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| UNIVERSITY OF MICHIGAN HOSPITALS AND HEALTH CENTERS, and EDWARD W. SPARROW HOSPITAL ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CVS HEALTH CORPORATION, CAREMARKPCS HEALTH, LLC, CAREMARK, LLC, CVS SPECIALTY, INC., WELLPARTNER, LLC, and JOHN DOES 1-15,<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Case No. 2:26-cv-11618<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, University of Michigan Hospitals and Health Centers and Edward W. Sparrow Hospital Association ("Plaintiffs"), by and through their attorneys, Frier Levitt, LLC, by way of this First Amended Complaint against Defendants CVS Health Corporation ("CVS Health"), CaremarkPCS Health, LLC ("CaremarkPCS"), Caremark, LLC ("Caremark"), CVS Specialty, Inc. ("CVS Specialty"), WellPartner, LLC ("WellPartner"), and John Does 1-15 (collectively, "Defendants"),[1] hereby allege the following:

**PRELIMINARY STATEMENT**

1.     Congress enacted the 340B Drug Pricing Program to provide financial support to community hospitals, federally-qualified health centers, and other safety net providers that serve a significant number of low-income and uninsured patients. These "Covered Entities"[2] under the

---

[1] Plaintiffs and Defendants are referred to throughout as the "Parties."

[2] In the 340B Program, a "Covered Entity" is a healthcare provider or organization that meets specific criteria and is therefore eligible to purchase outpatient drugs at discounted prices. These

340B Program are entitled to receive discounts on drug costs from drug manufacturers, and channel the savings from those discounts to fund their charitable mission of providing quality medical care to those in need.

2. Covered Entities realize the "340B Savings" by using Pharmacy Benefit Managers ("PBMs") like CaremarkPCS to bill health plans and insurance carriers for 340B-eligible claims. Covered Entities are able to purchase drugs at the "340B discount" from drug manufacturers, in connection with 340B eligible claims. The difference between that discounted acquisition cost and the fair market value reimbursement PBMs pay to Covered Entities for such drugs (the "340B Savings"), provides the "margin" necessary to stretch scarce federal resources and fund indigent care.

3. Defendants CVS Health, CaremarkPCS (the PBM), and their vertically-integrated pharmacies Caremark LLC and CVS Specialty have conspired to redirect a substantial portion of these 340B Savings to themselves. By surreptitiously diverting funds, Defendants prevent the critical 340B revenue from reaching Covered Entities and ultimately indigent and un-insured patients—the intended beneficiaries of the 340B Program.

4. Plaintiffs are 340B Covered Entities that operate hospitals in eastern Michigan. Due to PBM network restrictions, Covered Entities like Plaintiffs often are unable to fill each prescription for their 340B eligible claims at their own in-house pharmacies. For this reason, Plaintiffs entered into "Pharmacy Services Agreements" ("Agreements") with specialty pharmacies also owned by CVS Health, called Caremark LLC and CVS Specialty, the "Contract

---

entities include hospitals, Federally Qualified Health Centers, and other safety-net providers. They must register with the HRSA's Office of Pharmacy Affairs ("OPA") and comply with program requirements to purchase medications at the discounted 340B price.

Pharmacies."[3] Plaintiffs often sent 340B eligible patients to have their drugs filled at CVS Specialty, and for those claims, Plaintiffs contractually permitted Caremark LLC/CVS Specialty to keep a "dispensing fee." In order to fulfill the mission of the 340B program, Caremark LLC/CVS Specialty were contractually obligated to remit back to Plaintiffs all payments received for the drug, less the dispensing fee.

5.      Covered Entities rely on Contract Pharmacies and third party administrators to manage dispensing the 340B drugs, billing the drug claims to PBMs for adjudication, collecting any applicable co-pay or co-insurance from the patients, and remitting the fully adjudicated/gross insurance payment amount less a dispensing fee back to the Covered Entities.

6.      The Agreements between Plaintiffs and Caremark LLC require Defendants to pass along to Plaintiffs all revenues the PBM receives from insurance carriers and other third-party payors for the 340B-discounted drugs dispensed, minus a dispensing fee. The adjudicated payment amount from payors, less the dispensing fees, is the amount Defendants owe Plaintiffs under the Agreements (the "340B Remittance").

7.      Caremark LLC and CVS Specialty are well compensated for merely dispensing the 340B drugs that are prescribed by Plaintiffs' 340B physicians, receiving a certain defined percentage of the adjudicated reimbursement for the 340B drugs as their dispensing fee. The dispensing fee is pure profit for Caremark LLC and CVS Specialty, since Contract Pharmacies do not pay the cost of the 340B drugs.

8.      But Caremark LLC's and CVS Specialty's substantial dispensing fee under the Agreements is not enough for Defendants. To divert and retain even more of the 340B revenue for

---

[3] In the 340B Program, a "Contract Pharmacy" is a retail or specialty pharmacy that enters into an agreement with a covered entity (like a hospital or clinic) to dispense medications at discounted 340B prices to the covered entity's patients.

themselves, CaremarkPCS, Caremark LLC, and other affiliates within the CVS Health umbrella conspired to secretly and drastically lower the 340B Remittance that would be passed on to Plaintiffs.

9.      Defendants diverted (and continue to divert) 340B revenue for themselves by implementing a secret pricing scheme for 340B drugs, which required cooperation among its affiliated entities within the 340B drug supply chain. Here, CVS Health vertically owns (1) CaremarkPCS, the PBM, that sets network reimbursement rates to pharmacies, (2) Caremark LLC and CVS Specialty, the Contract Pharmacies that dispense the 340B drugs at issue, and (3) Wellpartner, the 340B third party administrator ("TPA") that identifies which claims are 340B claims and provides the Plaintiffs with data that hides the actual revenue and payments received by CaremarkPCS for the drugs.  These affiliated entities work together behind the prescription drug transaction to secretly manipulate the 340B reimbursement rate while concealing their scheme from Plaintiffs.

10.     The scheme operates as follows. Patients belong to networks. Nearly 68,000 pharmacies participate in CVS's network.[4] A patient can only be in one network.  Generally, each network has its own standard network reimbursement rates for all patients in the network.  When Caremark LLC/CVS Specialty dispenses a drug to a 340B-eligible patient, it is adjudicated under CaremarkPCS' standard national network reimbursement rate at the point of sale. During the "adjudication process" at the "point of sale," CaremarkPCS informs CVS Specialty the reimbursement amount and directs CVS Specialty to collect a copayment from the patient. CaremarkPCS pays CVS Specialty, the Contract Pharmacy, under this standard reimbursement.

11.     After the point of sale, CVS Health's 340B Third Party Administrator, WellPartner

---

[4] Caremark FAQs (last accessed May 15, 2026) at https://bmshc.org/wp-content/uploads/2025/07/CVS_Caremark_Member_FAQs.pdf.

flags the adjudicated claim as a 340B claim and relays that information to CaremarkPCS and CVS Specialty. For any such 340B claims, CaremarkPCS and CVS Specialty artificially lower the reimbursement rate. CaremarkPCS retains the "Spread" comprised of the difference between (1) the total revenue paid from all outside sources or third party payors to CaremarkPCS or its affiliates for 340B drug claims, and (2) the artificially depressed reimbursement amount that CaremarkPCS pays to the dispensing pharmacy (here, a contract pharmacy that has signed a Pharmacy Services Agreement with Plaintiffs) for the same 340B drugs.

12. After the claim is identified as 340B, CaremarkPCS and CVS Specialty agree to an artificially low reimbursement rate for the now-identified 340B drug claim.

13. The 340B reimbursement amount is substantially lower than the original fair market value that was paid at the point of sale, under the standard network reimbursement rates. Indeed, the patient already received the drug and paid a copayment based on the originally adjudicated higher amount.

14. This secret 340B arrangement exists solely to divert and retain a significant portion of the 340B revenue intended to flow to the Covered Entity Plaintiffs. Indeed, both payors and patients are paying for the drugs at the full standard reimbursement rate, and they are not refunded the difference, which is pocketed by Defendants.

15. The differential pricing scheme resulted and continues to result in Defendants retaining a portion of the 340B revenue on top of the generous dispensing fee and TPA fee permitted under the Agreements. Plaintiffs are deprived of much of the 340B Savings that they would otherwise have received but for Defendants' unlawful scheme.

16. This not only constitutes a breach of contract by retaining more of the 340B revenue than the Agreements allow but also constitutes a deceptive and unfair practice under the Michigan

Consumer Protection Act § 445.903, common law fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c).

17.     Defendants' differential pricing scheme also is unlawful. The scheme violates Michigan's 340B Pricing Law, MCL § 550.926, because it discriminates against the Covered Entities by proving for less favorable reimbursement than if that same drug were not a 340B drug claim.

18.     Plaintiffs have conducted an internal investigation using a subset of claims and available remittance data.

19.     Based on Plaintiffs' preliminary review of this dataset, Plaintiffs estimate that Defendants' breaches have led to ***more than $66 million dollars*** in damages and losses to Plaintiffs since 2020.

20.     The Agreements have an audit provision, yet Defendants have refused Plaintiffs' reasonable requests to access relevant data and conduct a transparent audit of CaremarkPCS, Caremark LLC and their affiliates to determine the full scope of "Spread" on the 340B claims.

21.     The above scheme is consistent with publicly available information that CVS is profiting handsomely from the 340B Program.[5] CVS Health, has warned investors in filings with the SEC that any reduction in 340B contract pharmacy arrangements could "materially and adversely affect the Company,"[6] and both public reporting and congressional investigations alike have revealed that CVS-affiliated retail and specialty contract pharmacies retain a portion of a

---

[5] See, e.g., https://www.drugchannels.net/2025/05/follow-340b-dollar-senator-cassidy.html (last accessed Mar. 1, 2026).

[6] See CVS Health Corporation 2021 Form 10-K at 25 (pdf pag.), available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000064803/d06cfa07-b8f8-49c0-9f5c-552a41b68e5d.pdf (last accessed Mar. 1, 2026).

substantial covered entity's 340B discounts in the hundreds of millions (if not billions) of dollars for CVS.[7]

22.    Defendants' fraudulent, unlawful, and deceptive profiteering from 340B is contrary to the intent and purpose of the 340B program, which is to support a Covered Entity's ability to "provide direct clinical care to large numbers of uninsured Americans." H.R. Rep. 102-384, pt. 2, at 12 (1992).

