# UNPUBLISHED AUTHORITIES

LexisNexis®

# Admin. Sys. Research Corp. Int'l v. Davita Healthcare

Seventeenth Judicial Circuit Court of Michigan, Kent County

September 15, 2016, Decided

Case No. 16-00804-CBB

**Reporter**
2016 Mich. Cir. LEXIS 410 *

ADMINISTRATION SYSTEMS RESEARCH CORPORATION INTERNATIONAL, Plaintiff, v. DAVITA HEALTHCARE PARTNERS INC.; DVA RENAL HEALTHCARE, INC.; PHYSICIANS DIALYSIS ACQUISITIONS, INC.; TOTAL RENAL CARE, INC.; BLANCO DIALYSIS, LLC.; IONIA DIALYSIS, LLC; and PORTOLA DIALYSIS, LLC, Defendants.

**Judges:** **[*1]** HON. CHRISTOPHER P. YATES, Kent County Circuit Court Judge.

**Opinion by:** CHRISTOPHER P. YATES

## Opinion

OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND COMPEL ARBITRATION

This dispute between the plaintiff, third-party claims administrator Administration Systems Research Corporation International ("ASR"), and the defendants, who are kidney-dialysis providers, presents thorny questions that must be decided by somebody. On November 2, 2015, the defendants initiated an arbitration proceeding before the American Health Lawyers Association ("AHLA") for the purpose of resolving the parties' issues concerning payments for dialysis services. But after that, ASR filed the instant case seeking a declaration that the parties' dispute must be resolved by a court, rather than in arbitration. The defendants subsequently moved for summary disposition pursuant to *MCR 2.116(C)(7)* requesting dismissal in deference to the pending arbitration proceeding. Because the Court concludes ASR agreed to arbitrate its disputes with the defendants, the Court must award summary disposition to the defendants and dismiss this case.

I. Factual Background

The defendants have moved for summary disposition under *MCR 2.116(C)(7)* on the theory that their dispute with **[*2]** Plaintiff ASR must be resolved by arbitration. "A party may support a motion under *MCR 2.116(C)(7)* by affidavits, depositions, admissions, or other documentary evidence[,]" and if "such material is submitted, it must be considered." *Maiden v Rozwood, 461 Mich 109, 119 (1999)*. Nevertheless, "[t]he contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." Id. Accordingly, the Court shall limn the facts by starting with ASR's first amended complaint and then adjusting those allegations as required by the evidence submitted in connection with the motion for summary disposition.

In simple terms, the defendants "own, operate or manage dialysis facilities in outpatient and hospital clinics in and around Grand Rapids," see First Amended Complaint, ¶ 10, and they receive payments for services by submitting claims to Plaintiff ASR, which in turn processes the claims and reimburses the defendants pursuant to contractual agreements between the parties. See id., Exhibit C (Demand for Arbitration, ¶¶ 13-14). The defendants allege that ASR has underpaid them to the tune of $6 million. See id. (Demand for Arbitration, ¶ 15). Thus, the defendants presented a demand for arbitration to the AHLA in late 2015. Id. **[*3]** (Demand for Arbitration). In doing so, the defendants contend that they were simply invoking the dispute-resolution process spelled out in their "provider agreements" with ASR. See id., Exhibits A & B (provider agreements).

Despite language in section 8.14 of each provider agreement prescribing "binding arbitration" as the

method for resolving disputes between the parties, see First Amended Complaint, Exhibits A & B, Plaintiff ASR did not initially participate in the arbitration proceeding. As a result, the process of selecting an arbitrator took place without ASR's input. See First Amended Complaint, ¶ 82. That development hardened ASR's opposition to the arbitration proceeding. On January 27, 2016, ASR filed this action in an attempt to forestall resolution of the parties' dispute through arbitration. After ASR submitted a first amended complaint on March 25, 2016, the defendants filed a motion seeking dismissal of ASR's complaint in favor of arbitration. Consequently, the Court must decide whether the parties' dispute should be resolved through arbitration or judicial proceedings.

II. Legal Analysis

The defendants have correctly presented their request for arbitration instead of litigation **[*4]** as a motion for summary disposition under MCR 2.116(C)(7). See DeCaminada v Coopers & Lybrand, LLP, 232 Mich App 492, 495-496 & n1 (1998). "If there is no factual dispute, whether a plaintiffs claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide." See RDM Holdings, Ltd v Continental Plastics Co, 281 Mich App 678, 687 (2008). "If a factual dispute exists, however, summary disposition is not appropriate." Id.

In Michigan, our legislature "has expressed a strong public policy favoring private voluntary arbitration, and our courts have historically enforced agreements to arbitrate disputes." Rembert v Ryan's Family Steak Houses, Inc, 235 Mich App 118, 127-128 (1999). Our legislature "significantly advanced the public policy favoring arbitration in 1961 when it enacted the Michigan arbitration act, (MAA), MCL 600.5001 et seq," id. at 131, and recently reaffirmed that commitment to arbitration in 2013 when it adopted the Uniform Arbitration Act, MCL 691.1681, et seq. Additionally, a steady stream of decisions from our Court of Appeals reflects our jurisprudential commitment to arbitration. See, e.g., Rooyakker & Sitz, PLLC v Plante & Moran, PLLC, 276 Mich App 146, 156 (2007). To be sure, "[a]rbitration is a matter of contract," Altobelli v Hartmann, 499 Mich 284, 295 (2016), so the preference for arbitration "' is triggered only if the parties agree to arbitrate.'" Macomb County v AFSCME Council 25 Locals 411 and 893, 494 Mich 65, 81 n47 (2013). There nonetheless exists "a presumption of arbitrability 'unless it may be said with positive assurance that the arbitration clause is not susceptible **[*5]** of an interpretation that covers the asserted dispute." Amtower v William C Roney & Co, 232 Mich App 226, 235 (1998). Indeed, "[a]ny doubts about arbitrability of an issue should be resolved in favor of arbitration." See City of Huntington Woods v Ajax Paving Indus, Inc, 196 Mich App 71, 75 (1992).

At the national level, "[t]o overcome judicial resistance to arbitration, Congress enacted the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16." Buckeye Check Cashing, Inc v Cardegna, 546 U.S. 440, 443 (2006). Indeed, section 2 of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts[.]" Id. Moreover, as the United States Supreme Court has noted, the FAA "'creates a body of federal substantive law' that is "applicable in state and federal courts" alike. Southland Corp v Keating, 465 Mich 1, 12 (1984). Thus, the FAA renders enforceable all "'agreements for arbitration contained in contracts involving interstate commerce,'"[1] see id. at 12-13, so the Court must respect the FAA's "broad reach," which is "unencumbered by state-law constraints." See id.

Against this backdrop, the Court must decide whether Plaintiff ASR may prevent arbitration of the defendants' state-law claims for breach of contract, innocent and negligent misrepresentation, and declaratory relief, as presented in the defendants' "Demand for Arbitration." See First Amended Complaint, Exhibit C. ASR insists that the defendants' **[*6]** various claims are not subject to arbitration, that several defendants cannot rely upon the arbitration language in the provider agreements because they are not parties to those contracts, and that the arbitration proceeding is fatally flawed in several respects. The Court shall address these three broad categories of concerns *seriatim*.

A. The Defendants' Claims Are Subject to Arbitration.

Plaintiff ASR contends that the claims presented in the defendants' "Demand for Arbitration" are not proper subjects for arbitration. This argument requires consideration of the language in the provider agreements prescribing the chosen dispute-resolution mechanism. Under section 8.14 of each provider agreement, the parties bound themselves to engage in the following process in order to resolve their disagreements:

[1] Neither side can dispute that their provider agreements involve interstate commerce.

> **Dispute Resolution** The parties shall make reasonable attempts to resolve any and all disputes arising hereunder through informal discussions. In the event a dispute which the parties cannot resolve involves a provision or circumstance covered by ERISA, the parties agree that the dispute resolution procedures and remedies available under ERISA will be their sole recourse. If the dispute is **[*7]** one for which ERISA does not provide a dispute resolution procedure and remedy, or the dispute falls outside of ERISA, then the parties agree their sole recourse shall be to submit the matter to binding arbitration conducted in Grand Rapids, Michigan, according to the Rules and Procedures of the Dispute Resolution Service of the NHLA, using a single arbitrator. Arbitration fees shall be borne equally by the parties.

See First Amended Complaint, Exhibits A & B (provider agreements, § 8.14). Thus, by their terms, the provider agreements dictate that the parties must arbitrate all of their disagreements except those that involve "a provision or circumstance covered by ERISA[.]" See id.

Each claim advanced by the defendants in their "Demand for Arbitration" does not involve a provision or circumstance covered by the Employee Retirement Income Security Act ("ERISA"), *29 USC 1001, et seq.* Each claim merely rests upon a garden-variety state-law theory. Moreover, the defendants' "Demand for Arbitration" disclaims any reliance upon ERISA. See First Amended Complaint, Exhibit C (Demand for Arbitration, ¶ 39). Nevertheless, Plaintiff ASR contends that all of the defendants' claims in the "Demand for Arbitration" are **[*8]** preempted by ERISA. To be sure, the United States Supreme Court has consistently ruled that "common law causes of action" that "'relate to' an employee benefit plan . . . fall under ERISA' s express pre-emption clause" set forth in 29 USC 514(a). *Pilot Life Ins Co v Dedeaux, 481 U.S. 41, 47 (1987)*. In addition, ERISA includes a provision at *29 USC 502(a)(1)(B)* that not only authorizes "a suit by a beneficiary to recover benefits from a covered plan," *Metropolitan Life Ins Co v Taylor, 481 U.S. 58, 62-63 (1987)*, but also "provides an exclusive federal cause of action for resolution of such disputes." *Id. at 63*. Accordingly, complete preemption under ERISA can, in appropriate circumstances, convert well-pleaded state-law claims into federal ERISA claims despite the intention of the party asserting the claims to avoid invoking ERISA. See *Aetna Health Inc v Davila, 542 U.S. 200, 207-208 (2004)*.

But the decisions cited by Plaintiff ASR in support of its ERISA-preemption theory all share one common element: they were all filed by ERISA plan participants or beneficiaries in an attempt to obtain benefits under the ERISA plans. Accordingly, each of those claims manifestly related to an employee-benefit plan, as contemplated by the ERISA preemption provision in 29 USC 514(a). Here, in contrast, the defendants — providers of dialysis services — have asserted common-law claims against a third-party administrator **[*9]** that arise from their provider agreements, as opposed to ERISA plans. Indeed, ASR has expressly disclaimed "any assurance or guarantee of payment by the ERISA Plans[,]" choosing instead to modestly describe its obligation as "'[a]rranging for payment' by the ERISA Plans[.]" See Plaintiff ASR's Response to Defendants' Motion to Dismiss at 24. Therefore, by its own admission, ASR is embroiled in a dispute with the defendants over its obligations — both contractual and otherwise.[2] This bilateral battle depends upon the language of the parties' provider agreements and common-law fraud principles, rather than any ERISA plan. As a result, ASR cannot convince the Court that the defendants' claims under state law relate to an employee-benefit plan in a manner that triggers ERISA preemption of those claims.[3]

---

[2] Plaintiff ASR asserts that all of the fraud claims fall prey to the economic-loss doctrine, but the arbitrator must consider that argument in the first instance. See *Nitro-Lift Technologies, LLC v Howard, 133 S Ct 500, 501 (2012)*; *Altobelli, 499 Mich at 296*. Thus, although ASR's reliance upon *Rinaldo's Construction Corp v Michigan Bell Telephone Co, 454 Mich 65 (1997)*, may well be persuasive on that point, the arbitrator must have the first opportunity to consider that issue.

[3] Plaintiff ASR has spent a substantial amount of time and effort discussing the implications of the assignment of claims to the defendants, but the Court regards that discussion as a red herring in light of the defendants' presentation of the claims in the "Demand for Arbitration." No defendant has asserted standing to seek relief based upon the assignment of any claim by a plan participant or beneficiary. Thus, each defendant "is neither a participant [in] nor a beneficiary" of an ERISA plan, so each defendant "does not have standing under ERISA to sue in its own right." Pascack Valley Hospital, Inc v Local 464A *UFCW Welfare Reimbursement Plan, 388 F3d 393, 400 (3d Cir 2004)*. As a result, the defendants' claims asserted in their "Demand for Arbitration" cannot be preempted by ERISA. See *id. at 401*. Beyond that, as noted by the United States Court of Appeals for the Ninth Circuit in a case similar to the instant dispute, "'the Providers' claims, which arise from the terms of their provider agreements and could not be asserted by their patient-assignors, are not

B. Each Defendant Is Entitled to Demand Arbitration.

Plaintiff ASR contends that several of the defendants that filed the "Demand for Arbitration" lack standing to pursue arbitration because they cannot rely upon either of the "provider agreements" signed by ASR. To be clear, seven separate corporate entities jointly filed the arbitration demand. **[*10]** ASR concedes that Defendant DVA Renal Healthcare, Inc. ("DVA") has the right to rely upon the arbitration clause in the so-called GAMBRO provider agreement and Defendant Physicians Dialysis Acquisitions, Inc. ("PDA") has the right to depend upon the arbitration clause in the so-called PDM provider agreement.[4] But ASR insists that the other five corporate entities that filed the demand for arbitration cannot assert rights under either provider agreement because they are not signatories. See *AFSCME Council 25 v Wayne County, 292 Mich App 68, 80 (2011)*. As our Court of Appeals has ruled: "Arbitration, which is a matter of contract, cannot be imposed on a party that was not legally or factually a party to the agreement wherein an arbitration provision is contained." Id. Similarly, then, an arbitration clause in a contract ordinarily cannot be invoked by "a party that was not legally or factually a party to the agreement wherein an arbitration provision is contained."[5] See id. Thus, the Court must decide whether the five defendants at issue can invoke the arbitration clause in either of the provider agreements.

In debating whether the defendants at issue can invoke the arbitration clause in the provider agreements, Plaintiff ASR has asked the **[*11]** Court to take a strict approach, whereas the defendants have urged the Court to employ a practical approach. For several reasons, the Court finds that a practical approach is appropriate. First, commercial and contractual relationships exist among the defendants. Second, the preamble of the GAMBRO provider agreement makes clear that the provider agreement is between ASR and "GAMBRO Healthcare, Inc. and its related affiliates and subsidiaries[.]" See First Amended Complaint, Exhibit A (GAMBRO provider agreement). Third, our Supreme Court recently applied agency principles to determine that the arbitration clause in a law firm's operating agreement applied to individual members of the firm as well, thereby rejecting the plaintiff's effort to avoid arbitration by naming as defendants those non-signatories to the operating agreement. See *Altobelli, 499 Mich at 296-299*. In reaching that result, our Supreme Court stated that the "burden is on the party seeking to avoid the agreement, not the party seeking to enforce the agreement." See *id. at 295*. Consequently, for all of those reasons, the Court must place the burden on ASR to make a persuasive showing that the five defendants at issue have no right to invoke the arbitration **[*12]** clause in the provider agreements. Absent a compelling presentation by ASR, the Court must defer to the arbitration process.

All five defendants at issue assert a right to arbitration based on their relationships with the signatories to the provider agreements, Defendants DVA and PDA. Specifically, Defendant DaVita Health Care Partners, Inc. ("DaVita") is a Fortune 500 company that sits atop a sprawling corporate structure of subsidiaries and affiliates organized by operating divisions. See Declaration of Joseph Brunink in Support of Defendants' Motion to Dismiss and Compel Arbitration, ¶ 4. Its Kidney Care division provides outpatient dialysis. Id. "Through a series of Management Services Agreements, DaVita provides management and administrative services to its operating affiliates and subsidiaries who own the actual dialysis facilities themselves." Id. DaVita's affiliates and subsidiaries include not only the two signatories to the provider

claims for benefits under the terms of ERISA plans, and hence do not fall within [29 US C] 502(a)(1)(B).'" *Id. at 403*, quoting *Blue Cross of California v Anesthesia Care Associates Medical Group, Inc, 187 F3d 1045, 1050 (9th Cir 1999)*. Accordingly, ERISA preemption does not convert the defendants' state-law claims into ERISA claims, so the parties' dispute does not involve "a provision or circumstance covered by ERISA," as contemplated by the dispute-resolution clause in section 8.14 of the provider agreements. See First Amended Complaint, Exhibits A & B (provider agreements, § 8.14).

[4] The so-called GAMBRO provider agreement is attached to the first amended complaint as Exhibit A, and the so-called PDM provider agreement is attached to that pleading as Exhibit B.

[5] That principle, however, is not categorical. The United States Supreme Court has not only rejected the notion "that those who are not parties to a written arbitration agreement are categorically ineligible for relief' under the FAA's provisions, see *Arthur Andersen LLP v Carlisle, 556 U.S. 624, 629 (2009)*, but also stated that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel[.]'" *Id. at 631*. As a result, state law defines the ability of the five defendants at issue here, who are all non-signatories, to rely upon a provider agreement in demanding arbitration of their disputes with Plaintiff ASR. Id. at 630-631.

agreements, *i.e.* , DVA and PDA, but also the four other defendants, Total Renal Care, Inc. ("TRC"), Blanco Dialysis, LLC ("Blanco"), Ionia Dialysis, LLC ("Ionia"), and Portola Dialysis, LLC ("Portola"). In other words, DaVita is the parent company **[*13]** of each of the other six defendants, which provide dialysis to patients in West Michigan. See id., ¶ 9. The Court must decide whether those corporate relationships are sufficient to enable each defendant to invoke the dispute-resolution clause in the provider agreements.

The so-called GAMBRO provider agreement makes clear in the preamble that that agreement is between Plaintiff ASR "and GAMBRO Healthcare, Inc. and its related affiliates and subsidiaries." See First Amended Complaint, Exhibit A. Thus, by its terms, the GAMBRO provider agreement extends the reach of that contract well beyond the "provider" itself, L *e.*, GAMBRO Healthcare, Inc., to include "its related affiliates and subsidiaries."[6] ASR insists that not all affiliates and subsidiaries of the "Provider" fall within the GAMBRO provider agreement because the preamble identifies the contracting party precisely as "GAMBRO Healthcare, Inc. and its related affiliates and subsidiaries ("Provider"), with business offices located at 1919 Charlotte Avenue, Nashville, TN, 37203 and their facilities as listed in Exhibit B" to the GAMBRO provider agreement. Although no defendant in the instant case is listed in Exhibit B to the GAMBRO **[*14]** provider agreement, ASR's argument founders upon the conjunctive, rather than disjunctive, phrasing of the contracting parties as GAMBRO *and* "its related affiliates and subsidiaries" *and* "their facilities as listed in Exhibit B." Consequently, the Court must reject ASR's crabbed definition of the entities that come within the GAMBRO provider agreement as only those companies listed in Exhibit B to the provider agreement. Instead, the Court shall consider whether the five defendants at issue are "affiliates" or "subsidiaries" of the "provider" identified in the GAMBRO provider agreement.

Both sides acknowledge that, in 2005, GAMBRO adopted the new name of Defendant DVA, so the Court must decide whether the five defendants at issue are "affiliates" or "subsidiaries" of that entity. The record leaves no doubt that Defendant DaVita is DVA's parent, and all of the other four defendants at issue are siblings of DVA because those four companies all provide dialysis services in West Michigan in the same manner as DVA under the oversight of parent DaVita. Our Court of Appeals has explained, albeit in an unpublished decision, that an "affiliate" is 'a corporation that is related to another **[*15]** corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.'" Mercantile Bank of Michigan v CLMIA, LLC, No 316777, slip op at 16 (Mich App Feb 12, 2015) (unpublished decision), quoting BLACK'S LAW DICTIONARY (7th ed). According to that definition, each of the five defendants at issue constitutes an "affiliate" of DVA. Moreover, decisions from our Court of Appeals establish that subjecting affiliates to dispute-resolution clauses in commercial contracts is commonplace. See, e.g., Coastal Communications of Michigan, LLC v AT&T Services, Inc, No 324241, slip op at 4-5 (Mich App March 29, 2016) (unpublished decision). Thus, the Court concludes that Plaintiff ASR has failed to carry its burden of demonstrating that the five defendants at issue have no right to rely upon the dispute-resolution language in the GAMBRO provider agreement. See *Altobelli, 499 Mich at 295*.

C. The Court Cannot Dictate Procedures in the Arbitration.

Plaintiff ASR has adopted a blunderbuss approach in challenging the procedures undertaken thus far in the arbitration proceeding. That is, ASR has contested the arbitral forum, the procedure for selecting the arbitrator, and the manner in which the defendants served ASR with notice of the arbitration proceeding. But precedent restricts **[*16]** the Court's ability to pass upon issues raised by ASR. As Judge (and now Chief Justice) Robert Young has observed, '"[o]nce it is determined . . . that the parties are obligated to submit the subject matter of the dispute to arbitration, procedural questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.'" See *Amtower, 232 Mich App at 232*, quoting *John Wiley & Sons, Inc v Livingston, 376 U.S. 543, 557-558 (1964)*. Therefore, although arbitration must take place in the manner prescribed by the parties' provider agreements, see *Volt Information Sciences, Inc v Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 479 (1989)*, the Court must tread carefully in dealing with

---

[6] The so-called GAMBRO provider agreement also indicates that the reference to GAMBRO itself as the "Provider shall include the entity identified above as the contracting party, and all of the individuals and facilities under contract with or controlled by the entity who participate in or are used in the provision of services or goods normally furnished by the entity to its patients, clients or customers." See First Amended Complaint, Exhibit A (GAMBRO provider agreement, § 1.10). As far as the Court can tell, that separate expansion of the concept of the "provider" has no bearing upon the right of the five defendants at issue to rely upon the GAMBRO provider agreement.

ASR's procedural challenges to the arbitration.

As a threshold matter, Plaintiff ASR contends that the defendants failed to provide notice of the arbitration proceeding to ASR in an appropriate manner. Without question, the effort to provide notice by telephone messages did not comport with due-process standards or Michigan procedures, but both sides now agree that, on December 3, 2015, the defendants furnished formal notice to ASR in a perfectly appropriate manner. See Plaintiff ASR's Response to Defendants' Motion to Dismiss and Compel Arbitration, Exhibit 1 (Affidavit of Todd Stacy). Accordingly, the Court need not get involved in any issue about the adequacy **[*17]** of notice.

Plaintiff ASR implores the Court to wade into an ongoing dispute about the timeliness of the notice of arbitration because the defendants' delay in notifying ASR of the arbitration purportedly led to appointment of an arbitrator without input from ASR. That dispute, however, falls within the authority of the arbitrator to weigh in the first instance. See *Amtower, 232 Mich App at 232*. If the defendants insist on excluding ASR from the process of selecting an arbitrator and they carry the day on that issue, the defendants will have to justify that outcome if they prevail in arbitration and ASR thereafter contests the arbitrator's award. See *MCR 3.602(J)(2)*. But the Court must stay its hand on that issue in deference to the arbitration proceeding at this early stage of the process.

Plaintiff ASR next insists that the arbitration proceeding cannot be conducted by the AHLA because section 8.14 of the provider agreements prescribes "arbitration conducted in Grand Rapids, Michigan, according to the Rules and Procedures of the Dispute Resolution Service of the NHLA, using a single arbitrator." See First Amended Complaint, Exhibits A & B. This is truly a tempest in a teapot, however, because the record reveals that "[o]n July 1, **[*18]** 1997, the National Health Lawyers Association (NHLA) and the American Academy of Healthcare Attorneys (AAHA) combined into a single organization named the American Health Lawyers Association (AHLA)." See Declaration of Geoff Drucker in Support of Defendants' Motion to Dismiss and Compel Arbitration, ¶ 3. Thus, the AHLA is the successor to the NHLA. Permitting the AHLA to conduct the arbitration in place of its predecessor, the NHLA, does not contravene the language of the dispute-resolution provision of the parties' provider agreements. Manifestly, the Court ought not block the arbitration proceeding merely because the AHLA, rather than the NHLA, is conducting that proceeding.[7] As a result, the Court shall grant the defendants' motion for summary disposition under *MCR 2.116(C)(7)*, thereby allowing the parties to resolve their disputes in the pending arbitration proceeding.

## III. Conclusion

For all of the reasons set forth in this opinion, the Court must grant summary disposition to the defendants under *MCR 2.116(C)(7)*.[8] The defendants are entitled to demand arbitration of their disputes with Plaintiff ASR pursuant to the dispute-resolution language in the provider agreements attached to ASR's First Amended Complaint **[*19]** as Exhibits A and B. If ASR has concerns about the manner in which the AHLA conducts the arbitration proceeding, those concerns can form the

---

[7] "An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of the suit but also the procedure to be used in resolving the dispute." *Scherk v Alberto-Culver Co, 417 U.S. 506, 519 (1974)*. Consequently, issues arise when "the forum selection clause cannot be enforced" because the specified arbitration forum no longer provides arbitration services. E.g., *Smith v ComputerTraining.com, Inc, 772 F Supp 2d 850, 860-862 (ED Mich 2011)*. In the instant case, however, the AHLA is simply the newer version of the NHLA that similarly provides arbitration services.

[8] In reaching this result, the Court must also deny Plaintiff ASR' s motion for partial summary disposition as to Counts Three and Four of the First Amended Complaint. The parties' briefing of that motion essentially tracks their arguments with respect to the defendants' motion to dismiss and compel arbitration, but ASR's motion does include one argument that the parties did not address in detail in briefing the defendants' motion to dismiss. That is, ASR contends that the FAA contains a provision that requires the defendants to obtain an order from a United States District Court that directs the parties to arbitrate their disputes. Specifically, *9 USC 4* states that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." Federal appellate courts have consistently ruled that that provision is permissive, not mandatory. See, e.g., *Bernstein Seawell & Kove v Bosarge, 813 F2d 726, 733 (5th Cir 1987)*. Thus, nothing in the FAA obligated the defendants to obtain an order from a United States District Court before invoking the dispute-resolution language in the provider agreements to initiate an arbitration proceeding.

basis for a challenge to any arbitration award resulting from that proceeding. See *MCR 3.602(J)*.

IT IS SO ORDERED.

**This is a final order that resolves the last pending claim and closes the case**.

Dated: September 15, 2016

/s/ Christopher P. Yates

HON. CHRISTOPHER P. YATES (P41017)

Kent County Circuit Court Judge

---

**End of Document**

LexisNexis®

# Atkins v. Unknown Henning

United States District Court for the Western District of Michigan, Northern Division

March 13, 2024, Decided; March 13, 2024, Filed

No. 2:22-cv-222

**Reporter**
2024 U.S. Dist. LEXIS 44005 *; 2024 WL 1115377

ALLEN ATKINS, #742687, Plaintiff, -v- UNKNOWN HENNING, et al., Defendants.

**Prior History:** *Atkins v. Unknown Henning, 2024 U.S. Dist. LEXIS 45071 (W.D. Mich., Jan. 2, 2024)*

**Counsel:** **[*1]** Allen Atkins #742687, named as Allen Aikens, plaintiff, Pro se, Carson City, MI.

For Unknown Henning, Property Officer or Property Manager, sued in his individual capacity, Terri Corey-Spiker, Resident Unit Manager and Deputy Warden, sued in her individual capacity, Lisa Bellanger, Sergeant, sued in her individual capacity, defendants: Joseph Ho, MI Dept Attorney General (MDOC), Corrections Division, Lansing, MI.

**Judges:** Honorable Paul L. Maloney, United States District Judge.

**Opinion by:** Paul L. Maloney

## Opinion

**ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION**

Plaintiff Atkins, a prisoner under the control of the Michigan Department of Corrections, alleges Defendants violated his civil rights. Defendants filed a motion for summary judgment asserting the failure to exhaust administrative remedies (ECF No. 31). The Magistrate Judge issued a report recommending the Court deny Defendant's motion (ECF No. 33). Defendants filed objections (ECF No. 35). The Court will adopt in part and reject in part the Report and Recommendation.

After being served with a report and recommendation (R&R) issued by a magistrate judge, a party has fourteen days to file written objections to the proposed findings and recommendations. **[*2]** *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)(2)*. A district court judge reviews de novo the portions of the R&R to which objections have been filed. *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)(3)*. Only those objections that are specific are entitled to a de novo review under the statute. *Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986)* (per curiam).

1. Forfeited Arguments.

Although not labeled as an objection, Defendants assert "[a]s a threshold matter" (PageID.173), that because Plaintiff did not respond to the motion, he forfeited any argument against their motion. The Court overrules the objection. Under both Rule 12(b)(6) and Rule 56, the moving party bears the burden of proof, regardless of whether an adverse party fails to respond. *Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991)*. Therefore, a court cannot grant a motion for summary judgment simply because the adverse party has not filed a response, and the court must examine the motion to determine whether the moving party has met its burden. *Id. at 455*. Here, the Magistrate Judge explains why Defendants' motion does not address the exhaustion arguments asserted in Plaintiff's complaint. The Magistrate Judge concludes that Defendants did not meet their burden.

2. Exhaustion of Remedies.

The Magistrate Judge found that Defendants did not meet their burden to show that Plaintiff's ability to exhaust was not hindered. The Magistrate Judge notes **[*3]** that "Atkins alleges that RUM Corey-Spiker interfered with the processing of at least one grievance

and one misconduct appeal, and he alleges that he was repeatedly threatened and retaliated against for filing or threatening to file grievances" (PageID.149).

A. Grievance Process.

Defendants object (Objection 1). Defendants contend that they presented evidence that Plaintiff was able to use the grievance procedure because he was filing Step III grievances during the relevant timeframe. The Court overrules the objection. Plaintiff does not assert that Defendant Corey-Spiker interfered with Plaintiff's ability to file any and all grievances. He alleges that Corey-Spiker interfered only with the grievance and appeal concerning her.

B. Misconduct Hearing.

Defendants object (Objection 2). Defendants contend that, contrary to the allegations in the complaint (see ECF No. 1 PageID.5 ¶ 25), MDOC did address Plaintiff's appeal of the Class II misconduct hearing. Defendants attach copies of the relevant documents (ECF No. 32-4). The Court will uphold this objection. Defendants' evidence establishes that MDOC granted Plaintiff a rehearing which was presided over by a different officer. The officer **[*4]** found Defendant guilty and also found that Plaintiff's statement which were allegedly omitted from the hearing report had no bearing on the finding of guilt (*id.* PageID.132-33). This evidence contradicts Plaintiff's allegations and fulfills Defendants' burden for their motion. Plaintiff has not created a genuine issue of material fact that Defendant Corey-Spiker retaliated by interfering with Plaintiff's appeal.

Accordingly, the Court **ADOPTS IN PART AND REJECTS IN PART** the Report and Recommendation (ECF No. 33). The Court grants in part and denies in part Defendants' motion for summary judgment (ECF No. 31). The Court grants summary judgment only as to Plaintiff's retaliation claim against Defendant Corey-Spiker concerning the misconduct appeal. All other claims remain, including Plaintiff's retaliation claim against Defendant Corey-Spiker concerning the grievance process. **IT IS SO ORDERED**.

Date: March 13, 2024

/s/ Paul L. Maloney

Paul L. Maloney

United States District Judge

---

End of Document

LexisNexis®

# Frisch v. FCA US, LLC

United States District Court for the Eastern District of Michigan, Southern Division

June 25, 2026, Decided; June 25, 2026, Filed

Case No. 24-cv-10546

**Reporter**
2026 U.S. Dist. LEXIS 141394 *; 2026 LX 317490; 2026 WL 1831998

GARY FRISCH, et al., on behalf of himself and all those similarly situated, Plaintiffs, v. FCA US, LLC, Defendant.

**Prior History:** *Frisch v. FCA US, LLC, 2025 U.S. Dist. LEXIS 99114, 2025 WL 1484398 (Mar. 27, 2025)*

**Counsel: [*1]** For Gary Frisch, behalf of themselves and all those similarly situated, Tammy Otto, behalf of themselves and all those similarly situated, Brian Kreb, behalf of themselves and all those similarly situated, Harry Vasquez, behalf of themselves and all those similarly situated, Christopher Wadleigh, behalf of themselves and all those similarly situated, David Perrera, behalf of themselves and all those similarly situated, Dennis Berns, behalf of themselves and all those similarly situated, Jonathan Liscano, behalf of themselves and all those similarly situated, Robert Stueve, behalf of themselves and all those similarly situated, Plaintiffs: Dennis A. Lienhardt, The Miller Law Firm, P.C., Rochester, MI; John Randolph Davis, Slack Davis Sanger LLP, Austin, TX; Nicholas W. Lee, Lieff Cabraser Heimann & Bernstein, LLP, CA, San Francisco, CA; Phong-Chau Nguyen, Lieff Cabraser Heimann & Bernstein, San Francisco, CA; Robert K. Shelquist, Cuneo Gilbert & LaDuca, LLP, St. Louis Park, MN; Roger N. Heller, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; E. Powell Miller, The Miller Law Firm, Rochester, MI.

For Eve Park, Erin May, Richard Perkal, Nataliia Liakhova, Stefani Carter, Kanon **[*2]** Spackman, Christopher Pumill, Donald Moore, Daniel Kongos, Thomas Teger, Kim Aiello, Jonathan McCrary, Daken Shane Fee, Tracy Lectka, Kevin Freedman, Ashley Landes, Heidi Walker, Sheryl Reid, Kerry Johnston, Plaintiffs: Dennis A. Lienhardt, The Miller Law Firm, P.C., Rochester, MI; E. Powell Miller, The Miller Law Firm, Rochester, MI.

For FCA US, LLC, Defendant: Fred J. Fresard, Ian Kennedy Edwards, Klein Thomas Lee & Fresard, Troy, MI; Scott H Morgan, Klein Thomas Lee & Fresard, Saint Louis, MO; Stephen A. D'Aunoy, Klein Thomas Lee & Fresard, St. Louis, MO.

**Judges:** HON. BRANDY R. MCMILLION, United States District Judge.

**Opinion by:** BRANDY R. MCMILLION

## Opinion

**OPINION AND ORDER GRANTING IN PART/DENYING IN PART DEFENDANT'S SECOND RENEWED MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS (ECF NO. 64) AND DENYING DEFENDANT'S RENEWED MOTION TO COMPEL AND MOTION TO STAY THE PROCEEDINGS (ECF Nos. 57, 58) AS MOOT**

Plaintiffs bring this class action suit against Defendant FCA US LLC ("FCA") for the risks and damages associated with the battery defects in their Jeep vehicles. *See generally* ECF No. 61.[1] Before the Court is FCA's Second Renewed Motion to Compel Arbitration

[1] On June 5, 2025, this Court issued its Opinion and Order Denying Defendant's Motion to Compel Arbitration and Denying Without Prejudice Defendant's Motion To Dismiss (ECF No. 44). Pursuant to that Order, the parties conducted "a period of limited targeted discovery on remaining contract formation questions." ECF No. 44, at PageID.6130-6131 (internal quotations and citations omitted). Plaintiffs then filed their Third Amended Class Action Complaint ("TAC") on November 14, 2025. ECF No. 61. As such, the TAC became the operative pleading for all matters arising thereafter, including the instant Motion.

and Stay the Proceedings Pending Arbitration (the "Second **[*3]** Renewed Motion").[2] *See generally* ECF No. 64. The Court held a hearing on all pending motions on June 23, 2026. *See* ECF No. 74. Having reviewed the parties' briefing and considered the arguments made at the hearing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Compel and Stay the Proceedings (ECF No. 64). Accordingly, the Court **DENIES AS MOOT** the Defendant's First Renewed Motion to Compel and Motion to Stay the Proceedings (ECF Nos. 57, 58).

**I.**

Plaintiffs bring this class action suit against Defendant FCA US LLC ("FCA") for the risks and damages associated with the battery defects in their model years 2020-2024 Jeep Wrangler 4xe and model years 2022-2024 Jeep Grand Cherokee 4xe plug-in hybrid electric vehicles (the "Class Vehicles"). *See generally* ECF No. 61. Plaintiffs allege that the battery defect can cause fires and explosions in the Class Vehicles and has deprived them of the benefit of their vehicles' hybrid functionality and full purchase value. *Id.* at PageID.7168-7169 ("The[] Class Vehicles . . . bear the stigma of an unexploded bomb, causing their resale values to plummet.").

Prior to discovering the alleged defect, each Plaintiff purchased or leased a Class **[*4]** Vehicle from an FCA-authorized dealership. *See* ECF No. 61, PageID.6968. As relevant here, the record reflects two categories of agreements that FCA contends require arbitration. First, the Class Vehicles were accompanied by written warranty booklets (the "Warranty Booklets") provided by FCA. *See* ECF Nos. 64-43-64-47. The Warranty Booklets contain a section entitled "Voluntary Binding Arbitration Provision," which purports to govern disputes between consumers and FCA and provides a thirty-day period in which consumers may opt out of arbitration. *Id.* Second, several Plaintiffs executed purchase or lease agreements with their respective dealerships (the "Dealership Agreements") containing arbitration provisions. ECF Nos. 64-2-64-26. Several of those agreements also contain language delegating threshold questions of arbitrability to an arbitrator or incorporate the rules of the American Arbitration Association ("AAA").

In its prior Opinion and Order, the Court denied FCA's Motion to Compel Arbitration, finding that FCA had failed to establish, on the record then before the Court, that Plaintiffs assented to the arbitration provision contained in the Warranty Booklets. ECF No. 44, PageID.6116-6125. **[*5]** The Court concluded that Plaintiffs' awareness of the existence of written warranties did not, by itself, establish notice of the arbitration provision contained therein. *Id.* The Court further noted the absence of evidence that Plaintiffs had been informed of the arbitration provision, the right to opt out, or any requirement that affirmative action be taken to reject arbitration. At the same time, the Court recognized that additional evidence might exist bearing on contract formation and assent. Accordingly, the Court denied the motion without prejudice and ordered limited targeted discovery regarding whether Plaintiffs had otherwise agreed to arbitrate disputes with FCA, including through dealership-related agreements, arbitration acknowledgment forms, or evidence that Plaintiffs had exercised benefits under the written warranties.

At the close of the limited discovery period, FCA filed its Renewed Motion to Compel Arbitration (ECF No. 57), which became moot upon the plaintiffs' filing of their TAC. FCA then filed its Second Renewed Motion to Compel Arbitration and Stay the Proceedings as to certain Plaintiffs (ECF No. 64), which is now before the Court. As to certain Plaintiffs, **[*6]** FCA relies upon the arbitration provision contained in the warranties. During discovery, FCA obtained records indicating that several Plaintiffs brought their vehicles to their dealerships for warranty-covered repairs and servicing after leasing or purchasing them. *See* ECF Nos. 64-27-64-42. The record includes both recall-related service visits and non-recall warranty repairs for various Plaintiffs. *Id.* FCA also produced information regarding Plaintiffs' use of other warranty-related benefits after the expiration of the Warranty Booklets' thirty-day opt-out period. *Id.*

FCA additionally relies upon dealership purchase and lease agreements executed by various Plaintiffs. According to FCA, those agreements contain arbitration provisions with delegation clauses that either expressly delegate gateway questions of arbitrability to an arbitrator or incorporate AAA rules that grant arbitrators authority to decide issues concerning the existence, scope, validity, and enforceability of arbitration

[2] There are two additional pending motions that the Court also resolves in the instant order, the Defendant's first Renewed Motion to Compel Plaintiffs to Arbitration (ECF No. 57) ("First Renewed Motion"), and the Defendant's Motion to Stay the Proceedings Pending Resolution of the First Renewed Motion (ECF No. 58) ("Motion to Stay").

agreements. ECF No. 64, PageID.8807. The agreements were executed in multiple states and contain varying language governing arbitration, delegation, and the parties' entitlement to invoke those provisions **[*7]** under the agreement.

In addition to addressing the remaining contractual disputes regarding the Warranty Booklets and raising new issues related to the Plaintiffs' respective dealership agreements, the parties addressed Plaintiff's Notice of Supplemental Authority, which the Court will also incorporate into its analysis. *See generally* ECF Nos. 64, 67, 68, 70, 72. For the reasons set forth below, having reviewed the parties' briefs and arguments at the hearing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Second Renewed Motion (ECF No. 64), and **DENIES** the First Renewed Motion and Motion to Stay (ECF Nos. 57, 58) as **MOOT** in light of the TAC and Second Renewed Motion.

**II.**

The *Federal Arbitration Act ("FAA" or "the Act")* governs arbitration agreements. *9 U.S.C. § 1 et seq.* The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable," except when there are legal or equitable grounds "for the revocation of any contract . . . ." *9 U.S.C. § 2*. The Act thus "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according **[*8]** to their terms." *Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 67-68, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010)* (internal citations omitted).

Parties can also "delegate threshold arbitrability questions"—such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy—to the arbiter, so long as "the parties' agreement does so by 'clear and unmistakable' evidence." *In re StockX Customer Data Sec. Breach Litig., 19 F.4th 873, 878 (6th Cir. 2021)* (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69, 139 S. Ct. 524, 202 L. Ed. 2d 480 (2019)*). Notwithstanding the presence of a delegation clause, "[a] challenge to arbitration agreement formation is always in the jurisdiction of the courts." *Becker v. Delek US Energy, Inc., 39 F.4th 351, 355 (6th Cir. 2022)* (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299-300, 130 S. Ct. 2847, 177 L. Ed. 2d 567, (2010)*).

Under the FAA, *9 U.S.C. § 4*, the Court must "hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue . . . make an order directing the parties to proceed to arbitration." *Id.* However, if the "making of the agreement" is in issue, the Court must proceed to a trial thereof unless the moving party presents evidence from which a reasonable jury could find that a contract exists, and the non-moving party fails to present any evidence of a genuine dispute of material fact as to the validity of the arbitration agreement. *See Memmer v. United Wholesale Mortg., No. 23-cv-11261, 2023 U.S. Dist. LEXIS 224761, 2023 WL 8818298, at *3 (E.D. Mich. Dec. 18, 2023)* (citing *Great Earth Cos., Inc. v. Simons, 288 F.3d 878, 889 (6th Cir. 2002)*); *In re StockX, 19 F.4th at 881* ("To determine whether the existence of an agreement is 'in issue,' this court applies the standard for summary judgment.").

**[*9]** The Court applies "ordinary state-law principles that govern the formation of contracts." *In re StockX, 19 F.4th at 881* (*quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*). Under Michigan law, "[t]he party seeking to enforce a contract has the burden of showing that it exists." *Hergenreder v. Bickford Senior Living Grp., LLC, 656 F.3d 411, 417 (6th Cir. 2011)* (citing *Kamalnath v. Mercy Mem'l Hosp. Corp., 194 Mich. App. 543, 487 N.W.2d 499, 504 (Mich. Ct. App. 1992)*). Meaning, as the moving party, FCA must first "carry its burden to produce evidence that would allow a reasonable jury to find that a contract exists." *In re StockX, 19 F.4th at 881*.

**III.**

FCA argues that the Court must compel Plaintiffs Aiello, Carter, Frisch, Kongos, Kreb, Landes, Liscano, May, McCrary, Moore, Otto, Park, Perrera, Spackman,[3] Teger, and Vasquez (the "Warranty Plaintiffs") to arbitrate pursuant to the arbitration agreement in their warranties based on their use of warranty benefits. ECF No. 64, PageID.8818. According to FCA, the warranty contract was formed upon these Plaintiffs' purchase or lease of their vehicles, and these Plaintiffs reaffirmed their acceptance of the warranty by bringing their

[3] Shortly after the parties finished briefing the Second Renewed Motion, Plaintiff Kannon Spackman voluntarily dismissed his claims against FCA, and has since been terminated from the suit. *See* ECF No. 69.

vehicles in for warranty repairs. *Id.* at PageID.8819-8822. Lastly, FCA argues that the Warranty Plaintiffs are equitably estopped from refusing to arbitrate because they accepted the benefits of the contract. *Id.* at PageID.8822.

In response, Plaintiffs contend that FCA still has not shown that the Warranty Plaintiffs entered into an agreement to arbitrate based on the Warranty Booklets for various reasons. First, Plaintiffs assert that the Court must consider whether the parties formed an agreement to arbitrate because the arbitration agreement within the **[*10]** Warranty Booklets did not contain a delegation clause. ECF No. 67, PageID.9449 (citing ECF No. 44, PageID.6114 (citing *Becker v. Delek US Energy, Inc., 39 F.4th 351, 355 (6th Cir. 2022)*). Second, Plaintiffs argue that FCA failed to establish that the Warranty Plaintiffs had adequate notice of the arbitration provision in the Warranty Booklet. *Id.* at PageID.9450. Third, that the Warranty Plaintiffs' receipt of services under their Warranty does not bind them to the terms of the Warranty Booklet's arbitration clause. *Id.* at PageID. 9453. And lastly, that FCA's equitable estoppel arguments fail as a matter of law, none of the Plaintiffs' claims are premised on enforcing their warranties. *Id.* at PageID.9456.

Despite Plaintiff's attempts to revive their dispute to formation, the Court now agrees with FCA. The record supports a finding that FCA satisfied its initial burden to provide sufficient evidence for a reasonable jury to find that a contract exists, and that the Plaintiffs failed to show that they lacked adequate notice of the arbitration clause or that they did not assent to its terms through their conduct. The Court will elaborate on its reasoning below.

### A. Plaintiffs Who Availed Themselves of Warranty Benefits Must Arbitrate[4]

The Court's original **[*11]** analysis of this issue remains applicable insofar as Plaintiffs' knowledge of the warranty, without more, did not automatically establish notice of the arbitration agreement or assent to its terms. ECF No. 44, PageID.6116-6125. As the Court previously explained, knowledge that a written warranty exists is not the same as knowledge that the warranty contains an agreement to arbitrate disputes with FCA. *Id.*; *see also Hergenreder v. Bickford Senior Living Grp., LLC, 656 F.3d 411, 418 (6th Cir. 2011)* ("it is incorrect to conflate" general knowledge of a document with knowledge of the arbitration agreement contained therein).

The Court nevertheless permitted limited discovery regarding the extent to which Plaintiffs exercised their warranties because the record at the time contained no evidence that Plaintiffs had actually availed themselves of the benefits provided under the Warranty Booklets. ECF No. 44, PageID.6127-6128. The Court expressly noted that the outcome might be different if discovery revealed that certain Plaintiffs had invoked the warranties they now seek to disclaim. *Id.* In particular, the Court observed that evidence that Plaintiffs exercised the warranties could support a finding that they manifested assent to the contractual framework as a whole. *Id.* ***[*12]***

Discovery ultimately revealed that this is precisely what occurred for several Plaintiffs. FCA has now produced evidence demonstrating that the Warranty Plaintiffs sought and received warranty-covered repairs and services after acquiring their vehicles. ECF Nos. 64-27-64-42. Unlike the record before the Court at the time of the original motion, the present record establishes that these Plaintiffs affirmatively invoked the benefits provided under the Warranty Booklets and accepted free repairs pursuant to their terms.

Michigan courts have long recognized that a party may manifest assent to contractual terms through conduct. *See Guelff v. Mercy Health Servs., No. 200040, 1999 Mich. App. LEXIS 1071, 1999 WL 33444156, at *2 (Mich. Ct. App. May 25, 1999)* (finding assent where the plaintiff "availed herself of many of the benefit provisions contained" in the agreement). Indeed, the Sixth Circuit specifically distinguished *Guelff* in *Hergenreder* because there was no evidence that the plaintiff there had "availed herself of the benefits contained" in the document housing the arbitration provision. *Hergenreder, 656 F.3d at 420*. Here, by contrast, the record now contains evidence that certain Plaintiffs did exactly that.

The Court is likewise persuaded by the reasoning of those courts holding that a party may not selectively invoke favorable provisions **[*13]** of a contract while repudiating unfavorable ones. *See Grundy v. FCA US LLC, No. 20-11231, 2024 U.S. Dist. LEXIS 75904, 2024*

[4] For any plaintiff against whom FCA asserts both the warranty-booklet and dealership-agreement theories to compel arbitration, the Court declines to reach the alternative theory where one independently establishes a basis to compel arbitration.

WL 1699500, at *4 (E.D. Mich. Feb. 29, 2024) ("When customers invoke and seek to enforce a limited warranty, as plaintiffs do here, they cannot also claim they are not bound by the terms of that warranty."); *Mathews v. REV Recreation Grp., Inc., 931 F.3d 619, 623 (7th Cir. 2019)* ("[Plaintiffs] cannot have it both ways: relying on the contract when it works to their advantage to get repairs done and then alleging that it is unconscionable when it doesn't."). As FCA notes, "requiring a more stringent set of rules for notice of the arbitration term than for notice of any other contractual term in the warranty would violate the Federal Arbitration Act because 'defenses that apply only to arbitration' are impermissible." *See* ECF No. 68, PageID.9571 (citing *AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339-40, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011)*). Here, too, the Court will not ratify Plaintiffs' attempts to use their warranties as both a sword and a shield.[5]

*i. The Warranty Plaintiffs Waived their Right to Continue Disputing Notice*

FCA argues that Plaintiffs' use of warranty-covered services provides further evidence that they assented to the Warranty Booklets and the arbitration provision contained therein. ECF No. 64, PageID.8820. Plaintiffs respond that they never received adequate notice of the arbitration provision prior to the close of the 30-day opt-out **[*14]** window and therefore cannot be deemed to have assented to arbitration. ECF No. 67, PageID.9449-9453. The Court agrees that, absent more, the notice deficiencies identified in its prior opinion would remain fatal to FCA's formation theory. Today's holding should not be construed otherwise. However, the Court finds that those Plaintiffs who subsequently invoked warranty benefits are differently situated.

Plaintiffs emphasize that many of their initial service visits involved safety recalls. ECF No. 67, PageID.9454. The Court would be reluctant to conclude that a consumer automatically assents to arbitration merely by presenting a vehicle for recall-related repairs. The record here, however, reflects more than recall compliance alone. The Warranty Plaintiffs each sought and received warranty-covered repairs and/or rental cars for vehicle issues and maintenance unrelated to recalls. *See* ECF No. 64, PageID.8820-8822; ECF No. 64-27-64-42. By accepting those benefits, the Warranty Plaintiffs objectively manifested assent to the contractual framework governing the warranties under which those services were provided. *See Kloian v. 'Domino's Pizza LLC, 273 Mich. App. 449, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006)* (acceptance occurs when a party undertakes an unequivocal act demonstrating **[*15]** an intent to be bound). Although these repairs occurred after expiration of the 30-day opt-out period, the Warranty Plaintiffs nonetheless continued to invoke the benefits of the Warranty Booklets throughout the life of the agreement. The Court therefore cannot conclude that the Warranty Plaintiffs may rely upon the Warranty Booklets when doing so secures free services, while simultaneously disavowing those same agreements when arbitration is sought.

Accordingly, the Court finds that those Plaintiffs who affirmatively sought and received non-recall warranty benefits waived their ability to continue challenging the arbitration provision based solely upon the notice deficiencies identified in the Court's prior opinion. For these Plaintiffs, the evidence developed during limited discovery establishes assent through conduct sufficient to compel arbitration under the Warranty Booklets based on the governing standard.

*ii. FCA Cannot Compel Arbitration Based on the Doctrine of Equitable Estoppel as a Matter of Law*

The Court reaches a different conclusion with respect to FCA's equitable estoppel theory. Although considerations underlying FCA's theory are implicated by the Court's analysis regarding **[*16]** notice, assent, and Plaintiffs' acceptance of warranty benefits, the equitable estoppel doctrine is not the proper vehicle for compelling arbitration in this case. Under the doctrine of equitable estoppel, a litigant may, in some circumstances, compel arbitration where the opposing party seeks to enforce rights from the same agreement containing the arbitration provision. *See AtriCure, Inc. v. Meng, 12 F.4th 516, 527 (6th Cir. 2021)* (explaining that

[5] At oral argument, Plaintiffs suggested that the thirty-day opt-out provision alters the Court's analysis because none of the relevant Plaintiffs invoked their Warranties within thirty days of purchasing their vehicles. According to Plaintiffs, because they did not use their Warranties until after the opt-out period expired, they only became aware of the arbitration provision after losing the opportunity to opt out and therefore could not have meaningfully assented to its terms. The Court is unpersuaded. Plaintiffs had an independent responsibility to review the terms of their Warranty Booklets before electing to invoke them. Having affirmatively sought and accepted benefits under those Warranties, Plaintiffs cannot now disclaim assent to provisions they failed to review simply because those provisions later proved unfavorable.

equitable estoppel "prevents a party from picking and choosing the contract terms that it alleges govern its relationship with the other litigant."). However, Plaintiffs here do not seek to enforce the substantive terms of the express warranties themselves. Rather, Plaintiffs assert claims for breach of implied warranty and related statutory causes of action. ECF No. 67, PageID.9457. As such, FCA's equitable-estoppel theory does not provide an independent basis for compelling arbitration.

In any event, the Court need not say more to resolve the parties' equitable estoppel arguments on their merits. The 'Court's decision to compel arbitration as to the Warranty Plaintiffs rests upon the factual record developed during limited discovery. The record presently demonstrates that the Warranty Plaintiffs **[*17]** affirmatively invoked and accepted benefits under their warranties, such that a reasonable jury could find that they assented to the contractual framework as a whole by their conduct, and therefore waived any grounds to continue challenging the arbitration provision solely on the basis of earlier notice deficiencies. The Court therefore compels the Warranty Plaintiffs (Carter, Frisch, Kongos, Kreb, Landes, Liscano, May, McCrary, Moore, Otto, Park, Perrera, Teger, and Vasquez) to arbitrate their Claims against FCA.

### B. Plaintiffs Who Signed Dealership Agreements Containing Delegation Clauses Do Not Have to Arbitrate

FCA separately argues that Plaintiffs Berns, Freedman, Johnston, Liakhova, Reid, Stueve, Wadleigh, and Walker (the "Dealership Agreement Plaintiffs") must arbitrate their claims pursuant to arbitration provisions contained in agreements they executed with their respective dealerships. According to FCA, those agreements contain delegation clauses that require an arbitrator, not this Court, to determine threshold questions of arbitrability. FCA further contends that it may enforce those provisions either under the plain language of the agreements or as an intended third-party **[*18]** beneficiary. ECF No. 64, PageID.8816. Plaintiffs respond that the Court must decide arbitrability because FCA was not a party to the agreements containing the delegation clauses. ECF No. 67, PageID.9458. Plaintiffs further argue that the dealership agreements contain no clear and unmistakable evidence that they agreed to arbitrate threshold issues of arbitrability with FCA and that FCA cannot satisfy the requirements for third-party beneficiary status under the applicable state laws governing the various agreements. *Id.* at PageID.9463-9478.

The Court agrees with Plaintiffs. With the exception of Plaintiff Daken Fee, whose Retail Buyer Order expressly requires arbitration of disputes with FCA, the dealership agreements do not contain clear and unmistakable evidence that Plaintiffs agreed to delegate threshold questions of arbitrability to an arbitrator in disputes involving FCA.[6] The Court, therefore, retains authority to determine arbitrability and must also evaluate whether FCA may enforce the agreements as a non-signatory under the applicable state law. The record reveals that FCA failed to establish that it was an intended third-party beneficiary under any of the remaining dealership **[*19]** agreements. Accordingly, arbitration will not be compelled as to Berns, Freedman, Johnston, Liakhova, Reid, Stueve, Wadleigh, or Walker.

#### *i. There is No Clear and Unmistakable Evidence that the Dealership Agreement Plaintiffs Consented to Arbitrate with FCA*

FCA argues that the Court lacks authority to decide arbitrability as to the Dealership Agreement Plaintiffs because the arbitration provisions contained in their respective dealership agreements either expressly delegate threshold questions of arbitrability to an arbitrator or incorporate the rules of the American Arbitration Association ("AAA"), which grant arbitrators authority to determine issues concerning the existence, scope, validity, and enforceability of arbitration agreements. ECF No. 64, PageID.8806-8818. According to FCA, Sixth Circuit precedent requires the Court to refer threshold questions of arbitrability to an arbitrator even where the party seeking enforcement is a non-signatory. *Id.* Plaintiffs respond that the Court must first determine whether they ever agreed to arbitrate the arbitrability issue with FCA, because FCA was not a party to the agreements containing the delegation clauses. ECF No. 67, PageID.9458-9466. **[*20]** The Court agrees with Plaintiffs.

Under the current line of Sixth Circuit precedent, "[w]hether a non-signatory can enforce [an] arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant." *Swiger v. Rosette, 989 F.3d 501, 507 (6th Cir. 2021)*; *see also*

---

[6] Plaintiff Fee voluntarily submitted to arbitration with FCA in light of his signed Buyer Order agreeing to arbitrate with FCA. *See* ECF No. 64-6, PageID.8847; ECF No. 67, PageID.9442.

*Blanton v. Domino's Pizza Franchising, LLC, 962 F.3d 842, 845 n.1 (6th Cir. 2020)*. Likewise, "[w]hether a non-signatory can enforce a delegation clause is . . . a question of enforceability, not existence." *Becker v. Delek US Energy, Inc., 39 F.4th 351, 356 (6th Cir. 2022)*. FCA relies heavily on this authority in arguing that the Court must compel arbitration and permit the arbitrator to decide whether FCA may invoke the Dealership Agreements' delegation provisions.

Plaintiffs contend that the Supreme Court's subsequent decision *in Coinbase, Inc. v. Suski* altered that analysis. *602 U.S. 143, 144 S. Ct. 1186, 218 L. Ed. 2d 615 (2024)*. The Court agrees. In *Coinbase*, the Supreme Court considered whether a user agreement containing an arbitration provision and delegation clause was superseded by a later agreement containing a forum-selection clause requiring litigation in California courts. *Id.* Although the ultimate issue before the Court concerned two allegedly conflicting agreements, the Supreme Court's analysis began with a more fundamental question: whether the parties had agreed to arbitrate the dispute. In answering that question, the Court **[*21]** reiterated that "arbitration is strictly a matter of consent" and instructed that "the first question in any arbitration dispute must be: What have *these parties* agreed to?" *Id. at 148* (emphasis added).

FCA argues that *Swiger, Becker*, and *Blanton* require the Court to refer the question of arbitrability to an arbitrator. The Court disagrees. As an initial matter, *Blanton* expressly noted that the question of whether a non-signatory could enforce a delegation provision was not before the court. *See Blanton, 962 F.3d at 845, n.1*. Likewise, *Swiger* and *Becker* arose in materially different procedural postures. In both cases, the Sixth Circuit emphasized deficiencies in the plaintiffs' challenges to the delegation provisions themselves. *See Swiger, 989 F.3d at 506-07*; *Becker, 39 F.4th at 355-56*. Neither decision addressed the effect of *Coinbase's* subsequent instruction that the threshold inquiry in "any arbitration dispute" is what "*these parties*" agreed to. *Coinbase, 602 U.S. at 148* (emphasis added).

Moreover, unlike the plaintiffs in *Swiger* and *Becker*, Plaintiffs here directly challenge FCA's ability, as a non-signatory, to invoke the delegation provisions in the first instance. Thus, the Court is not confronted with a generalized attack on the arbitration agreements. Rather, it is confronted with a specific challenge to whether **[*22]** any agreement existed between Plaintiffs and FCA regarding the delegation of threshold questions of arbitrability. Under *Coinbase*, that question must be answered by the Court before arbitration may be compelled. During oral arguments, FCA maintained that, with respect to both the Warranty Booklets and the Dealership Agreements, no question of contract formation remains before the Court and that the only issue is enforceability. Although the Court now agrees with FCA's position as it pertains to the Warranty Booklets,[7] the Court reaches a different conclusion with respect to the Dealership Agreements. There, Plaintiffs have squarely placed formation at issue by challenging whether they ever formed an agreement with FCA to arbitrate threshold questions of arbitrability.

During the hearing, FCA also directed the Court to *Frazee v. FCA US LLC*, where the court observed that "questions of formation are for the court. Questions of enforceability, by contrast, are arbitrability questions and thus may (or may not be, depending on the terms of the arbitration agreement) questions for the arbitrator." *Frazee v. FCA US LLC, No. 2:24-cv-3448, 2026 U.S. Dist. LEXIS 53757, 2026 WL 730313, at *7 (S.D. Ohio 2026)*. The Court does not disagree with that general proposition. But FCA's reliance on *Frazee* fails insofar **[*23]** as FCA treats the formation inquiry as though it drops out once FCA asserts that valid contracts exist.

That is not what *Frazee* or *Coinbase* requires. The question is not whether Plaintiffs ultimately prevail on their formation challenges before the Court may consider them. The question is whether Plaintiffs have raised a plausible challenge to the formation of the agreement to arbitrate or delegate. If they have, the Court must resolve that challenge because questions of contract formation are for courts, not arbitrators.

That conclusion is reinforced by *Coinbase*'s discussion of "the so-called severability principle." *Coinbase, 602 U.S. at 150*. Under that principle, "an arbitration provision is severable from the remainder of the contract," and "unless the challenge is to the arbitration [or delegation] clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* (citing *Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006)*). In *Coinbase*, the defendant argued that the Court should isolate the User Agreement's delegation provision and consider only

---

[7] As discussed above, the factual record developed through limited discovery demonstrates that certain Plaintiffs assented to the terms of their Warranties through their conduct by affirmatively invoking and accepting warranty benefits.

arguments specific to that provision. The Supreme Court rejected that framing. Although the severability principle requires a party resisting arbitration to challenge the **[*24]** arbitration or delegation provision itself, "this rule does not require that a party challenge only the arbitration or delegation provision." *Id. at 150-51* (emphasis in original). Rather, "where a challenge applies equally to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Id. at 151*.

That is the point here. Plaintiffs challenge both the relevant agreements and the arbitration/delegation provisions contained within them on formation grounds. As to the Warranty Booklets, Plaintiffs assert that they lacked adequate notice of the arbitration provision and therefore did not meaningfully assent to it. As to the Dealership Agreements, Plaintiffs assert that they never formed an agreement with FCA to arbitrate or delegate threshold questions of arbitrability. Those are formation challenges directed at the precise arbitration and delegation agreements FCA seeks to enforce. The Court must decide them before ordering compliance with those provisions, regardless of whether Plaintiffs ultimately prevail on the merits of those challenges.

FCA attempted to further distinguish *Coinbase* on the grounds that the issue before the Supreme Court was whether a forum-selection **[*25]** clause contained in a later agreement superseded an earlier agreement containing a delegation clause. ECF No. 68, PageID.9565. The Court is unpersuaded. While the factual posture and ultimate issues differ, the Supreme Court's reasoning applies in equal force here. The Supreme Court made clear that before a delegation clause may divest a court of authority to determine arbitrability, the court must first determine whether the parties to that dispute agreed to arbitrate. *Coinbase, 602 U.S. at 148* ("[T]he first principle that underscores *all* of our arbitration decisions' is that '[a]rbitration is strictly a matter of consent. . . .[c]onsequently, the first question in *any* arbitration dispute must be: What have *these* parties agreed to?") (quoting *Lamps Plus, Inc. v. Varela, 587 U.S. 176, 184, 139 S.Ct. 1407, 203 L.Ed.2d 636 (2019)*) (citation modified) (emphasis added). This threshold inquiry necessarily includes whether the parties agreed that a non-signatory, such as FCA, could invoke the delegation provision in the first instance. Beginning with that question, the flaw in FCA's position becomes apparent.

Today, the Court does not suggest that Plaintiffs failed to form valid arbitration agreements altogether; to the contrary, Plaintiffs plainly agreed to arbitrate certain disputes with their **[*26]** respective dealerships. The problem for FCA is narrower but dispositive: Plaintiffs never agreed to arbitrate disputes with FCA. The express language of the Dealership Agreements, therefore, fatally undermines the foundational premise of FCA's delegation argument. Thus, before an arbitrator may decide whether FCA can compel arbitration, the Court must first determine whether Plaintiffs clearly and unmistakably agreed that *FCA* could invoke the delegation provisions at all. The Court finds that they did not.

The majority of the Dealership Agreements identify only the purchaser and dealership as parties to the arbitration agreement. *See, e.g.*, ECF No. 64-4, PageID.8842; ECF No. 64-7, PageID.8849; ECF No. 64-15, PageID.8892. Others authorize arbitration at the purchaser's or dealership's election while remaining silent regarding FCA. *See, e.g.*, ECF No. 64-14, PageID.8888; ECF No. 64-21, PageID.8929. Several incorporate AAA rules, but doing so merely demonstrates an agreement to delegate arbitrability disputes between the parties to the agreement. *See, e.g.*, ECF No. 64-21, PageID.8929. It does not, standing alone, constitute clear and unmistakable evidence that Plaintiffs agreed to arbitrate **[*27]** arbitrability with a "theoretically limitless universe" of future non-signatories who might later seek to invoke the provision. *Olson v. FCA US LLC, No. 24-6527, 2026 U.S. App. LEXIS 14640, 2026 WL 1426411 at *6 (9th Cir. May 21, 2026)*.

The Court finds persuasive the Ninth Circuit's recent decision in *Olson*, which rejected materially similar arguments advanced by FCA. There, the court concluded that the relevant agreements lacked clear and unmistakable evidence that the consumer agreed to arbitrate arbitrability with FCA. *2026 U.S. App. LEXIS 14640, [WL] at *4*. Rather, the better reading of the agreements was that they delegated threshold questions of arbitrability in disputes between the consumer and the dealership if either party elected to invoke arbitration. *2026 U.S. App. LEXIS 14640, [WL] at *6*. This Court reaches the same conclusion.

Accordingly, the Court finds that, with the exception of Plaintiff Fee, the Dealership Agreements do not contain clear and unmistakable evidence that Plaintiffs agreed FCA could invoke the delegation provisions contained therein. The Court therefore retains authority to determine arbitrability as to the remaining Dealership Agreement Plaintiffs (Berns, Freedman, Liakhova, Reid, Stueve, Wadleigh, Walker, and Johnston).

*ii. FCA Cannot Prove it Was an Intended Beneficiary Under the Dealership Agreements*

Although the governing state-law **[*28]** formulations vary somewhat, each jurisdiction represented by the Dealership Agreement Plaintiffs requires clear evidence that the contracting parties intended to confer enforceable rights upon the alleged third-party beneficiary. *See Shay v. Aldrich, 487 Mich. 648, 790 N.W.2d 629, 639 (Mich. 2010)*; *Scarpitti v. Weborg, 530 Pa. 366, 609 A.2d 147, 150-151 (Pa. 1992)*; *Valdez v. Cillessen & Son, Inc., 1987- NMSC 015, 105 N.M. 575, 734 P.2d 1258, 1264 (N.M. 1987)*; *Mendez v. Hampton Ct. Nursing Ctr., LLC, 203 So.3d 146, 148 (Fla. 2016)*; *Huff v. FirstEnergy Corp., 130 Ohio St. 3d 196, 2011-Ohio 5083, 957 N.E.2d 3, 7 (Ohio 2011)*; *Norton v. First Fed. Sav., 128 Ariz. 176, 624 P.2d 854, 856 (Ariz. 1981)*; *Broadway Maint. Corp. v. Rutgers, State Univ., 90 N.J. 253, 447 A.2d 906, 909 (N.J. 1982)*; *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 485 N.E.2d 208, 211-212, 495 N.Y.S.2d 1 (N.Y. 1985)*. FCA has not satisfied that burden.

None of the agreements identify FCA as a party to the arbitration agreement. Nor do they expressly grant FCA the right to invoke arbitration, enforce delegation provisions, or compel arbitration of disputes brought against it by consumers. At most, the agreements contain references to affiliates, related entities, or additional parties who may become involved in disputes arising from the dealership transaction. Such language falls well short of the clear manifestation of intent required to confer independent enforcement rights upon a non-signatory manufacturer. Accordingly, FCA cannot compel arbitration as an intended third-party beneficiary under any of the dealership agreements at issue.

Plaintiffs Berns, Johnston, Liakhova, Reid, and Stueve's agreements warrant separate discussion because FCA relies on language requiring arbitration of disputes between the purchaser and dealer, or the dealer's agents, **[*29]** employees, successors, or assigns, third parties, "along with any other party arising from this transaction." ECF No. 64, PageID.8816; ECF No. 64-4, PageID.8842; ECF No. 64-10, PageID.8870; ECF No. 64-14, PageID.8888; ECF No. 64-21, PageID.8929; ECF No. 64-21, PageID.8929. Plaintiffs argue that this language does not clearly confer independent enforcement rights upon FCA as a non-signatory. ECF No. 67, PageID.9472. Rather, they contend that the provisions merely contemplate multiparty disputes arising from the dealership transaction itself. *Id.* at 9473.

The Court agrees. At most, the phrase "along with any other party arising from this transaction," when read in context, contemplates the inclusion of additional parties in disputes otherwise centered on the dealership relationship. These agreements do not clearly manifest an intent to confer independent contractual rights upon FCA or any other non-signatory. Nor do these provisions clearly and unmistakably demonstrate that Plaintiffs agreed that FCA could independently invoke the delegation clause to compel arbitration of threshold arbitrability disputes. In fact, all of these agreements expressly state that either Plaintiffs or the **[*30]** Seller/Lessor may "choose," "request," or "elect" to enforce the delegation clauses, and none specify that FCA nor any other non-signatory has the power to do so. ECF No. 64, PageID.8816; ECF No. 64-4, PageID.8842; ECF No. 64-10, PageID.8870; ECF No. 64-14, PageID.8888; ECF No. 64-21, PageID.8929; ECF No. 64-21, PageID.8929. Thus, FCA may not compel the Dealership Agreement Plaintiffs (Berns, Freedman, Liakhova, Reid, Stueve, Wadleigh, Walker, and Johnston) to arbitrate their claims against them.

**C. The Court will Stay the Proceedings in their Entirety Pending Resolution of the Compelled Plaintiffs' Arbitration Proceedings**

"*Section 3 of the FAA*, *9 U.S.C. § 3*, mandates courts to stay proceedings pending completion of arbitration." *Prude v. McBride Rsch. Labs., Inc., No. 07-13472, 2008 U.S. Dist. LEXIS 9440, 2008 WL 360636, at *7 (E.D. Mich. Feb. 8, 2008)*. "[I]f the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration." *Fazio v. Lehman Bros., 340 F.3d 386, 396 (6th Cir. 2003)* (quoting *Stout v. J.D. Byrider, 228 F.3d 709, 714 (6th Cir. 2000)*.

Although the Court declines to compel arbitration as to the Dealership Agreement Plaintiffs, arbitration will proceed as to the Warranty Plaintiffs and Plaintiff Fee. The Court finds that a stay of the remaining proceedings is appropriate. Because some Plaintiffs will proceed in arbitration **[*31]** while others remain before the Court, and because arbitrability determinations may result in additional claims returning to this Court, a stay will promote judicial economy, conserve party resources, and avoid inconsistent procedural postures. The Court therefore stays this matter in its entirety pending completion of the compelled Plaintiffs' arbitration proceedings.

**IV.**

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendant FCA US LLC's Second Renewed Motion to Compel Arbitration and Stay Proceedings (ECF No. 64) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff Daken Fee and Plaintiffs Carter, Frisch, Kongos, Kreb, Landes, Liscano, May, McCrary, Moore, Otto, Park, Perrera, Teger, and Vasquez shall submit their claims against FCA to binding arbitration in accordance with the applicable arbitration agreements.

**IT IS FURTHER ORDERED** that Defendant's Motion to Compel Arbitration is **DENIED** as to Plaintiffs Berns, Freedman, Johnston, Liakhova, Reid, Stueve, Wadleigh, and Walker.

**IT IS FURTHER ORDERED** that Defendant's Renewed Motion to Compel Arbitration (ECF No. 57) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Stay the Proceedings **[*32]** Pending Resolution of the Renewed Motion to Compel Arbitration (ECF No. 58) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this action is **STAYED** in its entirety pending completion of the Warranty Plaintiffs' arbitration proceedings.

**IT IS SO ORDERED**.

Dated: June 25, 2026

Detroit, Michigan

/s/ Brandy R. McMillion

HON. BRANDY R. MCMILLION

United States District Judge

---

End of Document

LexisNexis

# Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Mich.

United States District Court for the Eastern District of Michigan, Southern Division

July 21, 2017, Decided; July 21, 2017, Filed

Case No. 14-cv-11349

**Reporter**

2017 U.S. Dist. LEXIS 113759 *; 2017 LX 34613; 2017 WL 3116262

Grand Traverse Band of Ottawa and Chippewa Indians and its Employee Welfare Plan, Plaintiffs, v. Blue Cross Blue Shield of Michigan, Defendant/Third-Party Plaintiff, v. Munson Medical Center, Third-Party Defendant.

**Subsequent History:** Reconsideration denied by, Motion denied by *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross & Blue Shield of Mich., 2017 U.S. Dist. LEXIS 211418, 2017 WL 6594220 ( E.D. Mich., Dec. 26, 2017)*

Dismissed by, in part *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross & Blue Shield of Mich., 391 F. Supp. 3d 706, 2019 U.S. Dist. LEXIS 84691, 2019 WL 2173350 ( E.D. Mich., May 20, 2019)*

Motion denied by *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Mich., 2019 U.S. Dist. LEXIS 236390 ( E.D. Mich., July 2, 2019)*

**Prior History:** *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross & Blue Shield of Mich., 2015 U.S. Dist. LEXIS 199353 ( E.D. Mich., Sept. 22, 2015)*

**Counsel:** **[*1]** For The Grand Traverse Band of Ottawa and Chippewa Indians, and Its Employee Welfare Plan, Plaintiff: Aaron M. Phelps, Bryan R. Walters, Perrin Rynders, Varnum, Riddering, Grand Rapids, MI; John W. Sturgis, Kyle Patrick Konwinski, Varnum LLP, Grand Rapids, MI.

For Blue Cross and Blue Shield of Michigan, Defendant, ThirdParty Plaintiff: Aaron V. Burrell, Dickinson Wright, PLLC, Detroit, MI; Brandon C. Hubbard, Samantha A. Pattwell, Dickinson Wright PLLC, Lansing, MI; Christina K. McDonald, Dickinson Wright PLLC, Grand Rapids, MI; Kathleen A. Lang, Phillip J. DeRosier, Dickinson Wright, Detroit, MI.

For Munson Medical Center, Defendant, Cross Claimant, Cross Defendant: David A. French, Hall, Render, Killian, Heath & Lyman, PLLC, Troy, MI.

For Munson Medical Center, ThirdParty Defendant: David A. French, Hall, Render, Killian, Heath & Lyman, PLLC, Troy, MI; Timothy W. Feeley, Hall Render Killiam Heath & Lyman, P.C., Milwaukee, WI.

**Judges:** JUDITH E. LEVY, United States District Judge. Mag. Judge Mona K. Majzoub.

**Opinion by:** JUDITH E. LEVY

## Opinion

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [94]**

This ERISA case has been pending for over three years, and is currently before the Court on defendant Blue Cross Blue **[*2]** Shield of Michigan's motion to dismiss the amended complaint filed by plaintiffs Grand Traverse Band of Ottawa and Chippewa Indians and its Employee Welfare Plan. (Dkt. 94.)

For the reasons set forth below, the motion is granted.

### I. Background

Plaintiffs are a federally-recognized tribe and have filed suit against Blue Cross Blue Shield of Michigan ("BCBSM") for breach of fiduciary duty under ERISA

and have also brought five state-law claims allegedly relating to a contract between the tribe, BCBSM, and Munson Medical Center.

Plaintiffs' initial complaint was partially dismissed without prejudice to amend and clarify which actions of defendant are the subject of ERISA claims and which are the subject of state-law claims. (*See* Dkts. 73, 76.)[1]

***ERISA Agreement Between Plaintiffs and BCBSM***

Plaintiffs maintain a self-funded employee welfare plan ("Plan") governed by the *Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.* (Dkt. 90 at 1.) The Plan covers three groups of participants:

1. Members of the Tribe who are employed by the Tribe (Group #01019);

2. Members of the Tribe who are not employed by the Tribe (Group #01020); and

3. Employees of the Tribe who are not members of the Tribe (Group #48571). **[*3]**

In 2000, plaintiffs hired BCBSM to "provide administrative services for the processing and payment of claims" under the plan. (Dkt. 90-2 at 3.)

In 2007, new federal regulations implementing *section 506 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003* went into effect (hereinafter "MLR regulations"). These regulations stated that "[a]ll Medicare-participating hospitals . . .must accept no more than the rates of payment under the methodology described in this section as payment in full for all terms and services authorized by IHS, Tribal, and urban Indian organization entities." *42 C.F.R. § 136.30(a)*; *see also id. § 136.32*. And "if an amount has been negotiated with the hospital or its agent," the tribe "will pay the lesser of" the amount determined by the methodology or the negotiated amount. *Id. § 136.30(f)*. None of the parties disputes that these regulations apply to plaintiffs.

Plaintiffs allege that defendant was "well aware of the MLR regulations" and "systematically failed to take advantage of MLR discounts available to Plaintiffs." (Dkt. 90 at 3.) And "[a]s administrator of an ERISA plan, BCBSM owed a number of fiduciary duties" to plaintiff that were breached due to this failure to take advantage of the MLR **[*4]** discounts. (*Id.* at 2, 4-5, 18.) Plaintiffs seek restitution, statutory attorney fees, and other damages, costs, and interest permitted by law. (*Id.* at 23.)

***Facility Claims Processing Agreement with Plaintiffs, BCBSM, and Munson Medical Center***

After the 2007 MLR regulations went into effect, plaintiffs allege they "asked BCBSM to ensure that Plaintiffs were obtaining Medicare Like Rate discounts" for Groups #01019 and 01020. (Dkt. 90 at 14.) BCBSM said "it could not adjust its entire system to calculate MLR on those claims eligible for MLR discounts, but . . . could provide GTB a rate which . . . would be 'close to that which would be payable under the New Regulations' by providing a discount on Plaintiffs' claims for hospital services at Munson Medical Center" to Group #01020. (*Id.* at 15.)

"In reliance on this representation," plaintiffs and BCBSM entered into a Facility Claims Processing Agreement ("FCPA") with Munson Medical Center, effective March 1, 2009. (Dkt. 90 at 6; Dkt. 90-4.) The recitals to the FCPA indicate the purpose of the agreement was to facilitate the following: (1) "Munson desires to afford GTB most of the pricing benefits under the New Regulations"; and (2) "BCBSM is willing to accommodate the desire **[*5]** of both Munson and GTB by processing claims . . . at a price they believe is close to that which would be payable under the New Regulations." (Dkt. 90-4 at 2.) This agreement applies only to Group #01020, members of the Tribe who are not employed by the Tribe. (*Id.*) Under the terms of the FCPA, Munson Medical Center agreed to accept as payment in full the discounted rate set by defendant. (Dkt. 90 at 6; Dkt. 90-4 at 3.)

The initial discount rate was eight percent, and defendant was to recalculate the rate each year in accordance with the formula set forth in the FCPA. (Dkt. 90-4 at 3.) Specifically, defendant was required to first calculate two ratios: (i) ratio of all BCBSM PPO payments to all BCBSM PPO charges for Munson

[1] Plaintiffs appear to seek leave to amend the complaint in the response brief to defendant's motion to dismiss. (Dkt. 96 at 21 n.7.) The Sixth Circuit has held that a party may not request "leave to amend in a single sentence without providing grounds or a proposed amended complaint" in a response brief. *Evans v. Pearson Enters., 434 F.3d 839, 853 (6th Cir. 2006)*. Accordingly, plaintiff's request for leave to amend is denied.

claims for the prior calendar year, and (ii) ratio of all payments to all charges for all Medicare claims that Munson reported on its Medicare cost report for its prior calendar year. The new discount for the upcoming year would be the percentage difference between (i) and (ii), if positive. (*Id.*) The FCPA also states that the "arrangement . . . does not require BCBSM to process Munson Claims as if they were, in all other respects, actual Medicare Claims," and "GTB **[*6]** [plaintiff] acknowledges that this arrangement described in this Agreement is satisfactory to it and is in lieu of any claim that the New Regulations apply to any Claims and that Munson and BCBSM are relying on this representation by GTB." (*Id.* at 4.)

Plaintiffs claim that, in 2012, they "decided to . . . obtain a comparison of the costs of going with a different third-party administrator," and after an audit, discovered they were "not paying anything 'close to MLR' on claims." (Dkt. 90 at 16.)

Because plaintiffs were allegedly not receiving the promised discount that would make their payments "close to MLR," they filed suit alleging five state-law claims: breach of *Health Care False Claims Act*; breach of contract, and alternatively, covenant of good faith and fair dealing; breach of common law fiduciary duty; fraud/misrepresentation; and silent fraud. (Dkt. 90 at 22.)

## II. Legal Standard

Under *Fed. R. Civ. P. 12(b)(6)*, "[a] complaint must state a claim that is plausible on its face." *Johnson v. Moseley, 790 F.3d 649, 652 (6th Cir. 2015)*. A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. In other words, a plaintiff must plead facts **[*7]** sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 369 (6th Cir. 2011)*. And a court considering a motion to dismiss must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc., 684 F.3d 605, 608 (6th Cir. 2012)*.

## III. Analysis

Defendant argues the amended complaint should be dismissed because the ERISA count is either time-barred or fails as a matter of law, and the remaining state law claims are either preempted by ERISA or improperly duplicative of other counts. (Dkt. 94.)

### A. Count I: ERISA Violation

Defendant argues that the ERISA count fails as a matter of law and is time-barred.

#### *Whether Plaintiffs State an ERISA Claim*

Defendant argues that there is no fiduciary duty to obtain or pursue MLR under ERISA, and that it was not acting as a fiduciary when negotiating payment rates with providers. (Dkt. 94 at 17-24.)

First, defendant argues there is no fiduciary duty to pursue MLR, as set forth by Judge Ludington in *Saginaw Chippewa Indian Tribe of Mich. et al. v. Blue Cross Blue Shield of Mich., 200 F. Supp. 3d 697, 2016 WL 6276911 (E.D. Mich. 2016)* ("*SCI Tribe*"). In that case, plaintiffs pleaded a breach of fiduciary duty for "paying excess claim amounts **[*8]** to Medicare-participating hospitals for services authorized by a tribe or tribal organization carrying out a CHS program." (Case No. 16-cv-10317, Dkt. 7 at 31.) And the *SCI Tribe* court interpreted the complaint as alleging an independent fiduciary duty to pursue MLR. *SCI Tribe, 200 F. Supp. 3d 697, 2016 WL at *3* ("[Plaintiff] claims . . . that the MLR regulations may have significant and material effects on the rates paid by its plan members, so BCBSM had a duty to be aware of those effects.").

Fiduciary duties under ERISA include three components: "(1) the duty of loyalty, which requires 'all decisions regarding an ERISA plan ... be made with an eye single to the interests of the participants and beneficiaries'; (2) the 'prudent person fiduciary obligation,' which requires a plan fiduciary to act with the 'care, skill, prudence, and diligence of a prudent person acting under similar circumstances,' and (3) the exclusive benefit rule, which requires a fiduciary to 'act for the exclusive purpose of providing benefits to plan participants.'" *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich., 722 F.3d 861, 867 (6th Cir. 2013)* (quoting *James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 448-49 (6th Cir. 2012))*.

In this case, plaintiffs have made allegations similar to those considered by the *SCI Tribe* court. But construing the complaint in the light most favorable to plaintiffs, the allegations **[*9]** do not assert a fiduciary duty to obtain MLR, but instead a fiduciary duty to, among other things, preserve plan assets and make decisions with the care of a prudent person, which, as set forth above, are established fiduciary duties. Thus, the issue of whether defendant should have sought a discounted rate in connection with the MLR regulations appears to be a question of fact, not of law.

In a similar case, *Little River Band of Ottawa Indians and its Emp. Welfare Plan v. Blue Cross Blue Shield of Mich., 183 F. Supp. 3d 835 (E.D. Mich. 2016)*, Judge Lawson held that plaintiffs stated a claim because they pleaded defendant "knew that the payments should have been capped" but failed to ensure the rates "were appropriately capped," and rejected BCBSM's argument that "its fiduciary duty did not extend to ensuring that claims were paid at appropriate rates" because that argument was "merely a factual rebuttal to the breach of duty claim." *Id. at 843*.

The Court agrees with Judge Lawson's analysis. Plaintiffs in this case allege that defendant failed to act as a prudent person, to preserve plan assets, and act for the exclusive purpose of providing benefits to beneficiaries—in other words, breached a fiduciary duty—by failing to pursue an avenue to significantly reduce payments by the Plan (in this **[*10]** case "systematically fail[ing] to take advantage of MLR discounts available to Plaintiffs" (Dkt. 90 at 3)) despite knowing the regulations required providers to accept MLR as full payment even where the parties had negotiated service rates.

Similarly, the plaintiffs in *Little Band* alleged that they "should have been paying no more than Medicare-Like Rates ("MLR") for all levels of care furnished by Medicare-participating hospitals." *Little Band, 183 F. Supp. 3d at 843*. That there is also a separate contract at issue in this case does not alter this analysis. The FCPA is a contract separate from the ERISA plan, and the breach of contract claim therefore is distinct from the ERISA claim, which arises from the ERISA plan and Medicare regulations applicable to those plans, and not the FCPA.

Moreover, as the Supreme Court has recognized, "[t]here is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan." *Varity Corp. v. Howe, 516 U.S. 489, 504, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)*. Here, although the plan does not expressly require pursuit of MLR, it is plausible that, in deciding whether to pay claims and whether the negotiated **[*11]** rate should apply, defendant should have requested the provider accept MLR as payment in full as an "ordinary and natural means" of preserving plan assets and providing benefits to plan beneficiaries. Accordingly, defendant's motion to dismiss on this ground is denied.

Second, defendant argues it was not acting as a fiduciary with respect to negotiating payment rates with providers, and therefore cannot be held liable for breach of fiduciary duty based on failing to pursue MLR.

To state a claim for breach of fiduciary duty, a plaintiff must allege that a defendant was acting as a fiduciary with respect to the conduct at issue. *Pegram v. Herdrich, 530 U.S. 211, 223, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000)*. A fiduciary is defined as one who "exercises any discretionary authority or . . . control respecting management of [a] plan, or . . . disposition of its assets," and who "has any discretionary authority or . . . responsibility in the administration of [a] plan." *Akers v. Palmer, 71 F.3d 226, 231 (6th Cir. 1995)* (citing *29 U.S.C. § 1002(21)(A)(i)*). Neither party appears to dispute that defendant exercised discretionary authority or control over the plan and its assets; they disagree as to whether defendant was acting in a fiduciary capacity by failing to obtain MLR for plan participants. Defendant argues that the *Pegram* precedent is **[*12]** fatal to plaintiffs' claims, and also that obtaining MLR is analogous to negotiating rates, which the Sixth Circuit has held is not subject to breach of fiduciary duty claims. *DeLuca v. Blue Cross & Blue Shield of Mich., 628 F.3d 743, 747 (6th Cir. 2010)*.

But defendant's reliance on *Pegram* and *DeLuca* is misplaced. In *Pegram*, the plaintiff argued her physician breached a fiduciary duty under ERISA by making treatment decisions while simultaneously subject to a financial incentive to withhold or reduce treatment. *Pegram, 530 U.S. at 226*. The Supreme Court held that such claims were not cognizable as breach of fiduciary duty claims because "these eligibility determinations cannot be untangled from physicians' judgments about reasonable medical treatment." *Id. at 229*.

The circumstances at issue in *Pegram* are significantly different than the allegations in this case. Here, the parties are not debating whether certain services were medically necessary or covered by the ERISA Plan. Rather, plaintiffs' allegations address only whether defendant failed to preserve plan assets by continually and consistently overpaying claims that defendant found eligible for coverage. In other words, the parties in this case do not dispute whether treatment should have been given or if claims were eligible for coverage **[*13]** under the terms of the Plan, as was the case in *Pegram*. Thus, this is not a claim where "eligibility decisions cannot be untangled from physicians' judgments about reasonable medical treatment." *530 U.S. at 229*.

In *DeLuca*, plaintiff alleged that defendant breached its fiduciary duties by agreeing to increase the rates for PPO plans in exchange for decreases in HMO rates as a means of "equaliz[ing] the rates paid" between the types of plans. *DeLuca, 628 F.3d at 746*. The Sixth Circuit held that defendant "was not acting as a fiduciary when it negotiated the challenged rate changes, principally because those business dealings were not directly associated with the benefits plan at issue but were generally applicable to a broad range of health-care consumers." *Id. at 747*. More broadly, "a business decision that has an effect on an ERISA plan" is not subject to fiduciary standards, but conduct that "constitutes 'management' or 'administration' of *the plan*" does. *Id.*

Again, plaintiffs' allegations in this case vary from those addressed by the *DeLuca* court. Here, plaintiffs are not seeking rate renegotiation on behalf of their individual Plan or arguing that the rate negotiations constituted self-dealing, as in *DeLuca*. Instead, plaintiffs allege that **[*14]** defendant knew providers were required to accept MLR by regulation in lieu of other rates established via contract, and systematically failed to invoke the regulation, which would have preserved plan assets. In other words, their argument is that defendant "squandered plan assets under its authority or control," which the *DeLuca* court indicated would implicate fiduciary concerns. *See DeLuca, 628 F.3d at 747-48*. Moreover, the allegations involve the "trustee's most defining concern historically": "the payment of money in the interest of the beneficiary." *Pegram, 530 U.S. at 231*.

Defendant next argues that permitting this cause of action would create a "novel cause[] of action not expressly authorized by the text of [ERISA]," and "the Supreme Court has repeatedly warned courts against permitting" such suits. *Clark v. Feder Semo and Bard, P.C., 739 F.3d 28, 29, 408 U.S. App. D.C. 28 (D.C. Cir. 2014)*.

But permitting this cause of action would not create a novel cause of action of the kind at issue in *Clark* or the Supreme Court cases cited by the *Clark* court. In *Clark*, plaintiff attempted to argue the plan administrator breached its fiduciary duty pursuant to *29 U.S.C. § 1344*, which imposed enforcement obligations on the Secretary of the Treasury. The D.C. Circuit held that *section 1344*'s "authority for the Secretary" could not become "the source of a duty **[*15]** for a plan fiduciary." *Clark, 739 F.3d at 30*. And in *Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002)*, relied on by the *Clark* court, the Supreme Court held that plaintiffs were not entitled to damages under *section 502(a)(3)(A)* because the text envisioned only injunctive or "appropriate equitable relief." *534 U.S. at 209-10*.

By contrast, requiring defendant to take into account regulations that directly affect how it administers and manages plan assets would not create new remedies or conflict with statutory text that entrusts enforcement to an agency. Instead, as the *Clark* court pointed out, "general principles of fiduciary law imported into ERISA . . . set bounds on the distributions [fiduciaries] authorize[]," *739 F.3d at 30*, which is precisely the type of action at issue here. Moreover, alleging that defendant should have taken the MLR regulations into account when determining how much to pay out of plan assets boils down to a basic legal proposition that is neither novel nor controversial: fiduciaries must administer plans in compliance with federal laws. And although ERISA is a comprehensive regime, "the existence of duties under one federal statute does not, absent express congressional intent to the contrary, preclude the imposition of overlapping duties under another federal statutory regime." **[*16]** *In re WorldCom, Inc., 263 F. Supp. 2d, 745, 766-67 (S.D.N.Y. 2003)* (rejecting argument that "tension between the federal securities laws and ERISA" required dismissal, and holding ERISA fiduciaries cannot transmit false information to plan participants); *see also In re The Goodyear Tire & Rubber Co. ERISA Litig., 438 F. Supp. 2d 783, 792 (N.D. Ohio 2006)* ("compliance with securities laws does not negate their requirement to comply with other laws, such as ERISA").

In sum, plaintiffs assert that defendant acted as a

fiduciary in determining how much to pay on claims that it knew were subject to the MLR regulations because it had discretion to pay the lower rate rather than the contractual rate, as the MLR regulations clearly state. And for the reasons set forth above, defendant has failed to demonstrate that such allegations are barred by precedent or would improperly interfere with ERISA's statutory regime. Accordingly, plaintiffs have sufficiently pleaded that defendant was acting as a fiduciary when it paid out claims eligible for MLR, and defendant's motion to dismiss this claim as to Group #01020 on this ground is denied.

***Whether the ERISA Claim is Time-Barred***

Defendant next argues that the ERISA claim is barred by the statute of limitations because plaintiffs had actual knowledge by March 2009 that they were not receiving Medicare-Like **[*17]** Rates ("MLR"), when they entered into the FCPA with the intention of obtaining MLR for Group #01020. (Dkt. 94 at 13.)

Plaintiffs claim they did not know the "full extent of BCBSM's wrongful conduct until 2013" because defendant misrepresented to plaintiff that the FCPA discount would provide them with rates close to MLR. (Dkt. 90 at 18; Dkt. 96 at 16.) They further argue that because of these representations, the six-year period applies, or equitable tolling should apply.

"ERISA specifies a three-or six-year limitations period for claims of breach of fiduciary duty." *Durand v. Hanover Ins. Grp., Inc., 806 F.3d 367, 376 (6th Cir. 2015)* (citing *29 U.S.C. § 1113*). The six-year limitations applies "after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." *Id.* Thus, when the duty at issue is a continuing duty, such as the duty to inform, "so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely." *Tibble v. Edison Int'l, __ U.S. __, 135 S. Ct. 1823, 1828-29, 191 L. Ed. 2d 795 (2015)*; *Durand, 806 F.3d at 376*.

"[A]n accelerated three-year limitations period is triggered as of 'the earliest date on which the plaintiff had actual knowledge of the breach." *Id.* "Actual knowledge means 'knowledge **[*18]** of the facts or transaction that constituted the alleged violation,'" and a plaintiff is deemed to have actual knowledge "when he or she has 'knowledge of all the relevant facts, not that the facts establish a cognizable legal claim.'" *Brown v. Owens Coring Inv. Rev. Cmte., 622 F.3d 564, 570 (6th Cir. 2010)*.

Additionally, "in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation." *29 U.S.C. § 1113*.

First, with respect to Group #01019, the complaint indicates that prior to entering into the FCPA in March 2009, plaintiffs asked defendant to ensure they were receiving MLR, and were informed "BCBSM replied that it could not adjust its entire system." Nothing in the complaint shows that defendant represented to plaintiff at that time or at a later date that it would pursue MLR for Group #01019.[2] Plaintiffs argue the burden is on defendant to prove the limitations period has expired, but when the face of the complaint indicates the claim is untimely, a plaintiff has an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc., 520 F.3d 516, 520 (6th Cir. 2008)*. And because plaintiffs did not plead facts in the complaint that would plausibly indicate they lacked actual knowledge in 2009 or that defendant **[*19]** made misrepresentations to them regarding MLR for Group #01019, the claim should have been brought by March 1, 2012 at the latest. Accordingly, the ERISA claim as it pertains to Group #01019 is untimely.

Next, with respect to Group #01020, plaintiffs argue that they relied on defendant's representation that they would receive rates close to MLR, as evidenced by their decision to sign the FCPA, and defendant concealed from them the fact that they were not receiving such rates. But, as plaintiffs have taken pains to make clear, the FCPA is not governed by ERISA and is separate from the original agreement entered into with defendant. (*See* Dkt. 90 at 6 ("Plaintiffs' claims for breach of fiduciary duty under ERISA are separate and distinct from Plaintiffs' claim for breach of the FCPA"; describing FCPA as "separate contractual agreement").) In fact,

---

[2] Plaintiffs also attempt to introduce evidence not referred to in the complaint to argue defendant "consistently represented to Plaintiffs that BCBSM was developing a process to provide Medicare-Like Rate pricing to all Plan participants who were tribal members." (Dkt. 96 at 18.) But on a motion to dismiss, the Court may consider only the allegations in the complaint. Thus, the issue is whether it is clear from the face of the complaint that plaintiffs had actual knowledge in 2009 or 2013.

plaintiffs entered in to the FCPA *because* they knew they were not receiving MLR under the Plan governed by ERISA. Thus, any fraud or concealment would relate to the FCPA, and not the ERISA claim, and the three-year statute of limitations applies.

Plaintiffs argue that the ERISA claim is broader than the breach of contract issue because the FCPA **[*20]** applied to services only from Munson Medical Center, while the Plan applied to all Medicare-participating hospitals. (Dkt. 90 at 6.) While this is true, as with Group #01019, the complaint alleges nothing that would permit the inference that plaintiffs lacked knowledge with respect to these other providers by March 2009.

In sum, plaintiffs had actual knowledge by March 1, 2009 that they were not receiving MLR for Group #01020, and because the case was filed in 2014, the ERISA claim as to Group #01020 is untimely.

**B. Counts II-VI: State Law Claims**

Defendant argues that ERISA preempts Count II, part of Count III (good faith and fair dealing), and Count IV. (Dkt. 94 at 24.) Defendant also argues that Counts V and VI are improperly duplicative of the breach of contract claim. (*Id.* at 26.)

Plaintiffs concur that ERISA preempts Counts II and IV (Dkt. 96 at 29), and these counts are dismissed.

***Count III: Breach of Contract and Implied Covenant of Good Faith and Fair Dealing***

Defendant argues ERISA preempts plaintiffs' claim that it breached the implied covenant of good faith and fair dealing, and also that Michigan does not recognize this covenant as an independent cause of action. Defendant does not challenge **[*21]** the breach of contract claim. Plaintiffs make no argument as to why their claim under the implied covenant should not be dismissed.

Under Michigan law, there is no independent cause of action for a breach of the implied covenant of good faith and fair dealing. This implied covenant "applies to the performance and enforcement of contracts," and a breach of this covenant may be invoked as a breach of contract claim only when one party "makes its performance a matter of its own discretion." *Stephenson v. Allstate Ins. Co., 328 F.3d 822, 826 (6th Cir. 2003)*. "Discretion arises when the parties have agreed to defer decision on a particular term of the contract," *id. at 826*, or "omits terms or provides ambiguous terms." *Wedding Belles v. SBC Ameritech Corp., Inc., Case No. 250103, 2005 Mich. App. LEXIS 286, 2005 WL 292270, at *1 (Mich. App. Feb. 8, 2005)*. "Whether a performance is a matter of a party's discretion depends on the nature of the agreement." *ParaData Comp. Networks, Inc. v. Telebit Corp., 830 F. Supp. 1001, 1005 (E.D. Mich. 1993)*. A party may not invoke the implied covenant of good faith and fair dealing to override express contract terms." *Stephenson, 328 F.3d at 826*; *General Aviation v. Cessna Aircraft Co., 915 F.2d 1038, 1041 (6th Cir. 1990)*.

Here, the FCPA does not leave defendant with discretion as to whether to pay the discount or how to calculate it. There is a formula for calculating the discount, and defendant is obligated to pay that amount. Further, no terms appear to be omitted. Thus, plaintiffs may not rely on the implied covenant as an alternative to their breach **[*22]** of contract claim. Accordingly, defendant's motion to dismiss this part of Count III is granted.

***Counts V and VI: Fraud and Silent Fraud***

Defendants argue that Counts V and VI must be dismissed as improperly duplicative of plaintiffs' breach of contract claim. (Dkt. 94 at 26.)

Under Michigan law, "[w]hen a contract governs the relationship between the parties, the plaintiff must allege a 'violation of a legal duty separate and distinct from the contractual obligation' to support a fraud claim." *Gregory v. CitiMortgage, Inc., 890 F. Supp. 2d 791, 802 (E.D. Mich. 2012)* (quoting *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co., 454 Mich. 65, 84 (1997)), 559 N.W.2d 647*.

Here, plaintiffs argue defendant breached the contract by failing to provide it with the FCPA discount. They separately argue that defendant is liable for fraud and silent fraud by (1) representing repeatedly to plaintiffs between 2009 and 2012 that the FCPA discount would be close to MLR while knowing this to be false; and (2) failing to disclose that the FCPA discount was not close to MLR despite being obligated to do so. But any obligation to provide rates close to MLR and any obligation to disclose such discrepancies between the FCPA and MLR rates arise solely from the existence of the FCPA. Thus, there is no legal basis or duty separate

from the contract that would permit plaintiff to **[*23]** plead fraud and silent fraud claims. *Leonor v. Provident Life and Acc. Co., Case No. 12-cv-15343, 2013 U.S. Dist. LEXIS 38423, 2013 WL 1163375, at *2-3 (E.D. Mich. Mar. 20, 2013)* (alleged fraud that plaintiff would receive benefits arose from contractual obligation to pay plaintiff and fraud claim was not actionable; collecting cases holding the same). Accordingly, defendant's motion to dismiss these counts is granted.

**IV. Conclusion**

For the reasons set forth above, defendant's motion to dismiss (Dkt. 94) is GRANTED as to Count I, Count II, Count III (implied covenant of good faith and fair dealing only), Count IV, Count V, and Count VI.

IT IS SO ORDERED.

Dated: July 21, 2017

Ann Arbor, Michigan

/s/ Judith E. Levy

JUDITH E. LEVY

United States District Judge

---

**End of Document**

LexisNexis

# Great Lakes Acquisition Corp. v. Roncelli

Sixth Judicial Circuit Court of Michigan, Oakland County

September 28, 2021, Decided; September 28, 2021, Filed

Case No. 20-180056-CB

**Reporter**
2021 Mich. Cir. LEXIS 718 *

GREAT LAKES ACQUISITION CORP., and NURTURING HOME CARE, INC., Plaintiffs, v. THOMAS RONCELLI, CARELINE HEALTH GROUP-MI LLC, and CARELINE HOLDCO LLC, Defendants.

**Judges:** **[*1]** HON. MICHAEL WARREN, CIRCUIT COURT JUDGE.

**Opinion by:** MICHAEL WARREN

## Opinion

**OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR PARTIAL SUMMARY DISPOSITION**

**At a session of said Court, held in the County of Oakland, State of Michigan September 28, 2021**

**PRESENT: HON. MICHAEL WARREN**

**OPINION**

**I**

**Overview**

In June 2015 Defendant Thomas Roncelli ("Roncelli") began employment as a Patient Care Coordinator with Plaintiff Nurturing Home Care, Inc. ("Nurturing Home Care"). In connection with his hiring, Roncelli signed an employment agreement ("Employment Agreement"). The Employment Agreement provides for at-will employment and includes confidentiality, nonsolicitation, and noncompetition clauses.[1]

Plaintiff Great Lakes Acquisition Corp. ("GLAC") provides various health care services, including home health care and hospice care through a network of wholly owned subsidiaries and affiliated companies. Nurturing Home Care is a wholly owned subsidiary of Great Lakes Acquisition and is in the business of providing skilled home health care.[2] The affiliated companies and subsidiaries operated under the name, Great Lakes Caring ("Great Lakes").[3]

In January 2020, Roncelli voluntarily left his employment with Nurturing Home Care and joined **[*2]** Defendant Careline Health Group-MI LLC ("Careline") as a Hospice Liaison.[4] Careline provides hospice services and is based out of Jackson, Michigan. Roncelli became Careline's first sales representative for Oakland, Genesee, Macomb, and Livingston counties.[5]

The Plaintiffs filed the instant case in March 2020. The Second Amended Complaint (the "Complaint") alleges claims of Breach of Contract against Roncelli (Count I);

---

[1] Employment Agreement, attached as Exhibit C to Defendants' Motion, at ¶¶ 5, 6, and 11.

[2] Plaintiffs' Answer to Interrogatory Number 2, attached to Defendants' Motion as Exhibit A; Plaintiffs' Answer Number 7 to Request for Admission, attached to Defendants' Motion as Exhibit G.

[3] In May 2018 Great Lakes and another entity, Jordan Health Services, combined to form Elara Caring ("Elara"). The Second Amended Complaint refers to Nurturing Home Care and GLAC as "Elara." See ¶ 2.

[4] Defendants' Answer to Interrogatory Number 5, attached as Exhibit I to Defendant's Motion.

[5] Roncelli Deposition, attached to Plaintiffs' Brief as Exhibit G, at pp 143-144.

Tortious Interference with Contractual and Business Relationship against Careline (Count II); and Unjust Enrichment (Count III) and Civil Conspiracy (Count IV) against all Defendants. The Defendants now seek summary disposition under MCR 2.116(C)(8) and (C)(10) on the Breach of Contract claim.[6]

At stake in this Motion is whether the Employment Agreement is supported by legal consideration when continued at-will employment is such consideration and the Employment Agreement includes both of the Plaintiffs? Because the answer is "yes," the Defendants' Motion for Summary Disposition based upon the lack of a valid contract is denied.

Also at stake is whether the Noncompetition Clause in the Employment Agreement is enforceable? Because viewing the evidence in the light most favorable to the Plaintiffs **[*3]** reveals that the Plaintiffs have protectable confidential information and the Noncompetition Clause is reasonable in duration, geographic scope, and a question of fact exists as to whether the line of business restriction is reasonable, the Motion is granted with regard to palliative care (only) and otherwise denied.

**II**

**Standards of Review**

**A**

***MCR 2.116(C)(8)***

A motion for summary disposition pursuant to MCR 2.116(C)(8) tests the legal sufficiency of the complaint, not whether the complaint can be factually supported. El-Khalil v Oakwood Healthcare, Inc, 504 Mich 152, 159-160; 934 NW2d 665 (2019); Pawlak v Redox Corp, 182 Mich App 758; 453 NW2d 304 (1990). A motion for summary disposition based on the failure to state a claim upon which relief may be granted is to be decided on the pleadings alone. Bailey v Schaaf, 494 Mich 595, 603; 835 NW2d 413 (2013); Parkhurst Homes, Inc v McLaughlin, 187 Mich App 357; 466 NW2d 404 (1991).

[6] Although the Motion is Entitled "Defendants' Motion for Summary Disposition," it is a Motion for Partial Summary Disposition as it seeks dismissal as to Count I, the claim against Roncelli, only.

Exhibits attached to pleadings may be considered under MCR 2.116(C)(8) because they are part of the pleadings pursuant to MCR 2.113(C). Id. at 163. Matters of public record may also be considered. MCR 2.113(C)(1)(a). See also Dalley v Dijkema Gossett, 287 Mich App 296, 301 n.1; 788 NW2d 679 (2010) (court documents are matters of public record that may be considered on a motion under MCR 2.116[C][8]).

"All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." Maiden v Rozwood, 461 Mich 109,119; 597 NW2d 817 (1999); Wade v Dep't of Corrections, 439 Mich 158, 162; 483 NW2d 26 (1992). Summary disposition is proper when the claim is so clearly unenforceable as a matter of law that no factual development can justify a right to recovery. Parkhurst Homes, 187 Mich App 357; Spiek v Dept of Transportation, 456 Mich 331, 337; 572 NW2d 201 (1998).

**B**

***MCR 2.116(C) (10)***

A motion for summary **[*4]** disposition pursuant to MCR 2.116(C)(10) tests the factual support for a claim or defense. See, e.g., MCR 2.116(G)(3)(b); Quinto v Cross & Peters Co, 451 Mich 358,362 (1996). Accordingly, "[i]n evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." Maiden, 461 Mich at 119-120 (1999); MCR 2.116(C)(10); MCR 2.116(G)(4); Quinto, 451 Mich at 358. The moving party "must specifically identify the issues" as to which it "believes there is no genuine issue" of material fact and support its position as provided in MCR 2.116. MCR 2.116(G)(4).

Under Michigan law, the moving party may satisfy its burden of production under MCR 2.116(C)(10) by demonstrating to the court that the non-moving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. Quinto, 451 Mich at 361. If the moving party properly supports its motion, the burden "then shifts to the opposing party to establish that a genuine issue of disputed fact exists." Id. at 362. If the moving party fails to properly support its motion for summary disposition, the nonmoving party has no duty

to respond and the trial court should deny the motion. MCR 2.116(G)(4); see also Meyer v City of Center Line, 242 Mich App 560, 575 (2000) (concluding that the trial court erred when it granted an improperly supported motion **[*5]** for summary disposition under MCR 2.116[C][10]).

Granting a motion for summary disposition under MCR 2.116(C)(10) is warranted if the substantively admissible evidence shows that there is no genuine issue in respect to any material fact, and the moving party is entitled to judgment as a matter of law. Quinto, 451 Mich at 362-363.

**III**

**The Breach of Contract Claim (Count I)**

The claim for breach of contract is made against Roncelli only. The Second Amended Complaint alleges:

> By signing the [Employment Agreement], Roncelli expressly agreed, during his employment with Elara and for a period of two years thereafter, (a) not to use or furnish to anyone any Elara's Confidential Information, (b) not to solicit Elara's employees, clients, patients, and referral sources, (c) not to divert business away from Elara, and (d) not to engage in a business that is in any manner competitive with Elara with Elara's market area.[7]
>
> In violation of the terms of the Agreement, Roncelli is currently employed with Careline, a competitor of Elara, performing critical functions for Careline, and competing with Elara in Elara's market area. In that position, the highly sensitive and competitive business information that Roncelli had access to while employed at Elara have and **[*6]** will inevitably influence the tactical and strategic decisions he will make for the benefit of Careline and give Careline an unfair competitive advantage.
>
> Also in violation of the terms of the Agreement, Roncelli is and has been, directly or indirectly diverting business opportunities away from Elara. [Complaint at ¶¶ 27-29.]

[7] As was noted, in the Complaint the Plaintiffs use "Elara" when referring to GLAC and Nurturing Home Care. See ¶ 2.

**IV**

**There is legal consideration to support the Employment Agreement**

**A**

**Contract Law**

A party asserting a breach of contract must establish that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming the breach." *Miller-Davis Co v Ahrens Const, Inc, 495 Mich 161,178 (2014)*. The essential components of the existence of a "contract" (i.e., the first element of a breach of a contract claim) are that there are "parties competent to contract, a proper subject matter, a legal consideration, mutuality of agreement and mutuality of obligation." Mclnerney v Detroit Trust Co, 279 Mich 42, 46 (1937). Quoting Blackstone, the Court in Mclnerney explained that "'a contract is an agreement, upon a sufficient consideration, to do or not to do a particular thing.'" *Id. 2* Blackstone's Commentaries, p 442. Thus. A valid contract requires, among other things, legal consideration. Calhoun Co v Blue Cross Blue Shield Michigan, 297 Mich App 1, 13 (2012). The promise of continued at-will employment is adequate consideration **[*7]** to support a noncompete agreement. QIS, Inc v Indus Quality Control, Inc, 262 Mich App 592, 594 (2004).

**B**

**Arguments**

Roncelli argues that Count I must be dismissed because there is no consideration to support the Employment Agreement.[8] He asserts that the Employment Agreement is between Roncelli and GLAC but is not supported by any consideration given by GLAC because he was employed and paid by Nurturing Home Care. Thus, according to Roncelli, no valid contract exists. In opposition, the Plaintiffs argue that Roncelli's continued

[8] Although less than clear, Roncelli apparently makes this argument under MCR 2.116(C)(8). Regardless of the standard of review, the argument fails.

employment was consideration, and that the Employment Agreement clearly includes GLAC.

**C**

**Roncelli received consideration and GLAC was a party to the Employment Agreement**

Roncelli does not dispute that continued employment is adequate consideration for an employment agreement.

Moreover, that Nurturing Home Care was included as a party to the Employment Agreement is clear. The Employment Agreement provides, in pertinent part (emphasis added), that "THIS AGREEMENT is made and entered into . . . by and between Great Lakes Acquisition Corp. *including any and all subsidiaries, assigns, and affiliates collectively and/or individually d.b.a. Great Lakes Caring* ("We," "Us" or "Great Lakes"), and Thomas Roncelli . . . ."[9] "There cannot be any **[*8]** broader classification that the word 'all.' In its ordinary and natural meaning, the word 'all' leaves no room for exceptions." *Miller-Davis Co v Ahrens Const, Inc, 495 Mich 161, 175 n 34 (2014)* (quotation marks and citation omitted). Roncelli cites no authority for the argument that, because the Employment Agreement does not explicitly list Nurturing Home Care as a subsidiary of GLAC, the agreement cannot be supported by the consideration of the continued employment at Nurturing Home Care and the plain language of the agreement flatly defeats any such argument. Thus, the Employment Agreement includes Nurturing Home Care.[10]

Moreover, even if Nurturing Home Care was not a party to the Employment Agreement, the agreement would not fail for lack of consideration. Roncelli's employment at Nurturing Home Care was consideration. As long as there was consideration to support the Employment Agreement, the source of the consideration is irrelevant. See *Behrens v Apessos, 39 Mich App 426,429 (1972)* ("That consideration moves to or from a third party is immaterial.")

**V**

[9] Employment Agreement, attached as Exhibit C to Defendants' Motion, at p 1.

[10] Additionally, any argument that GLAC is not the proper party to bring a cause of action for breach of contract fails. GLAC is explicitly named as a party to the Employment Agreement.

**Other than with regard to palliative care, viewing the evidence in light most favorable to the Plaintiffs, the Noncompetition Clause protects confidential business interests**

**A**

**The law regarding the reasonability of noncompetition agreements**

"A **[*9]** contract. . . between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." *MCL 445.772*. However, certain agreements not to compete are authorized by Section 4a(l) of the Michigan Antitrust Reform Act ("MARA") which states:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited. [*MCL 445.774a(l)*.]

This section "represents a codification of the common-law rule '"that the enforceability of noncompetition agreements depends on their reasonableness.'" *St Clair Med, PC v Borgiel, 270 Mich App 260, 265-266 (2006)* (citation omitted). "[A] restrictive covenant must protect an employer's reasonable competitive business interests, but its protection in terms of duration, geographical **[*10]** scope, and the type of employment or line of business must be reasonable." *Id. at 266*. The party seeking to enforce a noncompetition clause has the burden of demonstrating its validity. *Coates v Bastian Bros, Inc, 276 Mich App 498, 508 (2007)*. When the relevant facts are not disputed, the reasonableness of a noncompetition clause is a question of law. *Id. at 506*.

**B**

**Arguments**

The Noncompetition Clause at issue provides:

> You agree to be bound by this non-compete provision as a condition of becoming employed by Great Lakes and as a condition of continued employment. During the term of this Agreement, and *for two (2) years following Your voluntary or involuntary termination from employment with Great Lakes, You agree that you shall not* directly or indirectly, either individually or on behalf of or in conjunction with another person, organization or company, *engage in any* self-employment, *employment with any other entity*, work as a consultant or independent contractor, or have full or partial ownership of any entity *that provides, or consults in providing, home health care, hospice care, palliative care, private duty care or the sale or rental of durable medical equipment within Great Lakes' market area*. "Great Lakes' market area" shall be defined as those counties **[*11]** in which Great Lakes has received Medicare certification at the time of Your voluntary or involuntary separation from Great Lakes. [11]

The Plaintiffs allege that Roncelli violated the terms of the Noncompetition Clause because he went to work for Careline, an entity that provides hospice care in GLAC's market area, less than two years after leaving Nurturing Home Care. Roncelli argues that the Noncompetition Clause is not enforceable because it does not serve to protect a reasonable competitive business interest. Roncelli also argues that the clause is unreasonable as to duration, geographic scope, and line of business. The Plaintiffs argue that they have a business interest in protecting confidential information and referral sources and that the terms of the Noncompetition Clause are enforceable because they are reasonable.

**C**

**Because there are genuine issues of material fact regarding whether the Noncompetition Clause protects confidential information, the Motion is denied with regard to this issue**

**1**

**The Law**

With regard to the requirement that a noncompete covenant must protect a reasonable business interest, Michigan law has long reasoned:

> Because prohibition on all competition is in restraint **[*12]** of trade, an employer's business interest justifying a restrictive covenant must be greater than merely preventing competition. To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill. [*St Clair Med, 270 Mich App at 266* (citations omitted).]

Thus, the protection of confidential information is a business interest that justifies the Noncompetition Clause.[12] See *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC, 276 Mich App 146,158 (2007)* quoting *Whirlpool Corp v Burns, 457 F Supp 2d 806, 812 (WD Mich 2006)* ("preventing the anticompetitive use of confidential information is a legitimate business interest"). A noncompetition agreement that provides reasonable protection for confidential information of an employer is enforceable. *Follmer, Rudzewicz & Co, P.C. v Kosco, 420 Mich 394, 408 (1984)*. However, a limitation is not enforceable to the extent it encompasses "information labelled confidential which is in fact not confidential." *Id. at 407*. General information acquired during the course of employment or "information generally known in the trade or readily ascertainable" is not confidential information. *Id. at 402*.

> Likewise, under Michigan law, "[e]mployers have legitimate business interests in restricting former

[11] Employment Agreement, attached as Exhibit C to Defendants' Motion, at p 7. Emphasis added.

[12] The Employment Agreement has a specific and comprehensive Confidentiality Clause that is separate from the Noncompetition Clause. The Confidentiality Clause provides, in part, that "for a period of two (2) years after termination of Your employment relationship with Great Lakes, You shall not directly or indirectly, either individually or on behalf of or in conjunction with another person, organization or company, use or disclose any Confidential Information of Great Lakes." [Employment Agreement, attached to Defendants' Motion as Exhibit C, at ¶ 5(e).]

employees from soliciting **[*13]** their customers." *Total Quality Inc v Fewless, 332 Mich App 681, 700 (2020)*. An employer has a reasonable business interest in protecting the goodwill of a business because an employee who establishes client contacts and relationships as of result of the goodwill of his employer's business "is in a position to unfairly appropriate that goodwill and thus unfairly compete with a former employer upon departure." *St Clair Med 270 Mich App at 268*.

**2**

**Viewing the evidence in the light most favorable to the Plaintiffs, they are protecting confidential information, including referral sources, accounts, and strategies**

The Plaintiffs argue that, during his employment with GLAC, Roncelli participated in quarterly business review meetings where other hospice and home healthcare salespeople discussed referral sources, their accounts, and strategies used with those accounts.[13] The Plaintiffs claim that by participating in the meetings "Roncelli learned competitively sensitive, non-public information about referral facilities both inside and outside of his assigned territory. . . ."[14]

However, the deposition testimony of Elara's regional vice president of hospice sales indicates that referral sources are generally known by those in the industry and are not confidential in nature.[15] Furthermore, **[*14]** Roncelli argues that, in the hospice industry, "referral sources" are different from "clients" who are the patients themselves and that the Plaintiffs have not provided this Court with binding case law holding that "referral sources" are a protectable business interest.[16] Roncelli also argues that the knowledge he employed in his position with the Plaintiffs was general knowledge any salesperson would need to be successful and that potential referral services could be discovered by anyone using readily available information. Therefore, according to Roncelli, the noncompete provision is not protecting a legitimate business interest. On the other hand, Roncelli's success with referral sources did not occur in a vacuum. Roncelli was provided training and assigned a territory.[17] He collaborated with other GLAC salespeople and attended meetings where salespeople discussed ways to increase referrals.[18]

Despite his arguments, Roncelli's efforts as a salesperson does not mean that the Plaintiffs had no reasonable competitive business interest in protecting referral sources. See *Brown Dairy Equip, Inc v Lesoski*, unpublished per curiam opinion of the Court of Appeals, issued Nov 9, 2010 (Docket **[*15]** No. 291372), p 2, where the court found that a salesperson benefited from the goodwill his employer established with its customers and knowledge he gained from the employer regarding pricing and product formulations. The Court found that the defendant continued to develop the goodwill on plaintiffs behalf during his employment and the restrictive covenant "was a reasonable means of preventing defendant from gaining an unfair advantage for his new employer." *Id.*

Roncelli's reliance on *Northern Michigan Title Co of Antrim-Charlevoix v Bartlett*, unpublished per curiam opinion of the Court of Appeals, issued March 15, 2005 (Docket No. 248751) to support the argument that the protection of referral sources is not a "reasonable competitive business interest" is hardly conclusive. After all, the Court in *Northern Michigan Title* found that the pertinent noncompetition clause did not protect a reasonable business interest but protected against "competition itself." *Id.* at 4. This is because the clause, which prevented the former employees from engaging in the title insurance business:

> [d]oes not narrow the focus of the prohibition to prevent unfair competition. Under these

---

[13] See Deposition of Roncelli, attached as Exhibit G to Plaintiffs' Response, at pp 113-114. Deposition of D. Filar, attached as Exhibit L to Plaintiffs' Response, at pp 56-57.

[14] Plaintiffs' Response at p 14.

[15] Deposition of T. Outcalt attached to Plaintiff's Response as Exhibit E, at pp 99-101.

[16] The Plaintiffs cite the case of *White v Mederi Caretenders Visiting Sew of Southeast Fla, LLC, 226 So3d 774, 786 (Fla, 2017)*, where the court held that home health service referral sources may be a protected legitimate business interest under the Florida Statute governing noncompetition agreements "depending upon the context and proof adduced." The Florida Statute, *Fla Stat 542.335*, provides a nonexhaustive list of "legitimate business interests." It is not necessary to consider the reasoning of the Florida court as this Court finds that, under Michigan law, the protection of referral sources can be a legitimate business interest.

[17] Roncelli Deposition, attached to Plaintiff Response as Exhibit G, at pp 34-35.

[18] *Id.* at pp 182-184; 113-115.

> circumstances, [the **[*16]** former employees] would not be permitted to obtain referrals from sources that had never had a relationship with plaintiff. Nor would they be permitted to offer title insurance services to clients who never had or never would have given business to plaintiff in the first place. *[Id.]*

The Court went on to find that "[i]n any event, according to the record, there are seldom repeat clients in the title insurance business." *Id.* at 4. The Court further concluded that there was nothing about defendants' employment in the title insurance business generally that gave them an 'unfair advantage' over the former employer. *Id.* at 4-5. In fact, the business addressed in *Northern Michigan Title Co* does not involve repeat clients makes that case distinguishable from the present case.[19]

In the instant case, there is no dispute that the referral sources that the Plaintiffs seek to protect as a business interest are capable of providing and do provide repeat referrals. In fact, it is a goal of GLAC, through its salespeople, to obtain repeat referrals.

Based on the foregoing, viewing the evidence in the light most favorable to the Plaintiffs, they possess reasonable competitive business interests to support **[*17]** the Noncompetition Clause.

**3**

**The Non-Competition Clause is reasonably drawn as to duration and geographic scope. The Non-Competition Clause is not reasonably drawn to the extent it prohibits Roncelli from working with an entity that provides palliative care. There is a question of fact as to whether the line of business restriction which prohibits Roncelli from employment with any entity that provides hospice services is reasonably drawn.**

**a**

**Duration**

The Defendants also argue that the two-year duration of the Noncompetition Clause is not reasonable and should be limited to six months because "by federal rule definition, a hospice patient is expected to live 6 month or less, a term of six months for any non-compete would be appropriate."[20]

However, the life expectancy of a hospice patient is not relevant here. As was noted previously, referrals for hospice care come from many sources and it is through those referrals that business is generated.[21] Michigan Courts have upheld noncompetition agreements with restrictions ranging from six months to three years. *Certified Restoration Dry Cleaning Network, LLC v Tenke Corp, 511 F3d 535,547 (CA 6,2007)* (citing cases). A two-year restriction has often been found reasonable. See, e.g., *Rooyakker & Sitz, 276 Mich App at 158*. In short, the Defendants have not shown that the two-year **[*18]** limitation is unreasonable as a matter of law.

**b**

**Geographic scope**

Geographic limitations in non-competition agreements "'must be tailored so that the scope of the agreement is no greater than reasonably necessary to protect the employer's legitimate business interests.'" *Certified Restoration Dry Cleaning Network, LLC, 511 F3d at 547* quoting *Capaldi v LiftAid Transport, LLC*, unpublished per curiam opinion of the Court of Appeals, issued Oct 24, 2006 (Docket No. 267981), p 4.

The Noncompetition Clause in this case restricts employment in" Great Lakes' market area" which is defined as "those counties in which Great Lakes has received Medicare certification at the time of Your voluntary or involuntary separation from Great Lakes."[22] Viewing the evidence in the light most favorable to the Plaintiffs, this limitation is sufficiently tailored to protect the Plaintiffs' interest in referral sources. After all, it does not involve a large swath of the country, just those places where Great Lakes is engaged in business.

---

[19] Again, the Court finds Roncelli's effort to limit the clients served by Plaintiffs to the hospice patients unpersuasive.

[20] Defendant's Motion at p 17.

[21] See footnote 16 supra.

[22] Defendants' motion Exhibit C at pp 6-7.

**c**

**Line of business**

To be enforceable, a noncompetition agreement must be "reasonable with respect to the line of business or type of employment it prohibits." *Mapal, Inc v Atarsia, 147 F Supp 3d 670, 680 (2015)*. See also *MCL 445.774a(l)*. In *Mapal* the line of business restriction barred the former employee from working **[*19]** in certain industries in which he was not involved while employed with Plaintiff. The Court found that the noncompetition agreement was overbroad as it related to the line of business prohibition and that Plaintiff had not sufficiently supported its position that "legitimate business interests necessitated the far-reaching restrictions of the non-compete." *Id. at 680*. See also *Certified Restoration Dry Cleaning Network, LLC, 511 F3d at 549*, where the court found reasonable a clause that did not prohibit all dry-cleaning services, but only restoration dry cleaning services, the type of business in which Defendants would have an unfair competitive advantage.

The Noncompetition Clause here prohibits Roncelli, for a period of two years after leaving his employment with the Plaintiffs, from working for any entity "*that provides, or consults in providing, home health care, hospice care, palliative care, private duty care or the sale or rental of durable medical equipment within Great Lakes' Market area*."[23]

In this case, there is no genuine issue of material fact that the Plaintiffs only began to offer palliative care after Roncelli left his employment.[24] Therefore, to the extent the Noncompetition Clause prohibits Roncelli from working for an entity that provides **[*20]** or consults in providing palliative care, it is unreasonable as Roncelli would have no unfair advantage with regard to palliative care. In short, this is not what Roncelli bargained for. If Great Lakes started renting houses or building cars, those new lines of businesses should not restrict Roncelli's choice of employment.

Roncelli also argues that to the extent that any line of business restriction is imposed it should be limited to home health care services because that is the line of business he was engaged in during his tenure with GLAC. Plaintiffs argue that Roncelli did sell hospice services while at GLAC.

The deposition testimony on this issue indicates that at GLAC the home care services and hospice services were different lines of business and that account executives sold one line or another.[25] However, an account executive could be compensated for selling a different line if there was a specific need "at the discretion of management."[26] There was also testimony indicating that within a referring entity such as a hospital, there could be different referral sources for hospice services and home health care services.[27]

Roncelli was employed at GLAC as a home health account executive. **[*21]** [28] The Defendants contend that Roncelli sold hospice services through at least one referral source, Hurley Hospital.[29] Roncelli denies that he solicited for hospice services with Hurley.[30] Rather he states that while he was a home health care representative at Hurley he helped out for a short period of time doing "follow-up" in connection with hospice services when a GLAC hospice representative was not available.[31]

Based upon the evidence presented, there is a question of fact as to whether Roncelli solicited hospice referrals during his employment with GLAC and, if he did, whether his involvement with hospice services was limited to one referral source. Therefore, there is a question of fact whether the line of business restriction which prohibits him from employment with any entity

---

[23] *Id.* at p 7.

[24] Deposition of T. Outcalt attached to Plaintiff's Response as Exhibit E, at p 37. In fact, the Plaintiffs do not argue that Roncelli was a salesperson for palliative care services. Plaintiffs' response at pp 3-4.

[25] *Id.* at pp 26; 65-66.

[26] *Id.* at 66.

[27] Roncelli Deposition, attached to Plaintiff Response as Exhibit G, at p 55.

[28] Deposition of T. Outcalt attached to Plaintiff's Response as Exhibit E, at p 67. Roncelli Deposition, attached to Plaintiff Response as Exhibit G, at p 52.

[29] Deposition of T. Outcalt attached to Plaintiffs Response as Exhibit E, at p 67. Plaintiffs also point to a page from a 2018 report designating Roncelli's specialty as "dual" indicating both health care and hospice. See Roncelli Deposition, attached to Plaintiff Response as Exhibit G, at p 59 and Exhibit G-9.

[30] Roncelli Deposition, attached to Plaintiff Response as Exhibit G, at pp 50-51.

[31] *Id.* at pp 50-51; 59.

that provides hospice services is reasonable.[32]

**ORDER**

Based upon the foregoing opinion, the Defendants' Motion for Partial Summary Disposition is GRANTED solely regarding the application **[*22]** of the Employment Agreement to palliative care and is otherwise DENIED.[33]

/s/ Michael Warren

HON. MICHAEL WARREN

CIRCUIT COURT JUDGE

---

**End of Document**

---

[32] Roncelli makes an additional argument that the noncompetition clause is contrary to the public interest. However, *MCL 445.774a(l)* embodies the public policy of Michigan to enforce reasonable noncompetition provisions in employment contracts. *Leach v Ford Motor Co, 299 F Supp2d 763, 776 (ED Mich 2004)*. Therefore, no additional analysis of the enforceability of the noncompetition clause is required.

[33] The Plaintiffs, asserting that there is no question of fact that Roncelli breached the non-solicitation clause in the Employment Agreement, ask this Court to grant summary disposition in their favor under *MCR 2.116(1) (2)*. This Court declines to do so. The Plaintiffs' argument regarding the non-solicitation clause is outside of the scope of the motion brought by the Defendants and has not been fully briefed by the parties.

LexisNexis®

# Kircher v. Boyne USA, Inc.

Supreme Court of Michigan

December 4, 2024, Argued; March 27, 2025, Decided; March 27, 2025, Filed

Docket No. 166459.

**Reporter**

2025 Mich. LEXIS 479 *; 2025 LX 283389; 2025 WL 938147

KATHRYN L. KIRCHER, Plaintiff-Appellee, v BOYNE USA, INC., and STEPHEN KIRCHER, Defendants-Appellants, and JOHN E. KIRCHER and AMY KIRCHER WRIGHT, Defendants.

## Syllabus

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Kathryn L. Kircher brought an action in the Emmet Circuit Court against Boyne USA, Inc., Stephen Kircher, and others not involved in this appeal, claiming in part that defendants breached a 2014 settlement agreement that the parties had reached after defendants fired plaintiff from their family business in 2012. The 2014 agreement provided that plaintiff would drop her claims against defendants in exchange for the right to redeem stock shares in Boyne USA at a redemption price calculated by a formula that was based in part on the amount of Boyne USA's debt. A second settlement agreement, executed in April 2019, supplemented the first agreement and settled a different lawsuit between plaintiff and defendants. Under that settlement agreement, the parties agreed to specific redemption prices for years 2015 through 2018 as calculated by the formula from the May 2014 settlement agreement, but the redemption price for plaintiff's 2019 shares was listed as "to be determined" because it hinged on Boyne USA's 2018 financial statements, which defendants stated had yet to be completed when the parties perfected the April 2019 settlement agreement. Because of this uncertainty, the parties agreed that the value of plaintiff's 2019 shares would again be determined using the formula from the 2014 settlement agreement. In 2018, Boyne USA borrowed approximately $300 million to purchase resort properties and other assets, which reduced plaintiff's 2019 redemption price to a negative number under the formula. Upon discovering the negative redemption price, plaintiff sued defendants for breach of contract, alleging that defendants had breached the 2014 settlement agreement and acted in bad faith by refusing to use an alternative method to calculate the redemption price. Defendants moved for summary disposition under *MCR 2.116(C)(8)*, and the trial court, Roy C. Hayes III, J., denied the motion, ruling that there were questions of fact regarding whether plaintiff could succeed on a theory that defendants had breached the implied covenant of good faith and fair dealing. Defendants applied for leave to appeal. After granting the application, the Court of Appeals, RICK, P.J., and SHAPIRO and YATES, JJ., affirmed, holding that plaintiff stated a cognizable breach-of-contract claim as to defendants' alleged bad faith in declining to use a different redemption-price formula, given that the settlement agreement allowed the parties to depart from the formula if they agreed to do so. *___ Mich App ___, 2023 Mich. App. LEXIS 7941 (November 2, 2023) (Docket No. 360821)*. Defendants sought leave to appeal in the Supreme Court, which scheduled and heard oral argument on the application regarding (1) whether the implied covenant of good faith and fair dealing applies only as an interpretive tool to understand the express terms of a contract, (2) whether plaintiff stated a valid claim for breach of contract based on the defendants' entering into a transaction that significantly added to the debt of Boyne USA, and (3) whether plaintiff stated a valid claim for breach of contract based on the defendants' refusal to negotiate an alternative formula to calculate the redemption price of the plaintiff's shares. *513 Mich 1054 (2024)*.

In a unanimous per curiam opinion, the Supreme Court, in lieu of granting leave to appeal, *held*:

The Court of Appeals erred by holding that plaintiff stated a valid claim for breach of contract based on defendants' refusal to negotiate an alternative formula to calculate the redemption price of plaintiff's shares. Under existing precedent, the implied covenant of good faith and fair dealing does not give rise to an independent cause of action, and it does not override or replace any express contractual term. To the extent the Court of Appeals held otherwise, its judgment was reversed.

1. In this case, the Court of Appeals relied on the implied covenant of good faith and fair dealing, which has been described as a promise that neither party will do anything that will have the effect of destroying or injuring the other party's right to receive the fruits of the contract. The Court of Appeals had previously held, however, that there is no independent cause of action for breach of the implied covenant of good faith and fair dealing, instead viewing this implied covenant as an interpretive tool with which to evaluate contractual obligations or other statutory duties. Under existing law, the implied covenant of good faith and fair dealing neither overrides nor replaces any express contractual term.

2. Applying the principles previously established regarding the implied covenant of good faith and fair dealing to the present case foreclosed plaintiff's breach-of-contract claim. At the outset, no party made calculating the redemption price of plaintiff's shares a matter of its own discretion; instead, the parties agreed to use a negotiated formula that unambiguously tied plaintiff's redemption price to Boyne USA's earnings and debt, and that agreed-upon formula governed the "to be determined" redemption price of plaintiff's 2019 stock shares. Because the parties unmistakably expressed their respective rights regarding redemption-price calculation, the Court of Appeals erred by holding that defendants were contractually obligated to use a different formula under the implied covenant of good faith and fair dealing. The phrase "unless otherwise agreed by the Parties" in the 2014 settlement agreement did not change this conclusion. Instead, this phrase merely permitted the parties to amend the contract at a future date, reflecting the bedrock principle that parties to a contract always have the ability to mutually modify their existing agreements after the original contract has been executed. If parties to a contract forgo such a modification opportunity, the terms of the existing contract govern. The Court of Appeals' holding effectively transformed the implied covenant of good faith and fair dealing into an independent cause of action that may be asserted in the absence of an underlying contractual duty or obligation. Because this surpassed the scope of the implied covenant as laid out in Court of Appeals precedent, the panel erred by holding that plaintiff stated a valid claim for breach of contract on that basis.

Court of Appeals judgment reversed in part, leave to appeal denied in part, and case remanded to the Emmet Circuit Court for further proceedings.

Justice THOMAS did not participate because the Court considered this case before she assumed office.

**Judges:** **[*1]** BEFORE THE ENTIRE BENCH (except THOMAS, J.). Elizabeth T. Clement, Chief Justice. Brian K. Zahra, Richard H. Bernstein, Megan K. Cavanagh, Elizabeth M. Welch, Kyra H. Bolden, Kimberly A. Thomas, Justices. THOMAS, J., did not participate. THOMAS, J., did not participate.

## Opinion

PER CURIAM.

In this case, plaintiff and defendants agreed to use a formula to calculate the redemption price of plaintiff's stock shares in defendant Boyne USA, Inc. After that formula produced a negative redemption price, plaintiff sued defendants, alleging that defendants refused to use an alternative formula in breach of the parties' contract. The narrow issue before this Court is whether the implied covenant of good faith and fair dealing can sustain plaintiff's claim. We hold that it cannot. Therefore, we reverse the Court of Appeals' decision to the contrary.

I. FACTS AND PROCEDURAL HISTORY

This case arises out of a long-running dispute between feuding family members. At all relevant times, plaintiff, Kathryn Kircher, was a shareholder of defendant Boyne USA, Inc., a ski business based in Emmet County. Everett Kircher, plaintiff's late father, founded Boyne USA in 1947, and it has remained in the Kircher family ever **[*2]** since. Plaintiff's brother, defendant Stephen Kircher, is currently the majority shareholder and CEO of Boyne USA, and other family members remain involved in various capacities.

Plaintiff also worked at Boyne USA for many years. But around 2010, plaintiff's relationship with her siblings soured. And in 2012, she was terminated from Boyne

USA. Several lawsuits followed. Relevant here are the settlement agreements resulting from those lawsuits—one executed in 2014, and another executed in 2019.

The first settlement agreement, executed in May 2014, provided that plaintiff would drop her claims against defendants in exchange for the right to redeem stock shares in Boyne USA. In relevant part, ¶ 2(b) of the 2014 settlement agreement provided the following:

> Beginning in 2014 and through 2017, Plaintiff may redeem additional shares in each year, not to exceed $250,000 in value as determined in accordance with Paragraph 2(c) of this Agreement, unless otherwise agreed by the Parties. Beginning in 2018 and each year thereafter, Plaintiff may redeem Plaintiff's shares not to exceed $150,000 in value as determined in accordance with Paragraph 2(c) unless otherwise agreed by the Parties and until **[*3]** such time as Plaintiff has redeemed all of her shares.

As indicated in this provision, ¶ 2(c) of the May 2014 settlement agreement established the formula for calculating the redemption price of plaintiff's stock shares in Boyne USA. That formula set forth the following calculation method:

> [(6.5 times an Average of EBITDA[1] ) minus the Total Company Debt[2] ] multiplied by 80% and then divided by the total number of outstanding shares to obtain a per share price. [Brackets in original.]

Therefore, the formula was variable and based the redemption price in part on Boyne USA's debt.

The second settlement agreement, executed in April 2019, supplemented the first agreement and settled a different lawsuit between plaintiff and defendants. The April 2019 settlement agreement also addressed the redemption price for plaintiff's shares in Boyne USA. Under that settlement agreement, the parties agreed to specific redemption prices for years 2015 through 2018, as calculated by the formula from the May 2014 settlement agreement. But the redemption price for plaintiff's 2019 shares was listed as "TBD," meaning "to be determined":

Go to table1

The 2019 redemption price was listed as "TBD" because it hinged on Boyne USA's 2018 financial statements, which defendants stated had yet to be completed at the time the parties perfected the April 2019 settlement agreement. Because of this uncertainty, the parties agreed that the value of plaintiff's 2019 shares would again be "calculated pursuant to the Settlement Agreement executed on May 7, 2014, in the same manner and form as the previous years." In other words, the redemption price for plaintiff's 2019 shares would be determined based on the same formula from the 2014 settlement agreement that incorporated Boyne USA's earnings and debt.

Under the agreed-upon formula, Boyne USA's debt significantly affected plaintiff's 2019 redemption price. Indeed, in 2018, Boyne USA borrowed approximately $300 million to purchase resort properties and other assets that it was leasing. As a result, this transaction reduced plaintiff's 2019 redemption price to a negative number under the formula.[3]

Upon discovering **[*5]** the negative redemption price, plaintiff sued defendants for breach of contract. Relevant here, plaintiff alleged that defendants breached the 2014 settlement agreement by refusing to "utilize an alternative method" to calculate the redemption price after the agreed-upon formula produced a negative redemption price. This, according to plaintiff, amounted to bad-faith conduct on defendants' part.[4] Defendants moved for summary disposition under *MCR 2.116(C)(8)*, but the trial court denied the motion in relevant part. The trial court reasoned that questions of fact lingered on whether the

---

1 The May 2014 settlement agreement defined "EBITDA" as "earnings before interests, taxes, depreciation and amortization," excluding "non-recurring and extraordinary items such as large real estate transactions."

2 "Total Company Debt" included Boyne USA's senior and subordinated debt "based on the immediately preceding calendar year-end financial statements" but excluded several other expenses incurred by Boyne USA.

3 The record suggests that plaintiff learned of this transaction before she entered into the 2019 supplemental settlement agreement. First, during a trial-court hearing, plaintiff's counsel stated that "the transaction happened in March, we found out about it in May of '18, but it's not really significant. We find out about this and we wanna redeem our shares." (Emphasis added.) Second, plaintiff at her deposition testified that she learned of the transaction before the parties executed the April 2019 settlement agreement.

4 Plaintiff also alleges that defendants breached the 2014 settlement agreement by entering into the 2018 transaction that increased Boyne USA's debt. The trial court allowed plaintiff's breach-of-contract claim to proceed on this basis. But the Court of Appeals disagreed, concluding that plaintiff failed to state a breach-of-contract claim as to debt acquisition because the 2014 settlement agreement lacked "any specifications or restrictions" on Boyne USA's ability to indebt itself. Kircher, Mich App at ; slip op at 5 n 7, 2023 Mich. App. LEXIS 7941. Although we ordered briefing on this issue, we decline to disturb the Court of Appeals' conclusion because we are not persuaded that it should be reviewed by this Court.

implied covenant of good faith and fair dealing could sustain plaintiff's breach-of-contract claim. The trial court thus allowed plaintiff's breach-of-contract claim to proceed on that basis.

Defendants appealed, and the Court of Appeals affirmed. *Kircher v Boyne USA, Inc, ___ Mich App ___, ___; ___ NW3d ___ (November 2, 2023) (Docket No. 360821), 2023 Mich. App. LEXIS 7941*. In so doing, the Court of Appeals relied on the implied covenant of good faith and fair dealing to hold that plaintiff sufficiently stated a breach-of-contract claim "on the basis of defendants' alleged bad-faith decision to not utilize a different formula to calculate **[*6]** her redemption price." *Id.* at 5. To the Court of Appeals, the phrase "unless otherwise agreed by the Parties" in the 2014 settlement agreement vested discretion in the parties to alter the formula if needed, thus opening the door to the implied covenant of good faith and fair dealing. *Id.* And in the Court of Appeals' view, plaintiff sufficiently alleged that defendants acted in bad faith by failing to "consider" a different formula. *Id.* Thus, the Court of Appeals held that plaintiff stated a cognizable breach-of-contract claim as to defendants' alleged bad faith in declining to use a different redemption-price formula. *Id.*

Defendants sought leave to appeal in this Court. We scheduled and heard oral argument on the application regarding the following issues:

> (1) whether the implied covenant of good faith and fair dealing applies only as an interpretive tool to understand the express terms of a contract, compare *Gorman v American Honda Motor Co, Inc, 302 Mich App 113, 133-134; 839 N.W.2d 223 (2013)*, with *In re Vylene Enters., 90 F.3d 1472, 1477 (CA 9, 1996)*; (2) whether the plaintiff stated a valid claim for breach of contract based on the defendants entering into the 2018 real estate transaction that significantly added to the debt of defendant Boyne USA, Inc.; and (3) whether the plaintiff stated a valid claim for breach **[*7]** of contract based on the defendants' refusal to negotiate an alternative formula to calculate the redemption price of the plaintiff's shares. [*Kircher v Boyne USA, Inc, 513 Mich 1054, 1054 (2024)*.]

II. STANDARD OF REVIEW

We review de novo denials of motions for summary disposition under *MCR 2.116(C)(8)*. *Bailey v Schaaf, 494 Mich 595, 603; 835 NW2d 413 (2013)*. *MCR 2.116(C)(8)* entitles the moving party to summary disposition when the "opposing party has failed to state a claim on which relief can be granted." Consequently, the "motion must be granted if no factual development could justify the plaintiff's claim for relief." *Spiek v Dep't of Transp, 456 Mich 331, 337; 572 NW2d 201 (1998)*.

III. ANALYSIS

We hold that the Court of Appeals erred by concluding that plaintiff stated a valid claim for breach of contract based on defendants' refusal to negotiate an alternative formula to calculate the redemption price of plaintiff's shares. As noted earlier, the Court of Appeals relied on the implied covenant of good faith and fair dealing in reaching its conclusion. The implied covenant of good faith and fair dealing has been broadly described as a promise "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v United of Oakland, Inc, 193 Mich App 146, 152; 483 NW2d 652 (1992)* (quotation marks and citation omitted).

Despite this broad definition, the Court **[*8]** of Appeals has set forth several principles that cabin the covenant's reach. For starters, the Court of Appeals has held that there is no independent cause of action for breach of the implied covenant of good faith and fair dealing. See, e.g., *Belle Isle Grill Corp v Detroit, 256 Mich App 463, 476; 666 NW2d 271 (2003)*. The Court of Appeals has instead viewed this implied covenant as an interpretive tool "by which contractual obligations or other statutory duties are to be measured and judged." *Gorman v American Honda Motor Co, Inc, 302 Mich App 113, 133; 839 NW2d 223 (2013)*. These principles track the Court of Appeals' longstanding holding that "[w]here a party to a contract makes the manner of its performance a matter *of its own discretion*, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Burkhardt v City Nat'l Bank of Detroit, 57 Mich App 649, 652; 226 NW2d 678 (1975)* (emphasis added). Naturally, then, the implied covenant of good faith and fair dealing under existing law "neither overrides nor replaces any express contractual term." *Bank of America, NA v Fidelity Nat'l Title Ins Co, 316 Mich App 480, 501; 892 NW2d 467 (2016)* (quotation marks and citation omitted).[5]

Applying these principles to the present case forecloses plaintiff's breach-of-contract claim. At the outset, no party made calculating the redemption price of plaintiff's

5 Because the parties agree with the legal principles espoused by the Court of Appeals, we need not define the contours of the implied covenant of good faith and fair dealing under Michigan law.

shares a matter of its own discretion. See *Burkhardt, 57 Mich App at 652*. To the contrary, the parties agreed to use a negotiated formula that **[*9]** unambiguously tied plaintiff's redemption price to Boyne USA's EBITDA and debt. And that agreed-upon formula governed the "TBD" redemption price of plaintiff's 2019 stock shares. Because the parties "unmistakably expressed their respective rights" regarding redemption-price calculation, *Hubbard Chevrolet Co v Gen Motors Corp, 873 F2d 873, 877 (CA 5, 1989)* (quotation marks and citation omitted), the Court of Appeals erred by holding that defendants were contractually obligated to use a *different* formula under the implied covenant of good faith and fair dealing.

The phrase "unless otherwise agreed by the Parties" in the 2014 settlement agreement does not change our conclusion. The Court of Appeals reasoned that this phrase introduced an implied duty to negotiate a new formula, such that it created the "type of discretionary authority on which a breach-of-contract action may be based." *Kircher, ___ Mich App at ___; 2023 Mich. App. LEXIS 7941*. Although parties to a contract always enjoy the ability to mutually modify their existing agreements, the language "unless otherwise agreed by the Parties" created no requirement to do so. Rather, "unless otherwise agreed by the Parties" merely permitted the parties to amend the contract at a future date, reflecting the bedrock **[*10]** principle that "parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed." *Quality Prods. & Concepts Co. v Nagel Precision, Inc., 469 Mich. 362, 372; 666 N.W.2d 251 (2003)*. And where, as here, parties to a contract forgo such a modification opportunity, the terms of the existing contract govern.

In sum, the parties here agreed to an unambiguous formula to calculate the plaintiff's redemption price. And the phrase "unless otherwise agreed by the Parties" created no discretionary duty or obligation to depart from this agreed-upon formula. The Court of Appeals' holding to the contrary effectively transformed the implied covenant of good faith and fair dealing into an independent cause of action that may be asserted in the absence of an underlying contractual duty or obligation. Because this surpasses the scope of the implied covenant as laid out in Court of Appeals precedent, the panel erred by holding that plaintiff stated a valid claim for breach of contract on that basis. See, e.g., *Belle Isle Grill Corp, 256 Mich App at 476*; *Burkhardt, 57 Mich App at 652*; *Gorman, 302 Mich App at 133-134*.

IV. CONCLUSION

At bottom, the Court of Appeals erred by holding that plaintiff stated a valid claim for breach of contract based on defendants' refusal to negotiate an alternative formula to calculate the redemption price of plaintiff's **[*11]** shares. We therefore reverse that part of the Court of Appeals' judgment and remand this case to the Emmet Circuit Court for further proceedings not inconsistent with this opinion. In all other respects, leave to appeal is denied, because we are not persuaded that the remaining questions presented should be reviewed by this Court.

Elizabeth T. Clement

Brian K. Zahra

Richard H. Bernstein

Megan K. Cavanagh

Elizabeth M. Welch

Kyra H. Bolden

THOMAS, J., did not participate because the Court considered this case before she assumed office.

**Table1 (*Return to related document text*)**

| Year | Amount | Strike Price | |
|---|---|---|---|
| 2015 | $250,000 | $360.23 | (12/31/2014 financials) |
| 2016 | $250,000 **[*4]** | $324 | (12/31/2015 financials) |
| 2017 | $250,000 | $401.81 | (12/31/2016 financials) |
| 2018 | $150,000 | $773 | (12/31/2017 financials) |
| 2019 | $150.000 | TBD | (12/31/2018 financials)l |
| Total | $1,050,000 | | |

**Table1 (*Return to related document text*)**

---

End of Document

LexisNexis

# Leonor v. Provident Life & Accident Co.

United States District Court for the Eastern District of Michigan, Southern Division

March 20, 2013, Decided; March 20, 2013, Filed

Case No. 12-15343

**Reporter**
2013 U.S. Dist. LEXIS 38423 *; 2013 LX 34358; 2013 WL 1163375

LOUIS LEONOR, Plaintiff, v. PROVIDENT LIFE AND ACCIDENT COMPANY and PAUL REVERE LIFE INSURANCE COMPANY, Defendants.

**Subsequent History:** Summary judgment granted by, Judgment entered by *Leonor v. Provident Life & Accident Co., 2014 U.S. Dist. LEXIS 59816 ( E.D. Mich., Apr. 30, 2014)*

**Counsel:** **[*1]** For Louis Leonor, Plaintiff: Michael M. Jacob, Young Basile Hanlon & MacFarlane PC, Troy, MI.

For Provident Life and Accident Company, Paul Revere Life Insurance Company, Defendants: K. Scott Hamilton, Dickinson Wright, Detroit, MI.

For Louis Leonor, Counter Defendant: Michael M. Jacob, Young Basile Hanlon & MacFarlane PC, Troy, MI.

For Paul Revere Life Insurance Company, Provident Life and Accident Company, Counter Claimants: K. Scott Hamilton, Dickinson Wright, Detroit, MI.

**Judges:** ROBERT H. CLELAND, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT H. CLELAND

## Opinion

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COUNT II

Defendants Provident Life and Accident Company and Paul Revere Life Insurance Company ceased paying Plaintiff Louis Leonor disability benefits pursuant to three disability income insurance policies. Plaintiff filed suit against Defendants alleging breach of contract and fraud. Defendants move to dismiss Plaintiff's fraud claim under *Federal Rule of Civil Procedure 12(b)(6)*. The motion has been fully briefed, and a hearing is unnecessary. *See* *E.D. Mich. LR 7.1(f)(2)*. For the following reasons, the court will grant the motion.

### I. BACKGROUND

Beginning in 1990, Plaintiff Louis Leonor purchased **[*2]** three disability income insurance policies (the "Policies") from Defendants Provident Life and Accident Company and Paul Revere Life Insurance Company. The Policies state that Plaintiff will receive disability benefits if he has a "Total Disability," which is defined as "being unable to perform the important duties of Your Occupation." (Dkt. # 1 at 2.) Plaintiff, a board certified dentist, when purchasing the Policies listed "dentist" as his "Occupation." Plaintiff alleges that, when he purchased the Policies, Defendants represented to him that the Policies would pay him disability benefits if Plaintiff became disabled and could no longer work as a dentist.

On March 11, 2009, Plaintiff allegedly became totally disabled due to a cervical spine disc herniation and was unable to continue working as a dentist. Plaintiff filed a disability claim, and in July 2009 Defendants began paying Plaintiff disability benefits under each of the Policies. On September 27, 2010, Defendants stopped paying disability benefits under two of the Policies, and on September 14, 2011, terminated payments under the third Policy. Defendants claimed that Plaintiff was not disabled from his "Occupation" because **[*3]** he was capable of managing his dental practices and real estate and, therefore, was no longer entitled to benefits.

On December 5, 2012, Plaintiff filed suit against Defendants alleging breach of contract (Count I) and fraud and misrepresentation (Count II). Defendants move to dismiss Plaintiff's fraud claim under *Rule 12(b)(6)*.

## II. STANDARD

A complaint may be dismissed under *Rule 12(b)(6)* when the plaintiff fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. A complaint "does not need detailed factual allegations," but "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* The plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Id. at 570*.

When ruling on a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must construe the complaint in a light most favorable to the plaintiff and accept all of the factual allegations as true. *Evans-Marshall v. Bd. of Educ., 428 F.3d 223, 228 (6th Cir. 2005)*. **[*4]** In doing so, the court must "draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007)*. Yet the court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby Cnty., Tenn., 220 F.3d 433, 446 (6th Cir. 2000)*. A court cannot grant a motion to dismiss under *Rule 12(b)(6)* based upon its disbelief of a complaint's factual allegations. *Wright v. MetroHealth Med. Ctr., 58 F.3d 1130, 1138 (6th Cir. 1995)*. "[T]he court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Amini v. Oberlin Coll., 259 F.3d 493, 502 (6th Cir. 2001)*.

## III. DISCUSSION

Generally, a claim for fraud must concern "statements of past or existing fact, rather than future promises or good-faith opinions." *Cooper v. Auto Club Ins. Ass'n, 481 Mich. 399, 751 N.W.2d 443, 452 (Mich. 2008)*. An exception to this general rule is that "an unfulfilled promise to perform in the future is actionable when there is evidence that it was made with a present undisclosed intent not to perform." *Foreman v. Foreman, 266 Mich. App. 132, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005)*. **[*5]** "[T]he mere fact that statements relate to the future will not preclude liability for fraud if the statements were intended to be, and were accepted as, representations of fact, and involved matters peculiarly within the knowledge of the speaker." *Id.*

It is unclear whether Count II alleges that Defendants' misrepresentation related to a present fact or was a future promise. The Count, in pertinent part, states:

> 23. At the time Leonor purchased each of his three (3) Policies, it was represented to him by Provident's and Paul Revere's agents that the Policies covered his Occupation (*i.e.,* a dentist).
>
> 24. In reliance upon that representation, Leonor purchased the Policies, renewed the Policies, and paid the annual premiums.
>
> 25. By claiming that Leonor was no longer totally disabled because he can manage dental practices and real estate but not practice dentistry, Provident and Pail [sic] Revere have misrepresented the terms, benefits, advantages and conditions of the Policies and have otherwise engaged in unfair methods of competition and unfair or deceptive acts or practices . . . .

(Dkt. # 1 at 5.)[1] The vague misrepresentation alleged in Count II may be interpreted in two ways: (1) Defendants **[*6]** stated that the Policies cover Plaintiff's occupation as a dentist (*i.e.,* stating a present fact); or (2) Defendants promised that the Policies would pay benefits if Plaintiff became disabled and could no longer work as a dentist (*i.e.,* a future promise). Plaintiff does not explicitly state whether Defendants' misrepresentation related to a present fact or constituted a future promise, apparently asking the court to decide the correct interpretation of Plaintiff's cause of action.[2] Resolving this question is unnecessary,

[1] The court notes that, to remedy Defendants' alleged fraud, Plaintiff seeks an order requiring Defendants to pay Plaintiff lifetime disability benefits in accordance with the Policies. However, a successful fraud claim does not provide such a remedy, but instead "renders [a] contract voidable at the option of the defrauded party." *Custom Data Solutions, Inc. v. Preferred Capital, Inc., 274 Mich. App. 239, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006)* (citation omitted).

[2] For example, Plaintiff, in his response, states: "If the Court

however, as Count II fails to state a claim for relief in either case.

"The law in Michigan is well-settled that an action in tort requires a breach of duty separate and distinct from a breach of contract." *Brock v. Consol. Biomedical Labs., 817 F.2d 24, 25 (6th Cir. 1987)* (collecting authority). A plaintiff cannot bring a tort action for nonperformance of a contract. *Casey v. Auto Owners Ins. Co., 273 Mich. App. 388, 729 N.W.2d 277, 286 (Mich. Ct. App. 2006)*. When a fraud claim is based on a breach of a contractual duty, the fraud claim must be dismissed for not arising under a separate legal duty. *Theuerkauf v. United Vaccines Div. of Harlan Sprague Dawley, Inc., 821 F. Supp. 1238, 1241 (W.D. Mich. 1993)* (dismissing a fraud claim where the defendant allegedly misrepresented that a product was safe and, therefore, the claim "[arose] only because the product did not work as it was supposed to work" and could only be brought under contract law); *Merchants Publ'g Co. v. Maruka Mach. Corp. of Am., 800 F. Supp. 1490, 1493 (W.D. Mich. 1992)* (dismissing a fraud claim after finding that the alleged misrepresentations of a product's safety "would not [have arisen] without the existence **[*8]** of the putative contracts between the parties"); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc., 209 Mich. App. 365, 532 N.W.2d 541, 546 (Mich. Ct. App. 1995)* (dismissing a fraud claim after holding that the alleged fraudulent representations concerning a product's quality and characteristics were "indistinguishable from the terms of the contract and warranty that plaintiff allege[d] were breached").

Here, Plaintiff's fraud claim alleges that Defendants misrepresented that Plaintiff would receive benefits if he became unable to work as dentist. Whether that alleged misrepresentation was stated as a present fact of the Policies' scope or as a future promise of coverage, Plaintiff's claim arises solely from Defendants' contractual obligation to pay Plaintiff benefits according to the Policies if he became disabled. The alleged fraudulent statement is indistinguishable from the Policy terms that Plaintiff argues were breached. Therefore, the fraud claim does not arise under a breach of a legal duty that is separate and distinct from the alleged breach of the Policies.

Plaintiff argues that *Cooper v. Auto Club Insurance Association, 481 Mich. 399, 751 N.W.2d 443 (Mich. 2008)*, is dispositive. In that case, the **[*9]** plaintiff and her daughters were injured in a car accident. *Id. at 445*. Both of the daughters suffered severe injuries, and one of the daughters required continuous skilled nursing care which was being paid for by the plaintiff's insurance association. *Id.* After the plaintiff received benefits for two years under Michigan's no-fault act, *Mich. Comp. Laws § 500.3105*, the insurance association told the plaintiff that it would pay her $50 a day if she quit her job to take care of her daughter. *Id.* The plaintiff accepted the offer and, over the course of a decade, the insurance association raised the plaintiff's payments to $10 per hour. *Id.* The plaintiff sued the insurance association and brought two causes of action: (1) failure to pay all of the personal protection insurance benefits that were due under the no-fault act; and (2) fraud. The plaintiff, with respect to the fraud claim, alleged that the insurance association "had fraudulently induced [the plaintiff] to accept an unreasonably low compensation rate for her in-home attendant care services." *Id. at 446*.

The Michigan Supreme Court held that the fraud claim was distinct from the no-fault claim for benefits, opining:

> Unlike a no-fault **[*10]** claim, a fraud claim does not arise from an insurer's mere omission to perform a contractual or statutory obligation, such as its failure to pay all the [insurance] benefits to which its insureds are entitled. Rather, it arises from the insurer's breach of its separate and independent duty not to deceive the insureds, which duty is imposed by law as a function of the relationship of the parties . . . .

*Id. at 448*. The court held that "where an insured's claim arises not out of the insurer's mere failure to pay no-fault benefits, but out of the insurer's fraudulent misrepresentations . . . the courts are faced with a fraud claim as opposed to a no-fault claim." *Id. at 450*. However, the court reiterated that "mere allegations of failure to discharge obligations under an insurance contract could not be actionable in tort." *Id. at 449* (citation and alterations omitted).

The facts of *Cooper* are distinguishable from this case. In that case, the alleged fraudulent statements were made to convince the plaintiff to accept lower benefits than she would have received under the no-fault act. Unlike *Cooper,* where the fraudulent statements did not address the terms of a contract, Defendants' alleged **[*11]** misrepresentation concerned the Policies' coverage provisions and whether Plaintiff would receive benefits if he could no longer work as a dentist.

---

agrees that the representations in question apply only to future conduct, then Plaintiff's **[*7]** fraud claim may properly be treated as a claim for fraud in the inducement." (Dkt. # 14 at 8.)

Plaintiff's fraud claim arises solely from Defendants' alleged failure to fulfill a contractual obligation and not from a breach of a separate and independent duty. This allegation of fraud is not actionable and must be dismissed.

**IV. CONCLUSION**

Accordingly, IT IS ORDERED that Defendants' motion to dismiss Count II [Dkt. # 9] is GRANTED, and Count II is DISMISSED WITH PREJUDICE.

/s/ Robert H. Cleland

ROBERT H. CLELAND

UNITED STATES DISTRICT JUDGE

Dated: March 20, 2013

---

**End of Document**

LexisNexis

# Liggett Rest. Group v. City of Pontiac

Court of Appeals of Michigan

November 29, 2005, Decided

No. 256571

**Reporter**

2005 Mich. App. LEXIS 2962 *; 2005 WL 3179679

LIGGETT RESTAURANT GROUP, INC., Plaintiff-Appellant, v CITY OF PONTIAC and PONTIAC STADIUM BUILDING AUTHORITY, Defendants-Appellees.

**Notice:** **[*1]** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Appeal denied by *Liggett Rest. Group, Inc. v. City of Pontiac, 2006 Mich. LEXIS 1887 (Mich., Sept. 15, 2006)*

**Prior History:** Oakland Circuit Court. LC No. 2001-036350-CZ.

**Disposition:** Affirmed.

**Judges:** Before: Davis, P.J., and Fitzgerald and Cooper, JJ.

## Opinion

PER CURIAM.

Plaintiff appeals as of right the order denying its motion to amend its complaint to add a claim for "breach of contract/breach of the implied covenant of good faith and fair dealing." We affirm.

The basic facts and procedural history of this case are set out in *Liggett Restaurant Group, Inc v City of Pontiac, 260 Mich. App. 127; 676 N.W.2d 633 (2003)*, wherein this Court affirmed the trial court's grant of summary disposition to defendants on plaintiff's claims for rescission of a contract that gave plaintiff's predecessor, Elias Brother's Restaurants, Inc. ("Big Boy"), the exclusive right to sell concessions at all events at the Pontiac Silverdome. *Id.* at 135-138. Plaintiff sought to rescind the contract based on frustration of purpose and unjust enrichment. *Id.* Although this Court affirmed the dismissal of those claims, it remanded the **[*2]** case because the trial court had denied plaintiff the opportunity to amend its complaint. *Id. at 138-139*. On remand, plaintiff moved to amend its complaint to add a claim for "breach of contract/breach of the implied covenant of good faith and fair dealing." The trial court denied the motion, finding that the proposed cause of action was not recognized in Michigan and, in any event, plaintiff had not properly pleaded such a claim.

We review a trial court's decision whether to allow amendment of a complaint for an abuse of discretion. *Liggett, supra at 138*. Where summary disposition is granted based on MCR2.116(C)(8), "the court shall give the parties an opportunity to amend their pleadings as provided by *MCR 2.118*, unless the evidence then before the court shows that the amendment would not be justified." *MCR 2.116(I)(5)*. An amendment is futile if it simply restates allegations that were already made or adds allegations that still fail to state a claim. *Yudashkin v Linzmeyer (On Remand), 247 Mich. App. 642, 651; 637 N.W.2d 257 (2001)*. A determination of futility is based **[*3]** on the legal sufficiency of the claim on its face. *Liggett, supra at 139*.

Here, the trial court did not abuse its discretion by denying plaintiff's motion to amend. An implied covenant of good faith and fair dealing generally exists in all contracts, except employment contracts. *Hammond v United of Oakland, Inc, 193 Mich. App. 146, 151-152; 483 NW2d 652 (1992)*; *Dahlman v Oakland Univ, 172 Mich. App. 502; 432 N.W.2d 304 (1988)*. The implied covenant applies to the performance and enforcement

of contracts where a contractual term leaves the manner of performance to one party's discretion. Ferrell v Vic Tanny Int'l, Inc, 137 Mich. App. 238, 243; 357 N.W.2d 669 (1984); Burkhardt v City Nat'l Bank of Detroit, 57 Mich App 649, 652; 226 N.W.2d 678 (1975). Where a party to a contract makes the manner of performance a matter of its own discretion, it must exercise that discretion honestly and in good faith. Ferrell, supra at 243. Michigan does not recognize a separate cause of action for breach of an implied covenant of good faith and fair **[*4]** dealing apart from a claim for breach of the contract itself. Kewin v Massachusetts Mut Life Ins Co, 409 Mich. 401, 411; 295 N.W.2d 50 (1980); Belle Isle Grill Group v City of Detroit, 256 Mich. App. 463; 666 N.W.2d 271 (2003). A breach of contract may be found where bad faith or unfair dealing exists in the performance of a contractual term when the manner of performance was discretionary. Ferrell, supra at 243-244.

This case involves a concession contract between Big Boy and defendant Pontiac Stadium Building Authority (stadium authority). Plaintiff's proposed amended complaint alleged breaches of an implied covenant of good faith and fair dealing, but it does not allege any corresponding breach of the concession contract itself. The essence of the concession contract was that Big Boy had the exclusive right to be concessionaire for all events at the Pontiac Silverdome. The proposed amended complaint contained no allegations that the manner of performance of any express terms of the concession contract were discretionary with defendants and that the discretionary performance of those acts occurred in bad **[*5]** faith. Rather, plaintiff's proposed amended complaint is based on allegations that defendants improperly settled separate litigation with the Detroit Lions over their lease of the Pontiac Silverdome and, in allowing the Detroit Lions out of the lease, defendants interfered with plaintiff's reasonable expectations that the Detroit Lions would play at the Silverdome through 2005. This conduct, in turn, affected plaintiff's revenues under the concession contract. Plaintiff's claim, as pleaded, fails to state a cause of action for a recognized claim in Michigan. Belle Isle Grill, supra. The trial court properly denied plaintiff's motion to amend the complaint.

We reject plaintiff's argument that it adequately pleaded a cause of action based on an implied contractual term related to the booking and retaining of events at the Silverdome. Plaintiff argues that, because the booking and retaining of events was left to the discretion of defendants under the concession contract, the implied covenant of good faith and fair dealing applies to the contract and was breached by defendants' conduct in settling the separate litigation with the Detroit Lions without considering the **[*6]** concession contract. Plaintiff did not plead any facts, however, to support that the booking and retaining of events was actually contemplated or agreed upon by the parties as an implied term of the concession contract. To the contrary, plaintiff acknowledged in its proposed amended complaint that the concessions contract was silent with regard to the booking and retaining of events. A valid contract requires mutual assent on all essential terms. Kamalnath v Mercy Mem Hosp Corp, 194 Mich. App. 543, 548-549; 487 NW2d 499 (1992). Although pleaded facts must be accepted as true when evaluating the sufficiency of a complaint, this principle does not extend to conclusions of fact or law. Stann v Ford Motor Co, 361 Mich. 225, 232-233; 105 N.W.2d 20 (1960). Thus, the conclusory allegation that the booking and retaining of events was a matter left to defendants' discretion under the concession contract is insufficient. Moreover, a review of the concession contract attached to the proposed amended complaint fails to reveal any terms from which it could be inferred that the act of booking and retaining of events was a matter of contract **[*7]** between the parties. The concession contract did not guarantee a specific number of events or specific revenues for Big Boy. The contract did not even guarantee that the Lions would play home games at the Silverdome. Liggett, supra at 136. Plaintiff failed to plead an essential element of a claim for breach of the implied covenant of good faith and fair dealing because it failed to adequately allege that defendants had discretion in the manner of performance of the term of the concession contract upon which the breach of the implied covenant is based.

In affirming the trial court's decision, we note that the primary factual assertions relied on by plaintiff in its proposed amended complaint are related to the Detroit Lions continued presence at the Silverdome for home games throughout 2005. Plaintiff alleges that the Detroit Lions continued presence was essential to the concession contract and that it had a reasonable expectation that the Detroit Lions would continue to play at the Silverdome. Plaintiff cannot rely on these assertions to state a valid claim. This Court previously determined that the concession contract contemplated that the Detroit Lions may not **[*8]** continue to play home games at the Silverdome. Liggett, supra at 135-136. This Court's previous determination respecting the concession contract is the law of the case. Kalamazoo v Dep't of Corrections (After Remand), 229 Mich. App.

*132, 135; 580 N.W.2d 475 (1998)*.

Plaintiff also claims that it adequately stated a cause of action because it alleged that defendants had discretion in the manner of performance of their lease contract with the Detroit Lions. Plaintiff did not actually plead that defendants had discretion with respect to any specific terms in their lease contract with the Detroit Lions. Nor did it allege any facts to support a finding that defendants were given discretion in the manner of performance under the terms of that contract. Rather, plaintiff pleaded its own legal conclusion that defendants could have compelled specific performance or obtained injunctive relief to keep the Lions at the Silverdome if they had chosen to do so. We are not required to accept this conclusory allegation as true when evaluating the sufficiency of the complaint. *Stann, supra at 232-233*. More importantly, we fail to see the **[*9]** relevance of defendants' discretion, if any, in the manner of performance under the lease contract with the Detroit Lions. Plaintiff has not cited any authority to support that the covenant of good faith and fair dealing may be imposed on one contract, here the concession contract, based on the fact that defendants had discretion with respect to their manner of performance under a separate contract, here the lease between the Lions and defendants for use of the Silverdome for football games. That issue is therefore abandoned. *Houghton v Keller, 256 Mich. App. 336, 339-340; 662 N.W.2d 854 (2003)*.

Finally, we find no merit to plaintiff's argument that the trial court made an improper factual determination when it found that defendants had no discretion under their lease with the Detroit Lions. Plaintiff alleged that defendants had a right under their lease with the Lions to compel specific performance or obtain injunctive relief. This allegation was a legal conclusion regarding the rights plaintiff believed were available to defendants. The trial court was not required to accept this allegation as true. *Stann, supra.* Moreover, the trial **[*10]** court's observation that defendants had no discretion in their lease contract with the Detroit Lions was not improper where there was no allegation to support that defendants had such discretion.

Affirmed.

/s/ Alton T. Davis

/s/ E. Thomas Fitzgerald

/s/ Jessica R. Cooper

---

**End of Document**

LexisNexis®

# Luxury Limousine, Inc. v. Nat'l Indem. Co.

United States District Court for the Eastern District of Michigan, Southern Division

August 7, 2019, Decided; August 7, 2019, Filed

Case No. 19-10893

**Reporter**

2019 U.S. Dist. LEXIS 132596 *; 2019 LX 32111; 2019 WL 3714458

LUXURY LIMOUSINE, INC., Plaintiff, v. NATIONAL INDEMNITY COMPANY, Defendant.

**Subsequent History:** Motion denied by, in part *Luxury Limousine, Inc. v. Nat'l Indem. Co., 2020 U.S. Dist. LEXIS 249959 ( E.D. Mich., Dec. 2, 2020)*

**Counsel: [*1]** For Luxury Limousine, Inc., Plaintiff: Mark L. Menczer, LEAD ATTORNEY, Southfield, MI; M. Michael Koroi, Law Offices of Salem F. Samaan, P.C., Plymouth, MI; Timothy M. Lessing, Lessing Legal, PLLC, West Bloomfield, MI.

For National Indemnity Company, Defendant: Kurt D. Meyer, Gregory and Meyer, Troy, MI.

**Judges:** HON. GEORGE CARAM STEEH, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE CARAM STEEH

## Opinion

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (DOC. 10)

Before the court is Defendant's motion to dismiss. The court heard oral argument on August 5, 2019, and took the matter under advisement. For the reasons explained below, Defendant's motion is granted in part and denied in part.

BACKGROUND FACTS

This action arises out of an insurance claim for property damage. Plaintiff Luxury Limousine, Inc., provides transportation services. On June 4, 2018, Plaintiff obtained a commercial policy of insurance from Defendant National Indemnity Company ("NIC") covering several vehicles. *See* Doc. 5 at ¶ 7. Plaintiff alleges that on September 4, 2018, five of its vehicles were vandalized, including four buses and a Rolls Royce. Plaintiff submitted a claim to NIC the following day.

NIC had an appraisal **[*2]** performed on the five damaged vehicles. Plaintiff's counsel sent a letter to NIC on September 28, 2018, regarding the claim, but received no immediate response. *Id.* at ¶ 13. On October 26, 2018, Plaintiff received a request from NIC for certain records. Plaintiff's counsel attempted to set up a meeting to discuss the claim in December 2018; Plaintiff alleges that its overtures were "not responded to" during December and that a meeting was not held until January 2019. Plaintiff contends that NIC has unreasonably delayed in processing its claim and that it continues to lose significant revenue as the damaged vehicles await repairs.

Plaintiff also alleges that the lost revenue has resulted in its inability to pay its insurance premiums. NIC cancelled Plaintiff's policy on February 3, 2019. Plaintiff alleges that it is unable to operate its business without insurance coverage, which is required under state law.

Plaintiff's complaint alleges the following causes of action: Count I, breach of contract; Count II, specific performance; Count III, breach of policy and statutory duties to give notice of cancellation; Count IV, statutory interest; Count V, tortious interference with business relations; **[*3]** and Count VI, arbitrary, reckless, indifferent and/or intentional actions in disregard of the duties owed to policy holder (bad faith). Defendant has filed a motion for partial dismissal with respect to Plaintiff's specific performance, tortious interference, and bad faith claims.

LAW AND ANALYSIS

I. Standard of Review

A motion under *Rule 12(b)(6) of the Federal Rules of Civil Procedure* seeks dismissal based upon the plaintiff's failure to state a claim upon which relief can be granted. To survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *see also* *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 319 (6th Cir. 1999)* (internal quotation marks omitted).

In general, the court does not consider matters outside the complaint when assessing whether the plaintiff has stated a claim. *Rondigo, L.L.C. v. Township of Richmond, 641 F.3d 673, 680-81 (6th Cir. 2011)*. If the court considers materials outside of the complaint, it must ordinarily treat the motion as one for summary judgment. *Id.* However, the court may consider exhibits attached to the complaint, public **[*4]** records, and exhibits that are "referred to in the complaint and central to the claims contained therein" without converting a motion to dismiss to a motion for summary judgment. *Id.*

Plaintiff attached exhibits to its response brief, including a police report, appraisals, correspondence, and an affidavit. These outside materials are not appropriate for the court to consider in conjunction with a *Rule 12(b)(6)* motion. Additionally, the court finds that these materials are not relevant to the question of whether Plaintiff has stated viable claims for relief. The court will disregard the exhibits and rely upon the four corners of Plaintiff's complaint.

II. Specific Performance

Although characterized as a separate claim in the complaint, specific performance is an equitable remedy, not a cause of action. *See* *Ruegsegger v. Bangor Twp. Relief Drain, 127 Mich. App. 28, 30-31, 338 N.W.2d 410 (1983)*. Specific performance is an appropriate remedy for a breach of contract when there is an "inadequate remedy at law." *JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 584 (6th Cir. 2007)*. "The equitable remedy of specific performance may be awarded where the legal remedy of damages is impracticable." *Ruegsegger, 127 Mich. App. at 31*. A damages remedy is deemed impracticable when "it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty, **[*5]** so that no real compensation can be obtained by means of an action at law." *Id.* (citation omitted).

Defendant contends that Plaintiff has an adequate remedy at law — damages for breach of the insurance contract. Plaintiff argues that specific performance is available to force an insurer to process a claim in an expeditious manner. Plaintiff cites no case law for the proposition that the court may order specific performance as a remedy for a breach of an insurance contract. Moreover, damages will fully compensate Plaintiff for any losses it has sustained as a result of NIC's failure to pay its claim. Under these circumstances, Plaintiff has not alleged that its remedy at law is inadequate or impracticable. The courts finds that specific performance is not a viable remedy as a matter of law and that Count II should be dismissed.

III. Tortious Interference

"The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant **[*6]** damage to the plaintiff." *BPS Clinical Lab. v. Blue Cross & Blue Shield, 217 Mich. App. 687, 698-99, 552 N.W.2d 919 (1996)* (citations omitted). In addition, "one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Feldman v. Green, 138 Mich. App. 360, 369-70, 360 N.W.2d 881 (1984)*. "To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Lab., 217 Mich. App. at 699*. However, "[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id.*

Plaintiff alleges that Defendant tortiously interfered with its business relationships with its clients by failing to

process its claim in a timely manner, improperly cancelling the policy, and falsely notifying the State of Michigan of the cancellation. Doc. 5 at ¶ 49. Defendant argues that these actions were not per se wrongful and were motivated by legitimate business reasons. At this stage of the proceedings, the issue of Defendant's motivation **[*7]** is best left to further factual development. *See* *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 458 (6th Cir. 2011)* ("Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."). The court will deny Defendant's motion with respect to Plaintiff's tortious interference claim.

IV. Bad Faith

In Count VI, Plaintiff alleges a bad faith claim against Defendant, entitled "arbitrary, reckless, indifferent, and/or intentional actions in disregard of the duties owed to Defendant's policy holder." Doc. 5 at 11. Defendant seeks dismissal of this claim, noting correctly that the "tort of bad-faith breach of an insurance contract does not exist in Michigan." *Burnside v. State Farm Fire & Cas. Co., 208 Mich. App. 422, 425 n.1, 528 N.W.2d 749 (1995)*; *see also* *Casey v. Auto Owners Ins. Co., 273 Mich. App. 388, 401-402, 729 N.W.2d 277 (2006)* ("An alleged bad faith breach of an insurance contract does not state an independent tort claim.") Plaintiff has failed to provide contrary authority. Accordingly, the court will dismiss Count VI.[1]

Under the umbrella of Count VI, Plaintiff seeks exemplary damages. To the extent that Plaintiff seeks exemplary damages for breach of the insurance contract, such damages are not available. *Casey, 273 Mich. App. at 402* (exemplary damages not recoverable "absent allegation and proof of tortious conduct that is 'independent **[*8]** of the breach'"). The court makes no ruling regarding whether Plaintiff may be entitled for exemplary damages as a remedy for its tortious interference claim. *See* Doc. 5 (Complaint) at ¶ 50.

CONCLUSION

The court concludes that Plaintiff cannot seek the remedy of specific performance or state a tort claim for bad faith as a matter of law; therefore, any amendment of the complaint with respect to these matters would be futile.

Accordingly, IT IS HEREBY ORDERED that Defendant's motion to dismiss (Doc. 10) is GRANTED IN PART with respect to Counts II (specific performance) and VI (bad faith) and DENIED IN PART with respect to Count V (tortious interference).

Dated: August 7, 2019

/s/ George Caram Steeh

GEORGE CARAM STEEH

UNITED STATES DISTRICT JUDGE

---

**End of Document**

[1] To the extent Defendant has acted in bad faith by failing to pay a claim that is not reasonably in dispute, Plaintiff may recover penalty interest at a rate of 12% per annum under the *Uniform Trade Practices Act*, *M.C.L. § 500.2006(4)*. *See* ***Burnside, 208 Mich. App. at 431***. Plaintiff has pleaded such a claim in Count IV.

LexisNexis®

# Mannion v. Henry Elec., LLC

United States District Court for the Eastern District of Michigan, Southern Division

January 29, 2026, Decided; January 29, 2026, Filed

Case No. 25-11344

**Reporter**
2026 U.S. Dist. LEXIS 17633 *; 2026 LX 39608; 2026 WL 243929

THOMAS MANNION, Plaintiff, v. HENRY ELECTRIC, LLC and KEVIN KUZA, Defendants.

**Counsel:** **[*1]** For Thomas Mannion, Plaintiff: Racine M. Miller, The Michigan Law Firm, PC, The Michigan Law Firm, PC, Birmingham, MI.

**Judges:** Hon. F. Kay Behm, United States District Judge.

**Opinion by:** F. Kay Behm

## Opinion

**OPINION AND ORDER ON MOTION FOR DEFAULT JUDGMENT (ECF No. 18)**

**I. PROCEDURAL HISTORY**

Plaintiff Thomas Mannion filed a complaint on May 7, 2025 against Defendants Henry Electric, LLC, and Kevin Kuza, alleging breach of contract and several related torts connected to a contract for sale of a custom electric bike. ECF No. 1. Plaintiff served the summons and complaint upon Defendants on July 17, 2025. *See* ECF No. 12, PageID.53; ECF No. 13, PageID.54.

*Fed. R. Civ. P. 12(a)(1)* provides that a defendant must provide an answer within twenty-one (21) days of being served with a summons and complaint. The deadline for Defendants to serve an answer or otherwise respond to the complaint in this matter was August 7, 2025. Mannion filed his requests for entries of default against Defendants on August 8, 2025, which were entered that same day. ECF Nos. 14, 15, 16, 17. On August 11, 2025, Mannion moved for a default judgment against Defendants. ECF No. 18. On January 28, 2026, the court held a hearing on Plaintiff's motion at which Plaintiff's counsel appeared. **[*2]**

For the reasons set forth below, the court **GRANTS** Plaintiff's Motion for Default Judgment as to Counts I, III, and V **IN PART**, awards damages accordingly, otherwise **DENIES** the motion, and closes the case.

**II. FACTUAL BACKGROUND** [1]

The facts here are straightforward. Plaintiff Thomas Mannion ordered a custom electric bicycle from Defendants Henry Electric, LLC and Kevin Kuza. In May 2022, Mannion paid Henry Electric $7,700 for the bicycle, but the bicycle was never delivered. In August 2022, Plaintiff requested a refund, which Kuza, acting on behalf of Henry Electric, agreed to. In March 2023, Defendants provided a written refund proposal stating that Plaintiff would be refunded $4,750.0 by April 25, 2023, with a $150 per day penalty accruing for any delay. No refund has been paid in any amount.

Plaintiff says the $150 per day penalty was a new contract binding on Defendants, and that he is therefore entitled to $391,800 in actual damages and treble damages, plus attorney's fees. ECF No. 18, PageID.80.

**III. STANDARD OF REVIEW**

"Entry of default and a default judgment are distinct events that require separate treatment." *Ramada Franchise Sys., Inc. v. Baroda Enters., LLC, 220 F.R.D.*

[1] On a motion for default judgment, the court takes these facts from the Complaint and accepts them as true. ECF No. 1, PageID.1-7.

303, 304 (N.D. Ohio 2004) (internal citation omitted). An entry of default is a prerequisite to a **[*3]** default judgment. Pursuant to *Fed. R. Civ. P. 55(a)*, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." An entry of default "conclusively establishes every factual predicate of a claim for relief." *Thomas v. Miller, 489 F.3d 293, 299 (6th Cir. 2007)* (citing *Harmon v. CSX Transp., 110 F.3d 364, 368 (6th Cir. 1997)*). However, entry of a default does not establish damages. *See Antoine v. Atlas Turner, Inc., 66 F.3d 105, 110 (6th Cir. 1995)*; *see also Kelley v. Carr, 567 F. Supp. 831, 841 (W.D. Mich. 1983)* ("A default judgment on well-pleaded allegations establishes only defendant's liability; plaintiff must still establish the extent of damages."). Thus, the plaintiff is required to provide proof of all damages sought in the complaint. *See John E. Green Plumbing and Heating Co., Inc. v. Turner Constr. Co., 742 F.2d 965, 968 (6th Cir. 1984)* ("We recognize that the law 'does not require impossibilities' when it comes to proof of damages, but it does require whatever 'degree of certainty tha[t] the nature of the case admits.'") (internal citations omitted). *Fed. R. Civ. P. 55(b)(2)* allows courts to conduct hearings in order to "determine the amount of damages" so it may effectuate a judgment.

**IV. ANALYSIS**

**A. Individual Liability**

The court must first address an issue not squarely presented by Plaintiff's motion for default judgment — whether Defendant Kevin Kuza can be held liable under any of Plaintiff's **[*4]** theories. Kuza is, by the terms of Plaintiff's complaint — the owner and operator of Henry Electric, LLC. *See* ECF No. 1, PageID.4.

But Michigan law presumes that the corporate form will be respected. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd., 475 F.3d 783, 798 (6th Cir. 2007)* (citing *Seasword v. Hilti, 449 Mich. 542, 537 N.W.2d 221 (1995)*). "This presumption, often referred to as a 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some overriding public policy." *EPLET, LLC v. DTE Pontiac N., LLC, 984 F.3d 493, 499 (6th Cir. 2021)* (citation omitted). Piercing the corporate veil is an equitable remedy "sparingly invoked to cure certain injustices that would otherwise go unredressed." *Gallagher v. Persha, 315 Mich. App. 647, 654, 891 N.W.2d 505 (2016)*. "Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, 475 F.3d at 798* (citing *Foodland Distribs. v. Al-Naimi, 220 Mich. App. 453, 457, 559 N.W.2d 379 (1995)*).

To determine whether the corporate entity was a "mere instrumentality" of an individual, courts consider, for example: whether the corporation is undercapitalized; whether separate books are kept; whether there are separate finances for the corporation; whether the corporation is used for fraud or illegality; whether corporate formalities **[*5]** have been followed; and whether the corporation is a sham. *See GM Glob. Tech. Operations, LLC v. Quality Collision Parts, Inc., No. 23-13026, 2026 U.S. Dist. LEXIS 14138, 2026 LX 87510, at *40 (E.D. Mich. Jan. 26, 2026)*; *Glenn v. TPI Petroleum, Inc., 305 Mich. App. 698, 716, 854 N.W.2d 509 (2014)*. Michigan courts have also considered the commingling of funds and the extent to which the shareholder controlled the decisions of the entity. *See Ryan Racing, LLC v. Gentilozzi, 231 F. Supp. 3d 269, 277 (W.D. Mich. 2017)* (citations omitted).

Plaintiff has not met his burden of proving that Henry Electric is an alter ego or mere instrumentality of Kuza, even taking his allegations as true. While the court accepts in this posture that Henry Electric fraudulently told Plaintiff he would be repaid his funds and that Kuza was its main and possibly sole shareholder controlling its decisions, there is no evidence that the corporation is undercapitalized, that its finances are inseparable from Kuza's personal finances, that Kuza or Henry Electric do not observe the corporate formalities, or that the operation is a sham (this single breach of contract notwithstanding). Plaintiff's counsel admitted at the hearing held on January 28, 2026, that Kuza never communicated with Plaintiff outside his role as representative of the company. *See S&S Innovations Corp. v. UUSI, LLC, No. 1:18-cv-1377, 2021 U.S. Dist. LEXIS 97615, at *16, 2021 WL 2070064 (W.D. Mich. May 24, 2021)* ("Merely being in charge of a company does not open the door to veil-piercing."). The only contracts or writings that have been shown to the court show communications **[*6]** from Kuza only in his capacity as an employee or owner of Henry Electric, LLC — for example, the offer of a refund appears on Henry Electric letterhead. Plaintiff's few allegations in his complaint regarding possible alter ego status would only

serve to illustrate possible alter ego status between Henry Electric LLC and another entity owned by Kuza, Box Design Group LLC. *See* ECF No. 1, PageID.4. But even assuming that overlap exists between those two entities, that does not necessarily lead to the conclusion that either corporate veil may be pierced to reach Kuza himself, rather than to reach the assets of Box Design Group (who is not named as a Defendant here). *See* *S&S Innovations Corp., 2021 U.S. Dist. LEXIS 97615, at *16-17* ("the lack of a formal distinction between THP and Nartron. . . . does not mean there is a similar lack of distinction between Rautiola and Nartron. Nartron is not a mere instrumentality of Rautiola simply because THP is.").

Therefore, motion is denied in its entirety as to Kuza and all claims as to Kevin Kuza will be dismissed without prejudice for failure to state a claim upon which relief can be granted. The discussion below relates to Defendant Henry Electric only.

**B. Default As to Liability Against Henry Electric**

Because **[*7]** a default has been entered, all of Plaintiff's well-pleaded allegations, except those relating to damages, are deemed to be admitted. However, the facts must still be "sufficient to support a finding of liability as to each defendant" as to each claim. *Ford Motor Co. v. Cross, 441 F. Supp. 2d 837, 848 (E.D. Mich. 2006)*. "In other words, the complaint must be able to survive a *Rule 12(b)(6)* motion to dismiss." *Howard v. Dearborn Motors 1, LLC, No. 17-12724, 2020 U.S. Dist. LEXIS 45175, at *9 (E.D. Mich. Mar. 16, 2020)*.

This case is before the court on the basis of diversity jurisdiction under *28 U.S.C. § 1332*, and Plaintiff's claims are based entirely on state law. The task of this court, sitting in diversity, is to apply the same law as would be applied by the Michigan state courts. *See* *Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*. Where a state's highest court has spoken to an issue, this court is bound by that decision unless it is convinced that the high court would overrule it if confronted with facts similar to those before it. *Bernhardt v. Polygraphic Co. of Am., 350 U.S. 198, 205, 76 S. Ct. 273, 100 L. Ed. 199 (1956)*. Where a state appellate court has resolved an issue to which the high court has not spoken, federal courts should "treat [those] decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently." *Garrett v. Akron-Cleveland Auto Rental, Inc. (In re Akron-Cleveland Auto Rental, Inc.), 921 F.2d 659, 662 (6th Cir. 1990)*.

*1) Count I: Breach of Contract*

Plaintiff is entitled to default judgment on part of his breach of contract claim against Henry Electric. Under Michigan **[*8]** law, a plaintiff establishes breach of contract by showing: (1) the existence of a valid contract; (2) the terms of the contract; (3) breach of those terms by the defendant; and (4) resulting damages. *Miller-Davis Co. v. Ahrens Constr., Inc., 495 Mich. 161, 178, 848 N.W.2d 95 (2014)*. Plaintiff and Henry Electric entered into an agreement for the sale and delivery of a custom electric bicycle in exchange for $7,700.00. Defendant never delivered the bicycle, and so breached the contract. After some months of realizing Defendant was in breach, Plaintiff requested a refund, which Defendant, according to the Complaint's allegations, agreed to. ECF No. 1, PageID.3. Upon breach of the contract (and an agreed upon refund, which was in effect a rescission of the contract), Defendant owed Plaintiff the original price of the bicycle. Plaintiff is therefore entitled to rescission of the original contract and to his original payment. *See* 5A MI Civil Jur Contracts § 214 ("Rescission of a contract is available to an injured party if the other has committed a substantial or material breach"); *Lash v. Allstate Ins. Co., 210 Mich. App. 98, 102-03, 532 N.W.2d 869 (1995)* ("To rescind a contract is . . . to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made.") (citation **[*9]** omitted); *Mesh v. Citrin, 299 Mich. 527, 537, 300 N.W. 870 (1941)* ("In rescission he is entitled to the recovery of what he has paid."). That breach of contract, rescission, and associated damages are each straightforward.

However, Plaintiff also alleges that part of the contract at issue was a modification to a) repay $4,750 and b) add a $150-per-day fee to that amount that acted as an enforceable "liquidated damages" provision to the contract. ECF No. 5, PageID.22; ECF No. 18-1, PageID.84. On this point, Plaintiff has not shown that he is entitled to default judgment. Under Michigan law, contracts for the sale of goods are governed by the Uniform Commercial Code (the UCC). *Mich. Comp. Laws §§ 440.1101 et seq.*; *MSSC, Inc. v. Airboss Flexible Prods. Co., 511 Mich. 176, 180, 999 N.W.2d 335 (2023)*. The UCC contains a statute-of-frauds provision that governs which agreements must be in writing. *Id.*; *Mich. Comp. Laws § 440.2201(1)*. The requirements of the statute of frauds section of the UCC

must be satisfied if the contract as modified is within its provision. *W. Cent. Packing, Inc. v. A. F. Murch Co., 109 Mich. App. 493, 505, 311 N.W.2d 404 (1981)*. This alleged modification to a contract for a sale of goods was, according to Plaintiff, an offer to provide a refund check in the amount of $4,750.00, plus a $150 per day late fee, which falls within the statute of frauds. The alleged modification is provided as an exhibit to the Complaint and is not (at least formally) signed **[*10]** by either party. ECF No. 1-1, PageID.9.

Assuming, however, that there was a sufficient signed writing from Henry Electric,[2] it still must satisfy the other elements of contract formation to be enforceable. The essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration,[3] mutuality of agreement, and mutuality of obligation. *McInerney v. Detroit Trust Co., 279 Mich. 42, 46, 271 N.W. 545 (1937)*. The alleged modification lacks valid proof of acceptance, even taking Plaintiff's allegations in the complaint as true. "Mutuality of agreement requires a valid offer and an acceptance." *McMillon v. City of Kalamazoo, 511 Mich. 855, 857, 983 N.W.2d 79 (2023)* (citing *Restatement (Second) of Contracts § 22* (1981)). The sole evidence of acceptance is the following statement in Plaintiff's affidavit: "I accepted that proposal." ECF No. 18-1, PageID.84. But "[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Williams v. CitiMortgage, Inc., 498 F. App'x 532, 536 (6th Cir. 2012)* (quoting *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend, 163 F.3d 449, 454 (7th Cir. 1998)*); *see also* *Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991)* ("[I]n the event of conflict between the bare allegations of the complaint and any [attached] exhibit . . . the exhibit prevails.")). The refund "proposal" on its face appears to seek a signature to indicate acceptance; none exists. *See* ECF No. 1-1, PageID.9. Plaintiff admits that agreement was "not signed" (ECF No. 5-1, **[*11]** PageID.30), and there is no reply email or other writing indicating acceptance.[4] Plaintiff would have no reason to think that his silence in the face of this offer was sufficient for Defendant to infer assent to the offer. *See Restatement (Second) of Contracts § 19(2)* ("The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."). While "[a]ssent to an offer may be indicated by acts as well as by words[,]" the general rule is that "silence alone will not constitute a valid acceptance." *Zurich Am. Ins. Co. v. Mack Indus., No. 14-cv-14244, 2015 U.S. Dist. LEXIS 167829, 2015 LX 67753, at *6 (E.D. Mich. Dec. 8, 2015)* (citing *Kvaerner U.S., Inc. v. Hakim Plast Co., 74 F. Supp. 2d 709, 714 (E.D. Mich. 1999)*, *Turner Associates, Inc. v. Small Parts, Inc., 59 F. Supp. 2d 674, 675, 681 (E.D. Mich. 1999)*). Therefore, there was no valid acceptance and no contract formation.

But even assuming a valid contract was formed and

---

[2] For purposes of this opinion, the court assumes that the offer for a refund and late fee was a sufficient signed writing by Defendant under the statute of frauds, even though it contains an unexecuted, blank signature block. *See, e.g.*, *MFS & Co., LLC v. Cyltec, LLC, No. 09-14063, 2011 U.S. Dist. LEXIS 115218, 2011 LX 45778, at *17 (E.D. Mich. Oct. 6, 2011)* ("the Purchase Order acknowledging the minimum purchase contract was issued by Caterpillar on Caterpillar letterhead, [so] it constitutes a writing signed by Caterpillar, the party against whom enforcement is sought.") (citing *Monetti, S.P.A. v. Anchor Hocking Corp., 931 F.2d 1178, 1185 (7th Cir. 1991)* (holding that a memorandum confirming a contract on company letterhead satisfied both the writing and signature requirement of the statute of frauds); *Dow Chem. Co. v. GE, No. 04-10275-BC, 2005 U.S. Dist. LEXIS 40866, at *67 (E.D. Mich. Aug. 4, 2005)* ("an email generally is considered a sufficient signed writing.") (citing *Michigan Regional Council of Carpenters v. New Century Bancorp, Inc., 99 F. App'x 15, 22 (6th Cir. 2004)*); *see also* ***Huckaba v. Ref-Chem, L.P., 892 F.3d 686, 689 (5th Cir. 2018)*** (regarding the importance of a blank signature block, noting that Texas courts have found "a signature block by itself is insufficient to establish the parties' intent to require signatures," but finding the agreement invalid because other evidence showed the parties intended only a signature to give it effect).

[3] There does not appear to be new consideration for this separate promise, but that is not fatal to this claim because an agreement to modify a contract for the sale of goods governed by the Uniform Commercial Code does not require new consideration. *Gentherm, Inc. v. Sargent & Greenleaf, Inc., 797 F. Supp. 3d 755, 761 (E.D. Mich. 2025)*; *Mich. Comp. Laws § 440.2209(1)*. "A party's ability to modify an agreement is limited only by Article Two's general obligation of good faith." *Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 145 (6th Cir. 1983)* (citations omitted).

[4] Plaintiff averred that "[w]hile the refund proposal was not signed, both Mr. Kuza and I referenced it and acknowledged its terms in subsequent email communications." ECF No. 5-1, PageID.30. But two problems exist with that. First, referencing and acknowledging the terms of an offer is not the same as formally accepting the offer. Second, none of those emails were provided to the court, and the sole exhibit before the court shows no proof of acceptance.

acceptance was shown through communications not presented to the court, the court would not enforce this purported "liquidated damages" provision. A liquidated damages provision is an agreement by the parties fixing the amount of damages in case of a breach. UAW-GM Human Res. Ctr. v. KSL Rec. Corp., 228 Mich. App. 486, 508, 579 N.W.2d 411 (1998). Whether such a provision is valid and enforceable or invalid as a penalty is a question of law. *Id.* Courts are to sustain such provisions if the amount is "reasonable with relation to the **[*12]** possible injury suffered" and not "unconscionable or excessive." *Id.* "[T]he court must determine whether the predetermined figure is really in the nature of an attempted computation of the actual damages likely to result, or whether it has the effect of exacting a penalty from the contract breaker." *Nichols v Seaks, 296 Mich. 154, 161, 295 N.W. 596 (1941)*.

Even leaving aside the question of treble damages Plaintiff sought under other theories, Plaintiff is seeking to enforce a $125,850.00 late fee on a $7,700 transaction. That Defendant originally proposed that number (at least for a limited time) makes no matter; it is excessive and is not reasonable in relation to the possible injury suffered. *See* *Shore Fin. Servs. v. Lakeside Title & Escrow Agency, Nos. 301143, 302707, 302723, 2013 Mich. App. LEXIS 875, at *12 (Ct. App. May 21, 2013)* ($1,000 per day penalty found unenforceable because it "require[d] the payment of the same sum regardless of the degree in the breaching party's failure to perform . . . and the penalty amount is unreasonable and excessive" compared to the total contract cost of $180,000); *see also* *Willard Packaging Co. v. Javier, 169 Md. App. 109, 124, 899 A.2d 940 (2006)* ("liquidated damages provisions [are] unreasonable, or penalties, when the sum for damages is so disproportionate with provable damages 'as to require the inference that the agreement must have been effected by . . . mistake'").[5] This proposal instead bears the hallmarks **[*13]** of an agreement that the Michigan Supreme Court has long warned would be unreasonable. That Court posited that "where a large sum (say $1,000) is made payable solely in consequence of the nonpayment of a much smaller sum (say $100), . . . the principle of compensation has been overlooked, or purposely disregarded; . . . the parties have wholly departed from the idea of just compensation, and attempted to fix a rule of damages which the law will not recognize or enforce." *See* *Curran v. Williams, 352 Mich. 278, 284, 89 N.W.2d 602 (1958)*. Here, Plaintiff seeks to make a large sum (over $125,000) made payable solely in consequence of nonpayment of a much smaller sum ($7,700). As *Curran* warned, the principle of reasonable compensation has been abandoned.[6] To allow such an inordinate sum to accrue also reflects no attempt on Plaintiff's part to mitigate these alleged damages. The court would not enforce the provision as written even had Plaintiff shown a contract was formed.

Therefore, no contract was formed as to the alleged refund proposal; even if it were, the court would find the liquidated damages provision unenforceable as an excessive penalty. Plaintiff's motion is for default judgment is granted as to breach **[*14]** of contract for his original agreement for the custom bicycle; Plaintiff's motion is denied as to the alleged modification terms.

*2) Count II: Statutory Conversion*

To establish statutory conversion, a plaintiff must prove: (1) that the defendant wrongfully exerted dominion over property inconsistent with the plaintiff's rights; and (2) that the defendant did so to his or her "own use," meaning for a purpose personal to the defendant. *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc., 303 Mich. App. 441, 448-49, 844 N.W.2d 727 (2013)*, *aff'd in part, vacated in part on other grounds*, *497 Mich. 337, 871 N.W.2d 136 (2015)*.

Here, Plaintiff never paid any additional money over and above the original $7,700 contract. Therefore, no

---

[5] This 16x liquidated damages multiplier (or looked at from another angle, a 1.3% late fee incurred every single day) bears no similarity to those cases that find liquidated damages provisions reasonable. *See* UAW-GM Human Res. Ctr. v. KSL Rec. Corp., 228 Mich. App. 486, 508, 579 N.W.2d 411 (1998) (sixty-five percent of the contract cost upon cancellation reasonable within certain time); *Domestic Unif. Rental v. Bronson's, No. 359297, 2023 Mich. App. LEXIS 447, at *10, 2023 WL 324103 (Ct. App. Jan. 19, 2023)* (fifty percent of contract value reasonable in relation to injury suffered); *De Simone v. Barberio, No. 351424, 2021 Mich. App. LEXIS 4071, at *14 (Ct. App. July 1, 2021)* (2.5% late charge every 30 days reasonable).

[6] Plaintiff's citation to *Anderson v. Detroit Police Officers*, 09-cv-11193, ECF No. 29, is inapposite. That case imposed a $250 per day sanction for a three-month period (totaling approximately $7,500). Not only was that sanction a fixed amount far below what is sought in this case, but that amount was entered against a $25,000 judgment and so did not reflect even a third of the original judgment value. Plaintiff here seeks more than 16 times the original contract value as a penalty.

conversion claim may lie as to the $150 per-day late fee proposal, because Defendant never exerted dominion over any of Plaintiff's property in relation to that proposal (i.e. there was no additional property allegedly converted).[7] Meanwhile, the money paid under the original $7,700 contract is covered by the terms of the original express contract, and a conversion claim as to that money is barred by the economic loss doctrine. *See* *Quest Diagnostics, Inc. v. MCI WorldCom, Inc., 254 Mich. App. 372, 380, 656 N.W.2d 858 (2002)* ("parties to a transaction for goods are precluded recovery in tort for economic loss" where "their economic expectations can be satisfied by contractual remedies."); *Llewellyn-Jones v. Metro Prop. Grp., LLC, 22 F. Supp. 3d 760, 778 (E.D. Mich. 2014)* ("The **[*15]** doctrine is animated by the idea that tort remedies should not bail out parties who could have anticipated losses caused by failed performance and negotiated an appropriate response."). While "tort claims are barred under the doctrine only where the duty alleged to have been violated by the defendant is implicated by the relevant contract[,]" the duty alleged here was one and the same as that implicated by the contract for the custom bicycle: to return the money paid under the contract after failure to perform. *See* *Tyson v. Sterling Rental, Inc., 836 F.3d 571, 582 (6th Cir. 2016)*; *e.g.* *1-800 Bathtub, LLC v. Rebath, LLC, No. 357932, 2024 Mich. App. LEXIS 3003, at *25, *24 n.8 (Ct. App. Apr. 18, 2024)* (applying the doctrine to statutory conversion and collecting cases where courts found "no duty separate and distinct from the contractual obligation" in conversion claims); *see also* *Powers Paper, LLC v. Northstar Sourcing LLC, No. 24-10731, 2025 U.S. Dist. LEXIS 203747, 2025 LX 495108, at *6 n.1 (E.D. Mich. Oct. 16, 2025)* (denying default judgment on conversion claim where plaintiff also brought breach of contract claim because "the sale of goods is a consensual transfer of property that does not meet the definition of conversion under Michigan law.").

The motion is therefore denied as to Count II.

*3) Count III: Fraudulent Misrepresentation*

Under Michigan law, fraudulent misrepresentation requires proof of: (1) a material representation by the defendant; (2) that was false; (3) knowledge of its falsity, **[*16]** or reckless disregard as to its truth; (4) intent that the plaintiff rely on it; (5) actual reliance by the plaintiff; and (6) resulting damage. *Titan Ins. Co. v. Hyten, 491 Mich. 547, 555, 817 N.W.2d 562 (2012)*.

The general rule is that claims of fraud where an express contract covers the same subject matter are barred by the economic loss doctrine. *See* *Huron Tool & Eng'g Co. v. Precision Consulting Servs., 209 Mich. App. 365, 375, 532 N.W.2d 541 (1995)*. Plaintiff emphasizes that "[f]raudulent inducement is actionable alongside a contract claim when the fraud is extraneous to the contract or relates to a future promise made in bad faith." *See* *id. at 372-73*. But fraud in the inducement to form a contract (misrepresentations that induce the buyer to enter into a contract) is not the same as any fraudulent misrepresentation during the contract (such as contract terms subsequently breached by the seller), and Plaintiff notably did not bring a claim for fraud in the inducement. *See* ECF No. 1, PageID.6. Plaintiff deemphasizes the contrary language in *Huron Tool* that, "[w]ith respect to the latter kind of fraud [fraudulent statements interwoven with the breach of contract], the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort." *Id. at 373*. Here, the only fraud alleged as to the original $7,700 **[*17]** is that "Defendants, through Kuza, repeatedly represented that a refund was imminent, via email, while failing to follow through." ECF No. 1, PageID.6. This failure to refund payment on a contract when Defendant failed to otherwise deliver the promised goods on the contract is indistinguishable from Plaintiff's breach of contract claim, because the duty to refund Plaintiff's money arose when Defendant materially breached the contract, and again when Plaintiff sought to rescind the contract by asking for a refund following that breach. Recovery under a fraudulent misrepresentation theory for promising to refund this amount is therefore barred by the economic loss doctrine; the contractual claim and remedy subsumes it entirely. *See, e.g.*, *MD Holdings, LLC v. R. L. Deppmann Co., No. 357462, 2022 Mich. App. LEXIS 6455, at *21 (Ct. App. Oct. 27, 2022)* ("because the misrepresentation claims alleged in Counts III, V, and VI do not allege conduct extraneous to the contractual obligations, the trial court properly dismissed the claims . . . on the basis that they were indistinguishable from the contract claims.").

As to the promise to pay $150 per day the refund was

[7] Perhaps Plaintiff's best argument against this conclusion is that the offer to modify the contract meant that the refund amount was for only $4,750, leaving $2,950 as converted property as to this second promise. But in his complaint, Mannion seeks the full $7,700 for breach of contract, which forecloses that alternative argument. ECF No. 1, PageID.5.

late, that is not barred by the economic loss doctrine because, as explained, no contract was formed as to that promise, and so no contractual **[*18]** remedy already covers that promise or fraud related to it. Plaintiff has also alleged that a) these statements were knowingly false or made with reckless disregard for their truth, b) Plaintiff relied on these assurances to his detriment in delaying legal action, and c) Plaintiff has suffered financial loss as a result. ECF No. 1, PageID.6. Although these allegations are fairly conclusory, in this procedural posture the court accepts that this is sufficient to show materiality; Plaintiff refrained from bringing legal action by relying on the truth of the promise that a refund was shortly coming. However, while Plaintiff has sufficiently alleged that he did in fact rely on the promise of a $150 late fee to delay bringing legal action, his reliance must still have been reasonable. *See* *Novak v. Nationwide Mut. Ins. Co., 235 Mich. App. 675, 690, 599 N.W.2d 546 (1999)* (surveying Michigan cases and holding that "a person who *unreasonably* relies on false statements should not be entitled to damages for misrepresentation") (emphasis in original); *MacDonald v. Thomas M. Cooley Law Sch., 724 F.3d 654, 662-63 (6th Cir. 2013)* (applying Michigan law, holding that a plaintiff's "reliance on the alleged misrepresentation must have been reasonable"). While the court accepts that there may have been some period of time that Plaintiff could have reasonably **[*19]** relied on Defendant's statements, such reliance would have become unreasonable very quickly. After only one week, the proposed "late fees" of $150 per day would have totaled over $1,000 - still without any refund being issued at all, partial or otherwise. After only a month, the "late fees" would have outstripped the total proposed refund amount, still without any word of any payment. The decision to rely on that promise, to continue waiting for payment, and to believe that "late fees" of $150 per day were still stacking up, likely could not, at either point, be considered reasonable — particularly when Plaintiff had already not received any portion of a promised refund for about seven months after first requesting it.

Finally, even accepting that Plaintiff met the other elements of fraudulent misrepresentation for at least a short period, while Plaintiff undoubtedly suffered financial loss by the delay in receiving a refund, his actual damages are not and were not $150 per day. The recipient of a fraudulent misrepresentation is entitled to recover (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and **[*20]** (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation. *Restatement (Second) of Torts § 549*; *see, e.g.*, *McCallum v. M 97 Auto Dealer, Inc., No. 367630, 2025 Mich. App. LEXIS 7915, 2025 WL 2784922, at *19 (Sep. 30, 2025)* (using that definition). The first of those potential remedies is, in this case, only applicable to the $7,700 that is covered by the express contract at issue in this case and is barred by the economic loss doctrine. As to the second, it speaks to compensatory damages, which are merely what is necessary to make a Plaintiff whole, as if the contract had been honored (or here, the rescission and full refund honored). Plaintiff suffered no pecuniary loss by the promise of a daily late fee that was not honored, because Plaintiff never paid any consideration for that promise. Instead, in this case reasonable interest on the original contract price is the proper measure of consequential damages, not an invented number that has no relation to Plaintiff's actual daily costs. *See* *McDaniel v. Macomb Co. Bd. of Rd. Comm'rs, 169 Mich. App. 474, 477, 426 N.W.2d 747 (1988)* (courts may grant "an award of prejudgment interest [] 'to compensate the prevailing party for the expenses incurred in bringing an action and for the delay in receiving money damages.'"). That remedy, too, is adequately captured by the contractual remedy, and so no further recovery is necessary. **[*21]**

The motion for default judgment is therefore granted in part as to liability under Count III, but Plaintiff's actual damages are entirely duplicative of his contract claim, thus no damages will be awarded under this claim.

*4) Count IV: Promissory Estoppel*

To establish promissory estoppel under Michigan law, a plaintiff must show: (1) a promise; (2) that the promisor should reasonably have expected to induce action or forbearance; (3) that the promise did in fact induce such action or forbearance; and (4) that enforcement of the promise is necessary to avoid injustice. *State Bank of Standish v. Curry, 442 Mich. 76, 84-85, 500 N.W.2d 104 (1993)*. Plaintiff says that Defendant made a clear and definite promise to refund $4,750.00 to Plaintiff by April 25, 2023, and to pay $150.00 per day for each day the refund was late. Plaintiff also claims that Defendant should have reasonably expected that this promise would induce Plaintiff to refrain from immediately pursuing litigation or other remedies, which, according to Plaintiff, it did. Plaintiff alleges that he relied on this promise by delaying suit.

First, as to the original $7,700 and any partial refund of

that amount, the express contract and breach of contract covering that matter bars any equitable claim as to **[*22]** that amount. *See* *Scholz v. Montgomery Ward & Co, Inc., 437 Mich 83, 93, 468 N.W.2d 845 (1991)* (explaining that "[a]n implied contract cannot be enforced where the parties have made an express contract covering the same subject matter"); *Zwiker v. Lake Superior State Univ., 340 Mich. App. 448, 482-483, 986 N.W.2d 427 (2022)* (holding that the plaintiffs' implied-contract theory failed because the express written agreements between the parties governed the same subject matter as the equitable claims). Thus any equitable claim here must rest solely on Defendant's promise to pay a $150 per-day late fee; the $4,750 proposed refund is immaterial because that claim is subsumed by the express contract for the bicycle.

As to the $150 per-day late fee, the court jumps straight to the final and most important factor for this case: whether enforcement of that promise is necessary to avoid injustice. The court finds that it is not; even taking as a given the questionable premise that Plaintiff could have *reasonably* relied on a promise to pay a $150-per-day late fee, which had racked up, according to him, over $100,000 on a $7,700 contract before he filed suit,[8] enforcement of that late fee is not necessary to avoid injustice. While Plaintiff alleges that Defendant's promise did in fact induce his forbearance in filing suit, the fact is that nothing in Defendant's **[*23]** promise to add a late fee to the refund check (if they paid at all) actually prevented Plaintiff from bringing this action for breach of contract before May 2025. Defendant's refund proposal said only that "If the check i[s] not received by this date, there will be a charge to Henry Electric of $150 per day until payment is received. Once payment is received [Plaintiff] will sign the document and the waiver in the envelope and conceded that this matter is now closed." ECF No. 1-1, PageID.9. That statement imposes no obligation on Plaintiff in exchange for the $150 per day charge prior to payment; it seeks some sort of release after payment is made but does not say, for example, that Plaintiff will promise to agree to refrain from filing suit for breach of contract until payment is received. Granted, Plaintiff's affidavit, which was submitted with his response to a show cause order, says he took the promise as an effort to avoid litigation. *See* ECF No. 5-1, PageID.31 ("I understood the $150/day to represent compensation for the delay. I viewed it as a way to avoid further conflict and litigation."). But that affidavit is not sufficient to overcome the plain terms of the alleged promise **[*24]** itself. When a "written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Cates v. Crystal Clear Techs., LLC, 874 F.3d 530, 536 (6th Cir. 2017)* (citing *Williams v. CitiMortgage, Inc., 498 Fed. Appx. 532, 536 (6th Cir. 2012)*). And as explained, no binding contract was formed as to that $150-per-day promise and there was no legal limitation in fact on Plaintiff's ability to file suit.

Thus, Plaintiff could have filed this action at any time after Defendant breached the contract, or again after they acknowledged his refund request in August 2022 (but did not pay it), and Plaintiff could again have filed this action after Defendant proposed a late fee in March 2023 (about seven months after requesting a refund in the first place). Plaintiff has alleged a straightforward breach of contract on his original $7,700 bike, and to compensate him the court can order the return of his money plus reasonable interest over the intervening years, and that result is not unjust.

The motion for default judgment as to Count IV is therefore denied.

*5) Count V: Michigan Consumer Protection Act*

The *Michigan Consumer Protection Act ("MCPA")* prohibits a variety of unfair, unconscionable, and deceptive trade practices in the conduct of trade or commerce. Although Plaintiff cites **[*25]** *Mich. Comp. Laws § 445.903(1)(c)*, *(e)*, and *(n)* for relevant provisions, the court finds only the first two applicable to this case. *Section (c)* prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have." *Section (e)* prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." *Section (n)* prohibits "[c]ausing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a

[8] As in fraudulent misrepresentation, the reliance interest protected by a promissory estoppel claim is *reasonable* reliance. *State Bank of Standish v. Curry, 442 Mich. 76, 84, 500 N.W.2d 104 (1993)*. The court has explained why, even accepting Plaintiff's allegations as true, as a matter of law it is likely that no person could have "reasonably" relied on a promise, unsupported by any explicit consideration, to pay a late fee of $150-per-day on a proposed $4,750 refund after weeks passed with no payment and where the promised refund had already been outstanding for seven months.

transaction."

As to *section (c)*, the exhibit attached to the complaint fairly indicates that Defendant ceased making custom bikes of the type Plaintiff wanted, and therefore Defendant did not have the "quantity" of the type of bicycles they said, because they had none. ECF No. 1-1, PageID.9. As to *section (e)*, Defendant had represented that the bike would be fully custom (of some sort), but moving forward, they instead planned to make a line of bicycles labelled "Henry Electric Bikes" with custom options, which is sufficient **[*26]** to establish in this posture that the goods actually on offer were of a different "style or model" than originally advertised. *Id.* These are, perhaps, a stretch, but as a remedial statute meant to prohibit unfair practices in trade or commerce, the MCPA is to be liberally construed to advance its intended goals. *Brownlow v. McCall Enterprises, Inc., 315 Mich App 103, 125, 888 N.W.2d 295 (2016)*.[9] Defendant's conduct constituted an unfair and deceptive act under the MCPA.

There was not, however, a violation of the MCPA in promising a late fee of $150 per day as to the refund. Although Plaintiff alleges that he refrained from filing suit on the basis of the promise of this late fee, there is no allegation or evidence that Plaintiff actually misunderstood or was confused about his legal rights as to his contract with Defendants. *See Mich. Comp. Laws § 445.903(1)(n)*. Nor does the promise to pay a late fee facially include any sort of misrepresentation regarding Plaintiff's rights that might give rise to reasonable probability of misunderstanding or confusion; as pointed out previously, the promise merely states what Defendants offered to do, and does not by its terms impose any reciprocal obligation on Plaintiff until and unless payment was received, and in that Defendant simply sought some sort of release **[*27]** once the matter was closed. *See* ECF No. 1-1, PageID.9.

The motion for default judgment is therefore granted in part on the MCPA claim as to the original $7,700 bicycle, but denied as to the $150 per-day late fee.

**C. Remedies**

Having determined that Plaintiff is entitled to default judgment against Defendants for breach of contract, fraudulent misrepresentation, and violation of the MCPA, the court now turns to the issue of appropriate remedies for Plaintiff.

Well-pleaded allegations in the complaint as to liability are taken as true when a defendant is in default, but not as to damages. *Ford Motor Co. v. Cross, 441 F. Supp. 2d 837, 848 (E.D. Mich. 2006)*. "[W]here the damages sought are not for a sum certain, the Court must determine the propriety and amount of the default judgment." *J & J Sports Prods. Inc. v. Rodriguez, No. 08-1350, 2008 U.S. Dist. LEXIS 96499, 2008 WL 5083149, at *1 (N.D. Ohio Nov. 25, 2008)* (citing *Fed. R. Civ. P. 55(b)*). *Rule 55(b)(2)* permits, but does not require, the district court to conduct an evidentiary hearing to determine damages. *Arthur v. Robert James & Assocs. Asset Mgmt., No. 11-460, 2012 U.S. Dist. LEXIS 47240, 2012 WL 1122892, at *1 (S.D. Ohio 2012)* (citing *Vesligaj v. Peterson, 331 F. App'x 351, 354-55 (6th Cir. 2009)*).

*1) Plaintiff's Compensatory Damages*

Here, the actual damages for the breach of contract claim are for a sum certain; Plaintiff paid $7,700 for an electric bicycle that was never delivered. He is entitled to that entire amount due to Defendant's breach. Meanwhile, actual damages established under his MCPA claim (*Mich. Comp. Laws § 445.911(2)*) are subsumed by those in Plaintiff's **[*28]** breach of contract claim, and so no actual damages will be awarded under that claim.

---

[9] Plaintiff also cited the MCPA as prohibiting "failing to provide goods or services promised after accepting payment[.]" ECF No. 18, PageID.75. While no specific provision uses that particular phrasing, and none of Plaintiff's cited sections (*(c)*, *(e)*, and *(n)*) make that point, *sections (g)* and *(u)* appear to make similar points. *Section (g)* prohibits "[r]epresenting or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the merchant knows or has reason to know it will not be so provided." *Section (u)* prohibits "[f]ailing, in a consumer transaction that is rescinded, . . . to promptly restore to the person or persons entitled to it a deposit, down payment, or other payment, . . . ." Plaintiff alleged that "Defendants made representations they did not intend to honor and accepted payment" for goods they did not intend to deliver within a reasonable time, and by defaulting, Henry Electric admitted that allegation. ECF No. 1, PageID.7. Plaintiff also alleged that he sought a refund in August 2022 and that Defendants agreed to that refund, in effect rescinding the contract, but Plaintiff was never paid that refund. ECF No. 1, PageID.3. Plaintiff did not plead these specific provisions and so the court does not ultimately consider them, but they would otherwise provide for recovery under the MCPA.

*2) Prefiling interest*

Michigan law has long recognized the common law rule that interest may be awarded as an element of damages in a contract or tort action to compensate for the lost use of funds. *Jones v. Lothamer, 819 F. Supp. 1382, 1383 (W.D. Mich. 1993)*. Courts have generally employed the 5% interest rate set by *Mich. Comp. Laws § 438.31* when awarding prefiling prejudgment interest. *See, e.g., Gordon Sel-Way, Inc. v. Spence Bros., Inc., 438 Mich. 488, 505, 475 N.W.2d 704 (1991)* ("This Court, several panels of the Court of Appeals, and federal courts interpreting Michigan law have consistently filled the interest rate gap in *MCL 438.7* . . . by incorporating the 'legal rate' provided under *MCL 438.31*.") (citing cases); *Holland v. Earl G. Graves Publ'g Co., 33 F. Supp. 2d 581, 584 (E.D. Mich. 1998)* ("Michigan courts have determined that the appropriate pre-filing rate of interest is 5%"). Therefore, the court will award 5% prejudgment interest on Plaintiff's breach of contract claim, beginning May 7, 2022 (the date of Plaintiff's original payment) and ending May 7, 2025, the date this action was filed, which totals $1,155.00. Some portion of this amount would also be appropriate to award as actual compensatory damages under Plaintiff's fraudulent misrepresentation claim, representing the time after the refund proposal was made, but because Plaintiff is not entitled **[*29]** to duplicative recovery, no damages will be awarded under the fraudulent misrepresentation claim.

*3) Attorney Fees*

Plaintiff is entitled to recover reasonable attorney's fees upon prevailing on an MCPA claim. *Mich. Comp. Laws § 445.911(2)*. Determining a reasonable fee begins with calculating the product of a "reasonable hourly rate" and the "number of hours reasonably expended on the litigation," known as the "lodestar" amount. *Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)* (noting that the court may adjust the fee based upon the circumstances of the case, including the "results obtained"); *Kennedy v. Robert Lee Auto Sales, 313 Mich. App. 277, 300-01, 882 N.W.2d 563 (2015)* (applying this framework in the context of the MCPA). Applying state law, the court should also consider the factors listed in *Michigan Rule of Professional Conduct 1.5(a)*. *Jordan v. Transnational Motors, 212 Mich. App. 94, 97, 537 N.W.2d 471 (1995)*.[10] "The key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Products, Inc., 515 F.3d 531, 553 (6th Cir. 2008)*. District courts are required to give a clear explanation for its award calculation (for example, which hours it is rejecting, which it is accepting, and why). *Moore v. Freeman, 355 F.3d 558, 566 (6th Cir. 2004)*. But in calculating a reasonable fee, "district courts are not **[*30]** required to act as 'green-eyeshade accountants' and 'achieve auditing perfection' but instead must simply to do 'rough justice.'" *The Northeast Ohio Coalition for the Homeless v. Husted, 831 F.3d 686, 703 (6th Cir. 2016)* (quoting *Fox v. Vice, 563 U.S. 826, 838, 131 S. Ct. 2205, 180 L. Ed. 2d 45 (2011)*). In other words, the court may rely estimates based upon its "overall sense of a suit." *Id.*

First, the court agrees that the hourly rate for each staff member listed is reasonable. $125 per hour for a paralegal-like staff member is reasonable, as is a $250 per hour rate for a staff member with a J.D. However, the court reduces Plaintiff's counsel's requested $550 hourly rate slightly. In general, "the 'prevailing market rate' is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Adcock-Ladd v. Sec'y of Treasury, 227 F.3d 343, 350 (6th Cir. 2000)*. "District courts have relied on the State Bar of Michigan [] Economics of Law Practice Survey to determine average billing rates in Michigan[.]" *O'Connor v. Trans Union, LLC., No. 05-cv-74498, 2008 U.S. Dist. LEXIS 94498, 2008 WL 4910670 at *5 (E.D. Mich. Nov. 13, 2008)*. Most relevant to this case, the mean, 75th percentile, and 95th percentile for hourly rates for Michigan contracts lawyers in 2023 was $348, $450, and $600, respectively. For Plaintiff's counsel's

[10] In this context, the court should also consider "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." *Smith v. Khouri, 481 Mich. 519, 530, 751 N.W.2d 472 (2008)*; *Kennedy, 313 Mich. App. at 303*.

geographic area of Oakland County, the rates were $354, $425, and $600, respectively. And for attorneys with 16-25 years of experience, hourly rates **[*31]** were $337, $425, and $600, respectively. Plaintiff's attorney has been practicing for 17 years. After reviewing the Survey and the circumstances of this case, the court will reduce Plaintiff's counsel's hourly rate to $425 given the relative lack of complexity of the issues presented. Because the court calculated Plaintiff's counsel's hours to be 10.6 of the total hours requested, only that amount of hours is recalculated. This results in a new total of $6,955 in attorney fees.

Second, the court finds that the time spent on this case was reasonable, but reduces the recovery based on the results of this motion. When determining the reasonable number of hours worked, "the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." *Wooldridge v. Marlene Indus. Corp., 898 F.2d 1169, 1177 (6th Cir. 1990)*. The "fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley, 461 U.S. at 437*. To carry the burden, attorneys must maintain time records detailed enough to enable courts to review the reasonableness of the hours expended. *Wooldridge v. Marlene Indus. Corp., 898 F.2d 1169, 1177 (6th Cir. 1990)*, *abrogated on other grounds by* *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001)*. Courts then review the billing **[*32]** claims and exclude "[e]xcessive, redundant, or otherwise unnecessary hours." *Butcher v. Bryson, No. 3:12-00251, 2014 U.S. Dist. LEXIS 125725, 2014 WL 4385876, at *3 (M.D. Tenn. Sept. 5, 2014)* (citing *Hensley, 461 U.S. at 434*). Plaintiff's counsel submitted an itemized invoice of the hours billed, both by counsel herself and by other staff in her office. *See* ECF No. 20 (bill of costs). After reviewing the invoice, the court finds that the hours Plaintiff's counsel and staff billed for this case (27.3 hours) does not reflect an unreasonable time spent pursuing these claims, and the individual entries appear reasonable. However, Plaintiff did not succeed on each of her claims; the court must also consider the "amount involved [in the case] and the results obtained[.]" *Smith v. Khouri, 481 Mich. 519, 530, 751 N.W.2d 472 (2008)*. One of Plaintiff's claims that was denied in this order, promissory estoppel, was merely an alternative to the breach of contract claim, so the court does not find a need to reduce any hours from lack of success on that claim. But the statutory conversion claim was fairly central to Plaintiff's presentation, was the sole basis for the majority of the damages that she sought, and the court did not find that claim to have merit. So the court will reduce the total recovery of attorney fees by 20% to reflect an approximate time spent on the conversion theory **[*33]** alone.

This brings Plaintiff's reasonable attorney fees to $5,564.

*4) Costs*

A party is not entitled to an award of attorney fees and costs unless such an award is expressly authorized by statute or court rule. *Haliw v. Sterling Hts., 471 Mich. 700, 707, 691 N.W.2d 753 (2005)*. "[U]nder the plain language of *MCL 445.911*, plaintiffs are entitled to recover reasonable attorney fees[,]" but "the MCPA does not address costs[.]" *See* *Lavene v. Volkswagen of Am., Inc., 266 Mich. App. 470, 477, 702 N.W.2d 652 (2005)*. This seems a conspicuous omission when compared to similar statutory provisions. *Compare* *Mich. Comp. Laws § 445.911(2)* ("reasonable attorney fees."), *with* *§ 600.2591* ("costs and fees"); *§ 445.257* (shall award reasonable attorney's fees and court costs). Given the lack of explicit authorization by statute for an award of costs, the court will not award Plaintiff's requested costs.

*5) Prejudgment interest*

The awarding of prejudgment interest in diversity cases is controlled by state law. *See* *American Anodco, Inc. v. Reynolds Metal Co., 743 F.2d 417, 425 (6th Cir. 1984)*. The awarding of prejudgment interest dating from the filing of a complaint in a successful civil action is mandatory under Michigan law. *Thorn Apple Valley v. Allianz Life Ins. Co., No. 94-1841, 1995 U.S. App. LEXIS 37063, at *15 (6th Cir. Nov. 29, 1995)*. Under *Mich. Comp. Laws § 600.6013*, interest shall be allowed on a money judgment in any civil action and is deemed to have begun accruing on the date the complaint was filed. *Jones, 819 F. Supp. at 1383*. Under that provision, "for complaints filed on or after January 1, 1987, interest on a money judgment recovered **[*34]** in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this

section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs." *Mich. Comp. Laws § 600.6013(8)*. However, "prejudgment interest pursuant to *MCL 600.6013*; . . . [can]not be assessed on attorney fees awarded under the MCPA." *Smolen v. Dahlmann Apartments, Ltd., 186 Mich. App. 292, 299, 463 N.W.2d 261 (1990)*.

In this case, the principal amount becomes $8,855.00 (including pre-filing interest but excluding attorney fees). Since filing this case on May 7, 2025, the interest totals $324.62, calculated as the sum of the following:

- From May 7, 2025 to June 30, 2025: $65.71
- From July 1, 2025 to December 15, 2025: $225.67
- From January 1, 2026 to January 29, 2026: $33.24.

**V. SUBJECT MATTER JURISDICTION**

One final issue of note: this court's subject matter jurisdiction. Plaintiff is a citizen of Montana; Defendants are citizens of Michigan. ECF No. 1, PageID.2. This case arises out of diversity **[*35]** jurisdiction, and this court previously questioned Plaintiff's proposed recovery and whether it truly met the jurisdictional prerequisite that the amount in controversy exceeds $75,000. ECF No. 4, PageID.16 (show cause order). In evaluating the jurisdictional threshold, "[a] district court should consider the amount alleged in a complaint and should not dismiss a complaint for lack of subject matter jurisdiction 'unless it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount'" at the time the complaint was filed. *See* *Massachusetts Cas. Ins. Co. v. Harmon, 88 F.3d 415, 416 (6th Cir. 1996)* (quoting *Klepper v. First Am. Bank, 916 F.2d 337, 340 (6th Cir. 1990)* (emphasis added)). Even considering attorney fees under the MCPA, this case seemed not to get over the necessary threshold on initial review. *See id.*; *see also* *Charvat v. GVN Michigan, Inc., 561 F.3d 623, 630 n.5 (6th Cir. 2009)* ("[R]easonable attorney fees, when mandated or allowed by statute, may be included in the amount in controversy for purposes of diversity jurisdiction.").

Here, there is a close question as to whether this case should be dismissed for lack of subject matter jurisdiction rather than resolved as a default judgment in Plaintiff's favor. The economic loss doctrine barred, as a legal certainty, his statutory conversion claim. *See* *Floyd Cty. Mut. Ins. Ass'n v. CNH Indus. Am. LLC, 18 F.4th 1024, 1029 (8th Cir. 2021)* (affirming dismissal for failure **[*36]** to meet the jurisdictional threshold when district court found economic loss doctrine barred relief). The resulting loss of recovery on the conversion claim is important because it renders Plaintiff's claim for treble damages against the $7,700 contract impossible as a legal certainty. *See* ECF No. 1, PageID.6 (treble damages only sought under statutory conversion). As to the $150 per-day late fee, which makes up the bulk of Plaintiff's jurisdictional amount, no property was converted and the breach of contract claim rested mainly on Plaintiff's allegation that he "accepted" the offer (but with no proof of such), and the reasonableness of that liquidated damages provision. While the MCPA could be read to have a provision that speaks to a fraudulent promise to provide a refund with a fee for each day late,[11] recovery is limited under that statute to actual damages, and as explained, Plaintiff was not damaged by that promise except as to a delay in bringing this suit. That decision was also, however, attributable to his own decision-making because no legal obligation in fact barred this suit.

However, although the court here awards Plaintiff an amount significantly below what was originally **[*37]** sought, and the result is below the jurisdictional threshold, the court ultimately finds that given Defendants' representations regarding a $150 per-day late fee, Plaintiff could "in good faith" claim the jurisdictional amount and attempt his theory of recovery for breach of contract, fraudulent misrepresentation, or promissory estoppel, even if he did not ultimately recover on those theories. Those claims, at least, rested on the assertion of the reasonableness of the alleged liquidated damages provision and the reasonableness of reliance on the promise to pay a late fee, and could be asserted in good faith even if the court now disagrees. *See* *Saint Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S. Ct. 586, 82 L. Ed. 845 (1938)* ("The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction."); *Royal Canin U.S.A., Inc. v. Wullschleger, 604 U.S. 22, 38, 145 S. Ct. 41, 220 L. Ed. 2d 289 n.8 (2025)* ("this Court has viewed [the statutory amount-in-controversy threshold] as

---

[11] *See* *Mich. Comp. Laws § 445.903(1)(g)* ("Representing or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the merchant knows or has reason to know it will not be so provided").

analogous to the time-of-filing rule applying to citizenship, which also assesses a factual issue relevant to jurisdiction only at the suit's outset"); *Conder v. Best Value Inc., 2008 U.S. Dist. LEXIS 82178 (W.D. Ky. Oct. 15, 2008)* ("[P]ost-removal events reducing the amount recoverable below the jurisdictional minimum, . . . do not oust the District Court's jurisdiction once it has attached."); *Nokes v. Petsmart, Inc., No. 1:09-cv-00194, 2009 U.S. Dist. LEXIS 142890, at *5-6 (N.D. Ohio Apr. 23, 2009)* (same). **[*38]**

**VI. CONCLUSION**

For the reasons stated above, the court (1) **GRANTS** the motion for default judgment with respect to Counts I, III, and V **IN PART** and against Henry Electric, LLC only; (2) **DENIES** the motion as to all counts against Kevin Kuza and as to Counts II and IV against all Defendants; (3) **DISMISSES** Kuza from this case without prejudice; and (4) **AWARDS** damages, fees, and costs as follows: $9,179.62 in compensatory damages on Plaintiff's breach of contract claim (including prefiling and pre-judgment interest), and $5,564 in attorney fees, against Henry Electric, LLC. Post-judgment interest will accrue as permitted by law. *See* *28 U.S.C. § 1961*.

An order of judgment will follow.

**SO ORDERED**.

Date: January 29, 2026

/s/ F. Kay Behm

F. Kay Behm

United States District Judge

**JUDGMENT**

It is **ORDERED** that, in accordance with the Order granting default judgment filed on this same day, judgment is entered in favor of Plaintiff and against Defendant Henry Electric in the amount of $9,179.62 in compensatory damages (including prefiling and pre-judgment interest), and $5,564 in attorney fees. Post-judgment interest will accrue as permitted by law. *See* *28 U.S.C. § 1961*. All claims against Kevin Kuza are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**.

Date: January **[*39]** 29, 2026

/s/ F. Kay Behm

F. Kay Behm

United States District Judge

---

End of Document

LexisNexis®

# *PTN-NRS, LLC v. County of Wayne*

Court of Appeals of Michigan

October 5, 2017, Decided

No. 332135

**Reporter**
2017 Mich. App. LEXIS 1523 *; 2017 WL 4447016

PTN-NRS, LLC, Plaintiff-Appellant, v COUNTY OF WAYNE, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History: [*1]** Wayne Circuit Court. LC No. 13-012537-CK.

**Judges:** Before: SAAD, P.J., and SERVITTO and GADOLA, JJ. GADOLA, J. (dissenting).

## Opinion

PER CURIAM.

Plaintiff appeals as of right the trial court order partially granting defendant's motion for summary disposition on plaintiff's complaint pursuant to *MCR 2.116(C)(8)* and the trial court order granting summary disposition in defendant's favor on plaintiff's first amended complaint asserting breach of contract pursuant to *MCR 2.116(C)(10)* and dismissing plaintiff's complaint.[1] We reverse and remand for proceedings consistent with this opinion.

In 2009, plaintiff and defendant entered into a contract whereby plaintiff would have the exclusive right and obligation to identify, solicit and pursue opportunities for defendant to earn revenue through sponsorships, naming rights, and similar advertising and promotions. For its services, plaintiff was to receive 25% of all revenues for revenue contracts it procured for defendant. According to plaintiff, it procured numerous opportunities for new revenue sources for defendant, yet defendant failed to abide by its obligations under the contract. Specifically, plaintiff alleged that defendant failed to effectuate the terms of a certain revenue agreement **[*2]** negotiated by plaintiff, and that defendant failed to provide information for and to implement numerous other (unidentified) proposed revenue contracts thereby breaching the parties' contract and causing damage to plaintiff. As a result, plaintiff brought a one count complaint for breach of contract against defendant.

Defendant moved for summary disposition pursuant to *MCR 2.116(C)(8)*, contending that the parties' contractual language did not *require* it to accept any proposed revenue opportunities procured or submitted by plaintiff, but instead merely provides that defendant "may" approve and sign contracts with the proposed revenue opportunities. That being the case, any decision to approve or deny plaintiff's proposed revenue opportunities was within defendant's discretion and defendant's failure or refusal to approve any specific opportunity, specifically the only one identified by plaintiff as the Coca-Cola pouring rights agreement[2], could not be the basis of a breach of contract action. Defendant further argued that plaintiff's failure to identify or attach to the complaint the specific other numerous

[1] Plaintiff's amended complaint also asserted claims for promissory estoppel and fraudulent misrepresentation which were dismissed pursuant to *MCR 2.116(C)(10)* and *(C)(7)*, respectively. Plaintiff does not challenge the dismissal of these claims on appeal.

[2] A pouring rights agreement has been described as one granting a beverage maker or distributer the exclusive right to have its products sold at a venue or venues and which, in return, provides stream(s) of revenue to the other contracting party.

revenue contracts it purportedly failed to provide information for or implement required a grant **[*3]** of summary disposition in defendant's favor, as did the speculative nature of plaintiff's proposed damages. The trial court agreed with defendant and granted its motion, but gave plaintiff 14 days to amend its complaint *solely* with respect to the allegation that defendant failed or refused to provide information to plaintiff for numerous revenue opportunities "which do not include the Coca Cola Pouring Right Agreement, to plead very specifically, breach of contract, fraud and misrepresentation."

Plaintiff thereafter filed a first amended complaint adding allegations that it provided defendant with revenue and savings opportunities, including the I-94 beautification project, the LED lighting project, the LED network project, and the 511 Woodward LED project. Plaintiff alleged that defendant refused and/or failed to abide by the parties' agreement and that these actions were in bad faith and amounted to a breach of the contract. Plaintiff's first amended complaint presented counts for breach of contract, promissory estoppel, and fraudulent misrepresentation.

Defendant moved for summary disposition on plaintiff's first amended complaint pursuant to *MCR 2.116(C)(7)* and *(10)*. Defendant argued that plaintiff **[*4]** materially breached the parties' contract first by not meeting the contract's revenue benchmarks, and could not demonstrate that defendant breached any revenue opportunity contract such that summary disposition was appropriate as to plaintiff's breach of contract claim. Defendant additionally asserted that plaintiff's promissory estoppel claim must fail because there was a written agreement between the parties, and that plaintiff's fraudulent misrepresentation claim is barred by governmental immunity. In a March 1, 2016 order, the trial court granted defendant's motion and dismissed plaintiff's case. This appeal followed.

Appellate review of a motion for summary disposition is de novo. *Spiek v Michigan Dept of Transp, 456 Mich 331, 337; 572 NW2d 201 (1998)*. Summary disposition may be granted pursuant to *MCR 2.116(C)(7)* when, among other things, a claim is barred by governmental immunity. When considering a motion brought under *subrule (C)(7)*, a court must consider any affidavits, depositions, admissions, or other documentary evidence submitted by the parties to determine whether there is a genuine issue of material fact precluding summary disposition. *Dybata v Wayne Co, 287 Mich App 635, 637-38; 791 NW2d 499 (2010)*. If no facts are in dispute, then the question whether the claim is barred by governmental immunity is an issue of law. **[*5]** *Id.* If, on the other hand, a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate under *subrule (C)(7)*. *Id.*

*MCR 2.116(C)(8)* tests the legal sufficiency of a claim, on the pleadings alone, to determine whether the plaintiff has stated a claim on which relief may be granted. *Spiek, 456 Mich at 337*. A motion brought under *(C)(8)* must be granted if no factual development could justify the plaintiff's claim for relief. *Id.*

A motion under *MCR 2.116(C)(10)* tests the factual support for a claim. *1300 LaFayette E Coop, Inc v Savoy, 284 Mich App 522; 773 N.W.2d 57 (2009)*. When reviewing a motion under *MCR 2.116(C)(10)*, the court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. *Id.* If there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law, summary disposition is properly granted under *MCR 2.116(C)(10)*. *Id.*

Plaintiff first asserts that the trial court erred in granting defendant's first motion relating to the Coca-Cola contract when plaintiff's complaint stated a valid claim for breach of contract, sufficient to survive under *MCR 2.116(C)(8)*. We agree.

A complaint must contain "[a] statement of the facts, without repetition, **[*6]** on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend . . . ." *Dalley v Dykema Gossett, 287 Mich App 296, 305; 788 NW2d 679 (2010)*, quoting *MCR 2.111(B)(1)*. If a party fails to plead facts with sufficient detail, the court should permit the party to file an amended complaint setting forth its claims in more specific detail. *Dalley, 287 Mich App at 306*. To state a claim for breach of contract, plaintiff must allege a contract, a breach of that contract, and damages. M Civ JI 142.01, citing *McInerney v. Detroit Trust Co., 279 Mich. 42, 46; 271 N.W. 545 (1937)*.

In its original complaint, plaintiff generally alleged that it entered into a contract with defendant giving plaintiff the exclusive right and obligation to pursue and identify revenue opportunities for defendant. Plaintiff would receive 25% of the revenue contracts received by defendant for its services. The contract, which was

attached to the complaint, was effective from November 5, 2009, through September 30, 2013, with an automatic 3 year renewal if the "target" revenue goal was met. Plaintiff alleged that it successfully negotiated a pouring rights agreement for defendant with Coca-Cola, but that despite acknowledging the existence of the agreement **[*7]** and plaintiff and defendant's agreement, defendant refused to put the terms of the parties' agreement into effect. In its breach of contract claim, plaintiff alleged that defendant breached its contract with plaintiff when it failed to provide plaintiff "with the information and support needed for the Coca-Cola Pouring Rights Agreement and hindered [plaintiff's] efforts to perform under the contract." Plaintiff further alleged that defendant breached the parties contract when it 'refused to put the terms of the Coca-Cola Pouring Rights contract into effect" and by "failing and/or refusing to implement the opportunities identified by Plaintiff and by refusing to provide information and assistance as required by the Primary Agreement." Plaintiff asserted that these failures/refusals caused defendant to lose hundreds of thousands of dollars in revenue and resulted in corresponding damages to plaintiff. The contract itself, a part of the complaint, provides at least one obligation on the part of defendant consistent with the allegations in plaintiff's complaint. For example, at section 5.01 the contract provides: "Upon the request of [plaintiff], without charge, [defendant] must furnish **[*8]** copies of all information, data, reports, records, etc. that [defendant] and [plaintiff] believe are necessary for [plaintiff] to provide the Work contemplated by this Agreement."

As set forth above, plaintiff alleged the existence of a valid contract, a breach of that contract by defendant, and damages as a proximate result of the breach by defendant. The trial court thus erred in finding that plaintiff failed to state a cause of action for breach of contract. It is true, as the trial court pointed out, that the contract places no obligation on defendant to implement or approve any revenue opportunity obtained by plaintiff. However, the contract does require defendant to furnish information necessary for plaintiff to perform its required work under the contract and plaintiff has alleged that defendant failed to do so. Whether this was a failure to provide necessary information in order to get the Coca-Cola pouring revenue contract to the Wayne County Commission or otherwise would bear out in discovery, and the trial court's reliance on defense counsel's factual statements at oral argument provided no basis for granting summary disposition based upon the pleadings alone, under *MCR 2.116(C)(8)*.

Moreover, **[*9]** an implied covenant of good faith and fair dealing generally exists in all contracts, except employment contracts, which is an implied promise that neither party will do anything "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v United of Oakland, Inc, 193 Mich App 146, 151-152; 483 NW2d 652 (1992)*. This implied covenant applies to the performance and enforcement of contracts even where a contractual term leaves the manner of its performance to one party's discretion. *Ferrell v Vic Tanny Int'l, Inc, 137 Mich App 238, 243; 357 NW2d 669 (1984)*. Where a party to a contract makes the manner of performance a matter of its own discretion, it must exercise that discretion honestly and in good faith. *Id. at 243*. Michigan does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing apart from a claim for breach of the contract itself. *Belle Isle Grill Group v City of Detroit, 256 Mich App 463; 666 NW2d 271 (2003)*. However, because the focus of the obligation of good faith is on the manner in which the agreement or other duty is performed or enforced, a breach of contract may be found where bad faith or unfair dealing exists in the performance of a contractual term when the manner of performance was discretionary. See *Ferrell,137 Mich App at 243-244*; *Gorman v Am Honda Motor Co, Inc, 302 Mich App 113, 132-136; 839 NW2d 223 (2013)*.

In sum, plaintiff has sufficiently alleged a breach of contract claim. Not only **[*10]** did it allege that specific provisions in the parties' contract were breached, but it also sufficiently alleged a breach of contract based upon bad faith or unfair dealing. The trial court erred in granting partial summary disposition of plaintiff's first complaint based upon *MCR 2.116(C)(8)*.

Plaintiff next contends that the trial court erred in dismissing its case and granting summary disposition in defendant's favor on plaintiff's amended breach of contract claim based upon *MCR 2.116(C)(10)* where issues of fact existed concerning whether defendant's breaches of the parties' contract made plaintiff's performance impossible. We agree.

The trial court granted defendant's motion on plaintiff's breach of contract claim based on its observation that it had not seen any evidence that defendant obstructed or precluded plaintiff from performing its part of the contract, but that the documentary evidence submitted did show that plaintiff failed to meet the contractually required benchmark revenue target by September 30, 2010. While defendant reads the trial court's oral

statement as a pronouncement that plaintiff's failure to meet the benchmark constituted the first material breach of the parties' contract, and thus precluded **[*11]** plaintiff from bringing its breach of contract claims, it is not entirely clear that this was the basis for the trial court's summary disposition ruling. The trial court did state that plaintiff breached the parties' contract by failing to meet the September 2010 revenue benchmark. Plaintiff does not dispute that it failed to meet the benchmark. The focus of the oral argument, however, and thus the more readily apparent basis for the trial court's ruling, was on the evidence, or lack thereof, creating a material question of fact concerning plaintiff's allegations in its first amended complaint that defendant breached the parties contract by: (1) refusing and/or failing to provide plaintiff with information and support for various revenue opportunities; (2) failing to act in good faith when it failed to assist plaintiff as required by the contract; (3) failing to act in good faith when it failed to assist plaintiff's efforts to perform under the contract, and; (4) when, in bad faith, it failed and/or refused to implement the opportunities identified by plaintiff and by refusing to provide information and assistance as required by the parties' contract. Plaintiff's argument was essentially **[*12]** that defendant breached the parties' contract by interfering with plaintiff's performance under the contract which, in turn, caused plaintiff to breach. The trial court found that there was no evidence that defendant breached the parties contract in such a manner. Only if plaintiff had provided evidence of some breach of contract by defendant would defendant's argument that plaintiff breached the contract first come into play.

Again, to establish a breach of contract claim, a party must establish that (1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting the breach suffered damages as a result of the breach of contract. *Dunn v Bennett, 303 Mich App 767, 774; 846 NW2d 75 (2013)*. Determining whether the trial court erred by concluding that defendant did not breach the contract requires us to interpret the underlying contractual language. We review de novo the proper construction and interpretation of a contract as a question of law. *Perry v Sied, 461 Mich 680, 681, n 1; 611 NW2d 516 (2000)*. "A trial court may determine the meaning of the contract only when the terms are not ambiguous," and terms are ambiguous if they are "susceptible to two or more reasonable interpretations." *D'Avanzo v Wise & Marsac PC, 223 Mich App 314, 319; 565 NW2d 915 (1997)*.

Plaintiff contends that the defendant's failure to provide information **[*13]** and assistance regarding the Coca-Cola pouring contract made it impossible to get that contract signed faster and that the Coca-Cola contract would have contributed toward the benchmark revenue. As we found above, the trial court erred in granting summary disposition in defendant's favor on plaintiff's original breach of contract claim as it pertained to the Coca-Cola pouring agreement. Plaintiff was precluded from alleging or arguing any facts with respect to the Coca-Cola pouring agreement in its first amended complaint or at the oral argument on defendant's second motion for summary disposition. As a result, the trial court did not and would not have ruled with respect to a claim that defendant failed to provide information with respect to the Coca-Cola pouring agreement or a claim that defendant acted in bad faith when it failed to assist plaintiff's efforts to perform under the contract. Remand is therefore necessary for the trial court to determine whether material questions of fact exist concerning plaintiff's breach of contract claim pertaining to the Coca-Cola pouring agreement.

With respect to whether questions of fact existed as to the breaches of contract as they were set **[*14]** forth in plaintiff's first amended complaint, plaintiff directs us to the documents submitted in support of its response to defendant's motion for summary disposition. Of relevance to the matters at hand,[3] plaintiff attached the affidavit of Timothy Nasso, the Chief Operating Officer for Wayne County from January 3, 2012, until December 2014. Nasso swore that he had significant marketing experience (including having been the director of global marketing for The Dow Chemical Company and Dow Automotive and that based upon his experience and background) and how defendant handled the Coca-Cola pouring contract was incomprehensible. Nasso further swore that overall, during the time he worked for defendant, information that was given to plaintiff was not timely and some of the requested information was never provided.

Ronald Makino's (president of plaintiff) deposition was also part of the lower court record. Makin testified that Steven Collins, his default contact for defendant, was very difficult to coordinate with and receive answers from. According to Makino, he and Collins would set up a meeting and Collins would "blow it off," would not answer phone calls for weeks at a time, and

[3] Because this Court is remanding to the trial court for consideration of issues concerning the Coca-Cola pouring rights agreement, we will not address any specific evidence concerning that agreement.

would **[*15]** not address issues for weeks at a time. Makino further testified that Clarence McNeal, the County's director of purchasing, told him shortly after the parties' contract went into effect that he had a wealth of information to assist plaintiff. According to Makino, McNeal sent him to a couple of useless places, and then stopped returning his phone calls and emails before telling Makino several months later that he couldn't help him and he was going to have to just start from scratch. Makino further testified that he had asked about banking information to see about a bank sponsorship and did not receive any information regarding that. Further, Makino researched the jail commissary contract with its concessionaire and it had expired. Makino testified that Maddasser Tawakul, defendant's director of purchasing, lobbied the commissary board on three occasions to extend the concessionaire's contract and did so without speaking to plaintiff.

Plaintiff also relies heavily upon a letter addressed to defendant county department directors and deputy directors from Elder. In the September 14, 2011 letter, Elder introduces plaintiff and indicates that defendant has contracted with it for the "sole **[*16]** purpose of developing opportunities for Wayne County in the naming Rights and Sponsorship areas." Elder asks, "Please make contact with [plaintiff] before implementing any new product, service, or lease contract for potential opportunities." In answers to interrogatories, defendant provided information concerning leases and contracts for revenue opportunities it had entered into from 2010 through 2013 without having contacted plaintiff. For example, defendant approved the extension of an agreement with Warren Valley and Inkster Valley Golf Courses on or about July 15, 2010. While the Elder letter is not a part of the parties' contract and serves as more of an introduction of plaintiff, it does indicate that at least defendant's deputy county executive believed that information should be provided to plaintiff prior to the implementation of any new service, lease, or product so that plaintiff could identify potential revenue opportunities. Defendant's failure to provide information to plaintiff concerning its contracts and leases that could present opportunities for potential additional revenue could be deemed a breach of defendant's contractual obligations.

As pointed out by defendant, **[*17]** plaintiff did obtain some information about defendant on its own. Vetra Stephens, regional director of corporate accounts for plaintiff, provided an affidavit wherein she swore that in early 2010 she and defendant's maintenance supervisor visited each county owned and/or operated site and that she created a list of revenue opportunity sites from those visits. Stephens swore that among those on the list were what the parties referred to as the 511 Woodward Project, the I-94 beautification project, and the LED lighting project. However, the parties' agreement provided plaintiff with the exclusive right and obligation to identify, solicit, pursue, and develop "opportunities for the County to earn additional revenues through corporate or other commercial sponsorship, naming rights, and/or similar advertising and promotional transactions." While Stephens could identify site locations for potential revenue opportunities, without information concerning any existing contracts, leases, or other relevant revenue information regarding the sites, plaintiff could not adequately perform its job functions.

Because there is evidence creating a question of material fact as to whether defendant breached **[*18]** the parties' contract, defendant's argument that plaintiff was the first to breach is relevant. It has long been held that "one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." _Michaels v Amway Corp, 206 Mich App 644, 650; 522 NW2d 703 (1994)_, quoting _Flamm v Scherer, 40 Mich App 1, 8-9; 198 NW2d 702 (1972)_.

As previously indicated, the parties' contract contained a target revenue schedule that plaintiff was to meet. Appendix B to the parties' contract provides that plaintiff and defendant have agreed that "during the Term [plaintiff] shall provide Revenue Contracts to [defendant]. [Defendant] shall have the ability to terminate this Contract pursuant to the provisions of Section 16.01 if [plaintiff] does not provide the following revenues to [defendant] during the time periods indicated." Appendix B thereafter sets forth the relevant time periods and target revenues for the following time periods (1) beginning with the commencement of the contract to September 30, 2010; (2) October 1, 2010 through September 30, 2011; (3) October 1, 2011 through September 30, 2012, and; (4) October 1, 2012 through September 30, 2013. The following sentence then appears in Appendix B: "[Plaintiff] shall be bound to provide the **[*19]** cumulative revenues to [defendant] prior to the end of the [defendant]'s fiscal year of September 31, 2011. If [plaintiff] is unable to meet the cumulative revenues indicated [defendant] shall have the ability to terminate the contract under provision 16.01.

Notably, the above contractual language is less than clear as to exactly when plaintiff could be deemed to have breached the parties' contract with regard to providing revenues to defendant. The beginning of Appendix B suggests that plaintiff is required to provide the stated revenues on a yearly basis, with the first revenue due date being September 30, 2010. However, the later sentence in Appendix B specifically states that plaintiff is bound to provide the revenues prior to September 31, 2011. This ambiguous contractual language provides a question of fact as to when plaintiff could be deemed to have first breached the parties' contract. See *Klapp v United Ins Group Agency, Inc, 468 Mich 459, 467, 469; 663 NW2d 447 (2003)*(A contract is ambiguous when two provisions are capable of conflicting interpretations or irreconcilably conflict with each other and when contractual language is ambiguous, its meaning become a question of fact).

Moreover, the rule that a party who first breaches a contract cannot sue the **[*20]** other party for breach of contract applies only when the initial breach is substantial. *Michaels v Amway Corp, 206 Mich App 644, 650; 522 NW2d 703 (1994)*. As our Supreme Court has stated, such a breach:

> can be found only in cases where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party. [*McCarty v Mercury Metalcraft Co, 372 Mich 567, 574; 127 NW2d 340 (1964)* (citations omitted).]

The more oft used and comparative "material" breach of contract standard requires a court to consider whether the nonbreaching party obtained the benefit it reasonably expected to receive as well as:

> the extent to which the injured party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party has partly performed, the comparative hardship on the breaching party in terminating the contract, the wilfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract. [*Omnicom of Michigan v Giannetti Inv Co, 221 Mich App 341, 348; 561 NW2d 138 (1997)* (internal citation omitted)].

Defendant points out that section 16 of the parties' contract **[*21]** defines plaintiff's failure to meet the target revenue as a material breach of contract. Indeed, Section 16, entitled "Termination" states at section 16.01, in pertinent part:

> If [plaintiff] materially breaches the Agreement, [defendant] may terminate the agreement after giving [plaintiff] written notice . . . of its intention to terminate for default , together with a reasonable identification of the reasons giving rise to the notice . . . . If [plaintiff fully cures the identified default within the specified notice period, and [defendant] shall revoke the notice in writing . . . it will not take effect.

Section 16.01 then lists actions taken by plaintiff that "will be deemed to constitute 'material breach' of the Agreement" including "failing to obtain Revenue Contracts that provide [defendant] with compensation schedule listed in Exhibit (sic) B."

Given that plaintiff's failure to meet revenues is defined as a material breach in the context of defendant's right to terminate the agreement and defendant did not terminate the agreement, it is questionable whether plaintiff's failure was deemed to be a material breach *outside* of the context of termination and whether defendant did, in **[*22]** fact, consider this failure a material or substantial breach.

In any event, plaintiff does not dispute that it failed to generate any revenues in 2010 or, in fact, any revenues as a result of the parties' contract. Assuming, without deciding, that plaintiff was in breach of the parties' contract as of September 30, 2010 (the first revenue target date), plaintiff nevertheless presented evidence that defendant failed to provide it information concerning at least one contract defendant renewed in July 2010 that could have potential revenue opportunities. It also presented evidence that defendant did not provide information requested to assist it in developing its work on potential revenue producing opportunities. Because plaintiff presented evidence creating a material question of fact as to whether defendant breached the parties' contract, and did so first, the trial court erred in granting summary disposition in defendant's favor on plaintiff's breach of contract claim.

Reversed and remanded for proceedings consisted with this opinion. We do not retain jurisdiction.

/s/ Henry William Saad

/s/ Deborah A. Servitto

**Dissent by:** Michael F. Gadola

## Dissent

GADOLA, J. (*dissenting*).

Plaintiff appeals as of right the final **[*23]** order of the trial court granting defendant summary disposition pursuant to *MCR 2.116(C)(7)* and *(10)*, and dismissing plaintiff's amended complaint. Plaintiff also challenges the earlier order of the trial court granting defendant summary disposition pursuant to *MCR 2.116(C)(8)* of the claim raised in plaintiff's original complaint. The majority opinion concludes that the trial court erroneously granted defendant summary disposition pursuant to *MCR 2.116(C)(8)* and *(10)*. I disagree, and would hold that the trial court correctly granted summary disposition of plaintiff's claims. I therefore respectfully dissent.

I. FACTS

This case involves an agreement executed by the parties in November 2009. As stated in the agreement, the purpose of the agreement was for plaintiff to take action "to increase [defendant's] revenues through advertising, sponsorship opportunities and/or granting naming right[s] to interested parties . . . ." The agreement provides in paragraph 3.01, in relevant part:

> [Defendant] hereby grants to [plaintiff] and [plaintiff] hereby accepts the exclusive right and obligation to perform the following work . . . on behalf of [defendant]: (1) identifying, soliciting, pursuing, and developing opportunities for [defendant] to earn additional **[*24]** revenues through, corporate or other commercial sponsorship, naming rights, and/or similar advertising and promotional transactions ("Revenue Opportunities"), (2) presenting to [defendant] for its consideration and review, proposed Revenue Opportunities, and proposed contract terms under which the Revenue Opportunities may be obtained, and (3) for such Revenue Opportunity contracts as [defendant] may approve and sign ("Revenue Contracts,"), overseeing all necessary implementation of [defendant's] obligations under such contracts. . . . [Plaintiff] agrees and understands that each Revenue Contract will be submitted to the Wayne County Commission from the Wayne County Executive for approval, prior to execution by the Wayne County Executive. . . .

In addition, paragraph 5.01 of the agreement provides, in relevant part:

> Upon the request of [plaintiff] . . . [defendant] must furnish copies of all information, data, reports, records, etc., that [defendant] and [plaintiff] believe are necessary for [plaintiff] to provide the Work contemplated by this Agreement.

Pursuant to the agreement, plaintiff was entitled to receive 25% of the revenues generated from each approved revenue contract as compensation **[*25]** for its work. That is, plaintiff would only receive payment under the agreement if defendant accepted a proposed revenue contract submitted by plaintiff and the implemented revenue contract thereafter generated revenue. The agreement explicitly states in paragraph 8.01 that the 25% of the revenue generated by approved revenue contracts is the "full compensation" to which plaintiff is entitled and, in paragraph 8.02, that "[Plaintiff] is not entitled to any costs incurred in carrying out the Work."

No provision of the agreement obligates defendant to accept any proposed revenue contract submitted by plaintiff; under the agreement, defendant had sole discretion to reject any and all revenue contracts proposed by plaintiff. The parties' agreement also specifies in paragraphs 16.01 and 16.02 that the remedy available to each party, if the other party should breach the agreement, is termination of the agreement.

In its original complaint before the trial court, plaintiff alleged that defendant had breached the parties' agreement by failing to accept the revenue opportunities plaintiff had presented. Plaintiff alleged that it had provided defendant "with numerous opportunities for new revenue **[*26]** sources" in accordance with the parties' agreement but that defendant "refused and/or failed to complete its obligations and abide by" the agreement. The original complaint specifically identified one proposal plaintiff had submitted to defendant involving a "pouring rights agreement" with Coca-Cola, and alleged that defendant had "refused to put the terms of the Primary Agreement into effect." Plaintiff alleged that this refusal to execute the pouring rights agreement with Coca-Cola caused plaintiff to lose the percentage of the revenue that defendant would have received had defendant accepted the Coca-Cola proposal (and, presumably, had that accepted proposal thereafter produced revenue). Plaintiff also alleged that defendant breached the initial agreement by failing to provide plaintiff with information and support needed to implement the Coca-Cola proposal, thereby hindering

plaintiff's ability to put the Coca-Cola proposal into effect.

Defendant moved for summary disposition of plaintiff's complaint pursuant to *MCR 2.116(C)(8)*, contending that plaintiff had failed to state a claim because the agreement between the parties did not require defendant to accept any proposed revenue opportunity presented **[*27]** to it by plaintiff. Defendant argued that the agreement provided plaintiff only with the exclusive right to present proposed revenue opportunities, that plaintiff's right to compensation was conditioned upon defendant's approval of a revenue contract and the generation of profit from the execution of such a revenue contract, and that defendant had sole discretion to accept or deny any such proposal.

In response to the motion, plaintiff argued that while the initial agreement did not require defendant to accept any revenue opportunity presented by plaintiff, defendant had a duty of honesty and good faith with respect to its discretion in the performance of the contract. Plaintiff argued that defendant's officials and employees had acted to further their own personal interests and/or with personal animosity toward plaintiff when considering and reviewing the proposed revenue opportunities, resulting in defendant breaching the primary agreement by failing to act in good faith, and the revenue opportunities being lost.

At the hearing on the motion before the trial court, defendant argued that plaintiff's complaint included no allegations of bad faith and unfair dealing, and that plaintiff **[*28]** had failed to state a claim for breach of the primary agreement. Plaintiff asserted that through discovery it could obtain evidence that defendant acted in bad faith in blocking the progress of the proposed revenue opportunities, and sought to amend the complaint to add specific allegations of bad faith. The trial court granted defendant's motion with regard to the allegations of the original complaint, specifically those allegations arising out of the Coca-Cola proposal, but permitted plaintiff to file an amended complaint to allege breach of contract, fraud, and misrepresentation arising out of any proposed revenue opportunity other than the Coca-Cola proposal.

Plaintiff thereafter filed its amended complaint, alleging breach of contract, promissory estoppel, and fraudulent misrepresentation. Specifically, plaintiff alleged in the amended complaint that pursuant to the agreement plaintiff had provided defendant with "numerous opportunities for new revenue sources" including, but not limited to: "the I-94 beautification project, the LED lighting project, the LED network project, the 511 Woodward LED project," as well as the Coca-Cola proposal that the trial court had earlier ruled **[*29]** upon. Plaintiff alleged that defendant had breached the initial agreement when it failed to provide plaintiff with "the information and support needed for various revenue opportunities" and that this failure was a bad faith refusal and/or failure by defendant to abide by the agreement causing defendant "huge revenues and savings cost opportunities" and "causing Plaintiff to incur unreimbursed time and unreimbursed expenses."

Defendant moved for summary disposition of plaintiff's allegations of fraudulent misrepresentation pursuant to *MCR 2.116(C)(7)* arguing that the claim was barred by governmental immunity, and moved for summary disposition of plaintiff's breach of contract claim pursuant to *MCR 2.116 (C)(10)*, arguing that there was no dispute of material fact and that defendant was entitled to judgment as a matter of law. The trial court granted defendant's motion regarding the claim of fraudulent misrepresentation pursuant to *MCR 2.116(C)(7)* and of the breach of contract and promissory estoppel claims pursuant to *MCR 2.116(C)(10)*.

On appeal to this Court, plaintiff challenges the trial court's orders granting summary disposition pursuant to *MCR 2.116(C)(8)* and *(10)*.[1] Plaintiff contends that the trial court erred when it granted summary disposition of the original **[*30]** complaint pursuant to *MCR 2.116(C)(8)* of the claim of breach of contract related to the Coca-Cola proposal, and further erred in granting summary disposition pursuant to *MCR 2.116(C)(10)* of plaintiff's breach of contract claim in the amended complaint.

II. THE ORIGINAL COMPLAINT

The majority opinion first concludes that the trial court erred in granting defendant summary disposition of plaintiff's original complaint which alleged that defendant breached the contract by not accepting the Coca-Cola revenue proposal and by failing to provide plaintiff with information and support regarding the Coca-Cola revenue proposal. The majority opinion concludes that the original complaint set forth allegations of breach of contract sufficient to survive a motion for summary disposition pursuant to *MCR 2.116(C)(8)*. I disagree.

---

[1] Plaintiff does not pursue on appeal its arguments regarding promissory estoppel or fraudulent misrepresentation.

This Court reviews de novo the grant or denial of summary disposition. *Graham v Foster, 500 Mich 23, 28; 893 NW2d 319 (2017)*. We also review de novo the interpretation of a contractual agreement. *Rory v Continental Ins Co, 473 Mich 457, 464; 703 NW2d 23 (2005)*. A motion for summary disposition pursuant to *MCR 2.116(C)(8)* tests the legal sufficiency of the complaint, and is considered on the pleadings alone.[2] *Bryan v JPMorgan Chase Bank, 304 Mich App 708, 713; 848 NW2d 482 (2014)*. If no facts can be developed to sustain the claim, the motion must be granted. *Id.*

To adequately allege a breach of contract, the party asserting **[*31]** the breach must establish by a preponderance of the evidence that (1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach. *Miller-Davis Co v Ahrens Construction, Inc, 495 Mich 161, 178; 848 NW2d 95 (2014)*. The alleged breach by the defendant must be the proximate cause of the plaintiff's harm. *Chelsea Investment Group LLC v City of Chelsea, 288 Mich App 239, 254; 792 NW2d 781 (2010)*.

In this case, plaintiff's original complaint did not adequately allege either breach or damages. The parties' agreement grants plaintiff the exclusive right (1) to identify, solicit, pursue and develop revenue opportunities; (2) to present proposed revenue opportunities to defendant for its consideration and review; and (3) of oversight of all necessary implementation of defendant's obligations under an executed revenue contract. The agreement requires defendant, upon plaintiff's request, to provide plaintiff with "all information, data, reports, records, etc.," that the parties believe is necessary for plaintiff to provide the work covered by the preliminary agreement. The agreement imposes no other duty upon defendant. The agreement makes clear that each proposed revenue opportunity must be submitted to defendant for approval, and gives defendant complete discretion to approve or reject any **[*32]** revenue opportunity presented to it by plaintiff. The agreement further provides that the remedy available to either party, upon breach of the agreement by the other party, is termination of the agreement.

We interpret a contractual agreement according to its plain and ordinary meaning. *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership (On Remand), 300 Mich App 361, 386; 835 NW2d 593 (2013)*. Because an unambiguous contract reflects the parties' intent as a matter of law, courts must interpret and enforce a contract as written. *In re Egbert R. Smith Trust, 480 Mich 19, 24; 745 NW2d 754 (2008)*. An agreement is unambiguous when it "fairly allows but one interpretation." See *Morley v Auto Club of Mich, 458 Mich 459, 465; 581 NW2d 237 (1998)*.

In this case, plaintiff's original complaint alleged that defendant breached the agreement "when it refused to put the terms of the Coca-Cola Pouring Rights contract into effect" and failed or refused "to implement the opportunities identified by plaintiff . . . ." That action, however, was permitted under the parties' agreement. A plain reading of the parties' agreement reveals that defendant had no obligation to accept any of the revenue opportunities presented to it by plaintiff, and whether to accept or reject any revenue opportunity was within the discretion of defendant alone. Alleging that defendant failed or refused to accept the Coca-Cola proposal or any other proposed revenue **[*33]** opportunity, therefore, does not articulate a claim for breach of the parties' agreement.

Plaintiff further alleged in the original complaint that defendant breached the agreement because it "failed to provide [plaintiff] with the information and support needed for the Coca-Cola Pouring Rights Agreement and hindered [plaintiff's] efforts to perform under the contract." Plaintiff's original complaint did not allege any facts to support this allegation, however. The express language of the parties' agreement provides in paragraph 5.01 that "[defendant] must furnish copies of all information, data, reports, records, etc., **that [defendant] and [plaintiff ] believe are necessary**. . ."(emphasis added). The plain language of the agreement thus provides that defendant is only obligated to provide the information that both parties agree is necessary. Further, plaintiff was able to negotiate and present the fully-negotiated Coca-Cola proposal to defendant for approval, demonstrating that it had the requisite information and support to do so. Because plaintiff did not allege any facts in its original complaint to establish that defendant breached any provision of the contract or that plaintiff **[*34]** had suffered any resultant damages, plaintiff's original complaint failed to state a claim for breach of contract, and the trial court properly granted defendant summary disposition of the original complaint pursuant to *MCR*

---

[2] Plaintiff attached the initial agreement to the complaint, thereby incorporating the agreement into the pleadings. See *Laurel Woods Apts v Roumayah, 274 Mich App 631, 635; 734 NW2d 217 (2007)*.

2.116(C)(8).

On appeal, however, plaintiff urges us to find that the original complaint should not have been dismissed because defendant breached the contract by breaching the implied covenant of good faith and fair dealing. The majority opinion agrees, and concludes that plaintiff's original complaint sets forth a claim for breach of contract both because it alleges that specific provisions of the parties' contract were breached and also because it sufficiently alleges a breach of contract based upon bad faith or unfair dealing. Again, I disagree.

Plaintiff's original complaint did not allege a breach of an implied covenant of good faith and fair dealing. A complaint must contain "[a] statement of facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend." MCR 2.111(B)(1). A mere statement of the pleader's conclusions, **[*35]** unsupported by allegations of fact, does not sufficiently state a cause of action. *Golec v Metal Exch Corp, 208 Mich App 380, 382; 528 NW2d 756 (1995)*.

Moreover, Michigan does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing. *In re Leix Estate, 289 Mich App 574, 591; 797 NW2d 673 (2010)*; see also *Belle Isle Grill Corp v Detroit, 256 Mich App 463, 476; 666 NW2d 271 (2003)* (explaining that because Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing, the trial court properly dismissed the claim). It is true that this Court has often noted that there exists in every contract an implied covenant of good faith and fair dealing, which is a promise "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v United of Oakland, Inc, 193 Mich App 146, 152; 483 NW2d 652 (1992)*. This Court has stated that "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Burkhardt v City Nat'l Bank, 57 Mich App 649, 652; 226 NW2d 678 (1975)*.

But under Michigan law, the implied covenant of good faith neither overrides nor replaces express contractual terms. *Bank of America, NA v Fidelity National Title Ins Co, 316 Mich App 480, 501; 892 NW2d 467 (2016)*, citing *Van Arnem Co v Mfr Hanover Leasing Corp, 776 F Supp 1220, 1223 (ED Mich, 1991)*. See also *Hubbard Chevrolet Co v General Motors Corp, 873 F2d 873, 877 (CA 5, 1989)* (Michigan law does not imply a covenant of good faith where the parties have "unmistakably expressed" their respective rights). **[*36]** [3] Nor will the implied covenant of good faith be used to fill alleged gaps in a contract where the contract is clear and specific regarding the parties' rights and obligations. See *Bank of America, 316 Mich App at 501*. So while an implied covenant of good faith has been recognized by this Court, the obligation of good faith cannot be used when interpreting a contract to override the express terms of the contract. *Cook v Little Caesar Enterprises, Inc, 210 F3d 653, 657 (CA 6, 2000)*. That is, an implied covenant of good faith does not require a party to "ignore, forego, or waive its express contract rights." *VanArnem Co, 776 F Supp at 1223*. See also *Stephenson v Allstate Ins Co, 328 F3d 822, 827 (CA 6, 2008)* (holding that there is no implied duty of good faith where the parties have "unmistakably expressed their respective rights," because the implied duty cannot override express contract terms). Rather, where an action is permitted by a contract, there is no contract violation even if the action undertaken thwarts the reasonable expectations of the contracting party. *In re Leix Estate, 289 Mich App at 591*.

In this case, the parties' agreement unmistakably expressed the respective rights and duties of the parties. Accordingly, plaintiff cannot successfully argue that an implied duty of good faith overrides these plain terms. *Stephenson, 328 F3d at 827*; see also *Hubbard, 873 F2d at 877-878* (holding that there was no implied duty of good faith and fair dealing when the **[*37]** parties' agreement gave one party the authority to approve or disapprove a term for its own reasons, thus setting limits on what the contract required of the parties). In sum, not only did the original complaint fail to allege breach of an implied duty of good faith and fair dealing, such an allegation would have been fruitless. I therefore must disagree with the conclusion of the majority opinion and would hold that trial court properly granted defendant summary disposition of the original complaint pursuant to MCR 2.116(C)(8).

III. THE AMENDED COMPLAINT

In this case, the trial court permitted plaintiff to amend

---

[3] The decisions of lower federal courts, though not binding upon state courts, may be persuasive. *Abela v Gen Motors Corp, 469 Mich 603, 607; 677 NW2d 325 (2004)*.

its complaint to allege with specificity its contention that defendant had breached the parties' agreement with regard to proposed revenue opportunities other than the Coca-Cola proposal. Plaintiff consequently filed its amended complaint, alleging breach of contract, promissory estoppel, and fraudulent misrepresentation. Specifically, plaintiff alleged in the amended complaint that pursuant to the agreement plaintiff had provided defendant with "numerous opportunities for new revenue sources" including, but not limited to, "the I-94 beautification project, the LED lighting project, the LED **[*38]** network project, the 511 Woodward LED project," as well as the Coca-Cola proposal that the trial court had earlier ruled upon. Plaintiff alleged that defendant had breached the initial agreement when it failed to provide plaintiff with "the information and support needed for various revenue opportunities" and that this failure was a bad faith refusal and/or failure by defendant to abide by the agreement causing defendant "huge revenues and savings cost opportunities" and "causing Plaintiff to incur unreimbursed time and unreimbursed expenses." The trial court granted defendant's motion regarding the claim of fraudulent misrepresentation pursuant to *MCR 2.116(C)(7)* and of the claims of breach of contract and promissory estoppel pursuant to *MCR 2.116(C)(10)*.

On appeal, plaintiff contends that the trial court erred by granting defendant's motion for summary disposition of plaintiff's amended complaint pursuant to *MCR 2.116(C)(10)* with respect to plaintiff's claim of breach of contract. Plaintiff argues that based on the allegations of the amended complaint and supporting documentation there existed a genuine issue of material fact regarding whether defendant breached the parties' agreement by hindering plaintiff's ability to perform **[*39]** the contract. Specifically, plaintiff argues that defendant failed to provide needed information and assistance for proposed revenue opportunities and that certain of defendant's employees attempted to thwart plaintiff in its performance of the agreement. Plaintiff argues that these actions constituted breach of the parties' agreement and that it was damaged in the amount that it spent working on proposed revenue projects and in the amounts to which plaintiff would have been entitled had defendant approved the proposals.

The majority opinion agrees that there was a genuine issue of material fact and cites documentary evidence plaintiff presented to the trial court ostensibly demonstrating that defendant was uncooperative in assisting plaintiff in its efforts to perform the contract. The amended complaint and supporting documentation, however, fail to articulate the elements of proximate cause or damages necessary to sustain a cause of action for breach of contract. I therefore disagree with the conclusion of the majority opinion.

A motion for summary disposition pursuant to *MCR 2.116(C)(10)* is to be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment **[*40]** as a matter of law. *Dawoud v State Farm Mut Auto Ins Co, 317 Mich App 517, 520; 895 NW2d 188 (2016)*. When reviewing an order granting summary disposition pursuant to *MCR 2.116(C)(10)* we consider all documentary evidence submitted by the parties in the light most favorable to the nonmoving party. *Id.*

Again, the interpretation of a contract presents a question of law for this Court to determine de novo. *Bank of America, 316 Mich App at 488*. In interpreting a contract, this Court must give the words of the contract their ordinary and plain meanings. If the language of a contract is unambiguous, we must interpret and enforce the contract as written because an unambiguous contractual provision reflects the parties' intent as a matter of law. *Id. at 489*.

In this case, the amended complaint continues to fail to state a claim for breach of contract and, as the trial court held, also fails to present a disputed issue of fact that would avoid summary disposition pursuant to *MCR 2.116(C)(10)*. Viewing all the documentary evidence in the light most favorable to plaintiff, the only allegation of the amended complaint that conceivably could constitute breach of the parties' agreement is the allegation that defendant failed to provide information to plaintiff as required by paragraph 5.01 of the agreement. But even if we accept this allegation as true, **[*41]** plaintiff has failed to show how this alleged action by defendant was the proximate cause of the damages plaintiff now seeks.

Under the terms of the agreement, breach by either party entitles the non-breaching party to terminate the agreement; breach does not entitle the non-breaching party to the amounts that party might have earned had a proposed revenue opportunity been accepted, and thereafter produced revenue. Again, we are constrained to give contract language its plain and ordinary meaning. The contract language states unequivocally that the only payment to which plaintiff can ever be entitled under the agreement is 25% of revenue realized by defendant, if defendant accepts a revenue proposal presented by plaintiff and if that accepted proposal generates revenue. The agreement explicitly states in

paragraph 8.01 that the 25% of revenue for such an accepted contract is the "full compensation" to which plaintiff is entitled and, in paragraph 8.02, that ". . . [Plaintiff] is not entitled to any costs incurred in carrying out the Work." Thus, even if we accept for purposes of the motion that there is a question of fact regarding whether defendant failed to provide plaintiff information **[*42]** as required by the agreement, plaintiff has nonetheless failed to establish that this alleged breach resulted in plaintiff's alleged damages.[4] The trial court therefore also appropriately granted summary disposition of plaintiff's amended complaint. I would therefore affirm.

/s/ Michael F. Gadola

---

**End of Document**

[4] There is an additional reason it cannot be said that any failure on the part of defendant to cooperate with plaintiff in the development of revenue opportunities was the proximate cause of any damages plaintiff may have suffered. Under the terms of the contract, any revenue opportunities plaintiff might have presented to defendant would have to be approved both by the County Executive and County Commission before taking effect. It is pure speculation to conclude, for example, that the Coca-Cola pouring rights agreement, or any other revenue opportunity, would have received the necessary approvals from these political actors. For this reason, any lack of cooperation plaintiff may have demonstrated in developing revenue opportunities was far too attenuated from its alleged damages to support the element of proximate cause. The same logic applies to the element of damages, as plaintiff could have had no meaningful expectation that it would profit under the terms of this contract given its dependence upon the approval of two separate branches of county government for any revenue opportunities to take effect. Plaintiff's damages are wholly speculative under these facts.

LexisNexis®

# Steel Strip Wheels, Ltd. v. General Rigging, LLC

United States District Court for the Eastern District of Michigan, Southern Division

September 30, 2009, Argued; September 30, 2009, Decided; September 30, 2009, Filed

Case No. 08-cv-13737

**Reporter**
2009 U.S. Dist. LEXIS 90407 *; 71 U.C.C. Rep. Serv. 2d (Callaghan) 82

STEEL STRIP WHEELS, LTD., Plaintiff, v. GENERAL RIGGING, LLC, a Michigan limited liability company, FRANCIS BLAKE, SR., FRANCIS BLAKE, JR., and PATRICK BLAKE, Defendants.

**Counsel:** **[*1]** For Steel Strip Wheels, Ltd, Plaintiff: Michael C. Simoni, Miller, Canfield, Detroit, MI; Todd A. Holleman, Miller, Canfield, (Detroit), Detroit, MI.

For General Rigging, LLC, Francis Blake, Sr, Francis Blake, Jr, Patrick Blake, Defendants: Daniel G. Helton, Detroit, MI.

For Titan International, Inc., Defendant: Thomas P. Bruetsch, Bodman, Detroit, MI.

**Judges:** PRESENT: Honorable Gerald E. Rosen, Chief Judge, United States District Judge.

**Opinion by:** Gerald E. Rosen

## Opinion

**OPINION & ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

At A session of said Court, held in the U.S. Courthouse, Detroit, Michigan on September 30, 2009

PRESENT: Honorable Gerald E. Rosen Chief Judge, United States District Court

### I. INTRODUCTION

Plaintiff Steel Strip Wheels, Ltd. is a manufacturer of wheels for trucks and automobiles based in India. It commenced this action on August 29, 2008, asserting claims of breach of contract, fraud, and conversion against corporate Defendant General Rigging, LLC ("General Rigging"), a Michigan industrial equipment dealer. The complaint was later amended to include individual Defendants Francis Blake, Sr., Francis Blake, Jr. and Patrick Blake, all Michigan residents. Plaintiff's claims arise out **[*2]** of General Rigging's repudiation of a contract binding it to sell seven industrial presses to Plaintiff. Jurisdiction is proper in this Court pursuant to *28 U.S.C. § 1332(a)* because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $ 75,000, exclusive of interest and costs. See *28 U.S.C. § 1332(a)(2)*.

This case is presently before the court on a Motion for Summary Judgment filed by Plaintiff on February 4, 2009. Plaintiff argues that (1) the corporate Defendant breached the contract by selling and shipping two of the seven presses promised to Plaintiff to another company; (2) the individual Defendants knowingly withheld the fact that the company breached the contract for the purpose of misleading Plaintiff to modify the terms of the contract and complete the sale of the remaining five presses; and (3) the corporate Defendant wrongfully withheld and continues to withhold $ 75,000 owed to Plaintiff. In response, General Rigging admits that it owes Plaintiff $ 75,000, but otherwise argues that the repudiation of the agreement was justified by Plaintiff's failure to provide contractually required open top containers for shipment without **[*3]** adequate assurances that it would timely perform. General Rigging further argues that Plaintiff's fraud claim is barred by the economic loss doctrine.

Having reviewed the parties' written submissions in support of and opposition to Plaintiff's motion, the accompanying exhibits, and the record as a whole, the Court finds that the pertinent facts, allegations, and legal issues are sufficiently presented in these materials, and that oral argument would not assist in the resolution of

Plaintiff's motion. Accordingly, the Court will decide this motion "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings.

## II. FACTUAL BACKGROUND

At the time of the events in this case, Plaintiff was building a new manufacturing facility in India, for which it needed industrial presses. Plaintiff's machinery agent learned of several used presses for sale by General Rigging that could fulfill these needs. On or about June 30, 2008, Plaintiff's representative, A.V. Unnikrishnan and his machinery agent, Prabhakar Shukla, met with General Rigging's representatives at the company's Detroit offices. At the time, General Rigging **[*4]** was owned and run by Francis Blake, Jr. Mr. Blake in turn employed his father, Francis Blake, Sr., and his brother, Patrick Blake, both of whom were involved in negotiating new contracts and sales. Upon meeting with Mr. Unnikrishnan and Mr. Shukla, Francis Blake, Jr. showed Mr. Shukla several 1000-ton presses available in General Rigging's Detroit inventory. The following day, the parties also inspected two 1600-ton presses, which were stored in a shuttered factory building in South Bend, Indiana.

On July 2, 2008, Plaintiff's representatives met with Francis Blake, Sr. over four to six hours to negotiate the terms of a sales contract. In the end, the parties reached an agreement which was memorialized in an invoice prepared by Francis Blake, Jr. The invoice outlined the sale of seven presses: five 1000-ton presses for $ 90,000 each and two 1600-ton presses for $ 172,500 each. In addition, the invoice indicated that Plaintiff would pay $ 10,000 to cover packing charges for each press. The invoice required a deposit of $ 175,000 by wire transfer, due before July 15, 2008. Subsequently, installment payments for each press would be due upon shipment. The invoice specified that General Rigging **[*5]** was responsible for securing the presses "in a seaworthy manner for ocean shipment. . . . All parts to be loaded into open top containers or into skids for break bulk per requirements." (Pl.'s Mot. for Summ. J. Ex. 1.) Plaintiff was responsible for supplying open top containers for packing and for all local freight and ocean shipment. (Id.) Finally, the invoice stated that all presses would be shipped by September 30, 2008.

Both Francis Blake, Jr. and Francis Blake, Sr. testified that a critical issue for General Rigging during the negotiation process was the time of performance: the Blakes hoped to begin shipping right away. At deposition, both said that Plaintiff's representatives claimed to be able to obtain open top shipping containers within a week of signing the invoice and repeatedly assured the Blakes that a contract with a shipping company was already in place. (Francis Blake, Jr. Dep. 16:13-24; Francis Blake, Sr. Dep. 24:21-25.) By contrast, Mr. Unnikrishnan testified that he told General Rigging's representatives at the close of negotiation that he would *begin* contacting shipping companies upon returning to India, and that dismantling and packing could conceivably begin within **[*6]** fifteen or twenty days. (A.V. Unnikrishnan Dep. 46:7-12, 47:3-9.) He denied that any specific date was given for when the open top containers would arrive in Detroit and South Bend, where the presses were to be dismantled; he did however testify to telling the Blakes that Plaintiff had a relationship with Kuehne+Nagel, a shipping company that usually handled Plaintiff's exports. (A.V. Unnikrishnan Dep. 47:15, 47:21-48:13.)

In the weeks that followed, several shipping companies including Kuehne+Nagel contacted General Rigging to prepare price quotes for Plaintiff. General Rigging claims to have only learned that Plaintiff did not already have a shipping contract in place at this time. (Def.'s Br. in Opp'n 7.) [1] On July 23, 2008, Patrick Blake sent an

---

[1] The sole affidavit submitted in support of General Rigging's Brief in Opposition to Plaintiff's Motion for Summary Judgment is an affidavit of "Francis A. Blake." Both Messrs. Francis Blake, Jr. and Sr., have the middle initial "A," however the affiant indicates that he is "in charge of negotiating contracts and assisting Rigging in the pursuit of business opportunities." (Blake Aff. P 1.) Based on other evidence in the record, it appears that the affiant is the elder Francis Blake. Beyond this, the affidavit offers only a blanket adoption of the statement of facts as outlined in General Rigging's Brief. (Blake Aff. P 2) ("I have read the Statement of Facts section of General Rigging's Brief. . . . Based upon my participation in the events and my review of relevant documents, I have personal knowledge of the facts set forth therein and aver **[*8]** that they are true and accurate to the best of my knowledge.")

This is a questionable practice, at best, in the context of a dispositive motion, as it converts the personal knowledge requirement of *Rule 56(e)(1) of the Federal Rules of Civil Procedure* into a mere formality. Although the Court is certainly aware that lawyers routinely draft affidavits for their lay clients, the virtual circumvention of the personal knowledge requirement here by summary blanket adoption makes the Court's job of insuring the affiant is in fact competent to testify to all of the matters in the affidavit all the more difficult

email to Mr. Unnikrishnan urging him to hire a shipping company as soon as possible: "We need to have the containers available to begin packing on Monday, July 28th." (Def.'s Br. in Opp'n Ex. 4.) In response, Mr. Unnikrishnan wrote that he hoped to have a shipping arrangement finalized by the end of July. (Id.) In the meantime, General Rigging sent a crew to South Bend to begin the dismantling of the 1600-ton presses. (Def.'s Br. in Opp'n **[*7]** 7.) A crew at the Detroit facility was allegedly left idle without the requisite containers to begin packing the 1000-ton presses. (Id.) Towards the end of July, Kuehne+Nagel's Ocean Manager in Detroit, Tammy Loeman, visited General Rigging's Detroit facility to inspect the five 1000-ton presses and meet with Francis Blake, Sr. and Patrick Blake.

On July 28, 2008, Patrick Blake again wrote to Mr. Unnikrishnan:

> Have you hired a shipping company yet? We must have container [sic] in our facility this week. Please advise by return email as soon as possible. If we do not receive containers this week [we] will not be able to make your schedule and we have a [sic] offsite job scheduled after September 30th that will required all our employees.

(Def.'s Br. in Opp'n Ex. 5.) The next day, Plaintiff and Kuehne+Nagel signed a letter of intent, indicating that shipment of the seven presses was a "time bound project" and that the presses should be "lifted" from General Rigging's Detroit and South Bend locations before August 25, 2008. (Pl.'s Mot. for Summ. J. Ex. 8.) It did not address the need for open top containers. (Id.) By email dated July 29, Mr. Unnikrishnan wrote to Patrick Blake, "We have engaged M/s. Kune+Nagal [sic], who will be in touch with you." (Id.) General Rigging contacted Kuehne+Nagel in an attempt to make arrangements for the delivery of the **[*10]** open-top containers only to learn that Kuehne+Nagel was not yet formally under contract with Plaintiff. (Def.'s Br. in Opp'n 8.)

On August 4, 2008, Francis Blake, Sr. emailed Mr. Unnikrishnan again:

> I am very troubled by the lack of progress on the shipment of the presses. During negotiations when you requested for payment after loading you assured me that containers would arrive within one week. It has been 30 days and you have not contracted a shipping company. We do not have any commitment for containers or for trucks for skidded items. We require 30 to 45 days from the date the first containers arrive to pack these presses. This delay has caused a cash flow problem for our company. We made the deal with you with the understanding that the presses would be shipped in a timely manner with no delays. I can offer the following solutions: (1.) Cancel the deal for the two 1600-ton presses and renegotiate the deal for the 1000-ton presses. (2.) Wire transfer Payment in full for the seven presses tomorrow. (3.) Cancel the deal and we will return your deposit. These options are not negotiable. I require a response this evening or I will cancel our deal and return your deposit.

(Pl.'s Mot. **[*11]** for Summ. J. Ex. 10.) In an email directed to Patrick Blake the following day, Mr. Unnikrishnan responded:

> I am very sorry to say there was no commitment from my side to place the containers within a weeks [sic] time. I fully agree to honor the mutually agreed terms as per the agreement between the two company [sic]. I am finalising [sic] the terms with the logistic [company] and shall arrange to lift the stuffs [sic] at the earliest possible. I seek your cooperation in this regard. In case you can arrange the logistics upto [sic] Chennai, iam [sic] ready to accept CIF Chennai terms also.

(Pl.'s Mot. for Summ. J. Ex. 11.)

On the morning of August 5, 2008, General Rigging reinitiated contact with one of its existing customers, Titan International, Inc. ("Titan"). Titan and General Rigging had previously discussed the sale of the two 1600-ton presses prior to General Rigging's negotiations with Plaintiff. General Rigging informed Titan that the 1600-ton presses were available for sale; it did not inform Titan of the contract with Plaintiff, explaining only that liens on the presses had been discharged and that

---

because the Court is forced to search the statements drafted by General Rigging's counsel in its brief and assume that *all* are based on the personal knowledge of a single witness. Nevertheless, the Court has made an attempt to corroborate General Rigging's statement of facts/Francis Blake, Sr.'s "affidavit" where possible, giving General Rigging as the non-moving party the benefit of the doubt. Where, as in this instance, the Court is unable to find corroborative evidence in deposition testimony and other evidence in the record, it is forced to cite simply to General Rigging's Brief **[*9]** in Opposition. However, for purposes of this Opinion, it does not appear that material questions of fact turn on the few instances where these statements cannot be thus corroborated.

the presses were now available "free and clear." (Pl.'s Mot. for Summ. J. Ex. **[*12]** 12.) On August 6, 2008, General Rigging issued an invoice to Titan for the sale of the presses, at a price of $ 225,000 each, plus $ 45,000 each to load them onto Titan's trucks. Titan wired full payment to General Rigging on August 8, 2008, and the 1600-ton presses were delivered to Titan's Illinois facility by late August.

Meanwhile, Plaintiff and Kuehne+Nagel finalized a shipping contract on August 5, 2008 for $ 550,000, covering the logistics of transporting the seven presses overseas. Mr. Unnikrishnan wrote to Patrick Blake to inform him of this news and of the fact that a Kuehne+Nagel official would be contacting General Rigging for further details. On August 6, 2008, Patrick Blake emailed Tammy Loeman to inquire about the availability of open-top shipping containers. She responded that Kuehne+Nagel had located three and that she was searching for more. No additional open-top shipping containers were ever located and Ms. Loeman ultimately sent written confirmation that there would be insufficient open top containers to ship the presses. Ms. Loeman, along with Plaintiff's representatives, sought an alternative solution. By mid-August Ms. Loeman informed General Rigging that she **[*13]** had arranged for Great Lakes Packing Company ("Great Lakes") to place the dismantled presses in ordinary ocean shipping containers. Plaintiff would pay Great Lakes directly for this service.

On August 8, 2008, Mr. Shukla traveled to South Bend, Indiana to oversee the dismantling of the 1600-ton presses. At the time, nobody from General Rigging's offices informed Mr. Shukla or Ms. Loeman of the sale of those presses to Titan, executed two days prior, although they continued to make arrangements for shipment of all seven presses. As late as August 12, 2008, Patrick Blake provided the weight and dimensions of the (already sold) 1600-ton presses upon Mr. Shukla's request. On August 14, 2008, Mr. Shukla and Ms. Loeman met with Patrick Blake to discuss a detailed shipping plan for all seven presses. Based on the ongoing concerns about Plaintiff's ability to deliver shipping containers and General Rigging's cash flow problems, Mr. Shukla offered to have Plaintiff make two installment payments of $ 200,000 for the 1000-ton presses, rather than the previously agreed upon payments due on shipping. Together with the $ 175,000 already tendered as deposit, these two payments would represent payment **[*14]** in full for the five 1000-ton presses ($ 500,000) and partial payment for the two remaining 1600-ton presses ($ 75,000 out of $ 365,000 due). The new payment plan was approved by Mr. Unnikrishnan on August 20, 2008 and memorialized in two invoices, which described the payments as "Advance of (5) 1000-ton Presses" to satisfy the July 2, 2008 agreement. (Pl.'s Mot. for Summ. J. Ex. 19.) Plaintiff remitted the two $ 200,000 payments by wire transfer on August 21 and August 29. Still no one from General Rigging informed Plaintiff that the 1600-ton presses were sold and in the process of being shipped to Titan.

By August 25, 2008, General Rigging was making progress on the shipment of the 1000-ton presses. However, when Mr. Shukla again traveled to South Bend to oversee progress there, he noticed that some of the parts of the 1600-ton presses were missing since his last visit. Although General Rigging employees allegedly told Mr. Shukla that the presses had been moved to another location because of space constraints at the South Bend location, upon further investigation, he learned that the parts had been shipped to Titan.

Based on these allegations, Plaintiff commenced this suit on August **[*15]** 29, 2008 asserting state-law claims of breach of contract, fraud, and conversion.

## III. ANALYSIS

### A. The Standards Governing Motions for Summary Judgment

Through the present motion, Plaintiff seeks summary judgment in its favor. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. As the Supreme Court has explained, "the plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)*. In addition, where, as here, a party (Plaintiff) seeks an award of summary judgment in his favor on issues as to which he bears the burden of proof, Plaintiff's "showing must be sufficient for the court to hold that no reasonable trier of fact could find

**[*16]** other than for the moving party." *Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986)* (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under *Rule 56*, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp., 434 F.3d 810, 813 (6th Cir. 2006)*. Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must -- by affidavits or as otherwise provided in [*Rule 56*] -- set out specific facts showing a genuine issue for trial." *Fed. R. Civ. P. 56(e)(2)*. Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *Fed. R. Civ. P. 56(e)(1)*. Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack, 434 F.3d at 814* (alteration, internal quotation marks, and citation omitted).

**B. Breach of Contract Claim**

In support of its Motion for Summary Judgment, Plaintiff argues that General Rigging repudiated the contract when it failed **[*17]** to deliver the two 1600-ton presses to Plaintiff as promised. General Rigging concedes that it sold the presses to Titan before time for performance, but argues that the sale was justified to mitigate possible damages from Plaintiff's delay in obtaining shipping containers. Furthermore, General Rigging argues that Plaintiff's misrepresentations about the status of shipping arrangements in the weeks following the July 2, 2008 agreement provided General Rigging with reasonable grounds for insecurity under *Mich. Comp. Law § 440.2609*, thereby excusing General Rigging's sale of the presses.

**1. Plaintiff Did Not Repudiate the Contract Where Alleged Oral Assurances That Plaintiff Would Supply Shipping Containers Within A Week Are Barred By the Parol Evidence Rule and Delays In Arranging Shipment Did Not Substantially Impair the Value of the Contract.**

Both parties agree that this case is governed by Michigan's enactment of the Uniform Commercial Code ("UCC"). Under the UCC, a contract for the sale of goods for the price of $ 1,000 or more is not enforceable unless there exists a writing sufficient to indicate that a contract has been made between the parties and signed by the party against whom **[*18]** enforcement is sought. *Mich. Comp. Laws § 440.2201(1)*. If either party to a contract repudiates the contract with respect to a performance not yet due "the loss of which will substantially impair the value of the contract to the other," the aggrieved party may await performance by the repudiating party, resort to any other remedy for breach and/or suspend his own performance. *Mich. Comp. Laws § 440.2610*; see also *Stoddard v. Manufacturers. Nat'l Bank of Grand Rapids, 234 Mich. App. 140, 163, 593 N.W.2d 630, 640 (1999)*. Anticipatory repudiation occurs where there is "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Mich. Comp. Laws § 440.2610 cmt. 1*.

Here, while the parties concede that a valid contract was formed under the UCC, they dispute the terms of the contract as a threshold matter. Plaintiff argues that General Rigging cannot rely on Plaintiff's failure to provide open-top container within several weeks of signing the July 2, 2008 agreement where Plaintiff was under no obligation to do so by a set date. General Rigging argues that it gave Plaintiff a discounted price **[*19]** on the presses based on Plaintiff's alleged oral assurances that it could quickly provide shipping containers--General Rigging could then pack and ship the presses, and be paid upon shipment within several weeks. The relevant contract language provides only: "Buyer is responsible to supply open top containers." (Pl.'s Mot. for Summ. J. Ex. 1, p. 2.) While there is no express "time is of the essence" clause, there is also no provision declaring that the invoice was intended to serve as a complete integration of the agreement between the parties. Ultimately, the invoice provides that the presses ship by September 30, 2008, but is silent with respect to the time of performance for Plaintiff's obligation to supply shipping containers. Therefore, the Court must first address whether oral statements made prior to or contemporaneous with the signing of the invoice are admissible to supplement the terms of the agreement.

Michigan courts follow the general rule that does not permit extrinsic evidence to contradict the terms of a written contract that was intended by the parties to be a complete expression of their agreement. *Johnson Controls, Inc. v. Jay Industries, Inc., 459 F.3d 717, 727 (6th Cir. 2006)* **[*20]** (*quoting CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 891 (6th Cir.1996)*). The statutory provision regarding parol evidence provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (section 1205) or by course of performance (section 2208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

*Mich. Comp. Laws § 440.2202*. The commentary to *Section 440.2202* further states, in part: "If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact." *Mich. Comp. Laws § 440.2202 cmt. 3*.

The invoice in this case appears to have been a final expression of **[*21]** the terms negotiated by the parties on July 2, 2008. Although it lacks an integration clause, the invoice unambiguously delineates price, quantity, schedule of payments, and ultimate time of performance. Thus, to the extent that General Rigging seeks to rely on statements allegedly made in the course of negotiation to change the scope and nature of Plaintiff's obligations, the parol evidence rule forbids consideration of those statements. See *In re Skotzke Estate, 216 Mich. App. 247, 251-52, 548 N.W.2d 695, 697 (1996)*.

Moreover, had the parties actually reached an agreement with respect to Plaintiff's purported time of performance to arrange for its obligation to supply open top shipping containers, such a provision--allegedly so integral to General Rigging--would certainly have been included in the written agreement. See *Mich. Comp. Laws § 440.2202 cmt. 3*; General Motors Corp. v. Alumi-Bunk, Inc., No. 270430, 2007 Mich. App. LEXIS 1809, 2007 WL 2118796, at *5 (Mich. Ct. App. July 24, 2007), *rev'd in part on other grounds*, No. 135117, 482 Mich. 1080, 757 N.W.2d 859, 2008 WL 5205678 (Mich. 2008) (excluding oral assurances made alongside contract negotiations as too significant *not* to have been included in written contract under parol **[*22]** evidence rule). In General Motors, an unpublished opinion, the Michigan Court of Appeals evaluated a breach of contract claim on an agreement to sell a steeply discounted fleet of trucks to the defendant. The plaintiff, General Motors, argued that it offered the discounted rate with the understanding that the defendant agreed to "modify, or 'upfit,' the vehicles before reselling them, so that they would not compete with other non-modified vehicles on the market." *2007 Mich. App. LEXIS 1809, [WL] at *1*. When the defendant failed to upfit the vehicles as orally promised, and sold them in their normal condition, General Motors filed a complaint alleging breach of an express or implied contract. Id. Despite the fact that the agreement between the parties contained no integration clause, the Michigan Court of Appeals found that the "the upfitting requirement was a significant factor and therefore was something that 'if agreed upon . . . would certainly have been included in the document.'" *2007 Mich. App. LEXIS 1809, [WL] at *5*.

In this case, General Rigging has made similar allegations: principally, that Plaintiff orally promised to arrange shipment in open top containers quickly and that General Rigging would not have sold the presses at the **[*23]** negotiated price without such a promise. However, given the significance of this apparent condition and the cost of securing nearly thirty open top containers within just a few weeks, it is significant the otherwise complete agreement conspicuously omits any mention of General Rigging's timing concerns. Francis Blake, Sr. testified that Francis Blake, Jr. himself typed up the terms of the invoice on July 2, 2008 after the parties "negotiated back and forth changing certain items." (Blake, Sr. Dep. 22:14-17.) The invoice is very specific with respect to time for payments and ultimate time of performance. On the day the invoice was drafted, the parties made handwritten changes and amendments to it, each initialed and dated. (Id.) General Rigging's representatives had ample opportunity to negotiate a time of performance term for Plaintiff's obligation to supply open top shipping containers. Because time of performance clause for Plaintiff's obligations is the type of term that would certainly have been included in the document had the parties agreed upon it and no term was actually included in the invoice beyond the final shipping deadline of September 30, the Court finds that there was **[*24]** no obligation to arrange for supply of open top containers for shipment by a set date.

Finally, even if Plaintiff had an obligation to provide shipping containers in a "timely fashion" as General Rigging argues, delays in obtaining open top containers

did not go to the heart of the bargain. The parties arranged for the sale of seven presses to be shipped within three months at a price of $ 865,000. Frank Blake, Sr. explained that, although General Rigging appeared to have a standing offer from Titan for the two 1600-ton presses, it opted to move forward in its deal with Plaintiff for several reasons. First, Plaintiff was willing to buy both the five 1000-ton presses and the two 1600-ton presses, so General Rigging would benefit from selling seven presses at the same time, rather than merely the two 1600-ton presses. (Blake Sr. Dep. 36:7-8.) Second, although the contract price with Plaintiff for the 1600-ton presses was less than the offer from Titan, Francis Blake, Sr. reasoned that negotiations had already moved forward with Plaintiff and General Rigging would benefit from gaining Plaintiff as a new customer. (Blake Sr. Dep. 36:16-23) ("[W]e assumed this would be a new customer, maybe **[*25]** there was an advantage that we could get some new business. . . . So I guess it just--we just really didn't care at the time which way it went.") Thus, although General Rigging seeks to characterize the "benefit of the bargain" as loading the presses as quickly as possible to get quick cash, close examination of the record reveals that the bargained for exchange was quite simply the sale of all seven presses to a new customer. Plaintiff remained ready to fully pay the amount as negotiated, and even agreed to change its payment schedule to two $ 200,000 lump sum payments in response to General Rigging's cash flow concerns. Mr. Shukla and Ms. Loeman continued to work with General Riggings's representatives to arrange for the shipment of the 1600-ton presses, and the evidence indicates that had Plaintiff followed the shipping plan finalized during the month of August, the presses could have shipped by the September 30 deadline.

Based on the foregoing, General Rigging has failed to show that Plaintiff repudiated its obligation under the contract. It strikes the Court that what has really happened here is that General Rigging was strapped for cash and the Titan deal provided an opportunity **[*26]** for a quick, and needed, infusion--but at Plaintiff's expense. The interjection of an early open top container requirement by General Rigging as a supposed integral part of the deal despite its not being included in any contract document further strikes the Court as a post-hoc justification which the record simply does not support.

Rather, the record supports the contrary conclusion. Plaintiff sought to satisfy its obligations within a reasonable time, given the overall scope of the agreement. See *Brady v. Central Excavators, Inc., 316 Mich. 594, 608, 25 N.W.2d 630, 635 (1947)* ("[W]hen a written contract is silent as to time of performance, a reasonable time is to be presumed without reference to parol evidence."). The record indicates that Plaintiff began securing a shipping contract within several weeks of signing the invoice, that after encountering some difficulty in obtaining open top containers an alternative plan was developed, and that by mid-August packing and shipping of the 1000-ton presses was well underway. The invoice contemplated alternatives to open top containers ("skids for break bulk") (Pl.'s Mot. for Summ. J. Ex. 1), and had General Rigging permitted Plaintiff to **[*27]** finalize logistics it is clear that the presses could have shipped by the September 30 deadline.

Under such circumstances, no reasonable jury could find that Plaintiff repudiated its obligations under the terms of the contract, where Plaintiff provided evidence that it was in the process of fulfilling this obligation well before the presses were due to ship, and any delays in performance did not substantially impair the value of the contract under *Mich. Comp. Law § 440.2610*.

**3. Plaintiff Did Not Fail to Give General Rigging "Adequate Assurances," Where General Rigging Made No Clear Demands Under *Mich. Comp. Laws § 440.2609*.**

General Rigging argues that Plaintiff's failure to provide adequate assurances of the shipping arrangements in the weeks following July 2, 2008 gave General Rigging grounds under *Mich. Comp. Laws § 440.2609* to repudiate the contract. Plaintiff counters that General Rigging's "demand" did not seek adequate assurances that Plaintiff would perform, but rather threatened to cancel the agreement unless Plaintiff paid the full contract price up front. This issue turns on the parties' differing charaterizations of Francis Blake, Sr.'s August 4, 2008 email, which confronted **[*28]** Plaintiff with the "lack of progress" on shipping arrangements. (Pl.'s Mot. for Summ. J. Ex. 10.) Mr. Blake explained that without a commitment of containers for shipping the seven presses, General Rigging could not proceed as originally set out in the contract. Instead, he offered three "solutions," which included cancelling the deal for the two 1600-ton presses, accepting immediate payment for all seven presses, or cancelling the contract altogether. (Id.) In light of these facts, the Court finds Plaintiff's argument persuasive--the August 4 email was not a "demand" under *Section 440.2609*.

This provision permits a party to a contract with reasonable grounds to believe the other party to the contract will not perform to "demand adequate assurance of due performance" and to suspend its own performance, if commercially reasonable to do so. Mich. Comp. Laws § 440.2609(1), (4). "Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards." Mich. Comp. Laws § 440.2609(2). Generally questions of whether a party provided "adequate assurance" and whether the other party had "reasonable grounds **[*29]** for insecurity" to ask for that assurance are fact questions left to the jury. See id. cmt. 4; see also 1 James J. White & Robert S. Summers, Uniform Commercial Code § 6-2 (4th ed. 2000) ("[T]he trier of fact must normally answer whether grounds for insecurity exist."). However, in some circumstances the Court may determine that as a matter of law, no reasonable jury could find that assurance was inadequate nor that a party had reasonable grounds for insecurity to ask for that assurance. See By-Lo Oil Co., Inc. v. Partech, Inc., No. 00-1148, 11 Fed. Appx. 538, 539 (6th Cir. May 30, 2001).

Assuming *arguendo* that there were reasonable grounds for General Rigging's insecurity, [3] the August 4, 2008 email cannot be construed as a demand for adequate assurance of performance. Rather, this contention, dressed up as a legal argument, is simply an extension of General Rigging's post hoc justification for its own premature breach. The email did not seek merely "adequate assurances" of performance--a necessary first step to suspension of performance--but rather comprised a unilateral attempt to alter or cancel the contract. Although the email explained the basis for General Rigging's concerns--namely **[*30]** cash flow problems and the belief that without containers, the presses would not be ready for shipment for another 30 to 45 days--it concluded with an ultimatum. Such a writing is not a "demand" under Section 440.2609. See 4 Lary Lawrence, Anderson on the Uniform Commercial Code § 2-609:33 (3d. ed. 2009) ("Any communication that does not clearly manifest that a demand for assurance of performance is being made does not satisfy UCC § 2-609."); Precision Master, Inc. v. Mold Masters Co., Nos. 268501, 268938, 2007 Mich. App. LEXIS 1736, 2007 WL 2012807, at *4 (Mich. Ct. App. Jul. 12, 2007) (holding that letters demanding alteration of actual contractual terms did not constitute merely "adequate assurances" of performance under Section 440.2609(1), but were a unilateral attempt to improve contract provisions); Petroleo Brasileiro S.A., Petrobras v. IBE Grp., Inc., No. 93-3305, 1995 U.S. Dist. LEXIS 7450, 1995 WL 326502, at *6 (S.D.N.Y. May 31, 1995) (precluding defendant's reliance on U.C.C. § 2-609 where the defendant's demand proposed to amend the existing contract rather than seek assurances of performance).

Here, the email made no reference to the UCC and did not explicitly or implicitly request any assurance of performance. Rather, it recited the consequences of the delay and threatened breach absent immediate payment--something General Rigging had no doubt already decided to do to remedy its severe cash crunch, since the next day, August 5, 2008, it reinitiated negotiations with Titan for the 1600-ton presses without revealing the contract on those same presses with Plaintiff (indeed, General Rigging represented to Titan that the presses were "free and clear"), and then, the following day, issued an invoice to Titan for the presses at a price of $ 225,000 each--as compared to the $ 172,500 each in the contract with Plaintiff--plus significantly increased shipping fees. The Court will have more to say about this unhappy factual chronology--and that General Rigging failed to disclose the already **[*32]** consummated Titan deal when Plaintiff's representative came to South Bend on August 8, 2008.

Even if read together with emails sent in the preceding weeks which sought updates on Plaintiff's progress in securing a shipping contract and communicated a sense of urgency, nothing in General Rigging's correspondence with Plaintiff can be construed as a demand for adequate assurance as contemplated by the UCC. See MG Refining & Marketing, Inc. v. Knight Enterprises, Inc., No. 94-civ-2512, 1996 U.S. Dist. LEXIS 22941, 1996 WL 229138, 28 U.C.C. Rep. Serv. 2d 1239 (S.D.N.Y. 1996) (holding that two letters that followed alleged repudiation of contracts did not constitute demand for adequate assurance under New York enactment of UCC § 2-609, where first letter invoked alleged breaches to initiate discussion about terminating the contracts, and the second letter announced the buyer's termination of its performance). Given these facts, no reasonable jury could find that Mr.

[3] And, in fact, there might have been grounds for some concern on General Rigging's side, as the record indicates that Plaintiff's representatives **[*31]** repeatedly suggested that shipping arrangements were progressing more quickly than they actually were, giving the impression that open top containers would be available as early as mid to late July. There is no dispute that Plaintiff underestimated the difficulty of obtaining open top containers.

Unnikrishnan's response--stating that there it was under no obligation under the terms of the contract to supply containers within one week and that Plaintiff was in the process of finalizing logistics with Kuehne+Nagle--constituted inadequate assurances.

The **[*33]** Court readily concludes that General Rigging cannot establish that Plaintiff had an obligation to provide shipping containers within a set time frame, or that Plaintiff's alleged repudiation of its obligations substantially impaired the value of the contract. Neither can General Rigging show that it made a demand for adequate assurances, such that Plaintiff's response that it would continue to honor the terms of the contract could be deemed an inadequate answer. Therefore, as a matter of law, General Rigging cannot avail itself of the remedies set out in either *Section 440.2610* (anticipatory repudiation) or *Section 440.2609* (demand for adequate assurances). There remain no genuine issues of material fact with respect to General Rigging's breach: the parties entered into a valid contract, under which General Rigging was required to sell two 1600-ton presses to Plaintiff, shipped by September 30, 2008. By selling the presses to Titan in August, General Rigging rendered its own performance impossible. [4] Failure to deliver the promised goods constituted a clear breach. The Court therefore grants Plaintiff's summary judgment motion as to General Rigging's liability on the breach of contract **[*34]** claim. [5]

**C. Fraud**

In addition to alleging breach of contract, Plaintiff claims that the individual defendants, Francis Blake, Jr., Francis **[*35]** Blake, Sr. and Patrick Blake, are individually liable to Plaintiff for fraudulently misleading the company into modifying the payment terms of the contract by failing to disclose the fact that General Rigging sold the 1600-ton presses to Titan. General Rigging argues that any fraud claim is barred by the economic loss doctrine, though it does not dispute that the individual defendants concealed or deliberately remained silent about the sale of the presses to Titan, while Plaintiff continued to make arrangements for their shipment. The Court finds that the economic loss doctrine does not apply, where the alleged fraud is wholly extraneous to Plaintiff's contract claims. The Court further finds that Plaintiff has established every element of a claim of fraud.

The economic loss doctrine bars a party from recovering in tort economic losses suffered because of a breach of duty assumed only by contract. *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc., 209 Mich. App. 365, 374, 532 N.W.2d 541, 546 (1995)* (*citing* *Neibarger v. Universal Cooperatives, Inc., 439 Mich. 512, 530, 486 N.W.2d 612, 619 (1992))*. [6] The doctrine does not however preclude a buyer from seeking tort **[*36]** remedies against a seller in *all* fraud claims. See id. For example, the doctrine does not apply where no contractual relationship exists between the parties or when the alleged fraud is extraneous to the contractual claims. Id.

In this case, Plaintiff's fraud claim is not based on General Rigging's failure to comply with its contractual obligations, but rather on the Blakes' silent fraud or deliberate misrepresentations, which **[*37]** induced

[4] General Rigging argues in passing that "the [1600-ton] presses are easily replaced with other available presses," and that General Rigging made numerous "offers to provide cover for the 1600-ton presses." (Def.'s Br. in Opp'n 3.) This is simply another post-hoc rationale for its breach. There is no evidence in the record that General Rigging actually had access to two 1600-ton presses with the specifications Plaintiff needed and that it had the capacity to dismantle and ship those presses by September 30, 2008. Moreover, the sale of the 1600-ton presses and subsequent failure to inform Plaintiff of this repudiation provided more than sufficient grounds for Plaintiff to suspend its own performance and sue immediately for breach of contract, pursuant to *Mich. Comp. Laws § 440.2610*.

[5] Plaintiff further claims that there is no genuine issue of material fact as to its damages for General Rigging's breach. However, the issue has not been comprehensively briefed. Therefore, the Court withholds judgment, addressing only the issue of liability in this Opinion.

[6] The Michigan Supreme Court explained the basis for this distinction in Neibarger:

The purpose of a tort duty of care is to protect society's interest in freedom from harm, i.e., the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises. Generally speaking, tort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement.

*486 N.W.2d at 615*.

Plaintiff to enter into additional undertakings. These additional undertakings--not provided for in the contract--included paying more money than required for the presses actually delivered and continuing to make shipping arrangements when none were warranted. Indeed, well after General Rigging's breach of contract, the Blakes sought to hide the fact that the 1600-ton presses were no longer available, all while renegotiating the terms of the contract for the remaining five presses. As such, the claimed fraud is wholly extraneous to the contractual claims and the economic loss doctrine does not apply.

Under Michigan law, the elements of fraud are: (1) that the charged party made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury. *M&D, Inc. v. W.B. McConkey, 231 Mich. App. 22, 27, 585 N.W.2d 33, 36 (1998)*. In order to establish a claim of silent fraud, there **[*38]** must be some type of misrepresentation, whether by words or action. *Id., 585 N.W.2d at 41*; see also *Hendricks v. DSW Shoe Warehouse, Inc., 444 F. Supp. 2d 775, 782 (W.D. Mich. 2006)*. A party who remains silent when fair dealing requires him to speak may also be guilty of fraudulent concealment. *Nowicki v. Podgorski, 359 Mich. 18, 31-32, 101 N.W.2d 371, 378 (1960)*; see also *Boumelhem v. Bic. Corp., 211 Mich. App. 175, 535 N.W.2d 574, 579 (Mich. Ct. App. 1995)* ("A misrepresentation of fact may be shown where the defendant had a duty to disclose facts but suppressed them instead.").

Plaintiff has established each element of a fraud claim. All three Blakes were involved in either the negotiation or re-negotiation of the invoice terms. All knew that General Rigging had already sold the 1600-ton presses to Titan, while Plaintiff continued to make arrangements for shipment. Although Plaintiff's machinery agent, Mr. Shukla, was often in General Rigging's Detroit office in August while the details of the shipping arrangement were being worked out, none of the individual defendants informed him of the sale. As late as August 26, 2008, both Francis Blake, Jr. and Francis Blake, Sr. knew that Mr. Shukla was driving **[*39]** to South Bend, Indiana to oversee the dismantling of the 1600-ton presses, but neither defendant informed him that the presses were already being dismantled for delivery to Titan. (Blake Sr. Dep. 91:23-92:6.) Mr. Blake, Sr. only admitted to having sold the presses to Titan after Mr. Shukla confronted him upon returning from South Bend--and, Mr. Blake conceded that he had kept silent about the sale to Titan so that Plaintiff would not back out of the deal on the five remaining 1000-ton presses. (Blake Sr. 92:22-93:1.) Similarly, to continue the ruse, Patrick Blake continued to meet with Ms. Loeman and Mr. Shukla through mid-August, formulating a shipping plan for all seven presses and providing them with information about the weight and dimensions of the presses, all despite knowing that the two 1600-ton presses were already sold to Titan. Based on the belief that General Rigging still planned to sell all seven presses, Plaintiff continued to make shipment arrangements with Kuehne+Nagel. Plaintiff also agreed to modify the payment schedule and advance $ 400,000 to General Rigging in two lump sums. These advances, in combination with the $ 175,000 already on deposit, totaling $ 575,000, **[*40]** exceeded the amount owed for the five 1000-ton presses that were ultimately delivered. Mr. Unnikrishnan testified that had he known that the 1600-ton presses were not available at the time the payment schedule was renegotiated, he would not have agreed to pay more money than the amount owed for the 1000-ton presses alone.

These facts, undisputed by General Rigging, are sufficient to establish a claim of fraud as a matter of law: (1) the Blakes represented a material fact, i.e., that the presses were still available as promised under the invoice; (2) the representation was false; (3) the Blakes knew it was false when it was made; (4) the Blakes made the representation with the intent that Plaintiff follow through with the rest of the agreement; (5) Plaintiff continued to make shipping arrangements for the 1600-ton presses and entered into renegotiations based on the Blakes' representation; and (6) Plaintiff thereby suffered an injury. [7] Accordingly, the Court concludes that Plaintiff has satisfied, as a matter of law,

---

[7] The Court notes that although Plaintiff has shown that it continued to **[*41]** make shipping arrangements for the 1600-ton presses and it overpaid by $ 75,000, it is unclear what damages if any beyond the return of the overpayment it will gain from this fraud claim. The $ 75,000 was part of an initial deposit made in mid-July to secure the terms of the contract, well before the fraud occurred. The two additional $ 200,000 lump sum payments were made expressly for the 1000-ton presses alone, which were ultimately shipped to Plaintiff. Finally, Ms. Loeman testified that Plaintiff did not incur any additional costs from Kuehne+Nagel by making shipping arrangements in August for the 1600-ton presses. Nevertheless, material issues of fact remain with respect to Plaintiff's damages for the fraud claim.

that Francis Blake, Sr., Francis Blake, Jr. and Patrick Blake's are individually liable for fraud.

### D. Conversion Claim

Finally, Plaintiff asserts that General Rigging converted the $ 75,000 deposit, held in excess of the $ 500,000 owed on the five 1000-ton presses actually delivered. General Rigging admits that it received $ 75,000 as part of the $ 175,000 deposit due under the invoice and that it has failed to return the money for lack of liquidity. The deposit was not held in escrow or otherwise segregated from General Rigging's other accounts.

Although the economic **[*42]** loss doctrine does not bar Plaintiff's fraud claim, in contrast the Court is unable to see how Plaintiff's conversion claim is distinct from the breach of contract. As discussed in the preceding section, the economic loss doctrine prevents plaintiffs from pursuing an action in tort where there is no duty separate and distinct from a breach of contract. See *Haas v. Montgomery Ward and Co., 812 F.2d 1015, 1016 (6th Cir. 1987)*; see also *Neibarger v. Universal Cooperatives, Inc., 439 Mich. 512, 486 N.W.2d 612, 615 (1992)*; *Wrench LLC v. Taco Bell Corp., No. 1:98-CV-45, 2003 U.S. Dist. LEXIS 7607, 2003 WL 21653410, at *3 n.4 (W.D. Mich. May 01, 2003)* (summarizing several federal court decisions which have applied the economic loss doctrine to bar tort claims, such as conversion, where they are mere restatements of contract claims). Here, General Rigging's only duty to Plaintiff with respect to the deposit is set by contract; the parties have no independent relationship and the deposit was tendered under the terms of the invoice, not wrongfully taken. Moreover, General Rigging has not denied its contractual obligation to return the overpaid funds. Thus, Plaintiff has failed to establish an independent legal duty distinct **[*43]** from the duties arising out of the contractual relationship and, accordingly, cannot sustain its claim of conversion. See *Rinaldo's Const. Corp. v. Michigan Bell Telephone Co., 454 Mich. 65, 78-79, 559 N.W.2d 647, 656 (1997)*. The Court accordingly dismisses Plaintiff's claim of conversion. [8]

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's February 4, 2009 Motion for Summary Judgment (docket # 14) is GRANTED in part as to Defendant General Rigging's liability on the breach of contract claim and as to individual Defendants, Francis Blake, Sr., Francis Blake, Jr. and Patrick Blake's liability on the fraud claim.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is DENIED as to General Rigging's liability on the conversion claim, and that the conversion claim is hereby DISMISSED.

/s/

Gerald E. Rosen

Chief Judge, United States District Court

Dated: September 30, 2009

---

**End of Document**

[8] Although General Rigging concedes that it owes Plaintiff $ 75,000, the Court does not reach the question of Plaintiff's damages for General Rigging's breach of contract, as noted above. *Supra* note 5.

LexisNexis®

# *Taylor v. Waste Mgmt. of Mich.*

Court of Appeals of Michigan

September 21, 2023, Decided

No. 361455

**Reporter**
2023 Mich. App. LEXIS 6802 *; 2023 WL 6170167

TROY TAYLOR and SHERYL TAYLOR, Plaintiffs, v WASTE MANAGEMENT OF MICHIGAN, INC., Defendant/Third-Party Defendant-Appellant, and WASTE MANAGEMENT NATIONAL SERVICES, INC., and WM RECYCLE AMERICA, LLC, Defendants/Cross-Plaintiffs-Appellants, and WASTE MANAGEMENT, INC., Defendant, and RAA TRUCKING, LLC, Defendant/Cross-Plaintiff, v NORTHERN LOGISTICS, INC., Third-Party Defendant/Cross-Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History: [*1]** Kalamazoo Circuit Court. LC No. 2018-000041-NI.

*Taylor v. Waste Mgmt., 2020 Mich. App. LEXIS 2294 (Mich. Ct. App., Mar. 24, 2020)*

**Counsel:** For WASTE MANAGEMENT OF MICHIGAN INC, WASTE MANAGEMENT NATIONAL SERVICES INC, Defendant - Third-Party Defendant - Appellant: JASON D. KILLIPS.

For NORTHERN LOGISTICS INC, Third-Party Defendant - Cross-Defendant - Appellee: THOMAS R. MEAGHER.

**Judges:** Before: SWARTZLE, P.J., and O'BRIEN and FEENEY, JJ.

## Opinion

PER CURIAM.

Troy Taylor was employed by Northern Logistics to drive a trailer that collected and transported recyclable cardboard for WM Recycle America. On November 13, 2015, Troy was injured when the trailer's lift-floor wall failed. Troy sued Waste Management National Services, Waste Management Michigan, and WM Recycle America for his injuries, and those corporations moved for indemnification from Northern Logistics. Northern Logistics argued that the Agreement had expired on February 28, 2015, before Troy was injured on November 13, 2015, and, thus, the indemnification clause was not controlling.

The trial court dismissed Northern Logistics, holding that Waste Management of Michigan, Waste Management National Services, and WM Recycle America were not subject to indemnification by Northern Logistics. We reverse the trial court's grant of summary disposition, **[*2]** vacate the trial court's award of attorney fees, and remand for proceedings consistent with this opinion.

I. BACKGROUND

Northern Logistics agreed to transport recyclable material to WM Recycle America under a Master Transportation Services Agreement that Northern Logistics entered into with Waste Management National Services. The Agreement stated that it was governed by the laws of Texas and it would expire on February 28, 2015, unless it was "extended by mutual written consent of the parties." After this date passed, however, the parties continued to operate under the Agreement without any written extension. This included WM Recycle America continuing to pay Northern Logistics for the continued services provided by Troy, under the same rate contained in the Agreement.

The Agreement also contained an indemnification

clause which provided:

15. INDEMNIFICATION

A. Subject to Section 15.B. below, each party hereto (an "Indemnifying Party") covenants and agrees to defend (with counsel reasonably acceptable to the Indemnified Party), protect, indemnify, hold harmless and render whole the other party, its parents, *subsidiaries* and *affiliates*, and their respective officers, directors and employees **[*3]** ("Indemnified Parties") from and against all damages, claims, demands or causes of action and any liability, cost, fine, environmental remediation and response cost, penalty and/or expense, including but not limited to reasonable attorney's fees and expenses ("Damages"), incurred by each such Indemnified Party arising or resulting from, or caused by, violation of any laws or regulations by the Indemnifying Party, the breach of this Agreement by the Indemnifying Party, or the Indemnifying Party's, its subcontractors' or agents' (or their respective shareholders', partners', officers', directors' or employees') negligent acts or omissions under this Agreement or relating to the Services provided hereunder.

B. CARRIER also hereby expressly agrees to indemnify, defend and hold harmless COMPANY, its parents, *subsidiaries* and *affiliates* and their respective officers, directors and employees, from and against any damages arising out of or resulting from any personal injury, death, or property damage suffered by any person (including employees and persons deemed by operation of law or contract to be an employee), agent, invitee or visitor of CARRIER while at the Origin or Destination Locations **[*4]** or suffered in connection with, or related to or arising from, the Services, even if the cause of such personal injury, death or property damage is the sole or concurrent negligence of COMPANY or any other Indemnified Party, excepting only such personal injury, death or property damage that is caused solely by the willful misconduct or gross negligence of COMPANY or any other Indemnified Party. The indemnity obligation described in this section shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the CARRIER under any Workmen's Compensation Acts, Disability Acts or other Employee Benefit Acts, nor shall the indemnity obligation described in this section be limited in any way due to any limitation in the insurance coverages carried by CARRIER and its subcontractors.

C. The indemnity obligations created by this section shall survive the expiration or termination for any reason of this Agreement. [emphasis added.]

During his deposition, a corporate representative of Waste Management National Services testified that Waste Management National Services and WM Recycle America were affiliates. The plant manager for WM **[*5]** Recycle America testified during his deposition that Waste Management National Services, Waste Management of Michigan, and WM Recycle America were companies under the same corporate umbrella. The plant manager also stated that WM Recycle America would process the material that was transported by Waste Management of Michigan.

Additionally, the treasurer of Waste Management, Inc., provided an affidavit that she was familiar with the subsidiaries of Waste Management, Inc., and that Waste Management of Michigan and Waste Management National Services were owned by Waste Management Holdings which was in turn owned by Waste Management, Inc. Further, WM Recycle America was owned by Recycle America Holdings, which was also owned by Waste Management Holdings.

Waste Management National Services, Waste Management of Michigan, WM Recycle America, and Northern Logistics all moved for summary disposition. The trial court held that there was not sufficient evidence to show that Waste Management of Michigan and WM Recycle America were affiliates of Waste Management National Services, and the Agreement had expired before Troy was injured. The trial court dismissed the claims for indemnification from Northern **[*6]** Logistics, and it awarded Northern Logistics attorney fees because the Agreement stated that "[i]n the event of litigation with respect to matters arising under this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and other costs of such litigation."

Waste Management National Services, Waste Management of Michigan, and WM Recycle America now appeal.

II. ANALYSIS

The trial court did not specify whether it granted Northern Logistics summary disposition under *MCR 2.116(C)(8)* or *(C)(10)*, but the trial court considered

documentation outside of the pleadings when it decided the motion. When, as here, the trial court grants a motion for summary disposition brought under both MCR 2.116(C)(8) and (C)(10), and it is clear that the trial court looked beyond the pleadings, this Court "will treat the motions as having been granted pursuant to MCR 2.116(C)(10)," which "tests whether there is factual support for a claim." Kefgen v Davidson, 241 Mich App 611, 616; 617 NW2d 351 (2000).

"We review de novo a trial court's decision to grant or deny a motion for summary disposition." Sherman v City of St Joseph, 332 Mich App 626, 632; 957 NW2d 838 (2020) (cleaned up). This Court reviews a motion brought under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." Patrick v Turkelson, 322 Mich App 595, 605; 913 NW2d 369 (2018). "Summary disposition **[*7]** is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." Sherman, 332 Mich App at 632.

A. AFFILIATES

Appellants argue that the trial court erred by holding that Waste Management of Michigan and WM Recycle America were not affiliates of Waste Management National Services and, thus, not included in the Agreement's indemnification clause. The Agreement stated that Northern Logistics agreed to "protect, indemnify, hold harmless and render whole the other party, its parents, *subsidiaries and affiliates*, and their respective officers, directors and employees ("Indemnified Parties") from and against all damages, claims, demands or causes of action and any liability." (Emphasis added.)

"The goal of contract interpretation is to determine and enforce the parties' intent on the basis of the plain language of the contract itself." Bayberry Group, Inc v Crystal Beach Condo Assoc, 334 Mich App 385, 393; 964 NW2d 846 (2020) (cleaned up). "The words of a contract are interpreted according to their plain and ordinary meaning, and this Court gives effect to every word, phrase, and clause while avoiding interpretations that would render any part of the document surplusage or nugatory." *Id.* (cleaned up). "Ultimately, this Court enforces clear **[*8]** and unambiguous language as written." *Id.*

The Agreement is governed by Texas law, and contracts are interpreted similarly under Texas law.

> When interpreting a written contract, the prime directive is to ascertain the parties' intent as expressed in the instrument. [O]bjective, not subjective, intent controls, so the focus is on the words the parties chose to memorialize their agreement. But language is nuanced, and meaning is often context driven. Contract language is thus construed in its lexical environment, which may include objectively determinable facts and circumstances that contextualize the parties' transaction. Surrounding facts and circumstances can inform the meaning of language but cannot be used to augment, alter, or contradict the terms of an unambiguous contract. [URI, Inc v Kleberg Co, 543 SW3d 755, 757-758 (Tex, 2018) (quotation marks and citation omitted; alteration in original).]

The term "affiliate" was not defined in the Agreement. "Any terms not defined in the contract should be given their plain and ordinary meaning, which may be determined by consulting dictionaries." McGrath v Allstate Ins Co, 290 Mich App 434, 439; 802 NW2d 619 (2010) (cleaned up). See also Eckland Consultants Inc v Ryder Stilwell, Inc, 176 SW3d 80, 88 (Tex App, 2004) (stating that if the term "affiliate" is not defined in the contract, "its ordinary meaning must be used" and using *Black's Law* **[*9]** *Dictionary* and *Webster's Third New International Dictionary* to define "affiliate"). *Black's Law Dictionary* (11th ed) defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."

In this case, WM Recycle America paid the invoices submitted by Northern Logistics under the rates that were agreed upon in the Agreement that Northern Logistics had with Waste Management National Services. Further, a corporate representative for Waste Management National Services testified that Waste Management National Services and WM Recycle America were affiliates, and the plant manager for WM Recycle America testified that Waste Management National Services, Waste Management of Michigan, and WM Recycle America were all under the same corporate umbrella. The treasurer's affidavit also provided uncontroverted evidence that Waste Management National Services, Waste Management of Michigan, and WM Recycle America were all subsidiaries of the same corporate structure, and all affiliated.

Northern Logistics argued that the trial court could not consider the treasurer's affidavit because it was

inadmissible **[*10]** hearsay, but this ignores that appellants were not required to present the foundation for the admission of the affidavit during summary disposition. See *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc, 285 Mich App 362, 373; 775 NW2d 618 (2009)* (stating that the plaintiff was not required to lay the foundation for the admission of invoices in order for the court to consider them on a motion for summary disposition). Further, our Supreme Court has held that the evidence presented in opposition of a motion for summary disposition "need not be in admissible form; affidavits are ordinarily not admissible evidence at a trial. But it must be admissible in content . . . " *Maiden v Rozwood, 461 Mich 109, 124 n 6; 597 NW2d 817 (1999)* (quotation marks and citation omitted; ellipsis in original).

The trial court erred because this evidence created a genuine issue of material fact that Waste Management of Michigan and WM Recycle America were affiliates of Waste Management National Services. Further, the trial court failed to consider that even if there was not an affiliation, Waste Management National Services was a party to the Agreement with Northern Logistics, and, as a result, may be entitled to indemnification under the terms of the Agreement.

B. EXTENSION

Next, appellants argue that the trial court erred by finding that there was no genuine **[*11]** issue of material fact that the Agreement had expired at the time of Troy's injury.

The plain language of the Agreement states that it was to expire on February 28, 2015, unless there was a written extension by the parties. There is no dispute, however, that Troy continued to transport materials for WM Recycle America, and that Northern Logistics continued to send invoices for Troy's services to WM Recycle America under the rate stated in the Agreement, after the expiration date.

Our Supreme Court recognized that the parties to a written contract may extend that contract through their conduct as an implied contract. *Paxson v Cass Co Rd Comm, 325 Mich 276, 280-281; 38 NW2d 315 (1949)*. Moreover, in *Siber & Calicutt, Inc v La Gloria Oil & Gas Co, 66 SW3d 340, 347 (Tex App, 2001)*, the Texas Court of Appeals stated that "[e]ven when an exact date of performance is specified in the contract, this provision can be waived by the parties." That court held that "[a]n extension of time for performance may be implied as well as express." *Id.* "When the exact duration of an extension of time is not express, the law will imply a reasonable time." *Id.* Further, "[t]he extension of a term of a contract is the extension of all of its provisions." *Id.*

The parties' performance did not change throughout the course of their relationship, even after the **[*12]** Agreement's expiration date. Thus, there is a genuine issue of material fact whether the parties' conduct extended the Agreement. See *id.* (holding that because the parties "continued to perform under the July 1, 1991 maintenance contract even after it had expressly expired on July 1, 1992" and the extension of the contract by letter Agreement on November 15, 1993, was sufficient evidence to support the trial court's finding that the maintenance contract was in effect on April 28, 1993, when the incident occurred).

C. ATTORNEY FEES

Lastly, appellants argue that the trial court erred in awarding Northern Logistics attorney fees. Because we conclude that the trial court erred in granting Northern Logistics summary disposition, it follows that it is premature to conclude that Northern Logistics is the prevailing party for the purpose of attorney fees under this Agreement. See *Rohrmoos Venture v UTSW DVA Healthcare, LLP, 578 SW2d 469, 483 (Tex, 2019)*; *Pransky v Falcon Group, Inc, 311 Mich App 164, 193; 874 NW2d 367 (2015)*.

III. CONCLUSION

The trial court erred when it held that there was not sufficient evidence to conclude that Waste Management National Services, Waste Management of Michigan, and WM Recycle America were affiliated. Further, the trial court erred when it held that there was not continuing performance sufficient to extend **[*13]** the Agreement past its expiration date. The evidence on the record creates a genuine issue of material fact for both issues.

For this same reason, we vacate the trial court's grant of attorney fees to Northern Logistics because it cannot be the prevailing party when summary disposition was granted in error.

Appellants also argue on appeal that summary disposition should have been granted in their favor. Given that we conclude that there are genuine issues of material fact, however, we decline to address appellants' additional issues and instead remand the matter to the trial court for further proceedings consistent with this opinion.

The order granting summary disposition for Northern

Logistics is reversed, the order granting Northern Logistics attorney fees is vacated, and we remand this matter for further proceedings consistent with his opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle

/s/ Colleen A. O'Brien

/s/ Kathleen A. Feeney

---

**End of Document**