23.    Defendants' fraudulent, unlawful, and deceptive practices have harmed Plaintiffs by taking millions of dollars that were supposed to flow to Plaintiffs to fund the provision of charitable and free medical care to the uninsured and under-insured.

24.    And, when Plaintiffs sought to conduct an audit of Defendants' books and records as Plaintiffs were obligated to do under HRSA regulations, Defendants refused to permit an audit. Thereafter, Plaintiffs invoked the cooperation provision in the parties' agreement to attempt to resolve the dispute in good faith.  Rather than cooperate, Defendants *terminated* Plaintiffs from the 340B contract pharmacy arrangement, in retaliation for uncovering the fraudulent scheme described herein and seeking to fulfill their obligations under the 340B Program and HRSA regulations.

25.    Defendants' fraudulent, unlawful, and deceptive scheme was knowingly and intentionally carried out to secretly divert 340B Savings to further their own financial growth and profitability.

26.    Accordingly, Plaintiffs bring this action against Defendants seeking redress for the financial harm and lost 340B revenue caused to Plaintiffs by Defendants' discriminatory pricing,

---

[7] See, e.g., https://www.help.senate.gov/rep/newsroom/press/chair-cassidy-releases-report-on-340b-reform-calls-for-congressional-action (last accessed Mar. 1, 2026); see also https://www.help.senate.gov/imo/media/doc/final_340b_majority_staff_reportpdf1.pdf (last accessed Mar. 1, 2026).

breach of contract, deceptive and unlawful practice, and fraudulent conduct; Plaintiffs seek three times the 340B revenue and "Spread" that Defendants improperly retained and were unjustly enriched therefrom; Plaintiffs also seeks attorneys' fees and costs; and seek to enjoin the unlawful and retaliatory terminations of the Agreements, and to enjoin Defendants from their ongoing and continuing breaches, as well as any other relief the Court deems just and proper.

## THE PARTIES

### I.      Plaintiffs

27.      Plaintiff University of Michigan Hospitals and Health Centers is a non-profit health system operated as part of the University of Michigan, with its principal place of business located at 1500 E. Medical Center Dr., Ann Arbor, MI 48109. University of Michigan Hospitals and Health Centers has a 340B ID number of DSH230046.

28.      Plaintiff Edward W. Sparrow Hospital Association is a non-profit health system operated as part of the University of Michigan, with its principal place of business located at 1215 E Michigan Ave., Lansing, MI 48912. Edward W. Sparrow Hospital Association has a 340B ID number of DSH230230.

29.      Plaintiffs and their facilities are Covered Entities under the 340B Program, as defined *supra*, ¶ 1.

30.      Plaintiffs entered into Pharmacy Services Agreements with Caremark, LLC for pharmacy services through Caremark, LLC's contract specialty pharmacies.

### II.      Defendants

31.      Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with a principal place of business at One CVS Drive, Woonsocket, RI 02895. At all times relevant to this First Amended Complaint, CVS Health exercised common ownership and control over the

other Defendants, who are wholly owned subsidiaries of CVS Health. CVS Health transacts and conducts significant business in this judicial district, including through the operation of pharmacy benefit management (PBM) services, its pharmacies and provision of specialty pharmacy services to Plaintiffs.

32. Defendant CaremarkPCS Health, LLC ("CaremarkPCS") is a Delaware limited liability company with a principal place of business at 9501 E. Shea Blvd., Scottsdale, AZ 85260. CaremarkPCS transacts and conducts significant business in this judicial district, including through the provision of PBM services to Plaintiffs.

33. Defendant Caremark, LLC ("Caremark LLC") is a California limited liability company with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. Caremark LLC transacts and conducts significant business in this judicial district, including through the provision of contract pharmacy services to Plaintiffs.

34. Defendant CVS Specialty, Inc. ("CVS Specialty") is a Delaware corporation with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Specialty transacts and conducts significant business in this judicial district, including through the provision of contract pharmacy services to Plaintiffs.

35. Defendant WellPartner, LLC ("WellPartner") is a Delaware corporation with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. WellPartner transacts and conducts significant business in this judicial district, including through the provision of third-party administration services to Plaintiffs.

36. Defendants CaremarkPCS, Caremark, LLC, CVS Specialty, and WellPartner are wholly owned subsidiaries of Defendant CVS Health and, among other things, function as pharmacy benefits managers and pharmacies for prescription drugs administered by CaremarkPCS

9

nationwide. The practices and conduct that is alleged in this First Amended Complaint are common and jointly attributable to all Defendants.

37.     Defendants John Doe 1-5 are individual officers of CVS Health who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC and CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiffs and other Covered Entities of 340B revenue they would otherwise have received.

38.     Defendants John Doe 6-10 are individual officers of CaremarkPCS who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC and CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiffs and other Covered Entities of 340B revenue they would otherwise have received.

39.     Defendants John Doe 11-15 are individual officers of Caremark LLC and/or CVS Specialty who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC and CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiffs and other Covered Entities of 340B revenue they would otherwise have received.

40.     The identities of the Doe defendants who knowingly executed and ratified the fraudulent scheme described herein are presently unknown to Plaintiffs. All Doe defendants have served as officers, representatives, and/or agents of the corporate Defendants who employed them and were acting within the course, scope and authority of such employment for the conduct described below.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(a), because there is complete diversity between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.

42.     This Court also has federal question jurisdiction over the Racketeer Influenced and Corrupt Organizations Act (RICO) claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964, because this action is brought by Plaintiffs seeking to enjoin and to recover damages for losses caused by Defendants' violations of RICO.

43.     Moreover, exercise of federal jurisdiction over this action is especially appropriate, as Plaintiffs allege that Defendants are profiteering from the federal 340B Program by diverting funds from the Covered Entities that Congress intended to be the beneficiaries of the 340B Program.

44.     This Court has personal jurisdiction over Defendants, because among other things, Defendants are present in the State of Michigan and are authorized to conduct and regularly conduct business in Michigan.  Defendants have marketed, promoted, distributed, and sold its services in Michigan and Defendants have sufficient minimum contacts with this State and sufficiently availed themselves of the protections of the laws of this State through their promotion, sales, marketing, and servicing within Michigan to render the exercise of jurisdiction by this Court permissible.

45.     Defendants further satisfy the requirements for the exercise of personal jurisdiction under the Michigan State long-arm statute, Mich. Comp. Laws Serv. § 600.715.

46.     Defendants have committed and conspired to commit tortious activity in the state of Michigan that has caused injury to a resident in the state.

11

47.     Additionally, the Pharmacy Services Agreement calls for Michigan law to be applied.

48.     This Court also has supplemental jurisdiction over the state law claims in this matter pursuant to 28 U.S.C. § 1367(a).

49.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated in this district.

### FACTS AND INFORMATION COMMON TO ALL COUNTS

**I.      The Federal 340B Program**

50.     In 1992, Congress enacted Section 340B as an amendment to the Public Health Service Act. Veteran's Health Care Act of 1992, Pub. L. No. 102-585 § 602, 106 Stat. 4943, 4967–71.

51.     Congress designed 340B to assist certain healthcare facilities serving poor, uninsured or otherwise vulnerable populations. See Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602 (codified as amended at 42 U.S.C. § 256(b).

52.     Under 340B, drug manufacturers—as a requirement to participate in Medicaid—are required to charge hospitals and other 340B providers no more than a significantly discounted "ceiling price" on certain outpatient prescription drugs purchased by these entities for their patients. 42 U.S.C. § 256b(a)(1), (4).

53.     In turn, and in theory, 340B providers can "pass on" those savings to their patients through lower costs for medications, or, as contemplated by 340B itself, 340B providers can seek reimbursement for 340B drugs in the normal course and use those greater profit margins to subsidize other unfunded areas of their operations (note, most 340B providers are safety net

providers, mandated by law or regulation to take on a disproportionate amount of uninsured or indigent patients).

54.     Because certain 340B providers, such as small community health centers, may not have in-house pharmacies, the Health Resources and Services Administration (HRSA) – the agency charged with administering 340B – issued sub-regulatory guidance in 1996 permitting 340B providers to "contract" with outside pharmacies (i.e., Contract Pharmacies), and to allow 340B inventory to be dispensed through such Contract Pharmacies. See 61 Fed. Reg. at 43,549.

55.     In 2010, however, HRSA dramatically shifted the 340B Contract Pharmacy landscape by permitting 340B providers to maintain an unlimited number of Contract Pharmacy relationships. See 75 Fed. Reg. 10,272-01 (Mar. 5, 2010). In the wake of this HRSA guidance, for-profit pharmacies, especially those owned or affiliated with PBMs, have seized on the opportunity to capitalize on substantial 340B drug discounts. Indeed, the 2010 guidance opened the door for the largest and most sophisticated for-profit PBMs to realize substantial profits by looting a federal drug pricing program designed to aid non-profit 340B providers caring for the most resource-strapped and vulnerable patients.

56.     The 340B Program "was intended to enable certain hospitals and clinics 'to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.'" H.R. Rep. 102-384, pt. 2, at 12 (1992). Put another way, a fundamental aim of 340B is to permit 340B providers to "provide direct clinical care to large numbers of uninsured Americans" regardless of their ability to pay. Id.

57.     HRSA has advised that Covered Entities like Plaintiffs may use the "savings" obtained by retaining the difference between the "actual acquisition cost" of the 340B-discounted drugs and the usual market reimbursement, "to reach more eligible patients and provide more

comprehensive services." HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43,551 (Aug. 23, 1996).

58.     Thus, the clear purpose of 340B is that uninsured, poor, and otherwise vulnerable patients would benefit by receiving discounted drugs or charity care.

59.     Congress did not intend 340B discounts to become a financial windfall for PBMs and their related pharmacies.

## II.     Pharmacy Benefit Managers and the 340B Program

60.     PBMs are fiscal intermediaries that administer and manage drug benefits on behalf of health insurance plans. PBMs are primarily responsible for processing and paying prescription drug claims submitted by providers on behalf of covered beneficiaries. The largest PBMs unilaterally dictate the provider's reimbursement for dispensing or administering the drug and the health plan will, in turn, reimburse the PBM for the amount paid to the provider.

61.     The largest PBMs are owned or affiliated with the nation's largest health insurance companies. These PBMs also own or are affiliated with retail, mail-order and/or specialty pharmacies. As a result, a small number of huge, vertically integrated corporations wield near-limitless power and influence in the prescription drug market and the adjudication of 340B eligible claims.

62.     Today, three PBMs control nearly 80 percent of the prescription drug market: CaremarkPCS, Express Scripts, and OptumRx.[8] Each of these PBMs also share common ownership with a major insurer and specialty and/or mail-order pharmacy. CaremarkPCS is owned

---

[8] Adam Fein ("Fein"), Drug Channels ("DC"), *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies—And What's Ahead,* (Apr. 9, 2024) https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html (last accessed Mar. 1, 2026).

by CVS Health, which also owns health insurer Aetna and CVS retail, mail order, and specialty pharmacies.

63.      Since 2010, the number of contract pharmacies participating in 340B and the number of arrangements these contract pharmacies maintain with 340B providers has skyrocketed. Contract pharmacies participating in 340B represent nearly 60% of all U.S. retail, mail, long-term care and specialty pharmacies and account for 229,531 contractual relationships with 340B providers.[9]  Between 2010 and 2020, the number of contract pharmacy arrangements with 340B providers grew by 4,228%,[10] with each 340B hospital utilizing 22 different contract pharmacies on average.[11]

64.      This expansion has coincided with an increasing reliance on PBMs. In 2024, hospitals had approximately 83,000 total relationships with contract pharmacies, with the largest five companies accounting for approximately 75% of that total figure.[12] Those companies—CVS Health, Walgreens, Walmart, Express Scripts (Cigna) and OptumRx (UnitedHealth)—include or are affiliated with the largest PBMs. Between just 2020 and 2025, CaremarkPCS dramatically

---

[9] Fein, DC, *The 340B Contract Pharmacy Market in 2025: Big Chains and PBMs Tighten Their Grip*, https://www.drugchannels.net/2025/06/340b-contract-pharmacy-market-in-2025.html (last accessed Mar. 1, 2026).

[10] Aaron Vandervelde et al ("Vandervelde"), BRG, For-Profit Pharmacy Participation in 340B Program, at 4 (Oct. 2020), https://media.thinkbrg.com/wp-content/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf (last accessed Mar. 1, 2026); see also AIR340B ("AIR340B"), *The Impact and Growth in 340B Contract Pharmacy Arrangements – Six Years Later*, at 1, https://340breport.com/wp-content/uploads/2024/05/AIR340B_340B-Contract-Pharmacies.pdf (last accessed Mar. 1, 2026).

[11] Vandervelde, at 7.

[12] Fein, DC, *Hospitals are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis*, https://www.drugchannels.net/2024/06/hospitals-are-relying-more-on-pbms-to.html (last accessed Mar. 1, 2026).

increased the number of its PBM-affiliated contract pharmacy relationships from approximately 23,000 to 77,000.[13]

65. CVS Health is the largest contract pharmacy participant in the 340B Program, with an estimated 77,000 contract pharmacy relationships, out of nearly 230,000 nationally.[14]

66. The above contract pharmacy relationships translate to substantial profits from 340B for the largest PBMs. In 2022 and 2023, CVS Health-affiliated contract pharmacies reported more than $800 million in gross profits.[15]

### III. CaremarkPCS's Operations Within the Broader PBM Landscape

67. The PBM industry has undergone significant consolidation in recent years. As noted above, approximately eighty percent (80%) of the PBM marketplace (or 80% of the covered lives in the United States) is comprised of three PBMs: CaremarkPCS, Express Scripts, and OptumRx. While there are other, smaller PBMs who administer some plans, the vast majority of lives are now managed by these three extremely large PBMs.

68. CaremarkPCS itself controls twenty-seven percent (27%) of the PBM market nationally.[16]

69. As a PBM, CaremarkPCS processes claims for prescription drug benefits for many

---

[13] Fein, DC, *The 340B Contract Pharmacy Market in 2025: Big Chains and PBMs Tighten Their Grip*, https://www.drugchannels.net/2025/06/340b-contract-pharmacy-market-in-2025.html (last accessed Mar. 1, 2026).

[14] Id.

[15] https://nephronresearch.com/340b-pharmacy-tailwind-manufacturer-headwind-poised-to-reverse-in-2h-2023/ (last accessed Mar. 1, 2026). Upon information and belief, CVS' report of gross profits for its contract pharmacies does not include the profits from the 340B pricing scheme described herein because those profits are captured and reported by CaremarkPCS.

[16] See https://www.drugchannels.net/2025/03/the-top-pharmacy-benefit-managers-of.html (last accessed Mar. 1, 2026); see also https://www.statista.com/statistics/1387515/market-share-of-largest-pbm-in-every-us-state/ (last accessed Mar. 1, 2026).

plan sponsors who are contracted directly with it or with its affiliates. This includes commercial insurance plans, Medicaid plans, and various Medicare Advantage and Medicare Part D plans.

70.     PBMs like CaremarkPCS also have a network of pharmacies that dispense drugs to its clients' members and CaremarkPCS unilaterally controls the reimbursement rates and dispensing fees that the network pharmacies receive for the dispensed drugs.

71.     In particular, CaremarkPCS manages the pharmacy benefits of more than 80 million plan members and beneficiaries. In addition, because CaremarkPCS is wholly owned by CVS Health, it is affiliated with CVS Health's "mail service pharmacy," an expending specialty pharmacy, CVS Specialty, 9,900 brick and mortar CVS Pharmacies, out of the 77,000 in-network pharmacies in Caremark's "network."

72.     PBMs like CaremarkPCS serve as intermediaries between pharmaceutical manufacturers and physician dispensers/pharmacies on one hand, and health benefit plans on the other. By managing both ends of the transaction (i.e., the reimbursement rate PBMs pay to pharmacies and the amounts the PBMs charge health benefit plan for such drugs), PBMs like CaremarkPCS are able to secretly retain Spread and other hidden cash flow to bolster its own profit at the expense of health benefit plans and even Covered Entities.

73.     As relevant here, many of CVS Health's retail, mail-order and specialty pharmacies also serve as "Contract Pharmacies" for Covered Entities under the 340B Program. These Contract Pharmacy services are provided under different subsidiary entities, including Defendants Caremark LLC and CVS Specialty, Inc.

74.     CaremarkPCS's and CVS Health's control over all aspects of the marketplace and drug supply chain (e.g., the relationships between drug manufacturers and health plans, between health plans and network pharmacies, between network pharmacies acting as Contract Pharmacies

and Covered Entities, and between CaremarkPCS and 340B TPA WellPartner), allows Defendants to engage in fraudulent schemes, including the 340B discriminatory pricing scheme alleged herein.

### IV. Relationship Between Defendants, Group Health Plans and Insurance Carriers, and Pharmacies

75. Group health plans, including self-funded employer plans, contract with CaremarkPCS for provision of administrative services related to adjudication and payment of network claims.

76. CaremarkPCS' pharmacy network includes mail-order, specialty, and retail pharmacies owned and operated by subsidiaries under the CVS Health umbrella, including pharmacies operated by Defendants Caremark LLC and CVS Specialty.

77. CaremarkPCS requires network pharmacies to comply with its policies, procedures, and other terms and conditions for network participation, including the reimbursement rates (including the ingredient cost and dispensing fees) that the pharmacies will receive from CaremarkPCS for the drugs dispensed to members of CaremarkPCS' clients.

78. Once CaremarkPCS receives a claim from a network pharmacy at the "point of sale" and the PBM determines that billed services are covered by one of its clients' plans, it determines at the point of sale, through an online adjudication process, the eligibility of the claim under a particular network, the reimbursement amount the network pharmacy is entitled to as per the rates dictated by CaremarkPCS (the "point-of-sale reimbursement rate"), and the appropriate co-pay or co-insurance amount that must be paid by the patient.

### V. The Role of 340B Third Party Administrator WellPartner

79. The process of determining whether a particular claim is 340B eligible is complex, and responsibility for compliance lies with the Covered Entity. Among other duties, Covered

18

Entities must ensure that prescriptions are 340B eligible, PBM payments to the Contract Pharmacies are tracked, and that the covered entity's 340B inventories are properly replenished.

80. To meet these responsibilities, Covered Entities typically hire a 340B Third Party Administrator ("340B TPA") that provide claims processing and management services and retroactively confirm with the Covered Entity which claims are 340B-eligible. TPAs, in turn, also receive a fee for their administrative services pursuant to contracts with the Covered Entities.

81. In fact, Contract Pharmacies owned or affiliated with CVS Health **mandate** the use of CVS's wholly owned subsidiary, WellPartner, as the 340B TPA by the Covered Entities.[17] This mandate is set so that Defendants can secretly hide their fraudulent activity behind inaccurate and misleading data so that they divert the 340B Savings.

82. Contract Pharmacies do not determine prior to or at the point of sale whether the patient is eligible for 340B-discounted drugs. Instead, 340B determination occurs on the back-end, after the drugs have already been dispensed by the pharmacy, or in this case the Contract Pharmacy, to the 340B eligible patient.

83. When dispensing the 340B drugs, the Contract Pharmacy will also collect the applicable co-pay/co-insurance from the patient at the point of sale, even on 340B-discounted drugs. In the point of sale adjudication process, the PBM reports to the Contract Pharmacy the co-insurance the pharmacy must collect from the patient.

84. The co-pay or co-insurance amount collected from the patient is based on the originally adjudicated point-of-sale reimbursement rate that the PBM determines should be paid

---

[17] Defendants have been sued across the country by Covered Entities and by the State of New York for mandating the use of WellPartner as an unlawful tying arrangement. *See, e.g., Brandywine Hospital, LLC v. CVS Health Corporation, et al.,* E.D. Pa. No. 2:23-cv-1458; *Sentry Data Systems Inc. v. CVS Health, et al.,* S.D. Fla. No. 0:18-cv-60257; *see also* https://ag.ny.gov/press-release/2022/attorney-general-james-sues-cvs-harming-new-york-safety-net-hospitals-and-clinics.

to the pharmacy for the cost of the drugs.  This is again because, at the point of sale, the Contract Pharmacy is unaware that the drugs being dispensed are 340B-discounted drugs.

85.     The complex relationship between the CaremarkPCS (the PBM), Caremark/CVS Specialty (the Contract Pharmacies), WellPartner (the 340B TPA), and Plaintiffs (the Covered Entities) is summarized in the figure below, relating to a Medicare claim:



86.     From left to right in the figure, an insurance plan (Plan) pays CaremarkPCS (the PBM) for the drug dispensed to a patient.  CaremarkPCS then pays CVS Specialty (the Contract Pharmacy) for dispensing the drug.  CVS Specialty keeps a dispensing fee and remits the remainder to the Covered Entity Plaintiffs (the "340B Remittance"). Finally, Wellpartner (the TPA) takes an administrative fee. Plaintiffs (the Covered Entities) receive the remaining money (the "340B Savings").

87.     CaremarkPCS and CVS Health exploit their vertical control over the entirety of the 340B Drug Supply Chain, through the PBM, the mandatory use of Wellpartner and CVS Specialty. Through that process, Defendants have created a discriminatory pricing scheme wherein CaremarkPCS receives payment for a drug claim from the payor/plan; adjudicates the drug claim at the point of sale at the standard national network reimbursement rates, and determines the appropriate pharmacy reimbursement and co-pay/co-insurance amounts; CVS Specialty actually collects the adjudicated reimbursement and co-pay/co-insurance.

88.     However, after WellPartner informs CaremarkPCS and CVS Specialty that the claim is a 340B drug claim, CaremarkPCS and CVS Specialty artificially reduce the reimbursement on that claim, despite the fact that patient has already paid the relevant co-pay or co-insurance on the higher price, and retains the difference between the original point-of-sale reimbursement and the artificially reduced rate. Defendants do not inform Covered Entities of the original, higher reimbursement for the drug.

89.     Defendants have no purpose for this transaction other than to divert 340B savings to themselves as pure profit.

90.     As a consequence of Defendants' actions, the intended 340B savings is not passed on to the Plaintiff/Covered Entity for indigent and non-insured clinical care.

## VI.     The Parties' Pharmacy Service Agreements

91.     The Agreements between Plaintiffs and Caremark LLC provide for the provision of Contract Pharmacy services by Caremark LLC (as the "Specialty Pharmacy").

92.     The Agreements impose obligations not merely on Caremark but also its affiliates. Indeed, in the introductory paragraph to the Agreements, the parties are defined as the "Covered

Entity," on the one hand, and Caremark LLC and its affiliates (collectively defined as the "Pharmacy") on the other hand.

93. As relevant here, the Agreements contain substantially similar provisions that provide that the "Pharmacy" (again, defined as Caremark LLC and its affiliates) owes the Covered Entity Plaintiffs an amount equal to the reimbursement for the drug less the dispensing fee.

94. In other words, under the Agreements, *all reimbursement* received by Caremark LLC or any of its affiliates from third party payors must be remitted to the Plaintiffs/Covered Entities less the applicable dispensing fee. And, because Defendants CVS Health and CaremarkPCS, among others, are also affiliates of Caremark, any payments the PBM receives from payors must also be passed on to the Plaintiffs/Covered Entities.

95. As further alleged below, Defendants failed to comply with this pass-through provision of the Agreements.

### VII. The Audit Provisions in the Pharmacy Service Agreements

96. In part because of the opaqueness of how 340B claims are identified after the point of sale, HRSA requires Covered Entities to audit their Contract Pharmacies to ensure that 340B drugs are not being diverted (i.e., going to non-eligible patients) and that Covered Entities' participation in the 340B program complies with all 340B rules and regulations.[18]

97. The Pharmacy Services Agreements contain procedures for Plaintiffs to conduct audits of Caremark LLC.

98. Under the audit provision, Plaintiffs have the right to audit the Contract Pharmacy's books and records to ensure compliance with the terms of the Agreements.

---

[18] HRSA audit and compliance parameters under the contract pharmacy guidelines (last accessed May 15, 2026) at https://www.hrsa.gov/about/faqs/what-are-audit-compliance-parameters-under-contract-pharmacy-guidelines.

99. Caremark LLC, in its capacity as the Contract Pharmacy, agreed to cooperate with any such audits in good faith.

100. As further alleged below, Caremark LLC failed to meet its obligation to comply with Plaintiffs' reasonable audit requests.

101. CaremarkPCS and Caremark LLC's motivation to refuse to permit the audit was to hide the fact that Defendants diverted the 340B Savings to themselves in violation of Program terms and Agreements' terms.

## VIII. HRSA Guidelines and Regulations Governing Contract Pharmacy Services Agreements

102. The Parties also agreed to comply with the contract pharmacy services guidelines as promulgated by HRSA's Office of Pharmacy Affairs ("OPA").

103. HRSA has stated that the primary intent of the 340B Program is to "enable[] covered entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."[19]

104. HRSA has also issued guidance that Covered Entities may bill insurers for the 340B drugs at higher than the actual acquisition cost, and use the revenue from the usual market reimbursement to "reach more eligible patients and provide more comprehensive services" 61 Fed. Reg. 43549, 43551 (Aug. 23, 1996 Final Notice).

105. In 2010, HRSA reaffirmed that "*the benefit of the program was intended to accrue to the covered entities*" – not to the PBMs. 75 Fed. Reg. 10272, 10277 (Mar. 5, 2010 Final Notice) (emphasis added).

106. As further alleged below, Caremark LLC failed to meet its obligation to comply with these HRSA/OPA guidelines and regulations.

---

[19] https://www.hrsa.gov/opa (last accessed Mar. 1, 2026).

IX.     **Defendants' Fraudulent and Discriminatory Pricing Scheme on 340B Claims and Retention of the Spread Between the Amount Paid by the Payor/Plan and the Monies Received by the Covered Entities**

107.    Through their discriminatory pricing scheme, Caremark LLC and CVS Specialty, in conjunction and coordination with CVS Health, CaremarkPCS, and WellPartner, conspired together to breach the above-referenced HRSA regulations and guidelines, and to hide those breaches. The individual Doe defendants are unidentified employees and officers of CVS Health Corporation, CaremarkPCS Health, and Caremark LLC who knowingly ratified and executed the illegal and fraudulent scheme described herein and set the scheme in motion.

108.    Caremark LLC and CVS Specialty serve as Contract Pharmacies for Plaintiffs (Covered Entities) pursuant to the Agreements. The Contract Pharmacy services are provided by specialty pharmacies that are already part of CaremarkPCS' standard pharmacy networks. Each standard pharmacy network has "covered lives" in it, and pre-determined standard reimbursement rates.

109.    When a 340B eligible patient of Plaintiffs seeks to fill a prescription for 340B drugs at Caremark LLC or CVS Specialty, the claim is (1) adjudicated by CaremarkPCS/the PBM at the point of sale based on the standard network reimbursement rates; (2) the drugs are dispensed to the patient; (3) CaremarkPCS/the PBM reimburses CVS Specialty/the Contract Pharmacy according to the reimbursement rate under the applicable standard national network reimbursement rates; and (4) the patient pays the applicable co-pay or co-insurance based on the standard national network reimbursement.

110.    Subsequently, CVS' wholly-owned 340B TPA WellPartner determines that the patient is 340B eligible and that the specialty drugs that were dispensed were in fact the 340B eligible drugs connected to the Plaintiffs/Covered Entities.

24

111.    Once the 340B determination is made, Caremark LLC/CVS Specialty is obligated to pass on all insurance payments for the 340B drugs to Plaintiffs, less an agreed-upon dispensing fee.

112.    But this is not what occurs. For patients that receive specialty drugs from CVS Specialty where the PBM is CaremarkPCS, Plaintiffs received a drastically reduced reimbursement rate for the 340B drugs.

113.    The reason is Defendants' discriminatory pricing scheme for 340B drugs. CaremarkPCS and CVS Specialty conspire to artificially reduce the reimbursement rate to divert 340B Savings from the Covered Entities. CaremarkPCS retains the difference between the original point of sale payment for the drug  and the lower reimbursement amount.

114.    Plaintiffs have access to reports from WellPartner, the 340B TPA, that show the "Gross Insurance Payment" reported by the CVS Specialty and remitted to Plaintiffs. This "Gross Insurance Payment" in the WellPartner reports is substantially lower than the amount that CaremarkPCS actually received for the 340B drugs.

115.    The WellPartner reports also contain a column/field for the applicable co-pay/co-insurance collected from patients on each 340B drug claim, but this column/field falsely reflects a "patient paid" amount of $0 for the majority of claims.

116.    WellPartner therefore aids in making sure the fraud is hidden by falsely reporting the revenue received by CaremarkPCS.

117.    Between 2020 and 2025, Plaintiffs estimate that the "delta" between deflated reimbursement rate paid to CVS/Caremark Contract Pharmacy and remitted to the Covered Entity, and the usual market reimbursement rate, exceeds ***$66 million***, as shown below:

| Year | Estimated Loss |
|------|----------------|
| 2020 | $9,778,409.54 |
| 2021 | $14,038,985,57 |
| 2022 | $11,962,701.57 |
| 2023 | $12,941,335.32 |
| 2024 | $4,724,644.81 |
| 2025 | $12,557,698.20 |

Total: **$66,003,775.37**

118. The explanation is CaremarkPCS, Caremark LLC and CVS Specialty's discriminatory pricing scheme wherein Defendants and their affiliates arbitrarily slash the reimbursement on the 340B claims so that they can manufacture "Spread."

119. Because the claim was already adjudicated at the point of sale by CaremarkPCS, the only way the "switch" occurs is if CaremarkPCS, Caremark LLC, and CVS Specialty are covertly working together to deprive the 340B Covered Entities of funding intended for charitable and indigent care. Defendants do this solely to reduce the 340B Remittance that is owed to the Plaintiffs Covered Entities under the Agreement, and divert more of the 340B revenue to themselves.

120. The switch to the lower-reimbursement occurs entirely on the back-end by and between CaremarkPCS (the PBM) and Caremark LLC/CVS Specialty (the Specialty Pharmacy), out of sight of the payors, Covered Entities, or even the patients, who end up paying more out-of-pocket based on the higher, originally adjudicated price.

121. To summarize, under CVS's discriminatory 340B pricing scheme, CaremarkPCS receives the originally adjudicated Reimbursement amount (reflecting the standard national network reimbursement rate CaremarkPCS paid at the point of sale before the pharmacy knows whether the drugs being dispensed are 340B-discounted drugs). After learning that the claim was a 340B claim, CaremarkPCS and Caremark LLC/CVS Specialty conspire to lower the point-of-

26

sale Reimbursement amount. CaremarkPCS lowers the reimbursement rate for the 340B drug paid to its affiliated pharmacy for the purpose of creating an artificial "Spread" and keeps the difference.

122.    To illustrate how the scheme works, suppose a hypothetical drug with an Average Wholesale Price ("AWP") of $10,000 is typically reimbursed by CaremarkPCS to CVS Specialty at AWP-10%. The PBM thus should have paid CVS Specialty $9,000, and under the Agreements, Plaintiffs should have received $9,000 minus a dispensing fee and a TPA fee charged by WellPartner.

123.    Under Defendants' Scheme, however, once the claim is identified as 340B, the $9,000 transaction is altered to reflect the substantially reduced reimbursement rate. The "standard network rate" of approximately AWP-10% is changed to AWP-35%, as a hypothetical example, yielding a reimbursement rate of $6,500 (instead of $9,000). CaremarkPCS pays CVS Specialty the $6,500 for the 340B drug, and CaremarkPCS retains the additional $2,500 simply because CaremarkPCS knows it is a 340B claim where there is a large delta between the cost of the drug and the reimbursement.



124.    To further illustrate how the scheme works, take the following real-world examples of 340B claims processed by CaremarkPCS:

| Drug (NDC) | Dispensed Date | CVS Specialty Pharmacy Reimbursement | University of Michigan Specialty Pharmacy Reimbursement | Delta |
|---|---|---|---|---|
| Stelara (57894006103) | 12/13/23 | $18,455.83 | $24,979.01 | $6,523.18 |
| Xeljanz (69100101) | 4/8/24 | $4,025.62 | $5,414.00 | $1,388.38 |
| Enbrel (58406003204) | 7/9/24 | $5,151.68 | $7,039.00 | $1,887.32 |

125.    The three sets of claims in the table above are for the exact same 340B drugs (including quantity dispensed), dispensed on the same day, and covered by the same insurance

28

plan (managed by CaremarkPCS).[20]

126.    In the first example, when the Stelara prescription was filled at a University of Michigan Specialty Pharmacy, the Covered Entity received from the pharmacy a "Payor Reimbursement" amount of $24,979.01, representing the gross insurance payment amount for the drugs.

127.    However, when an identical Stelara prescription was filled by CVS Specialty on the same day, the Covered Entity received a "Payor Reimbursement" amount of just $18,455.83.

128.    The $6,523.18 reflects the "Spread" artificially created and pocketed by the Defendants as pure profit.

129.    In the second example, when the Xeljanz prescription was filled at a University of Michigan Specialty Pharmacy, the Covered Entity received from the pharmacy a "Payor Reimbursement" amount of $5,414.00, representing the gross insurance payment amount for the drugs.

130.    However, when an identical Xeljanz prescription was filled by CVS Specialty on the same day, the Covered Entity received a "Payor Reimbursement" amount of just $4,025.62.

131.    The $1,388.38 reflects the "Spread" artificially created and pocketed by the Defendants as pure profit.

132.    In the third example, when the Enbrel prescription was filled at a University of Michigan Specialty Pharmacy, the Covered Entity received from the pharmacy a "Payor Reimbursement" amount of $7,039.00, representing the gross insurance payment amount for the drugs.

133.    However, when an identical Enbrel prescription was filled by CVS Specialty on the

---

[20] For purposes of maintaining confidentiality, the identity of the patient, the drug dispensed, and payor information are not specified herein.

same day, the Covered Entity received a "Payor Reimbursement" amount of just $5,151.68.

134. The $1,887.32 reflects the "Spread" artificially created and pocketed by the Defendants as pure profit.

135. The significant gaps between the remitted "Payor Reimbursement" amounts ($6,523.18, $1,388.38 and $1,887.32 respectively) do not take into account the dispensing fee paid to Caremark/CVS Specialty under the Agreements or the TPA fee paid to WellPartner. Instead, the "Payor Reimbursement" reflects the reimbursement reported as received by the CVS Specialty/Contract Pharmacy from insurance plans/payors.

136. This gap cannot be explained by variances in reimbursement rates paid by different payors or plans, since both claims were paid by the same insurance plan.

137. Moreover, Plaintiffs know that the higher "Payor Reimbursement" amounts remitted to the Covered Entity on the claim dispensed at the University of Michigan Specialty Pharmacy are representative of the fair market reimbursement rate for the drugs because they have other relationships where they receive reimbursements in line with the market reimbursement rates.

138. The University of Michigan also has a self-funded employee benefit plan such that Plaintiffs have direct visibility into the ingredient cost and dispensing fee that the plan paid for specialty drugs, reflecting the fair market reimbursement rate.

139. Thus, the lower reimbursement amounts ($18,455.83, $4,025.62, and $5,151.68 respectively) are far below the fair market reimbursement rate for the drugs in the examples, and reflect the reduced reimbursement rate under the secret 340B discriminatory pricing scheme between CaremarkPCS and CaremarkLLC/CVS Specialty.

140. Indeed, an independent pharmacy and data analytics expert has reviewed the data

and reimbursement rates reportedly received by CVS Specialty in the WellPartner remittance reports and concluded that they are far below national network reimbursement rates.

141. Defendants' artificially deflated reimbursement scheme for 340B specialty drug claims is further demonstrated through the average monthly unit cost data that Aetna and Silverscript Medicare Part D Plans (both administered by CaremarkPCS) reported to CMS. Each year, Part D Plan Sponsors are required to submit drug unit cost data to CMS, which is then published by CMS in the CMS Prescription Drug Plan Public Use File ("PPUF") dataset.[21]

142. For example, Silverscript reported for the drug Xeljanz (NDC 69050130) an "average monthly unit cost" of $187.26 for Quarter 3 2022. In comparison, on August 18, 2022, CVS Specialty, through WellPartner, reported that it received $3,433.10 for 30 units of Xeljanz, or $114.43 per unit, in reimbursement from a Silverscript Part D Plan.

| Drug (NDC) | Dispensed Date | CVS Specialty Pharmacy Reimbursement | CVS Specialty Pharmacy Reimbursement Per Unit | Silverscript PDP Reported Average Unit Cost in Q3 2022 |
|---|---|---|---|---|
| Xeljanz (69050130) | 8/18/2022 | $3,433.10 | $114.43 | $187.26 |

143. Defendants lowered the 340B reimbursement by approximately $73 per pill for this particular drug simply to create a spread so that Defendants can pocket 340B Savings intended for Plaintiffs to use for uninsured and indigent care programs.

144. But this reduced reimbursement rate is not disclosed to anyone outside of CVS Health umbrella. In particular, the lower rate was not passed onto the plans and payors who foot

---

[21] Available at https://data.cms.gov/provider-summary-by-type-of-service/medicare-part-d-prescribers/quarterly-prescription-drug-plan-formulary-pharmacy-network-and-pricing-information.

the bill for the drug claim. Instead, the plans and payors paid the higher point-of-sale adjudication price for the 340B drugs that reflects the usual market reimbursement rate.[22]

145. The patients are also paying a copay and co-insurance for the drugs based on the originally adjudicated amount.

146. The payors and patients who foot the bill for the drugs see no benefit of the lower "secret 340B" price; instead, the Defendants conceal the true price so they can retain all the "Spread" for themselves.

147. And, despite the payors and patients paying the originally adjudicated market reimbursement rate, this amount does not flow to the Covered Entity Plaintiffs. Instead, Defendants divert a percentage of the 340B revenues to itself.

148. Notably, *no other parties outside of the CVS umbrella* – not the payors, not the Covered Entities, and not the patients – knew about, consented to, or benefited from, the reduced secret 340B rate.

149. Indeed, even the Contract Pharmacies (Caremark LLC and CVS Specialty) would not have agreed to the lower 340B rate because it also reduces the dispensing fee that the Contract Pharmacies would be entitled to receive. This demonstrates that there is no true arms' length relationship between CaremarkPCS and Caremark LLC/CVS Specialty.

150. But the small difference in lost dispensing fee pales in comparison to the large Spread that CVS Health/CaremarkPCS receives, retains and profits from the 340B scheme. In other words, the scheme results in a huge net positive for the Defendants.

151. In fact, through the scheme, **CVS retains more than half of the 340B Savings** (defined as total third-party payor revenue on 340B drugs minus the 340B drug cost).

---

[22] These lower payments for 340B drug claims are the precise discriminatory pricing that is prohibited by Michigan's 340B Pricing Law, MCL § 550.926.

152.    Between 2020 and 2025, Plaintiffs estimate that **CVS/Caremark pocketed approximately 59.6% in 340B savings** (comprised of the dispensing fee, TPA fee, and 340B spread retained through CVS's artificially deflated reimbursement scheme), **whereas the Covered Entities only received 40.4%**:



153.    It is contrary to the fundamental design of the 340B Program that CVS/Caremark receive more than half of the 340B Savings because the 340B Savings is intended to flow to the Covered Entities to fund uninsured and indigent clinical care.

154.    Moreover, the patients are also victimized by Defendants' scheme, since they pay a co-pay or co-insurance based on the higher, non-340B reimbursement rate initially adjudicated by the PBM at the point of sale. Upon information and belief, any excess co-pay or co-insurance paid by the patient as a result of the switch to the secret 340B price is not refunded.

155.    WellPartner, CaremarkPCS, and Caremark LLC/CVS Specialty must conceal the full co-pay and co-insurance amounts from the Covered Entity Plaintiffs, or otherwise it would

reveal that the patients are paying co-pay and co-insurance at the point of sale based on a higher reimbursement rate.

156.    In short, this scheme could not function without vertical integration. It requires a PBM willing to artificially slash reimbursement rates after the point of sale, a contract pharmacy willing to accept that reduced rate, and a captive TPA willing to mask the true transaction from the Covered Entity.

157.    The Defendants' scheme is a breach of the Agreements, violates Michigan's 340B Pricing law, and violates HRSA and OPA regulations and guidelines regarding contract pharmacy services.

158.    Defendants agreed that Plaintiffs would receive the full payment amount from all payors based on all reimbursement for the 340B drugs, less the agreed-upon dispensing fee and TPA fee. However, due to Defendants' secret 340B arrangement, Plaintiffs received far lower than the reimbursement received at the point of sale because Defendants contrived a scheme where CaremarkPCS retains a portion of the drug reimbursement and then pays Caremark LLC/CVS Specialty lower rates for the 340B claims, despite the fact that CaremarkPCS charged the plan/payor the original higher amount, and the 340B eligible patient the original higher copay just so that Defendants retain 340B profits.

159.    Defendants falsely represented to Plaintiffs that the 340B Remittance received by the Covered Entities was equal to the total reimbursement that the contract pharmacies (Caremark LLC and/or CVS Specialty) and their affiliates received for the 340B drugs (less the agreed-upon fees), but had actual knowledge that this was not the case.

160. Defendants knowingly and willingly engaged in this fraudulent, unlawful, and deceptive scheme regarding 340B drug claims despite the fact that it violates HRSA and OPA regulations and guidelines.

161. Defendants' scheme also constitutes wire fraud, and each Defendant played a distinct role in the execution of the scheme: (a) CaremarkPCS (in Arizona) transmitted electronic claims adjudication data and post-sale rate-reduction instructions via interstate computer networks directing CVS Specialty and/or Caremark LLC to accept, and CaremarkPCS to retain, an artificially depressed "340B rate" for each identified 340B claim; (b) Caremark LLC and CVS Specialty, Inc. (both in Rhode Island) knowingly accepted the artificially reduced 340B rates directed by CaremarkPCS, transmitted and caused to be transmitted electronic reimbursement data reflecting those false amounts, and provided those false amounts to WellPartner for transmission to Plaintiffs, despite being contractually obligated under the Agreements to pass the full reimbursement; (c) WellPartner, LLC (in Rhode Island) generated and transmitted to Plaintiffs— by means of interstate electronic wire communications—remittance reports that falsely stated the reimbursements received and falsely reported patient co-pay/co-insurance amounts of $0.00; and (d) CVS Health Corporation, as the parent and controlling entity, directed and ratified the above conduct with full knowledge that the electronic remittance data transmitted to Plaintiffs was materially false and that Plaintiffs were deprived of 340B revenues to which they were entitled.

**X.      The March 2, 2026 Audit Demand and Retaliatory Termination of the Agreements**

162. On March 2, 2026, Plaintiffs, through counsel, served a demand letter to the Executive Director of 340B at CVS Health and Caremark LLC (the "Demand Letter") requesting access to relevant data to conduct an audit.

163. In that Letter, Plaintiffs demanded that Caremark LLC and CaremarkPCS provide access to their books and records, including all electronic records, to verify and ensure compliance with the duties, obligations, and transactions outlined in the Agreements.

164. Plaintiffs requested, among other things, (1) data showing any adjudication of the Covered Entity's claims prior to the time the Pharmacy knew the patient was 340B eligible; (2) all communications between Caremark LLC/CVS Specialty and Wellpartner, (3) reconciliation reports for 340B drugs; (4) bi-monthly invoices identifying all claims that the Pharmacy will provide reimbursement to Plaintiffs; and (5) the reimbursement addenda in the contracts between Caremark LLC/CVS Specialty and various PBMs and plan sponsors.

165. As of the date of filing, however, Defendants have not meaningfully responded to Plaintiffs' requests for data and information.

166. Instead, on April 22, 2026, in an effort to preclude the Covered Entities from exercising their right to conduct an audit as they are obligated to do under HRSA regulations, Defendants gave notice of termination of the Agreements in retaliation for uncovering the scheme and seeking to conduct an audit to uncover the exact measure of loss to the Plaintiffs.

* * *

167. By retaining Spread and taking money intended to flow to Plaintiffs for use in indigent care in accordance with the 340B Program, and refusing to provide the necessary data to evaluate the extent of Defendants' behavior and losses to Plaintiffs, Defendants have breached the Agreements and Michigan law.

168. Furthermore, by conspiring to unlawfully deprive Plaintiffs of their 340B savings, Defendants conducted an enterprise to carry out its scheme to commit a pattern of unlawful racketeering activity in violation of RICO, thereby causing significant financial injury to Plaintiffs.

**CAUSES OF ACTION**

**COUNT ONE**
**BREACH OF CONTRACT**

169.    Plaintiffs repeat and reiterate each and every allegation set forth in the prior paragraphs of this First Amended Complaint as if set forth at length herein.

170.    Plaintiffs entered into Pharmacy Services Agreements with Caremark LLC. The Agreements constitute valid contracts between Plaintiffs and Caremark LLC, which govern the relationship between the Parties.

171.    CVS Specialty, which performed services under the Agreements between Plaintiffs and Caremark as the Contract Pharmacy, is also bound by the Agreements.

172.    The Agreements contain a provision relating to the remittance of all reimbursement obtained by Defendants from all sources (including patients and third-party payors), less an agreed-upon dispensing fee, to Plaintiffs.

173.    This provision applies not just to Caremark, but also to its subsidiaries and affiliates, including Defendants CVS Health, CaremarkPCS, and CVS Specialty.

174.    The Agreements contain a provision under which the Contract Pharmacies agreed to abide by and comply with HRSA and OPA regulations and guidelines governing contract pharmacy services.

175.    The Agreements also contain an audit provision under which Plaintiffs have the right to audit the Contract Pharmacy's books and records to ensure compliance with the terms of the Agreements.

176.    The Agreements further contain a compliance with law provision where Defendants agreed to comply with laws, including the Michigan 340B Pricing Law (MCL § 550.926) that

makes it unlawful for a PBM to reimburse a 340B Covered Entity differently than other similarly situated entities and pharmacies.

177. Plaintiffs adequately performed all their obligations under the Agreements.

178. However, Defendants failed to perform under the Agreements, by (1) not remitting all payments made to CaremarkPCS at the point-of-sale for the 340B drugs to Plaintiffs; (2) lowering the 340B reimbursement amount paid to Caremark LLC/CVS Specialty for no purpose other than to deprive Plaintiffs of the 340B Savings; (3) not complying with HRSA and OPA regulations and guidelines referenced above that require Caremark LLC/CVS Specialty to ensure that all 340B savings will accrue to the Covered Entities and that Defendants will not retain Spread on 340B claims; (4) not complying with Plaintiffs' reasonable audit requests; and (5) not complying with Michigan's 340B Pricing Law.

179. Plaintiffs estimate **more than $66 million in losses of 340B revenue** due to Defendants' 340B scam to Plaintiffs over the last six years.

180. As a direct and proximate result of Defendants' breach of contract, Plaintiffs (and their patients and beneficiaries) have suffered a concrete and irreparable harm as well as significant damages in an amount to be determined at trial.

**COUNT TWO**
**MICHIGAN CONSUMER PROTECTION ACT SECTION 445.903**
**DECEPTIVE AND UNLAWFUL BUSINESS PRACTICE**

181. Plaintiffs repeat and reiterate each and every allegation set forth in the prior paragraphs of this First Amended Complaint as if set forth at length herein.

182. The Michigan Consumer Protection Act proscribes any "[u]nfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce." MCL § 445.903.

183. The Michigan Consumer Protection Act creates a cause of action for anyone who

"suffers a loss as a result of a violation" of the statute, and in particular as a result of a defendant's deceptive acts or practices. *See id*. § 445.911. The law also provides for actual damages, attorneys' fees, and injunctive relief to enjoin the deceptive conduct. *Id*.

184. Defendants engage in deceptive and unconscionable conduct in "trade" and "commerce" in violation of the Michigan Consumer Protection Act when they unlawfully divert 340B savings from Plaintiffs through their discriminatory pricing scheme for 340B drugs, as alleged herein.

185. Defendants CVS Health, CaremarkPCS, Caremark, and CVS Specialty conspired together and coordinated a scheme under which 340B drug claims were processed under a secret 340B discriminatory pricing scheme with significantly reduced reimbursement rates, with the goal of reducing the amount of 340B savings received by Plaintiffs while Defendants lined their own pockets with funds that Congress intended to flow to the Covered Entities and their patients.

186. The John Doe Defendants executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC and CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiffs and other Covered Entities of 340B revenue they would otherwise have received.

187. Defendants committed a deceptive trade practice by (1) not remitting all payments made to CaremarkPCS at the point-of-sale for the 340B drugs to Plaintiffs; (2) lowering the 340B reimbursement amount paid to Caremark LLC/CVS Specialty for no purpose other than to deprive Plaintiffs of the 340B Savings; (3) not complying with HRSA and OPA regulations and guidelines referenced above that require Caremark LLC/CVS Specialty to ensure that all 340B savings will accrue to the Covered Entities and that Defendants will not retain Spread on 340B claims; and (4) not complying with Michigan's 340B Pricing Law.

188. The above conduct is deceptive because Defendants misrepresented to Plaintiffs that they would abide by the rules and regulations promulgated by HRSA and OPA, including the requirement that 340B savings flow to the Covered Entities to spend as they see fit.

189. Defendants' conduct also is unlawful because it violates the Michigan 340B Pricing law (MCL § 550.926) when Defendants represented that they would comply with all applicable laws. See Agreements, ¶ 16.

190. Defendants also concealed the existence of the secret 340B pricing that slashed reimbursement rates for 340B drugs dispensed to Plaintiffs' patients.

191. Defendants acted willingly and knowingly to retain the profits that were intended to flow to the Covered Entities.

192. Defendants failed to provide Plaintiffs the promised benefits and captured the 340B savings for themselves when Defendants represented that the 340B savings would flow to the Plaintiffs minus a dispensing fee.

193. Plaintiffs would not have entered into the Agreements had they known that Defendants would impose discriminatory pricing that dramatically reduced the reimbursement paid to Contract Pharmacies from the originally adjudicated market rate at the point-of-sale, in exchange for a lower reimbursement, to the tune of **$66 million** between 2020 and 2025.

194. Defendants' discriminatory pricing scheme is further unfair because it directly impacts the Plaintiffs' poorest and most vulnerable patients who are the true intended beneficiaries of the 340B Program.

195. As a direct and proximate result of Defendants' unfair and deceptive conduct in violation of the Michigan Consumer Protection Act, Plaintiffs and their beneficiaries have suffered a concrete and irreparable harm as well as significant damages in an amount to be determined at

40

trial.

196. Plaintiffs further seek an injunction pursuant to MCL § 445.911 to prevent future violations by enjoining Defendants from their discriminatory pricing scheme.

## COUNT THREE
## COMMON LAW FRAUD

197. Plaintiffs repeat and reiterate each and every allegation set forth in the prior paragraphs of this First Amended Complaint as if set forth at length herein.

198. Defendants CVS Health, CaremarkPCS, Caremark LLC, CVS Specialty, and WellPartner conspired together and coordinated a scheme under which 340B drug claims were processed under a secret 340B discriminatory pricing scheme with significantly reduced reimbursement rates, with the goal of reducing the amount of 340B savings received by Plaintiffs while Defendants lined their own pockets with funds that Congress intended to flow to the Covered Entities and their patients.

199. The John Doe Defendants executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC and CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiffs and other Covered Entities of 340B revenue they would otherwise have received.

200. Caremark LLC, CVS Specialty, and WellPartner represented to Plaintiffs that all reimbursement obtained by Defendants from all sources (including patients and third-party payors), less an agreed-upon dispensing fee, would pass to Plaintiffs.

201. However, that representation was false because CVS Health, CaremarkPCS, Caremark LLC, CVS Specialty, and WellPartner conspired not to remit the payments obtained but rather secretly lowered the original 340B reimbursement amount for no purpose other than to deprive Plaintiffs of the 340B Savings.

41

202.   Defendants also concealed the existence of secret 340B pricing that slashed reimbursement rates for 340B drugs dispensed to Plaintiffs' patients.

203.   Caremark LLC's, CVS Specialty's, and WellPartner's representation was material because Plaintiffs agreed to pay Caremark LLC, CVS Specialty, and WellPartner a substantial dispensing fee and TPA fee in exchange for all reimbursement obtained by Defendants from all sources.  Defendants went behind Plaintiffs' back to drastically reduce the 340B Savings by many millions of dollars.

204.   Defendants represented the amount paid to Plaintiff was the total amount received, but Defendants had actual knowledge it was not. Defendants made this representation knowing its falsity in order to hide their scheme and prevent Plaintiff from exercising its audit rights and discovering the true amount it was owed.

205.   In other words, Plaintiffs would not have entered into the Agreements had they known that Defendants would impose discriminatory pricing that dramatically reduced the reimbursement paid to Caremark LLC/CVS Specialty from the originally adjudicated market rate at the point-of-sale, in exchange for a lower reimbursement, to the tune of **$66 million** between 2020 and the present.

206.   Defendants' fraudulent scheme was knowingly and intentionally carried out to secretly steal 340B Savings to further their own financial growth and profitability. The John Doe Defendants put the fraudulent scheme in motion knowing that the scheme would deprive Plaintiffs and other Covered Entities of 340B revenue they would otherwise have received.

207.   Plaintiffs relied on Caremark LLC's, CVS Specialty's, and WellPartner's material misrepresentation by agreeing to allow Caremark LLC and CVS Specialty to act as a Contract Pharmacy in exchange for a substantial dispensing fee and TPA fee.

208. Defendants also misrepresented to Plaintiffs that they would abide by the rules and regulations promulgated by HRSA and OPA, including the requirement that 340B savings flow to the Covered Entities to spend as they see fit.

209. Defendants acted willingly and knowingly to retain the profits that were intended to flow to the Covered Entity Plaintiffs.

210. As a direct and proximate result of Defendants' fraud, Plaintiffs and their beneficiaries have suffered a concrete and irreparable harm as well as significant damages in an amount to be determined at trial.

## COUNT FOUR
## CIVIL RICO
## 18 U.S.C. 1962(c)

211. Plaintiffs repeat and reiterate each and every allegation set forth in the prior paragraphs of this First Amended Complaint as if set forth at length herein.

212. The corporate and vertical relationships between CVS Health, CaremarkPCS, Caremark LLC, CVS Specialty, and WellPartner and their close association in relation to the administration of Plaintiffs' 340B drug program, constitute a corporate enterprise as well as an association-in-fact enterprise among CVS Health's corporate entities, pursuant to 18 U.S.C. § 1961(4).

213. The above enterprise maintains an existence separate and apart from the pattern of racketeering activity alleged in this First Amended Complaint.

214. The conduct of this enterprise, in relation to the management of Plaintiffs' 340B drug claims and remittances of 340B revenue to Plaintiffs, is carried out by Defendants CVS Health, CaremarkPCS, Caremark LLC, CVS Specialty, and WellPartner with a common purpose of depriving profits and revenue from the administration of Plaintiffs' 340B Drug Program (the

43

"CVS 340B Enterprise").

Predicate Act 1: 18 U.S.C. § 664

215. 18 U.S.C. § 664, embezzlement from employee benefit plan, makes it unlawful for "any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith."

216. As relevant here, much of the reimbursement for 340B drugs come from self-funded employee benefit plans that also provide medical and pharmacy benefits to their members.

217. By unlawfully steering and diverting these 340B payments that should be flowing in the ordinary course to the Plaintiffs to themselves, Defendants violated 18 U.S.C. § 664 by unlawfully converting "to [their] own use" the "fund connected" with a welfare benefit plan, when conducting the affairs of the CVS 340B Enterprise.

Predicate Act 2: 18 U.S.C. § 1954

218. 18 U.S.C. § 1954, offer, acceptance or solicitation to influence operations of employee benefit plan, makes it unlawful for any agent or representative of organizations providing services to an employee welfare benefit plan to, inter alia, receive any "kickback, commission, gift, loan, money, or thing of value" in respect to "any of the actions, decisions, or other duties relating to any question or matter concerning such plan," that exceeds the "bona fide salary, compensation, or other payments" that the agent is owed for its services.

219. Defendants violated 18 U.S.C. § 1954 by accepting "kickback, commission, gift, loan, money, or thing of value" that exceeds the bona fide compensation and fair market value of the Contract Pharmacy services rendered in relation to the administration of Plaintiffs' 340B

program, when conducting the affairs of the CVS 340B Enterprise.

Predicate Act 3: 18 U.S.C. § 1343

220. 18 U.S.C. § 1343, wire fraud, makes it unlawful for any person having devised, or intending to devise, any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

221. Defendants violated 18 U.S.C. § 1343 by devising and executing a coordinated scheme to defraud Plaintiffs through the use of interstate wire communications. Each use of the interstate wires in furtherance of the fraudulent scheme alleged herein constitutes a separate predicate act of racketeering activity. See 18 U.S.C. §§1961(1)(B), 1961(5).

222. Defendants devised and executed a coordinated scheme to defraud Plaintiffs of more than $66 million in 340B Savings and reimbursement revenues to which Plaintiffs were contractually and legally entitled under the Pharmacy Services Agreements and HRSA/OPA regulations. The scheme was executed in material part through repeated uses of interstate wire communications, including but not limited to the following:

- *WellPartner Monthly Electronic Remittance Reports*. Since at least January 2020 and occurring monthly thereafter, WellPartner transmitted to Plaintiffs, via interstate electronic data transmission, monthly remittance reports for processed 340B drug claims. Those reports were transmitted by means of interstate wire communication from WellPartner's systems in Rhode Island to Plaintiffs' systems in Michigan. Each report falsely reflected a gross insurance payment to CVS Specialty that was materially less than the amount actually adjudicated and paid by the applicable payor at the point

of sale, and falsely reflected a patient co-pay/co-insurance amount of $0.00 on the majority of claims. As a specific example, WellPartner transmitted a remittance report to Plaintiffs reflecting a "Payor Reimbursement" of $18,455.83 for a Stelara prescription (NDC 57894006103) dispensed by CVS Specialty on December 13, 2023, when CaremarkPCS had in fact received $24,979.01 from the applicable payor for the identical drug on the same date—as confirmed by the $24,979.01 reimbursement Plaintiffs received when an identical Stelara prescription was filled at a University of Michigan Specialty Pharmacy on the same day under the same insurance plan.

- *CaremarkPCS Electronic Claims Rate Reduction Transmissions*. Since at least January 2020 and occurring on each occasion a 340B-eligible claim was processed through the CVS 340B scheme, CaremarkPCS transmitted via interstate electronic data interchange (EDI) and/or NCPDP claims processing networks a post-sale electronic adjustment or instruction to CVS Specialty and/or Caremark LLC directing that the originally adjudicated point-of-sale reimbursement rate be reduced to the artificially depressed 340B rate. These transmissions crossed state lines from CaremarkPCS's systems in Arizona to CVS Specialty's and Caremark LLC's systems in Rhode Island (and/or other states). The Spread retained by CaremarkPCS as a result of these transmissions—the difference between the point-of-sale adjudicated amount and the lower 340B reimbursement—is money that belonged to Plaintiffs under the Agreements.

- *Internal Coordinating Electronic Communications*. Unidentified CVS Health and CaremarkPCS employees (John Does 1-15) transmitted by email and/or other electronic means via interstate wire communications to recipients including CaremarkPCS, CVS Specialty, and/or WellPartner personnel (John Does 1-15)

46

electronic communications that: (i) established, ratified, and directed the internal policy to reduce reimbursement rates on 340B-identified claims after the point of sale; (ii) directed WellPartner to report only the artificially reduced 340B rates (and not the higher point-of-sale adjudicated amounts) in the remittance data transmitted to Plaintiffs; and (iii) directed CVS personnel to refuse Plaintiffs' November 3, 2025 audit demand in order to prevent Plaintiffs from discovering the full extent of the scheme.

223.    Each of the wire transmissions described above was made by means of wire communication in interstate commerce. Each such crossing of state lines in furtherance of the fraudulent scheme constitutes a separate use of the interstate wires within the meaning of 18 U.S.C. § 1343 and a separate predicate act of racketeering activity.

224.    Defendants acted with specific intent to defraud Plaintiffs of the 340B Savings. CVS Health publicly warned investors in its SEC filings that reductions in 340B Contract Pharmacy revenues could "materially and adversely affect" CVS Health's financial results, establishing that the retention of 340B Spread was a deliberate and financially significant business decision. CVS Health-affiliated contract pharmacies reported more than $800 million in gross profits from 340B arrangements in 2022-2023. The sophistication and concealment built into the scheme—including using the mandatorily imposed and CVS-owned WellPartner as the exclusive vehicle to generate and transmit false remittance data to Plaintiffs, processing the post-sale rate reduction entirely within the CVS Health corporate family and invisible to Plaintiffs, refusing Plaintiffs' contractually and regulatorily required audit request, and then terminating the Pharmacy Services Agreements in retaliation for Plaintiffs' efforts to expose the scheme—is strong circumstantial evidence of conscious misbehavior and deliberate intent to defraud.

225.    The predicate acts of wire fraud described herein constitute a "pattern" of

racketeering activity under 18 U.S.C. §§ 1961(1)(B) and 1961(5). These acts have been committed on a continuous and regular basis across thousands of individual 340B drug claims processed per month since 2020, establishing both open-ended continuity (the scheme is ongoing, as evidenced by continued processing of 340B claims after Defendants' retaliatory termination) and closed-ended continuity (the scheme has operated without interruption for more than six years). These predicate acts directly and proximately caused Plaintiffs' injury. See 18 U.S.C. § 1964(c).

226.   Plaintiffs relied on the materially false interstate wire communications described herein to their financial detriment. Specifically, Plaintiffs received each WellPartner electronic remittance report and, relying on its representation that the gross payment reflected therein was the full reimbursement from the applicable payor for 340B-eligible drug claims, accepted the remitted amounts (less the agreed dispensing and TPA fees) as full performance under the Agreements. In reliance on those false reports, Plaintiffs continued to perform under the Pharmacy Services Agreements, continued to allow Caremark LLC and CVS Specialty to serve as Contract Pharmacies, and continued to pay substantial dispensing fees and TPA fees—none of which they would have done had they known the true amounts CaremarkPCS was receiving from payors at the point of sale. Each dispensing fee and TPA fee paid by Plaintiffs in reliance on WellPartner's false remittance data constitutes a concrete, out-of-pocket financial loss directly and proximately caused by Defendants' wire fraud.

227.   The false reporting of patient co-pay/co-insurance as $0.00 further concealed the true point-of-sale transaction from Plaintiffs, depriving them of a critical indicator that would have revealed the discrepancy. As a direct result of relying on the false amounts stated in each wire transmission, Plaintiffs received less than the full 340B Savings to which they were entitled on each claim processed.

228.    As a direct and proximate result of Defendants' racketeering activities described herein, Plaintiffs have suffered significant damages in an amount to be determined at trial.

229.    Plaintiffs further seek an injunction pursuant to 18 U.S.C. § 1964(a) to prevent future violations of 18 U.S.C. § 1962 by enjoining Defendants from their discriminatory pricing scheme.

## COUNT FIVE
### BREACH OF CONTRACT VIA THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

230.    Plaintiffs repeat and reiterate each and every allegation set forth in the prior paragraphs of this First Amended Complaint as if set forth at length herein.

231.    Under Michigan law, "the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Hammond v United of Oakland, Inc, 193 Mich App 146, 152; 483 NW2d 652 (1992).

232.    Here, Defendants breached the implied covenant of good faith and fair dealing when Defendants created a secret 340B arrangement under which CaremarkPCS artificially reduced the reimbursement rate for Plaintiffs' 340B drugs dispensed by Caremark LLC and CVS Specialty to 340B-eligible patients of the Covered Entities. Defendants did so intentionally to lower the 340B savings that they would need to pass on to Plaintiffs so that they can divert the 340B savings as pure profit to themselves.

233.    Additionally, CaremarkPCS, Caremark LLC, CVS Specialty, and WellPartner breached the covenant of good faith and fair dealing by actively concealing their discriminatory 340B pricing scheme, thereby also depriving Plaintiffs of the benefit of their bargain.

234.    Defendants further breached the covenant of good faith and fair dealing by

terminating the Agreements in response to the Covered Entities' exercise of their audit rights under the Agreements consistent with their obligations under 340B Program rules and HRSA regulations. Accordingly, Plaintiffs seek an injunction to enjoin the unlawful and retaliatory terminations of the Agreements.

235. The unlawful and retaliatory terminations further harmed Plaintiffs by depriving them of the 340B savings that would have been generated through the contract pharmacy relationship had the Agreements not been terminated.

236. As a direct and proximate result of Defendants' improper conduct, Plaintiffs have suffered significant damages in an amount to be determined at trial.

## COUNT SIX
## UNJUST ENRICHMENT

237. Plaintiffs repeat and reiterate each and every allegation set forth in the prior paragraphs of this First Amended Complaint as if set forth at length herein.

238. In the alternative, to the extent it is somehow found that the Agreements do not expressly prohibit Defendants from retaining Spread and failing to remit to Plaintiffs all payments from patients and third-party payors less the agreed-upon dispensing fee, then Defendants improperly obtained for themselves benefits to which they were not entitled and which it would be unconscionable and otherwise inequitable for them to retain, because the 340B savings were intended by Congress to accrue to the Covered Entities and their patients. See, e.g., Karaus v. Bank of New York Mellon, 300 Mich. App. 9, 22-23, 831 N.W.2d 897 (2012) (defining unjust enrichment as "the receipt of a benefit by the other party from the complaining party and an inequity resulting to the complaining party because of the retention of the benefit by the other party.").

239. As a result of Defendants' having unfairly obtained a benefit to which Plaintiffs

50

were in fact entitled, Plaintiffs have suffered a concrete and irreparable harm as well as significant damages to be determined at trial.

## COUNT SEVEN
## TORTIOUS INTERFERENCE WITH CONTRACT

240. Plaintiffs repeat and reiterate each and every allegation set forth in the prior paragraphs of this First Amended Complaint as if set forth at length herein.

241. In the alternative, Plaintiffs assert a claim for tortious interference with contract against all Defendants that were not express signatories to the Agreements, including CVS Health, CaremarkPCS, CVS Specialty, WellPartner, LLC and the John Doe Defendants.

242. At all relevant times, Plaintiffs had valid and enforceable Pharmacy Services Agreements with Caremark LLC governing the provision of Contract Pharmacy services and the remittance of 340B Savings.

243. Defendants CVS Health, CaremarkPCS, CVS Specialty, WellPartner, and the John Doe Defendants had knowledge of the Agreements and the contractual relationship between Plaintiffs and Caremark LLC.

244. Defendants intentionally and improperly interfered with the Agreements by implementing and executing the discriminatory 340B pricing scheme described herein, which caused Caremark LLC and CVS Specialty to breach their obligations to remit to Plaintiffs all reimbursements received for 340B drugs less the agreed-upon dispensing fee.

245. As a direct and proximate result of Defendants' tortious interference, Plaintiffs have suffered significant damages in an amount to be determined at trial.

## COUNT EIGHT
## BREACH OF CONTRACT RELATING TO THE DENIAL OF AN AUDIT

246. Plaintiffs repeat and reiterate each and every allegation set forth in the prior

paragraphs of this First Amended Complaint as if set forth at length herein.

247.    At all relevant times, Caremark LLC and CVS Specialty had a contractual duty to cooperate with Plaintiffs' requests to audit the pharmacies' books and records.

248.    On March 2, 2026, Plaintiffs served on Caremark LLC and CVS Specialty an audit demand letter setting forth Plaintiffs' requests to conduct an audit.

249.    Caremark LLC and CVS Specialty have refused Plaintiffs' request for access to such books and records.

250.    Plaintiffs seek an order enjoining Caremark LLC and CVS Specialty from restricting Plaintiffs' access to the pharmacy's books and records and requiring Caremark LLC and CVS Specialty to comply with the audit provisions of the Agreements.

251.    Defendants further breached the contractual audit provisions by terminating the Agreements in response to the Covered Entities' exercise of their audit rights under the Agreements consistent with their obligations under 340B Program rules and HRSA regulations. Accordingly, Plaintiffs seek an injunction to enjoin the unlawful and retaliatory terminations of the Agreements.

252.    Further, an accounting of Defendants' records is necessary to determine the full extent and amount of Plaintiffs' damages and losses resulting from the violations and breaches alleged herein.

**WHEREFORE,** Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor and against Defendants as follows:

(a)    Declaring that Defendants breached the Pharmacy Services Agreements, violated the Michigan Consumer Protection Act, committed fraud, and violated 18 U.S.C. § 1962 by, among other things, (1) failing to remit to Plaintiffs the full amount of reimbursements the

Defendants received from third-party payors less the agreed-upon dispensing fee, (2) failing to comply with HRSA and OPA regulations and guidelines regarding contract pharmacy services; (3) depriving Plaintiffs of the 340B savings they were entitled to receive due to Defendants' fraudulent pricing scheme; (4) refusing to cooperate with Plaintiffs' reasonable request to audit Defendants' records pursuant to the audit provisions of the Agreements; and (5) failing to comply with Michigan's 340B Pricing Law.

(b)　Further declaring that Defendants breached their duty of good faith and fair dealing, and/or was unjustly enriched due to the conduct alleged above;

(c)　Entering a preliminary and permanent injunction to prevent future violations of the above;

(d)　Entering a preliminary and permanent injunction to enjoin the unlawful and retaliatory termination of the Agreements;

(e)　Awarding Plaintiffs all damages adequate to compensate them, such damages to be determined by a jury, including but not limited to treble damages pursuant to the RICO statute and damages for the lost 340B Savings caused by Defendants' unlawful and retaliatory terminations of the Agreements;

(f)　Ordering Defendants to disgorge any profits or "Spread" unjustly retained by Defendants from Plaintiffs' 340B savings;

(g)　Ordering Defendants to provide all accountings necessary to determine the amounts it must remit to Plaintiffs to restore losses and to disgorge any profits Defendants unlawfully and unjustly retained;

(h)　Awarding Plaintiffs prejudgment and post judgment interest as allowed by law;

(i)　Awarding Plaintiffs their attorneys' fees and all costs of court; and

(j)     Awarding Plaintiffs any other relief the Court deems just and proper.

## JURY DEMAND

Pursuant to RULE 38(b) of the FEDERAL RULES OF CIVIL PROCEDURE, Plaintiffs demand a trial by jury as to all claims and all issues properly so triable.

Respectfully submitted,

**FRIER LEVITT, LLC**

By:     */s/ Jonathan E. Levitt*
        Jonathan E. Levitt, Esq.
        Matthew J. Modafferi, Esq.

        One World Trade Center
        Suite 45E
        285 Fulton Street
        New York, NY 10007
        Telephone: (646) 970-2711

        84 Bloomfield Avenue
        Pine Brook, NJ 07058
        Telephone: (973) 618-1660
        Facsimile: (973) 618-0650

        *Attorneys for the Plaintiffs*

Dated:  May 27, 2026